UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION



| | |
|---|---|
| JOHN DOE HM, an individual, | ) ) ) |
| | ) |
| Plaintiff, | ) |
| vs. | ) Case No. |
| | ) 4:07CV00946 ERW |
| | ) |
| CITY OF CREVE COEUR, MISSOURI, and JOHN BEARDSLEE, Individually and in his Official Capacity as Police Chief in the Creve Coeur Police Department, et al., | ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) |

COPY

DEPOSITION OF OFFICER MICHAEL THOMECZEK
TAKEN ON BEHALF OF THE PLAINTIFF
MARCH 11 & 12, 2009



EXHIBIT
C



Catherine E. Boyd
P.O. Box 190601
St. Louis, MO 63119
314.918.8265
Fax: 314.918.0429

**Boyd-Gwinn Reporting**

David J. Gwinn
6459 Arsenal
St. Louis, MO 63139
314.645.5229
Fax: 314.644.3579

OFFICER MICHAEL THOMECZEK, MARCH 11 & 12, 2009

```
1    DIRECT EXAMINATION                              4
2    QUESTIONS BY MS. RANDLES

3
     68 and 69                                        4
4    General Orders                                   4
     Exhibit 54                                       50,
5                                                     110
     Exhibit 68, General Order                        67
6    Crises Intervention Team Policy for St.
     Louis County
7    Exhibit 69, General Order                        86
     Care and Transportation of the Mentally Ill
8    70                                               102
     Crises Intervention Team Report                  102
9
     71                                               112
10   St. Anthony's Records                            112
     72                                               112
11   Highland Center Records                          112
     73                                               121
12   Arial Photograph of Scene                        121
     74 - Remarked Exhibit 68
13   Crises Intervention Team Report                  206
```

```
14                  A P P E A R A N C E S:
     For the Plaintiff:
15        Randles, Mata & Brown, LLC
          406 West 34th Street
16        Suite 623
          Kansas City, Missouri 64111
17        By:  Rebecca M. Randles, Attorney at Law
     For the Defendant, Creve Coeur Police Department and
18   Chief Beardslee:
          Sandberg Phoenix & von Gontard, L.L.C.
19        One City Centre
          Suite 1500
20        Saint Louis, Missouri 63101
          By:  Stacie A. Owens, Attorney at Law
21   For the Defendant, St. Louis County Police Department,
     et al:
22        St. Louis County Counsel Counselor's Office
          41 South Central
23        Lawrence K. Roos County Government Building
          Clayton, Missouri 63105
24        By:  Lorena V. Merklin von Kaenel, Attorney at Law

25        Also present:  Sergeant Lasater, John Doe HM
               (Exhibits retained by Stacie A. Owens.)
```

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

1

2

3

JOHN DOE HM, an                )
individual,                    )
4                              )
                               )
5        Plaintiff,            )
    vs.                        ) Case No.
6                              ) 4:07CV00946 ERW
                               )
7  CITY OF CREVE COEUR,        )
   MISSOURI, and JOHN          )
8  BEARDSLEE, Individually     )
   and in his Official         )
9  Capacity as Police Chief    )
   in the Creve Coeur          )
10 Police Department, et       )
   al.,                        )
11                             )
        Defendants.            )

12

13       DEPOSITION OF OFFICER MICHAEL THOMECZEK,
produced, sworn, and examined on MARCH 11 & 12, 2009
14 between the hours of 9:30 in the forenoon and 4:00
o'clock in the afternoon of March 11th, 2009, and
15 between the hours of 10:00 and 10:30 in the forenoon of
March 12th, 2009 at the offices of Saint Louis County
16 Counselor's Office, 42 South Central, Clayton,
Missouri, before CATHERINE E. BOYD, Certified Court
17 Reporter, #0233, within and for the State of Missouri,
Registered Professional Reporter, and Certified
18 Shorthand Reporter within and for the State of
Illinois, in a certain cause now pending in the United
19 States District Court of the Eastern District of
Missouri, Eastern Division, wherein JOHN DOE HM, is
20 Plaintiff, and CITY OF CREVE COEUR, MISSOURI, and JOHN
BEARDSLEE, Individually and in his Official Capacity as
21 Police Chief in the Creve Coeur Police Department, et
al., are Defendants.

22

23

24

25

Boyd-Gwinn Reporting

OFFICER MICHAEL THOMECZEK, MARCH 11 & 12, 2009                    4

1        IT IS HEREBY STIPULATED AND AGREED, by and
between counsel for the Plaintiff and counsel for the
2  Defendant(s) that this deposition may be taken in
shorthand by Catherine E. Boyd, Certified Court
3  Reporter, and Registered Professional Reporter, and
afterwards transcribed into typewriting; and the
4  signature of the witness is expressly reserved.
                    * * * * *
5            {The deposition commenced at 9:26 a.m.}

6            OFFICER MICHAEL THOMECZEK,

7  of lawful age, produced, sworn, and examined on behalf

8  of the Plaintiff, deposes and says:

9                    DIRECT EXAMINATION

10  QUESTIONS BY MS. RANDLES:

11           {Marked for identification Plaintiff Exhibit

12  68 and 69, General Orders, 3/11/09, cb.}

09:26  13       Q.    Officer Thomeczek, I've seen you on a number

09:26  14  of occasions.  I know you know who I am, but for the

09:26  15  record, I'll introduce myself anyway.  My name is

09:26  16  Rebecca Randles, and I represent John Doe HM, the

09:26  17  plaintiff in this matter.  And you've also been here

09:26  18  through a number of depositions, so I know you know

09:26  19  what the rules of giving a deposition are, but just so

09:27  20  we're on the same page, I'll run through them anyway.

09:27  21  It is always a good reminder because both of us will

09:27  22  tend to step on each other during the course of a

09:27  23  deposition because that's the way we typically talk

09:27  24  during human discourse.  As we're going through the

09:27  25  deposition, if you would wait until I finish a question

09:27  1  before you begin to answer, it will help the court

09:27  2  reporter.  Will you do that?

09:27  3      A.    Yes, ma'am.

09:27  4      Q.    And you're also doing a very nice job of

09:27  5  answering orally, as opposed to a nod of the head, or

09:27  6  an uh-huh or huh-uh's.  But those things, the nod of

09:27  7  the head, the uh-huh and huh-uh's are difficult to

09:27  8  understand, whether you're saying an affirmative or a

09:27  9  negative when they're written in black and white.  So

09:27  10  would you please continue to do as you're doing now,

09:27  11  and that is to answer everything vocally, as opposed to

09:27  12  a yes or no, as opposed to an uh-huh or huh-uh.

09:27  13      A.    Yes, I will.

09:27  14      Q.    During the course of the deposition, if for

09:27  15  any reason you need a break, feel free to take one.

09:27  16  That's perfectly fine.  And if you need to speak with

09:28  17  counsel, that's perfectly fine, we'll take a break for

09:28  18  that.  This is not supposed to be a marathon, but on

09:28  19  the other hand, I know you want to get it over and done

09:28  20  with, so we'll try to move it along at a fairly quick

09:28  21  clip.  Okay?

09:28  22      A.    Yes.

09:28  23      Q.    And you know that your deposition -- you

09:28  24  were just placed under oath, and your deposition can be

09:28  25  used in court as if you were testifying live.  Do you

OFFICER MICHAEL THOMECZEK - MARCH 11 & 12, 2009                6

| | | |
|---|---|---|
| 09:28 | 1 | understand that? |
| 09:28 | 2 | A.   Yes, I do. |
| 09:28 | 3 | Q.   And so the same penalties of perjury would |
| 09:28 | 4 | apply in deposition, as they apply to testimony in open |
| 09:28 | 5 | court.  You understand that as well? |
| 09:28 | 6 | A.   Yes. |
| 09:28 | 7 | Q.   Have you been deposed before? |
| 09:28 | 8 | A.   Just for small, like motor vehicle |
| 09:28 | 9 | accidents, small things like that. |
| 09:28 | 10 | Q.   Okay.  On how many occasions have you been |
| 09:28 | 11 | deposed? |
| 09:28 | 12 | A.   Possibly, five. |
| 09:28 | 13 | Q.   Do you recall when the last time was that |
| 09:28 | 14 | you gave a deposition? |
| 09:28 | 15 | A.   Last year. |
| 09:28 | 16 | Q.   And what was the nature of that deposition? |
| 09:28 | 17 | A.   It was a deposition on a vehicle accident |
| 09:28 | 18 | that I had worked. |
| 09:28 | 19 | Q.   When you say you had worked a vehicle |
| 09:29 | 20 | accident, what do you do in that situation? |
| 09:29 | 21 | A.   Respond to the scene, write -- draw the |
| 09:29 | 22 | diagram.  Take down the pertinent information.  The |
| 09:29 | 23 | statements from the witnesses, and transpose it onto an |
| 09:29 | 24 | official accident report designed by the Missouri State |
| 09:29 | 25 | Highway Patrol. |

09:29  1      Q.    Okay.  Do those kinds of responds to the

09:29  2  scene, does that differ from other types of scenes that

09:29  3  you might respond to?  In other words, with the types

09:29  4  of material that you write down in an accident report,

09:29  5  does that differ than the types of material that you

09:29  6  would write down if you were responding to the scene of

09:29  7  a crime?

09:29  8      A.    No.

09:29  9      Q.    Okay.  So you would use the same kind of

09:29  10 information to write down for a scene of the crime that

09:29  11 you would for a motor vehicle accident?

09:29  12     A.    Right.

09:29  13     Q.    And in the case of someone that you pick up

09:29  14 for a mental illness issue, do you write the same kinds

09:29  15 of materials down in your report that you would write

09:29  16 down if it were an accident or a crime?

09:29  17     A.    As far as statements, yes.

09:30  18     Q.    Okay.  And what do you mean by as far as

09:30  19 statements?  You mean statements that you take from

09:30  20 witnesses?

09:30  21     A.    An accident report.  It's a form.  Where you

09:30  22 more or less check the box, fill in the blank, then you

09:30  23 take your statements.  For any other crime, you don't

09:30  24 have that luxury of fill in the blanks, you have to

09:30  25 generate the information by asking questions.

OFFICER MICHAEL THOMECZEK—MARCH 11 & 12, 2009                    8

| 09:30 | 1 | Q.     So the report, itself, will look a little |
| 09:30 | 2 | bit different if it's a motor vehicle accident, or any |
| 09:30 | 3 | other kind of call that you would take; is that |
| 09:30 | 4 | correct? |
| 09:30 | 5 | A.     Correct. |
| 09:30 | 6 | Q.     You had indicated that you had given a |
| 09:30 | 7 | deposition last year in a small motor vehicle accident. |
| 09:30 | 8 | Can you describe, was this in a civil case, or in a |
| 09:30 | 9 | criminal case? |
| 09:30 | 10 | A.     It was a civil matter. |
| 09:30 | 11 | Q.     Do you know the name of that civil matter? |
| 09:30 | 12 | A.     No, I don't. |
| 09:30 | 13 | Q.     Do you know either of the parties? |
| 09:30 | 14 | A.     No, I don't. |
| 09:31 | 15 | Q.     And do you know the names of any of the |
| 09:31 | 16 | attorneys involved? |
| 09:31 | 17 | A.     I remember the office was on Chouteau in St. |
| 09:31 | 18 | Louis. |
| 09:31 | 19 | Q.     Okay.  Do you recall the type of cars that |
| 09:31 | 20 | were involved?  I know sometimes that's what we would |
| 09:31 | 21 | focus on, instead who the individuals were. |
| 09:31 | 22 | A.     One was a small vehicle, and I believe it |
| 09:31 | 23 | was a Cavalier, but I believe it was a small vehicle. |
| 09:31 | 24 | But the other was a large pickup truck. |
| 09:31 | 25 | Q.     Okay.  Do you recall where the accident, |

09:31  1  itself, occurred?

09:31  2      A.    Yes, I do.

09:31  3      Q.    And where was that?

09:31  4      A.    It was at Meramec Bottom Road on the bridge

09:31  5  over I-55.

09:31  6      Q.    And was this a significant injury case, to

09:31  7  your recollection?

09:31  8           MS. MERKLIN VON KAENEL:   Well, to the extent

09:32  9  you can make that kind of legal determination.

09:32 10      A.    The victims were transported to the hospital

09:32 11  for treatment.

09:32 12      Q.    (By Ms. Randles)   Okay.   And we've gone

09:32 13  through some of the facts of the case, does that help

09:32 14  stimulate your -- or refresh your recollection as who

09:32 15  the individual involved may have been?

09:32 16      A.    I can't recall.

09:32 17      Q.    Do you recall whether they were kids or

09:32 18  elderly adults?

09:32 19      A.    They were adults.

09:32 20           MS. MERKLIN VON KAENEL:   I guess I'm going

09:32 21  to object to all of this.   I don't see how this is in

09:32 22  any way relevant with respect to this case.

09:32 23           MS. RANDLES: I'm trying to find out -- get

09:32 24  enough information so I can track down the case, so I

09:32 25  can read his testimony.



09:32  1          MS. MERKLIN VON KAENEL:  That's fine.  I'm

09:33  2   just going to put my objection on the record.

09:33  3          Q.    (By Ms. Randles)  Beside this deposition,

09:33  4   you indicated you've given four maybe five others; is

09:33  5   that correct?

09:33  6          A.    Possibly.  I can't recall every one that

09:33  7   I've given.  I haven't given a lot.

09:33  8          Q.    And prior to the deposition on the auto

09:33  9   accident on the bridge over I-55, can you tell me what

09:33  10  was the previous deposition that you recall having

09:33  11  given?

09:33  12         A.    It was many years ago.  It was when I was

09:33  13  working with Festus Police.  And I don't recall all the

09:33  14  details on it.

09:33  15         Q.    Okay.  When you say working with -- many

09:33  16  years ago, approximately how many years would that have

09:33  17  been?

09:33  18         A.    Let me think what year it may have been.  At

09:33  19  least 20 years ago.

09:33  20         Q.    Okay.  Now, aside from depositions that

09:33  21  you've given, have you testified in court?

09:33  22         A.    Oh, yes.

09:33  23         Q.    On how many occasions you would estimate

09:33  24  that you've testified in court?

09:34  25         A.    Numerous cases.

09:34   1          Q.      Are those criminal matters, or have they

09:34   2    been civil matters?

09:34   3          A.      Those would have been criminal matters.

09:34   4          Q.      Do you recall when the last time you

09:34   5    testified in court was?

09:34   6          A.      Criminally?

09:34   7          Q.      Yes.

09:34   8          A.      Maybe, two years ago.

09:34   9          Q.      Do you recall what was nature of that

09:34   10   testimony was?

09:34   11         A.      It was a traffic ticket.

09:34   12         Q.      Have you ever been in a lawsuit yourself

09:34   13   aside from this matter?

09:34   14         A.      No.

09:34   15         Q.      Have you ever sued anybody?

09:34   16         A.      Have I ever sued anybody?

09:34   17         Q.      Yes.

09:34   18         A.      No, ma'am.

09:34   19         Q.      You've never been sued aside from this

09:34   20   matter?

09:34   21         A.      No.

09:34   22         Q.      I'm not going to ask you much in the way of

09:35   23   personal information, and I'm not going to get any

09:35   24   information on the record that could in way endanger

09:35   25   any person.  But are you married?

| 09:35 | 1 | A.     Yes, I am. |
| 09:35 | 2 | Q.     And how long have you been married? |
| 09:35 | 3 | A.     Let's see.  17 years. |
| 09:35 | 4 | Q.     I won't ask you your anniversary.  That's |
| 09:35 | 5 | always a way to get in trouble.  Do you have any |
| 09:35 | 6 | children? |
| 09:35 | 7 | A.     I have one. |
| 09:35 | 8 | Q.     And how old is your child? |
| 09:35 | 9 | A.     She's 30 years old. |
| 09:35 | 10 | Q.     And have you been married previously? |
| 09:35 | 11 | A.     No. |
| 09:35 | 12 | Q.     Can you tell me from the time you graduated |
| 09:35 | 13 | high school, what has been your educational background? |
| 09:35 | 14 | A.     I graduated high school.  I then attended |
| 09:36 | 15 | Jefferson College.  Have an Associate's in Applied |
| 09:36 | 16 | Science in Machine Drafting and Design, which I |
| 09:36 | 17 | received in the spring of 1972.  I have then completed |
| 09:36 | 18 | the requirement for an Associate of Applied Science |
| 09:36 | 19 | degree in Law Enforcement.  Received that in 1981 from |
| 09:36 | 20 | Jefferson Junior College.  I have graduated from St. |
| 09:36 | 21 | Louis University in 1998 with a Bachelor's degree in |
| 09:36 | 22 | Psychology.  And I graduated from St. Louis University |
| 09:36 | 23 | in 2004 with a Master's degree in Public |
| 09:37 | 24 | Administration. |
| 09:37 | 25 | Q.     When did you first become a police officer? |

| | | |
|---|---|---|
| 09:37 | 1 | A.    1971, November the 4th. |
| 09:37 | 2 | Q.    And where did you first work? |
| 09:37 | 3 | A.    Pardon me, ma'am? |
| 09:37 | 4 | Q.    I'm sorry.  Where did you first work? |
| 09:37 | 5 | A.    DeSoto Missouri Police Department. |
| 09:37 | 6 | Q.    And how long did you work for DeSoto? |
| 09:37 | 7 | A.    For ten years, ma'am. |
| 09:37 | 8 | Q.    And then from DeSoto, where did you work? |
| 09:37 | 9 | A.    I went to Festus Police Department. |
| 09:37 | 10 | Q.    And how long did you work at Festus? |
| 09:37 | 11 | A.    14 years.  14, 15 years. |
| 09:37 | 12 | Q.    And from Festus, where did you go? |
| 09:37 | 13 | A.    I went into the public sector after that, |
| 09:37 | 14 | for a while. |
| 09:37 | 15 | Q.    What did you do in the public sector? |
| 09:37 | 16 | A.    I explored an opportunity with Wal-Mart as |
| 09:37 | 17 | an assistant manager. |
| 09:38 | 18 | Q.    What brought you back to police work? |
| 09:38 | 19 | A.    The fact that they didn't exactly tell me |
| 09:38 | 20 | how many hours would be required for the job. |
| 09:38 | 21 | Q.    A common complaint with Wal-Mart.  Then |
| 09:38 | 22 | where did you go after you left Wal-Mart? |
| 09:38 | 23 | A.    I left Wal-Mart.  I then managed a gas |
| 09:38 | 24 | station for one month.  And it was an upstart company |
| 09:38 | 25 | and I just -- they weren't run very well. |

OFFICER MICHAEL THOMECZEK, MARCH 11 & 12, 2009                14

09:38  1        Q.    Then what did you do?

09:38  2        A.    I went to work for Bucheit's.

09:38  3        Q.    For what?

09:38  4        A.    Bucheit's, Incorporated.  It's a farm

09:38  5   implement store as an assistant manager for them.  With

09:38  6   the understanding I would only be there a little while.

09:38  7        Q.    And why did you have that understanding?

09:38  8        A.    Because I wanted to get back into law

09:38  9   enforcement, but first I wanted to complete my Master's

09:39  10  degree.

09:39  11       Q.    Okay.  After Bucheit's, where did you go?

09:39  12       A.    I went to work for St. Louis University

09:39  13  Public Safety, so that I could get my Master's degree

09:39  14  paid for.

09:39  15       Q.    You have your Master's in Public

09:39  16  Administration?

09:39  17       A.    Yes, I do.

09:39  18       Q.    And did you pursue any positions in Public

09:39  19  Administration?

09:39  20       A.    I was told, when I was thinking about a

09:39  21  Master's degree, I explored this with very, very many

09:39  22  friends of mine, people in high places.  And they said

09:39  23  as far as law enforcement goes, that was a very broad

09:39  24  field, a very good field.  It allowed you to get into

09:39  25  all sectors of public government.  So that's why I went

Boyd-Gwinn Reporting

09:39    1    with Public Administration.

09:39    2        Q.    And a Public Administration degree wasn't

09:39    3    required for law enforcement?

09:39    4        A.    It wasn't required.  It did match up with

09:39    5    it.  It's a related field.

09:39    6        Q.    Have you looked to do anything else beside

09:40    7    law enforcement with your Public Administration degree?

09:40    8        A.    No, I haven't.

09:40    9        Q.    Okay.  After you went to SLU, and finished

09:40    10    your Master's, I assume you were working for Public

09:40    11    Safety at SLU during the remainder of your time that

09:40    12    you were completing your Master's degree?

09:40    13        A.    Most of it.  When it got close to my

09:40    14    completion on the degree, I started looking for a

09:40    15    police job, and got hired by St. Louis County.

09:40    16        Q.    And how long have you been with St. Louis

09:40    17    County?

09:40    18        A.    Since 2002, 7 years.

09:40    19        Q.    Since you've been hired by St. Louis County,

09:40    20    can you tell me what your job titles have been?

09:40    21        A.    I've always been at the Patrol Division,

09:40    22    served my one year as a probationary officer.  I became

09:40    23    a field training instructor.  And other than that, it's

09:40    24    just a patrolman.

09:41    25        Q.    When you worked with DeSoto, can you

Boyd-Gwinn Reporting



09:41  1  describe for me all of the job titles that you've held?

09:41  2       A.   Again, as a probationary police officer.

09:41  3  Became a patrolman.  Was elevated to the rank of

09:41  4  sergeant.  And under the rank of sergeant, I became a

09:41  5  field training instructor, a midnight watch commander,

09:41  6  and at times would serve as the acting chief.

09:41  7       Q.   What caused you to leave DeSoto and move to

09:41  8  Festus?

09:41  9       A.   A lot of money.

09:41  10      Q.   Festus paid better?

09:41  11      A.   A lot better.

09:41  12      Q.   When you were in Festus, can you tell me

09:41  13  what the positions were, the titles that you held

09:42  14  there?

09:42  15      A.   Probationary police officer, to patrolman,

09:42  16  attained the rank of sergeant, which duties included

09:42  17  being a watch commander.  Had my own platoon to run.

09:42  18  And I was placed in a service as a desk officer, desk

09:42  19  sergeant, for about five years, in which case I was

09:42  20  basically the administrative aide to the chief.

09:42  21      Q.   Was that a position that you enjoyed, being

09:42  22  a desk sergeant?

09:42  23      A.   It was different.  But after a while you get

09:42  24  tired of being stuck inside all the time.

09:42  25      Q.   What caused you to go to work for Wal-Mart

OFFICER MICHAEL THOMECZEK, MARCH 11 & 12, 2009          17



09:43    1   then?

09:43    2       A.    My wife has two cousins who are managers at

09:43    3   Wal-Mart, and they were explaining to me how much money

09:43    4   they made.   And it sounded pretty enticing.   One fact

09:43    5   they neglected to tell me is how many hours it was

09:43    6   going to require.   I can see why they've been divorced

09:43    7   twice now.

09:43    8       Q.    I assume you would say that the hours there

09:43    9   were oppressive?

09:43   10       A.    I would call them oppressive, yes.

09:43   11       Q.    And were you always assistant manager at

09:43   12   Wal-Mart?

09:43   13       A.    Well, I started as a clerk, as a regular

09:43   14   worker, but quickly elevated into assistant manager.

09:43   15       Q.    When you hired on, did you hire on with the

09:43   16   intention of being assistant manager?

09:43   17       A.    That was the understanding.

09:43   18       Q.    And did you advance above assistant manager

09:44   19   to manager?

09:44   20       A.    No.   I left before I got any further than

09:44   21   that.

09:44   22       Q.    How long were you at Wal-Mart?

09:44   23       A.    About two years.

09:44   24       Q.    Then you indicated you went to a gas station

09:44   25   very briefly, but then you went to Bucheit's,

OFFICER MICHAEL THOMECZEK - MARCH 11 & 12, 2009

18

09:44  1  Incorporated?

09:44  2      A.    Correct.

09:44  3      Q.    What caused you to leave the gas station?

09:44  4      A.    They were run very poorly.  It was a new

09:44  5  company.  They were just starting out.  And I didn't

09:44  6  see a future with them because I didn't see the

09:44  7  operation going very far, and they were bankrupt within

09:44  8  three years.

09:44  9      Q.    Did you leave, or were you terminated from

09:44  10  that position?

09:44  11      A.    Pardon me, ma'am.

09:44  12      Q.    Did you leave, or were you terminated from

09:44  13  that position?

09:44  14      A.    Oh, I left.

09:44  15      Q.    And then you took the position with

09:44  16  Buchholtz?

09:45  17      A.    Bucheit's.

09:45  18      Q.    Bucheit's.  And how long were you with

09:45  19  Bucheit's?

09:45  20      A.    7, 9 months, something like that.  It wasn't

09:45  21  very long.

09:45  22      Q.    Is this the one that you said you took

09:45  23  knowing that it would be a short-term situation?

09:45  24      A.    I told the store manager that it would be a

09:45  25  short-term position.

09:45  1      Q.    And what did you do at Bucheit's?

09:45  2      A.    I was a management trainee.  I worked under

09:45  3  an assistant manager and had a small portion of the

09:45  4  store that I was in charge of, as far as making sure it

09:45  5  was run properly.

09:45  6      Q.    And why did you leave Bucheit's?

09:45  7      A.    It was the understanding I would leave.  And

09:45  8  I wanted to go to work.  I told them that I had an

09:45  9  application at St. Louis University, and when they

09:45  10 called me, that I would leave because that way I could

09:45  11 get my education paid for.

09:45  12     Q.    And when you say you had an application with

09:46  13 St. Louis University, you mean the Security Division?

09:46  14     A.    Yes.

09:46  15     Q.    Okay.  Then you were at St. Louis University

09:46  16 Security during the remainder of your Master's program,

09:46  17 pretty much; correct?

09:46  18     A.    Most of it.  I left in 2002.

09:46  19     Q.    And when did you finish your Master's

09:46  20 program?

09:46  21     A.    2004.

09:46  22     Q.    Okay.  And where did you graduate high

09:46  23 school?

09:46  24     A.    Salem, Missouri.

09:46  25     Q.    I notice that you were sergeant at DeSoto

Boyd-Gwinn Reporting

09:47  1   and Festus.  Have you ever applied to become a sergeant

09:47  2   at St. Louis County?

09:47  3        A.    I took the test twice.  And after that

09:47  4   decided that I -- I'm getting close to retirement,

09:47  5   close enough that I'm just going to stay a patrolman.

09:47  6        Q.    So you did not pass the sergeant's test?

09:47  7        A.    I didn't make the qualifications, no.

09:47  8        Q.    When you say you did not make the

09:47  9   qualifications?

09:47  10       A.    It's not really a pass.  It's against each

09:47  11  other, and they only take the top 50 percent.

09:47  12       Q.    Ah.  Okay.  About how many officers test for

09:47  13  sergeant, do you know?

09:47  14       A.    Oh, I think the last time I took it, it was

09:48  15  15 or 20, in that range.

09:48  16       Q.    So you would have had to be in the top 7 to

09:48  17  10 in order to --

09:48  18       A.    That's how many passed the written part and

09:48  19  went on.

09:48  20       Q.    Okay.  Did you pass the written part and

09:48  21  then --

09:48  22       A.    No.

09:48  23       Q.    Since you've been at St. Louis County, have

09:48  24  you ever been the subject of any discipline?

09:48  25       A.    Once.

09:48  1          Q.    And what was that matter?

09:48  2          A.    I had a vehicle accident, and I was found

09:48  3  negligent.

09:48  4          Q.    And what was the discipline that was

09:48  5  imposed?

09:48  6          A.    Three-day suspension.

09:48  7          Q.    Do you know if there were any injuries

09:48  8  resulting from that accident?

09:48  9          A.    No, I ran into a telephone pole.  Well, I

09:48  10  was checked out.  I wasn't really hurt.  I didn't miss

09:49  11  any work, or anything, over it.

09:49  12          Q.    When you say you were checked out, it

09:49  13  knocked you out?

09:49  14          A.    No, I was checked at the hospital to make

09:49  15  sure I didn't have any injuries.

09:49  16          Q.    Aside from the auto accident, have you ever

09:49  17  had any other discipline while you were at St. Louis

09:49  18  County?

09:49  19          A.    No, ma'am.

09:49  20          Q.    Have you ever had any discipline imposed

09:49  21  when you were at DeSoto?

09:49  22          A.    Yes, I did.

09:49  23          Q.    Okay.  And what was the discipline that you

09:49  24  had imposed when you were at DeSoto?

09:49  25          A.    I was suspended for a week for having an

| | | |
|---|---|---|
| 09:49 | 1 | accident. |
| 09:49 | 2 | Q.    Auto accident? |
| 09:49 | 3 | A.    Yes, ma'am. |
| 09:49 | 4 | Q.    And what were the circumstances of that? |
| 09:49 | 5 | A.    I was responding to a burglar alarm call |
| 09:49 | 6 | with red lights and siren on, went through a stop sign, |
| 09:49 | 7 | and was broadsided. |
| 09:50 | 8 | Q.    What year would that have been, |
| 09:50 | 9 | approximately? |
| 09:50 | 10 | A.    It would have been early in '72. |
| 09:50 | 11 | Q.    Okay.  And were you injured in that? |
| 09:50 | 12 | A.    No. |
| 09:50 | 13 | Q.    Did you have any other discipline of any |
| 09:50 | 14 | kind while you were an officer at DeSoto? |
| 09:50 | 15 | A.    No. |
| 09:50 | 16 | Q.    Then when you went to Festus, did you have |
| 09:50 | 17 | any discipline when you were at Festus? |
| 09:50 | 18 | A.    I had one. |
| 09:50 | 19 | Q.    What was that? |
| 09:50 | 20 | A.    It was a motor vehicle accident. |
| 09:50 | 21 | Q.    And what were the circumstances of that |
| 09:50 | 22 | accident? |
| 09:50 | 23 | A.    I was proceeding through an intersection |
| 09:50 | 24 | with red lights and siren on, and a person made a |
| 09:50 | 25 | left-hand turn into my patrol vehicle. |

Boyd-Gwinn Reporting

OFFICER MICHAEL THOMECZEK     MARCH 11 & 12, 2009

09:50  1        Q.    What was the discipline that was imposed for
09:50  2  the accident?
09:50  3        A.    I think it was a two-day suspension.   It
09:51  4  wasn't very long.
09:51  5        Q.    Was it found that you were in some manner
09:51  6  negligent?
09:51  7        A.    The chief said I was.   I didn't feel I was.
09:51  8        Q.    And with respect to the DeSoto accident, was
09:51  9  there a finding that you had been somehow negligent
09:51 10  when you were responding to that burglar alarm?
09:51 11        A.    Yes.   The chief said I should have stopped
09:51 12  and then proceeded.
09:51 13        Q.    Aside from these auto accidents, has there
09:51 14  ever been any other discipline that's been imposed on
09:51 15  you?
09:51 16        A.    No, ma'am.
09:51 17        Q.    Have you ever been the subject of an
09:51 18  internal affairs -- or I don't recall what St. Louis
09:51 19  County calls internal affairs.
09:51 20        A.    Twice.
09:51 21        Q.    And can you tell me the circumstances --
09:51 22  Well, first, was that at St. Louis County?
09:51 23        A.    Yes, it was.
09:51 24        Q.    Both times?
09:51 25        A.    Yes.



09:51  1        Q.     Can you tell me the circumstances of the

09:51  2    first time that you were investigated by internal

09:52  3    affairs?

09:52  4        A.     Responded to a disturbance call.  Responded

09:52  5    to the same address twice.  Subsequently made a arrest

09:52  6    of a property owner for peace disturbance, and he filed

09:52  7    a complaint on me and other officers for oppressive

09:52  8    conduct.

09:52  9        Q.     What was the result of that investigation?

09:52  10       A.     It was found that I wasn't -- I didn't do

09:52  11   anything wrong.

09:52  12       Q.     Approximately, what year was that?

09:52  13       A.     I believe it was three years ago.

09:52  14       Q.     So, approximately, '06?

09:52  15       A.     Approximately.

09:52  16       Q.     And what is the second internal affairs

09:52  17   investigation that you've been --

09:52  18       A.     That was another one through oppressive

09:52  19   conduct.  We got a call at St. Anthony's Hospital, a

09:52  20   mentally ill patient.  When we arrived, the family was

09:53  21   creating a disturbance in the emergency room.  And we

09:53  22   had to use, myself and two other officers, had to use

09:53  23   force to restrain the patient and remove the family

09:53  24   from the emergency room.  And we were found that we

09:53  25   acted in a professional manner and did nothing wrong.

09:53   1        Q.    When you said you -- You indicated that you

09:53   2   and other officers had to restrain the patient.  In

09:53   3   what manner did you have to restrain the patient.

09:53   4        A.    He ended up being tased.

09:53   5        Q.    What was going on that caused to you to Tase

09:53   6   that patient?

09:53   7        A.    He was attempting to kick the officer, hit

09:53   8   the officers, hit the nurses.

09:54   9        Q.    Were you the one who --

09:54   10        MS. MERKLIN VON KAENEL:  Can you -- I'm

09:54   11   sorry.  You put a fact -- You assumed a fact that was

09:54   12   not in evidence.

09:54   13        MS. RANDLES:  I was just going to ask him --

09:54   14        MS. MERKLIN VON KAENEL:  And you do that a

09:54   15   lot.  And so I am going to ask you, if you don't mind,

09:54   16   if you could ask him the question without inserting a

09:54   17   fact, and he'll tell you the story.  Because he didn't

09:54   18   do the tasing.  I think you need to clarify.

09:54   19        MS. RANDLES:  I was just going to ask him if

09:54   20   he did the tasing.

09:54   21        MS. MERKLIN VON KAENEL:  Go ahead.  I'm

09:54   22   sorry.  You may answer the question.

09:54   23        Q.    (By Ms. Randles)  The question was:  Were

09:54   24   you the one who actually tased the patient?

09:54   25        A.    No, I wasn't.

09:54    1        Q.    Do you know the name of the individual who

09:54    2   tased the patient?

09:54    3        A.    Yes, I do.

09:54    4              MS. MERKLIN VON KAENEL:   I'm going to

09:54    5   object.   It's not relevant.

09:54    6        A.    Go ahead and answer?

09:54    7              MS. MERKLIN VON KAENEL:   Go ahead and

09:54    8   answer.

09:54    9        A.    Officer Gordon.

09:54   10        Q.    (By Ms. Randles)  How many officers were

09:54   11   there at the time of the incident in which the patient

09:54   12   had to be tased?

09:54   13        A.    Three.

09:54   14        Q.    Was Sergeant Lasater there, one of the

09:55   15   three?

09:55   16        A.    No.

09:55   17        Q.    At the time that the patient had to be

09:55   18   tased, did any officer have to pull a weapon aside from

09:55   19   the Taser?

09:55   20        A.    No.

09:55   21        Q.    And to be very specific, because I did the

09:55   22   same thing, you did not pull a weapon?

09:55   23        A.    No.

09:55   24        Q.    You indicated that the family had to be

09:56   25   removed from ER.  How many individuals had to be

09:56  1  removed from the ER that were causing the disturbance?

09:56  2        A.    Three people had to be physically removed.

09:56  3        Q.    Did those people have to be restrained in

09:56  4  any manner?

09:56  5        A.    They were just taken by the arm and led out

09:56  6  of the room into the lobby area.

09:56  7        Q.    Were any charges filed as a result of the

09:56  8  incident at St. Anthony's?

09:56  9        A.    Yes.

09:56  10       Q.    And what charges were filed?

09:56  11       A.    Assault, peace disturbance.  I think there

09:56  12  was a third charge.  I don't remember what it was.

09:56  13       Q.    Were these against the patient or the family

09:56  14  members?

09:56  15       A.    They were against the patient.

09:56  16       Q.    Approximately, when did that occur?

09:56  17       A.    About two years ago.

09:57  18       Q.    Were any of the police officers on the scene

09:57  19  physically struck or battered by --

09:57  20       A.    Yes.

09:57  21       Q.    -- the patient?  And that was a yes?  We

09:57  22  fought with each other.

09:57  23       A.    That was a yes.

09:57  24       Q.    Were you struck by the patient?

09:57  25       A.    No.



09:57  1        Q.    Did you write the report on that incident?

09:57  2        A.    Yes, I did.

09:57  3        Q.    When there are multiple officers on the

09:57  4   scene, is it common that only one officer writes the

09:57  5   report of the incident that occurs?

09:57  6        A.    Yes, it is.

09:57  7        Q.    And do you know if there is a policy as to

09:57  8   why that is so?

09:57  9        A.    Why only one officer writes the report?  No,

09:57 10   I don't.  It's just a policy.

09:58 11        Q.    The individual who writes the report, are

09:58 12   they the ones who are responsible for recommending that

09:58 13   charges be brought?

09:58 14        A.    No.

09:58 15        Q.    Who makes the recommendation as to whether

09:58 16   or not charges should be filed?

09:58 17        A.    It varies.  Sometimes it's the responding

09:58 18   officer.  Sometimes it's the supervisor on the scene

09:58 19   who responds.

09:58 20        Q.    If charges -- If it's determined that

09:59 21   charges are to be filed, do you delineate in the report

09:59 22   who made the recommendation that charges be brought?

09:59 23        A.    No.

09:59 24        Q.    Okay.  Aside from these two investigations,

09:59 25   have you ever been the subject of any other internal

OFFICER MICHAEL THOMECZEK  MARCH 11 & 12, 2009

| | | |
|---|---|---|
| 09:59 | 1 | affairs type investigations? |
| 09:59 | 2 | A.    Not internal affairs, no. |
| 09:59 | 3 | Q.    Have you ever been the subject of a |
| 09:59 | 4 | citizen's complaint? |
| 09:59 | 5 | A.    Other than St. Louis County? |
| 09:59 | 6 | Q.    Yes.  On how many occasions have you been |
| 09:59 | 7 | the subject of a citizen's complaint? |
| 09:59 | 8 | A.    Twice. |
| 09:59 | 9 | Q.    Were those the auto accidents that we've |
| 09:59 | 10 | spoken of? |
| 09:59 | 11 | A.    No. |
| 09:59 | 12 | Q.    Can you describe for me -- Well, first, at |
| 10:00 | 13 | which police department were you working when you were |
| 10:00 | 14 | the subject of the citizen's complaint? |
| 10:00 | 15 | A.    DeSoto Police Department. |
| 10:00 | 16 | Q.    And can you describe for me what the subject |
| 10:00 | 17 | matter of the citizen's complaint was? |
| 10:00 | 18 | A.    Resisting -- Assaults and resisting arrest. |
| 10:00 | 19 | Q.    And I assume that they indicated that you |
| 10:00 | 20 | had used too much force? |
| 10:00 | 21 | A.    True. |
| 10:00 | 22 | MS. MERKLIN VON KAENEL:  Let's stop |
| 10:00 | 23 | assuming, and ask him what is the subject of the |
| 10:00 | 24 | complaint. |
| 10:00 | 25 | MS. RANDLES:  You're welcome to make your |

Boyd-Gwinn Reporting

10:00   1   objections, Lorena.

10:00   2       Q.   (By Ms. Randles)  Can you describe for me

10:00   3   what the situation was that the citizen's complaint

10:00   4   arose from?

10:00   5       A.   From excessive force.

10:00   6       Q.   You had indicated earlier that it was

10:00   7   assaults and resisting arrests.  What was the person

10:00   8   actually doing when you came on the scene?

10:00   9       A.   For which one?

10:00   10      Q.   For the first one?

10:00   11      A.   Two different cases.

10:00   12      Q.   The first one?

10:01   13      A.   The first one, the person was on the side of

10:01   14  the road creating a disturbance, and the neighbors had

10:01   15  called about him.

10:01   16      Q.   Was this a mental health concern, or was it

10:01   17  something else?

10:01   18      A.   No, it was just peace disturbance.

10:01   19      Q.   And how did you respond?

10:01   20      A.   When I arrived on the scene and observed the

10:01   21  subject, asked him what was going on, he immediately

10:01   22  wanted to fight me.

10:01   23      Q.   And what happened next?

10:01   24      A.   When I approached him, he kicked me.

10:01   25      Q.   And how did you respond to that?

OFFICER MICHAEL THOMECZEK, MARCH 11 & 12, 2009          31

10:01  1        A.    I struck him, and knocked him down.

10:01  2        Q.    With your fist?

10:01  3        A.    With a flashlight.

10:01  4        Q.    With a flashlight.   After he was on the

10:01  5   ground, what happened then?

10:01  6        A.    I handcuffed him, took him to jail.

10:02  7        Q.    And then he filed a citizen's complaint

10:02  8   against you concerning that incident?

10:02  9        A.    He contacted the FBI for a civil rights

10:02 10   violation.

10:02 11        Q.    Was there an investigation done by the FBI,

10:02 12   to your knowledge?

10:02 13        A.    The FBI came down to talk to me, and found

10:02 14   that his complaint wasn't substantiating.

10:02 15        Q.    Was there an office of citizens complaints

10:02 16   in DeSoto?

10:02 17        A.    Chief of police.

10:02 18        Q.    And did the chief of police do an individual

10:02 19   investigation separate and apart from the FBI?

10:02 20        A.    Not that I was aware of.

10:02 21        Q.    Did anything result as a result of -- strike

10:02 22   that.  Were there any consequences to you as a result

10:02 23   of this citizen's complaint?

10:03 24        A.    No.

10:03 25        Q.    Now, you had a second citizen's complaint?

OFFICER MICHAEL THOMECZEK MARCH 11 & 12, 2009

| 10:03 | 1 | A. True. |
| 10:03 | 2 | Q. And that was DeSoto also? |
| 10:03 | 3 | A. That was in DeSoto. |
| 10:03 | 4 | Q. Can you describe for me what were the |
| 10:03 | 5 | circumstances of that? |
| 10:03 | 6 | A. Went to a residence for a disturbance. |
| 10:03 | 7 | Q. And what happened when you got to the |
| 10:03 | 8 | residence? |
| 10:03 | 9 | A. I saw that the 17-year old son was wanting |
| 10:03 | 10 | to fight his parents, and his brothers, and was just |
| 10:03 | 11 | creating a general disturbance. |
| 10:03 | 12 | Q. And how did you respond to that? |
| 10:03 | 13 | A. Tried to calm him down. In which case, it |
| 10:03 | 14 | was -- I was unsuccessful. Placed him under arrest for |
| 10:03 | 15 | peace disturbance and he resisted. |
| 10:03 | 16 | Q. How did you respond to his resistance? |
| 10:03 | 17 | A. After he hit me in the head, I hit him in |
| 10:03 | 18 | the head with a flashlight. |
| 10:03 | 19 | Q. What did he hit you with? |
| 10:03 | 20 | A. His fist. |
| 10:04 | 21 | Q. And who filed the citizen's complaint? |
| 10:04 | 22 | A. He did. Contacted the FBI about a civil |
| 10:04 | 23 | rights violation. |
| 10:04 | 24 | Q. And did the FBI once again investigate? |
| 10:04 | 25 | A. Yes, they did. |



10:04   1      Q.     Were there any findings as a result?

10:04   2      A.     They found that I was justified in my

10:04   3 actions.

10:04   4      Q.     And did the chief conduct any kind of

10:04   5 investigation?

10:04   6      A.     Not that I'm aware of.

10:04   7      Q.     And were there any consequences to you as a

10:04   8 result of this citizen's complaint?

10:04   9      A.     None.

10:04   10      Q.     Have you ever had to draw a weapon during

10:04   11 the course of an investigation?  Strike that.

10:04   12      Have you ever had to draw your weapon resulting

10:04   13 from an incident in which you came upon a scene?

10:05   14      A.     Yes, I have.

10:05   15      Q.     Is that something that has commonly

10:05   16 occurred?

10:05   17      A.     For a while, it did.

10:05   18      Q.     Is there a reason that you were having to

10:05   19 draw your weapon more frequently?  Were you, for

10:05   20 example, assigned to a particular beat that was more

10:05   21 heavily crime ridden?

10:05   22      A.     It was just the calls that I was getting.

10:05   23      Q.     And you said for a while you had to draw

10:05   24 your weapon more often.  During what time frame was

10:05   25 that?



10:05  1        A.    My years in DeSoto.

10:05  2        Q.    Since you've been an officer with St. Louis

10:05  3  County, have you had to draw your weapon?

10:05  4        A.    Not at any -- Well, a couple of times, at

10:05  5  someone.

10:05  6        Q.    Do you recall when the last time was that

10:05  7  you had to draw your weapon?

10:05  8        A.    The incident we're here for.

10:05  9        Q.    You drew your weapon on HM?

10:06  10       A.    Yes.

10:06  11       Q.    Prior to drawing your weapon on HM, was

10:06  12  there anyone else that you had drawn your weapon on in

10:06  13  St. Louis County?

10:06  14       A.    I think there was one other incident, but

10:06  15  there wasn't any shots fired.  It was just until I got

10:06  16  the situation under control.

10:06  17       Q.    And what was the incident that you recall?

10:06  18       A.    It started off as leaving the scene of an

10:06  19  accident.

10:06  20       Q.    And what happened?

10:06  21       A.    I had to follow the car at a high rate of

10:06  22  speed until I got him stopped.  Me and some other

10:06  23  officers got him stopped.  And then he refused to put

10:06  24  himself in a position where we had control of him.

10:06  25       Q.    Do you know when this occurred?

OFFICER MICHAEL THOMECZEK, MARCH 11 & 12, 2009

| | | |
|---|---|---|
| 10:06 | 1 | A.    Maybe four years ago. |
| 10:07 | 2 | Q.    So, approximately 2004/2005? |
| 10:07 | 3 | A.    Right around in that area. |
| 10:07 | 4 | Q.    Did the individual who was the subject of |
| 10:07 | 5 | this file any complaints, to your knowledge? |
| 10:07 | 6 | A.    Not that I'm aware of, no. |
| 10:07 | 7 | Q.    And what caused you to draw your weapon on |
| 10:07 | 8 | that particular situation? |
| 10:07 | 9 | A.    He refused to get out of the car. |
| 10:07 | 10 | Q.    Have you ever had to discharge your weapon? |
| 10:07 | 11 | A.    Yes, I have. |
| 10:07 | 12 | Q.    On how many occasions have you had to |
| 10:07 | 13 | discharge your weapon? |
| 10:07 | 14 | A.    Seven instances. |
| 10:07 | 15 | Q.    Were all of these while you were in DeSoto? |
| 10:07 | 16 | A.    Yes, ma'am. |
| 10:07 | 17 | Q.    On any of those instances in which you had |
| 10:07 | 18 | to discharge the weapon, did you also have to -- |
| 10:07 | 19 | MS. MERKLIN VON KAENEL:  I'm going to object |
| 10:07 | 20 | that none of this is relevant with respect to the |
| 10:08 | 21 | allegations made in the complaint.  Subject to that, |
| 10:08 | 22 | you may answer. |
| 10:08 | 23 | A.    Okay.  I forgot what the question was. |
| 10:08 | 24 | MS. RANDLES:  We hadn't finished it. |
| 10:08 | 25 | A.    Oh, okay. |

10:08  1          MS. MERKLIN VON KAENEL:  I apologize.

10:08  2      Q.   (By Ms. Randles)  On the occasions you had

10:08  3  to discharge a weapon, did any of those result in the

10:08  4  death of the individual that was involved in the

10:08  5  incident?

10:08  6      A.   No deaths.

10:08  7      Q.   Have you actually had to shoot a person

10:08  8  during anytime that you had to discharge a weapon?

10:08  9      A.   One time.

10:08 10          MS. MERKLIN VON KAENEL:  I'm just going to

10:08 11  have a continuing objection on the record.

10:08 12      Q.   (By Ms. Randles)  Sure.  Can you describe

10:08 13  for me the circumstances in which you had to shoot that

10:08 14  individual?

10:08 15      A.   I was ambushed, and I returned fire,

10:08 16  striking an individual, who subsequently escaped.

10:08 17      Q.   Was he at some point caught?

10:08 18      A.   No.  He was never caught.  We never found

10:08 19  out who it was.

10:08 20      Q.   When you say you were ambushed, can you

10:08 21  describe for me the circumstances of that?

10:08 22      A.   We -- The Sheriff's Department received an

10:08 23  alarm call at the AmVets Hall, which is located just

10:09 24  outside the city limits of DeSoto.  They did not have a

10:09 25  deputy in position to respond to the call.  So, as

10:09   1   common practice at the time, this asked DeSoto if they

10:09   2   could send an officer out there to respond.  As I was

10:09   3   driving around the building, I suddenly was fired upon.

10:09   4   A gun fight ensued.  One subject was struck.  And

10:09   5   they -- With the help of his friends, he escaped.

10:09   6        Q.    Do you know how many individuals were

10:09   7   involved in that ambush?

10:09   8        A.    At least three.

10:09   9        Q.    And were you the only officer responding to

10:09  10   that scene?

10:09  11        A.    I was the only officer in DeSoto on duty at

10:10  12   that time.

10:10  13        Q.    Your method of report writing, has it

10:10  14   changed from the places that you have worked; in other

10:10  15   words, do they have different ways that they expect

10:10  16   reports written at each of the police departments that

10:10  17   you've worked, or are they the same?

10:10  18        A.    No, they change from department to

10:10  19   department.

10:10  20        Q.    Okay.  In St. Louis County, do you know if

10:10  21   there was a policy concerning noting in a report

10:10  22   whether or not a weapon is discharged?

10:11  23        A.    Yes.  We have to put that in the report.

10:11  24        Q.    Okay.  If a weapon is draw, is that supposed

10:11  25   to be placed in the report?

10:11  1        A.    It's not a necessity.

10:11  2        Q.    You had indicated that you had to draw your

10:11  3  weapon on at least two occasions since you've been at

10:11  4  St. Louis County?

10:11  5        A.    I think so.

10:11  6        Q.    Do you recall whether on the second

10:11  7  occasion, whether you noted in the report that you had

10:11  8  drawn your weapon?

10:11  9        A.    I think I did.

10:11 10        Q.    Do you recall with the circumstances were --

10:11 11  Let me go back.  You had indicated that on the other

10:11 12  occasion, the individual had left the scene of an

10:12 13  accident?

10:12 14        A.    Yes.

10:12 15        Q.    And then there was a high speed chase that

10:12 16  ensued; is that correct?

10:12 17        A.    It wasn't real high speed, but it was a

10:12 18  chase to catch up to him and get him stopped.

10:12 19        Q.    Okay.  And then you drew your weapon because

10:12 20  he refused to get out of the car?

10:12 21        A.    Right.

10:12 22        Q.    And that was in, approximately, 2004/2005?

10:12 23        A.    Yeah, about that.

10:12 24        Q.    Is there anyway to track down that report?

10:12 25        A.    I wasn't the reporting officer, but there

| | | |
|---|---|---|
| 10:12 | 1 | was a report written on it. |
| 10:12 | 2 | Q. Okay. Do you know who the reporting officer |
| 10:12 | 3 | on that one was? |
| 10:12 | 4 | A. Officer Matt Taylor. |
| 10:12 | 5 | Q. And how are reports kept in St. Louis |
| 10:12 | 6 | County? What would I look for to get that report? |
| 10:12 | 7 | A. That would have been an accident report, and |
| 10:12 | 8 | it would be kept at central records. |
| 10:13 | 9 | Q. Is it kept by the name of the individual who |
| 10:13 | 10 | has been involved in the accident? How is it kept? |
| 10:13 | 11 | A. I'm not sure how they classify them, ma'am. |
| 10:13 | 12 | Q. Okay. And do you know whether or not there |
| 10:13 | 13 | is a policy at St. Louis County with regard to noting |
| 10:13 | 14 | in police reports that a weapon had been drawn? |
| 10:13 | 15 | A. Pardon, ma'am? |
| 10:13 | 16 | Q. Do you know if there is a policy, if St. |
| 10:13 | 17 | Louis County has a written policy noting the drawing of |
| 10:13 | 18 | weapons in police reports? |
| 10:13 | 19 | A. There is none that I'm aware of. |
| 10:13 | 20 | Q. Okay. No SOP that you're aware of? |
| 10:13 | 21 | A. Not that I'm aware of. |
| 10:13 | 22 | Q. Do you know if there is a policy or an SOP |
| 10:13 | 23 | concerning the discharge of weapons in reports? |
| 10:13 | 24 | MS. MERKLIN VON KAENEL: Can you define SOP |
| 10:13 | 25 | for the record? Because we don't use that terminology |

| | | |
|---|---|---|
| 10:13 | 1 | in Saint Louis County. |
| 10:13 | 2 | Q.    (By Ms. Randles)   SOP is considered a |
| 10:14 | 3 | Standard Operating Procedure.   Do you have what are |
| 10:14 | 4 | known as Standard Operating Procedures for the County |
| 10:14 | 5 | of St. Louis? |
| 10:14 | 6 | A.    For -- |
| 10:14 | 7 | Q.    For St. Louis County, the police department? |
| 10:14 | 8 | A.    For which, discharging a weapon? |
| 10:14 | 9 | Q.    No.   Just going back to -- What do you call |
| 10:14 | 10 | your daily practices, your operating procedures, the |
| 10:14 | 11 | rules that you have? |
| 10:14 | 12 | A.    We have General Orders we go by. |
| 10:14 | 13 | Q.    General Orders? |
| 10:14 | 14 | A.    Uh-huh. |
| 10:14 | 15 | Q.    So we'll use that term instead of SOP, or |
| 10:14 | 16 | Standard Operating Procedures.   But do you have any |
| 10:14 | 17 | General Orders concerning noting the discharge of |
| 10:14 | 18 | weapons in police reports? |
| 10:14 | 19 | A.    Yes, we do. |
| 10:14 | 20 | Q.    Do you know, can you describe for me what |
| 10:14 | 21 | that policy is? |
| 10:14 | 22 | A.    It's our use of gun policy, or use of weapon |
| 10:14 | 23 | policy.   And if we discharge a weapon, it has to be |
| 10:14 | 24 | noted in the report. |
| 10:15 | 25 | Q.    When reports are written by one of officers |

Boyd-Gwinn Reporting

| | | |
|---|---|---|
| 10:15 | 1 | who are responding to the scene, do the other officers |
| 10:15 | 2 | have input into that report? |
| 10:15 | 3 | A.   He asked them what they saw, what they did; |
| 10:15 | 4 | clarification purposes. |
| 10:15 | 5 | Q.   Do you actually get to edit any reports in |
| 10:15 | 6 | which you were a responding officer, but not the report |
| 10:15 | 7 | writer? |
| 10:15 | 8 | A.   If you're not the report writer, you do not |
| 10:15 | 9 | edit the other officer's report.  You may confer with |
| 10:15 | 10 | him. |
| 10:16 | 11 | Q.   Have you ever been charged with conduct |
| 10:16 | 12 | unbecoming a police officer during the course of your |
| 10:16 | 13 | career? |
| 10:16 | 14 | A.   Never. |
| 10:16 | 15 | Q.   Do you know if there is a General Order |
| 10:16 | 16 | concerning what is in the vernacular called "the rule |
| 10:16 | 17 | of one more"? |
| 10:16 | 18 | A.   Pardon, ma'am? |
| 10:16 | 19 | Q.   Are you familiar with the vernacular, "the |
| 10:17 | 20 | rule of one more"? |
| 10:17 | 21 | A.   No, ma'am, I'm not. |
| 10:17 | 22 | Q.   Okay.  Do you know if there is a General |
| 10:17 | 23 | Order concerning the use of handcuffs following the |
| 10:17 | 24 | drawing of a weapon by a police officer? |
| 10:17 | 25 | A.   We have a policy on the transporting of |

OFFICER MICHAEL THOMECZEK MARCH 11 & 12, 2009

| 10:17 | 1 | prisoners. |
| 10:17 | 2 | Q.   Okay.  Do you have a policy -- and I'm |
| 10:17 | 3 | familiar with that policy, we'll get to it here pretty |
| 10:17 | 4 | soon.  But do you have any other policies concerning |
| 10:17 | 5 | the use of handcuffs beside the transporting of |
| 10:17 | 6 | prisoners policy? |
| 10:17 | 7 | A.   Not that I'm aware of. |
| 10:17 | 8 | Q.   To your knowledge, has there been any |
| 10:18 | 9 | investigation in this matter by St. Louis County |
| 10:18 | 10 | independent from the litigation, itself? |
| 10:18 | 11 | A.   Not that I'm aware of. |
| 10:18 | 12 | Q.   So you've never been asked to give a |
| 10:18 | 13 | statement with regard to anything that may have |
| 10:18 | 14 | occurred on 12/31 of '05, except by your attorney in |
| 10:18 | 15 | this matter? |
| 10:18 | 16 | A.   That's it. |
| 10:18 | 17 | Q.   Do you know Officer Dan McIntyre of St. |
| 10:18 | 18 | Louis County? |
| 10:18 | 19 | A.   Never heard of him. |
| 10:18 | 20 | Q.   I understand -- Well, what precinct do you |
| 10:18 | 21 | work? |
| 10:18 | 22 | A.   I work in the 3rd Precinct, Affton. |
| 10:18 | 23 | Q.   And how many officers are in the 3rd |
| 10:18 | 24 | Precinct? |
| 10:18 | 25 | A.   Let's see.  Counting supervisors, I'm going |

Boyd-Gwinn Reporting

| | | |
|---|---|---|
| 10:19 | 1 | to give an approximation, about 60. |
| 10:19 | 2 | Q.   Do you work with officers outside of your |
| 10:19 | 3 | precinct on a regular basis? |
| 10:19 | 4 | A.   Not on a regular basis. |
| 10:19 | 5 | Q.   You occasionally work with officers outside |
| 10:19 | 6 | of your precinct? |
| 10:19 | 7 | A.   I may occasionally respond to a call with |
| 10:19 | 8 | them, like an adjoining precinct. |
| 10:19 | 9 | Q.   And what are the adjoining precincts? |
| 10:19 | 10 | A.   We are adjoined by the 4th Precinct, which |
| 10:19 | 11 | is the South Precinct, and also in close proximity is |
| 10:19 | 12 | the Fenton precinct, which is the 5th Precinct. |
| 10:19 | 13 | Q.   Did you say Fenton? |
| 10:19 | 14 | A.   Fenton. |
| 10:19 | 15 | Q.   Have you ever had an occasion to work with |
| 10:19 | 16 | an officer in the 1st or 2nd Precinct that you can |
| 10:19 | 17 | recall? |
| 10:19 | 18 | A.   Just ones that have transferred from here. |
| 10:20 | 19 | Q.   Okay.  But none who worked in the 1st |
| 10:20 | 20 | Precinct who happened to run a scene with you? |
| 10:20 | 21 | A.   No. |
| 10:20 | 22 | Q.   Have you had the same shift or watch during |
| 10:20 | 23 | the time that you've been at St. Louis County? |
| 10:20 | 24 | A.   No.  It's changed slightly. |
| 10:20 | 25 | Q.   What is your current shift or watch? |

Boyd-Gwinn Reporting



10:20  1        A.      I'm a school resource officer at Washington

10:20  2   Middle School.

10:20  3        Q.      How long have you been the school resource

10:20  4   officer?

10:20  5        A.      This is my second year.

10:20  6        Q.      Are you still on patrol?

10:20  7        A.      Just during the summertime, fill in for

10:20  8   vacations.

10:20  9        Q.      You're still in the patrol division, though?

10:20  10       A.      Yes.

10:21  11       Q.      Prior to working as the school resource

10:21  12  officer, did you have a shift or a watch that you were

10:21  13  associated with?

10:21  14       A.      I had an assigned beat for my platoon.

10:21  15       Q.      What was your beat?

10:21  16       A.      My beat was called the seventh beat, which

10:21  17  was the southern-most beat in our precinct.

10:21  18       Q.      Is that the beat that you were assigned to

10:21  19  on December 31st of 2005?

10:21  20       A.      Yes, ma'am.

10:21  21       Q.      And are there particular hours that you have

10:21  22  regularly maintained?

10:21  23       A.      We rotated shifts by platoon.

10:21  24       Q.      Do you recall on December 31st of 2005, what

10:21  25  shift you were on?

10:21   1          A.    I was on day watch.

10:21   2          Q.    And what are the hours for day watch?

10:21   3          A.    My hours were 6:30 a.m. to 2:30 p.m.

10:22   4          Q.    Do you recall whether or not you were also

10:22   5   on day watch on New Year's Day of 2006?

10:22   6          A.    I'm pretty sure I was.

10:22   7          Q.    Do you recall if you had any of the time off

10:22   8   around New Year's in '05, '06?

10:22   9          A.    I'm not sure what my days were then.

10:22   10         Q.    For the record, New Year's Eve was on a

10:22   11  Saturday.  New Year's was on a Sunday.  Do you know

10:22   12  whether or not you had that Sunday off?

10:22   13         A.    If I worked Saturday, I worked Sunday.

10:23   14         Q.    The 2nd then was on a Monday.  Do you recall

10:23   15  whether or not you were at work on Monday the 2nd of

10:23   16  2006?

10:23   17         A.    I can't say positively I was.

10:23   18         Q.    Is it your recollection that you may have

10:23   19  been?

10:23   20         A.    It's my recollection that I was probably off

10:23   21  either Tuesday, Wednesday, or Wednesday, Thursday.

10:23   22         Q.    You had indicated that you did not know Dan

10:24   23  McIntyre of St. Louis County.  Did you know Crystal

10:24   24  Marshall before the night of the incidence -- or the

10:24   25  day of the incidence in question?

OFFICER MICHAEL THOMECZEK, MARCH 11 & 12, 2009                    46

10:24  1        A.     Never heard of her before then.

10:24  2        Q.     Had you heard any rumors about a police

10:24  3  officer driving down 270 with a gun in his mouth prior

10:24  4  to the incidence in 2005?

10:24  5        A.     No.

10:24  6        Q.     At 12/31 of 2005?

10:24  7        A.     No, ma'am.

10:24  8        Q.     Have you ever been part of the internal

10:24  9  affairs or investigative team that investigates

10:24  10  complaints against police officers?

10:24  11        A.     Not since I've been with St. Louis County.

10:24  12        Q.     Were you part of either internal affairs or

10:25  13  any investigative group, whether ad hoc or not?

10:25  14        A.      It was part of my duty as the watch

10:25  15  commander, DeSoto.  And when I was a desk officer in

10:25  16  Festus, I was involved.

10:25  17        Q.     But nothing at St. Louis County?

10:25  18        A.     Nothing at St. Louis County.

10:25  19        Q.     When you were in DeSoto and Festus, were you

10:25  20  ever involved in any investigation into allegations

10:25  21  against an officer from a neighboring municipality?

10:25  22        A.     No.

10:25  23             MS. MERKLIN VON KAENEL:  I'm going to object

10:25  24  that it is not relevant, and doesn't lead to admissible

10:25  25  evidence, or any discoverable evidence that would be

OFFICER MICHAEL THOMECZEK MARCH 11 & 12, 2009                    47

| 10:25 | 1  | relevant with respect to the issues posed against these |
| 10:25 | 2  | defendants.  Subject to that objection, you can answer. |
| 10:25 | 3  |         MS. RANDLES:  Lorena, with regard to |
| 10:26 | 4  | objections, I think the Federal rules are fairly clear |
| 10:26 | 5  | all objections are waived -- are saved for trial, |
| 10:26 | 6  | except for those as to form. |
| 10:26 | 7  |         MS. MERKLIN VON KAENEL:  I'm going to pose |
| 10:26 | 8  | them on the record, and he'll answer.  Thank you. |
| 10:26 | 9  |     A.    It wasn't part of our responsibilities. |
| 10:26 | 10 |     Q.    (By Ms. Randles)  That was not part of your |
| 10:26 | 11 | responsibilities? |
| 10:26 | 12 |     A.    Our responsibilities for other agencies. |
| 10:26 | 13 |     Q.    All right.  Was there ever a situation when |
| 10:26 | 14 | you were either at DeSoto or Festus in which |
| 10:26 | 15 | allegations were made against a police officer having |
| 10:26 | 16 | committed some sort of offense in DeSoto or Festus? |
| 10:26 | 17 |         MS. MERKLIN VON KAENEL:  Continuing |
| 10:26 | 18 | objection on the record. |
| 10:26 | 19 |     A.    I investigated a couple of them. |
| 10:26 | 20 |     Q.    (By Ms. Randles)  And were those involving |
| 10:26 | 21 | officers who were with DeSoto or Festus, or were they |
| 10:27 | 22 | concerning officers who were officers in another |
| 10:27 | 23 | jurisdiction? |
| 10:27 | 24 |     A.    They were with officers within our agency. |
| 10:27 | 25 |     Q.    Okay.  On how many occasions did that occur? |

| | | |
|---|---|---|
| 10:27 | 1 | A.    I didn't hear what she said. |
| 10:27 | 2 | Q.    I'm sorry.  On how many occasions did that |
| 10:27 | 3 | occur? |
| 10:27 | 4 | A.    Two in DeSoto and one in Festus. |
| 10:27 | 5 | Q.    And were these disciplinary investigations |
| 10:27 | 6 | to determine whether or not discipline would be |
| 10:27 | 7 | undertaken again these officers? |
| 10:27 | 8 | A.    Yes. |
| 10:27 | 9 | Q.    Can you tell me what CARE is? |
| 10:27 | 10 | A.    It's our reporting system. |
| 10:27 | 11 | Q.    Do you know what CARE, C-A-R-E, stands for? |
| 10:28 | 12 | A.    Not really.  I haven't committed it to |
| 10:28 | 13 | memory. |
| 10:28 | 14 | Q.    When you say our reporting system, is CARE |
| 10:28 | 15 | used by St. Louis County alone, or is it something that |
| 10:28 | 16 | can be accessed by other municipalities? |
| 10:28 | 17 | A.    We have municipalities that belong to it, |
| 10:28 | 18 | use it. |
| 10:28 | 19 | Q.    Okay.  I don't quite understand.  I |
| 10:28 | 20 | understand that it's part of your report writing, but |
| 10:28 | 21 | can you describe for me what the CARE system is? |
| 10:28 | 22 | A.    It's a computer reporting system where we |
| 10:28 | 23 | call into a central area, and they type the reports for |
| 10:28 | 24 | us. |
| 10:28 | 25 | Q.    Oh, that's kind of nice. |

10:28  1        A.    In a way.

10:28  2        Q.    Is it like dictating a report to CARE, and

10:28  3   then they type it up for you, and you edit and

10:28  4   finalize?

10:28  5        A.    True.

10:29  6        Q.    And then you had indicated that there are

10:29  7   other municipalities that are part of CARE; is that

10:29  8   correct?

10:29  9        A.    Yes, they use it.

10:29 10        Q.    Okay.  If you wanted to access a Town and

10:29 11   Country report, can you, from St. Louis County, access

10:29 12   a Town and Country police report?

10:29 13        A.    I don't have that authority.

10:29 14        Q.    Do you have to have a password, or something

10:29 15   like that, to get into the CARE system?

10:29 16        A.    Yes.

10:29 17        Q.    And once you get into the CARE system, can

10:29 18   you access only St. Louis County police reports?

10:29 19        A.    I can only access St. Louis County reports.

10:29 20        Q.    Can you access any St. Louis County report,

10:29 21   or are you only allowed to access those that you have

10:29 22   been involved with?

10:29 23        A.    I can view any St. Louis County report.

10:29 24        Q.    Can you view any Creve Coeur police report?

10:29 25        A.    I do not have that accessibility.

OFFICER MICHAEL THOMECZEK, MARCH 11 & 12, 2009

| | | |
|---|---|---|
| 10:30 | 1 | Q.    Do you know if anyone with a higher rank at |
| 10:30 | 2 | St. Louis County could view reports from a sister |
| 10:30 | 3 | municipality? |
| 10:30 | 4 | A.    No, I don't, ma'am. |
| 10:30 | 5 | Q.    You don't? |
| 10:30 | 6 | A.    I don't have personal knowledge of that. |
| 10:30 | 7 | Q.    Okay.  At what point in time, to your |
| 10:30 | 8 | knowledge, is a report viewable on CARE by other |
| 10:30 | 9 | officers? |
| 10:30 | 10 | A.    A St. Louis County report? |
| 10:30 | 11 | Q.    Yes. |
| 10:30 | 12 | A.    It's my understanding that any St. Louis |
| 10:31 | 13 | County officer can view my report anytime that they |
| 10:31 | 14 | need to. |
| 10:31 | 15 | Q.    Does your report have to be finalized before |
| 10:31 | 16 | it can be viewed by CARE? |
| 10:31 | 17 | A.    Not that I'm aware of. |
| 10:31 | 18 | Q.    I'll show you what I'm referring to.  I'm |
| 10:31 | 19 | going to hand you what has previously been marked as |
| 10:31 | 20 | Exhibit 54.  And I stapled it down at the bottom so |
| 10:31 | 21 | there would be no -- the staples wouldn't interfere |
| 10:31 | 22 | with the report, itself. |
| 10:31 | 23 | A.    Okay. |
| 10:31 | 24 | MS. MERKLIN VON KAENEL:  This is 54 that's |
| 10:31 | 25 | been marked in this case already? |

10:31   1            MS. RANDLES:  Yes.

10:31   2            MS. OWENS:  Are you introducing it as

10:31   3   another exhibit?

10:31   4            MS. RANDLES:  No, it's previously marked.

10:31   5            MS. MERKLIN VON KAENEL:  Can you -- I'm

10:31   6   sorry.  Let me get it to.  Okay.

10:32   7        Q.   (By Ms. Randles)  Okay.  If you'll look at

10:32   8   the bottom of page 1, it says:  "Other agency, agency

10:33   9   personnel, management, day/time entered, and then

10:33   10  approval record, final approval."  Do you see those?

10:33   11       A.   Yes.

10:33   12       Q.   This final approval, it says, Joseph Stobey,

10:33   13  I believe, is the name to the side.

10:33   14       A.   Yes.

10:33   15       Q.   Do you know what this final approval means?

10:33   16       A.   No, I don't.

10:33   17       Q.   Okay.  Over to the right, it shows the final

10:33   18  approval was 1/2 of '06 at 15:15.  Do you know if that

10:33   19  is the time that you entered the report into CARE?

10:33   20       A.   No, that wouldn't have been the time that I

10:33   21  entered the report.

10:33   22       Q.   So that's something else?

10:33   23       A.   Right.

10:33   24       Q.   Do you know when you entered the report into

10:33   25  CARE?

OFFICER MICHAEL THOMECZEK - MARCH 11 & 12, 2009                52

10:33    1         A.    I've got to find it.  Where it says date and

10:33    2    time entered, that would be the date and time that I

10:34    3    entered the report.

10:34    4         Q.    Okay.  And where are you looking?

10:34    5         A.    That's under management, just above the

10:34    6    final approval.  And it was entered by the person who is

10:34    7    listed there.

10:34    8         Q.    So that would be 5:01 on Saturday afternoon?

10:34    9         A.    Right.

10:34   10         Q.    Okay.  And then it says Linda McCrady over

10:34   11    to the side, as entered by?

10:34   12         A.    Uh-huh.

10:34   13         Q.    The time that it's entered, is this the time

10:34   14    that you understand that it is typed after you have

10:34   15    dictated it to them, or is this the time of your

10:34   16    dictation?

10:34   17         A.    They're typing it while I'm dictating it to

10:34   18    them.

10:34   19         Q.    And do you recall whether or not Linda

10:34   20    McCrady was the individual that you dictated the report

10:34   21    to?

10:34   22         A.    I don't recall specifically, but it says she

10:34   23    was, and she probably was.

10:34   24         Q.    Do you know any of the individuals who work

10:35   25    for CARE, are those people that you get to know?

OFFICER MICHAEL THOMECZEK, MARCH 11 & 12, 2009

10:35  1        A.      Just by name, and I know their voices, some

10:35  2    of them.

10:35  3        Q.      And do you recall whether or not the

10:35  4    individual that you dictated to was female?

10:35  5        A.      I can't recall for sure.

10:35  6        Q.      Okay.  But it's your understanding that the

10:35  7    report would have been entered by you at 5:01 on a

10:35  8    Saturday afternoon; is that correct?

10:35  9        A.      Yes.

10:35  10       Q.      Now, after you enter a report such as this

10:35  11   one, can you go back, if you go, oh, I forgot to put in

10:35  12   the number of my car, can you go back and add that at a

10:35  13   later point?

10:35  14       A.      I can.  And up until the time it's approved.

10:35  15   Once it's approved, then I have to write a supplemental

10:36  16   to change anything.

10:36  17       Q.      Okay.  So it's not a final report then,

10:36  18   until the approval is given?

10:36  19       A.      True.

10:36  20       Q.      Do you recall whether or not you had to

10:36  21   amend, or to make any changes to the report that you

10:36  22   submitted at 5:01 on Saturday 12/31/05 before it was

10:36  23   approved?

10:36  24       A.      I didn't make any changes to it.

10:36  25       Q.      Do you have access logs that you're familiar

| | | |
|---|---|---|
| 10:36 | 1 | with, to determine who has accessed particular reports |
| 10:36 | 2 | through CARE? |
| 10:36 | 3 | A.   I'm not familiar with any, no, ma'am. |
| 10:37 | 4 | Q.   So when you log on to, say, change a report, |
| 10:37 | 5 | do you have to actually write on a log that you've |
| 10:37 | 6 | logged to change the report? |
| 10:37 | 7 | A.   No, I don't. |
| 10:37 | 8 | Q.   I've noticed that you have a CIT pin on? |
| 10:37 | 9 | A.   Yes, ma'am. |
| 10:37 | 10 | Q.   And how long have you been CIT trained? |
| 10:37 | 11 | A.   I went to CIT school in 2004, I believe it |
| 10:37 | 12 | was in March. |
| 10:37 | 13 | Q.   And how many hours of training, CIT training |
| 10:37 | 14 | have you had? |
| 10:37 | 15 | A.   I had 40 hours. |
| 10:38 | 16 | Q.   Are you required to have continuing updated |
| 10:38 | 17 | training for CIT? |
| 10:38 | 18 | A.   I go back for a refresher occasionally. |
| 10:38 | 19 | Q.   And what kind of training do you receive for |
| 10:38 | 20 | CIT? |
| 10:38 | 21 | A.   We receive training on how to deal with the |
| 10:38 | 22 | mentally ill, people in mental crises.  We give some |
| 10:38 | 23 | training on various mental diseases, and what people |
| 10:38 | 24 | will exhibit when they're suffering from some of the |
| 10:38 | 25 | diseases.  We talk to people who are suffering from |

OFFICER MICHAEL THOMECZEK, MARCH 11 & 12, 2009

10:38  1  mental illness, find out their feelings, how things go.

10:38  2  And why they react, as police officers in certain

10:38  3  questions, and how best it would be react with them,

10:38  4  especially if they're in crises.  The classes are in

10:39  5  conjunction with Behavior Health Resources, and NAMI.

10:39  6  And we get professional training on how to deal with

10:39  7  the mentally ill and the symptoms they observe, and the

10:39  8  best things to do.

10:39  9      Q.    So do you get some information on

10:39  10 assessments, assessing of mental illness?

10:39  11     A.    Enough that we can take -- that we can get

10:39  12 enough information to determine that they need to -- we

10:39  13 need to go a step further, and have them examined by a

10:39  14 psychiatrist, a qualified psychiatrist.

10:39  15     Q.    Okay.  What types of information do you

10:39  16 collect in cases where you're running into someone who

10:39  17 you think could possibly be mentally ill?

10:39  18     A.    Well, the first we do is we observe their

10:39  19 mannerisms and statements that they make, which is

10:39  20 sometimes not that easy.  We also rely upon information

10:40  21 from friends, relatives, or anyone else that may

10:40  22 observe what they would consider odd or bizarre

10:40  23 behavior.

10:40  24     Q.    Okay.  Any other kind of information or data

10:40  25 that you gather?

OFFICER MICHAEL THOMECZEK, MARCH 11 & 12, 2009

10:40   1       A.   If a person has got a previous history, we

10:40   2   try to ascertain that.  And, again, we use that from

10:40   3   the victim, themselves; the consumer as we call them.

10:40   4   Or the family and relatives, people that would know.

10:40   5       Q.   I would assume, since you have a special

10:40   6   badge for CIT training, does that give you some special

10:41   7   qualification, or are you an officer who is called in

10:41   8   cases of mental illness?

10:41   9       A.   Yes.  If there is a mental crises, or a

10:41   10  perceived mental crises, a CIT officer has to respond.

10:41   11  Now, there are occasions when one is not available that

10:41   12  we don't get one.

10:41   13      Q.   And what is a CIT officer's role, if they

10:41   14  respond to a mental health issue?

10:41   15      A.   Upon our arrival on the scene we take over

10:41   16  the scene.  We're in charge of it, as far as the

10:41   17  investigation of the crises goes, until a supervisor

10:41   18  arrives.

10:41   19      Q.   And upon the arrival of the supervisor, does

10:41   20  the scene then shift to the supervisor's authority?

10:41   21      A.   We turn the scene over to them, and they

10:41   22  confer with us about what's going on.

10:42   23      Q.   Are there any special duties that a CIT

10:42   24  officer has that are different than someone who has not

10:42   25  had CIT training?

OFFICER MICHAEL THOMECZEK   MARCH 11 & 12, 2009

| 10:42 | 1 | A.   Well, the reason we're in charge of the |
| 10:42 | 2 | scene is we can recognize certain things that a |
| 10:42 | 3 | non-trained officer would probably miss, would not |
| 10:42 | 4 | know. |
| 10:42 | 5 | Q.   What kind of things are you talking about? |
| 10:42 | 6 | A.   The statements that are made, the |
| 10:42 | 7 | mannerisms, the body language, the way to react. |
| 10:42 | 8 | Q.   When you say "the way to react," do you mean |
| 10:42 | 9 | the way that a police officer should react to what's |
| 10:42 | 10 | going on with the individual? |
| 10:42 | 11 | A.   The way that's preferred to react to the |
| 10:42 | 12 | person in mental crises.  You know, you should keep |
| 10:42 | 13 | them calm.  You shouldn't agitate them any more. |
| 10:43 | 14 | Q.   Now, you had indicated that you observed |
| 10:43 | 15 | mannerisms in the statements that individuals make, and |
| 10:43 | 16 | that's part of the training that you've received as |
| 10:43 | 17 | CIT; correct? |
| 10:43 | 18 | A.   Right. |
| 10:43 | 19 | Q.   What mannerisms are you looking at?  What |
| 10:43 | 20 | are you trying to observe? |
| 10:43 | 21 | A.   Agitated, maybe not a clear train of |
| 10:43 | 22 | thought, flighty from one subject to another.  The |
| 10:43 | 23 | manner in which they speak, you know. |
| 10:43 | 24 | Q.   What do you mean by that? |
| 10:43 | 25 | A.   Are they talking in a rapid manner, very |

10:43  1   rapidly?  Do they seem disjointed; their statement is

10:43  2   disjointed.

10:44  3        Q.    Anything else that you've been trained to

10:44  4   observe with regard to their mannerisms or the

10:44  5   statements they make?

10:44  6        A.    Just how to conduct the investigation, check

10:44  7   with all the people that you can to get as much

10:44  8   information as you can.

10:44  9        Q.    Okay.  I really want to know about your

10:44  10  personal observations, beside the -- you know, checking

10:44  11  to see if they're agitated, checking to see if there is

10:44  12  a flight of thought, checking to see whether or not

10:44  13  their speech is rapid, lucid, or disjointed, is there

10:44  14  anything else that you've been taught to look for to

10:44  15  assess whether or not there is mental illness going on?

10:44  16       A.    That pretty much covers it.

10:44  17       Q.    Have you been trained to ask questions of

10:44  18  those who may be mentally ill?

10:44  19       A.    Yes.

10:44  20       Q.    And what kind of questions -- for example,

10:45  21  in mental hospitals they often do questions to find out

10:45  22  whether they're oriented to time, place, and person?

10:45  23       A.    No, we don't do that.

10:45  24       Q.    What kind of questions have you been taught

10:45  25  to ask those who may be suffering mental illness?

OFFICER MICHAEL THOMECZEK, MARCH 11 & 12, 2009                    59

10:45   1        A.    The first thing we do, is we ask them,

10:45   2   straight up:  "Are you going to harm yourself or

10:45   3   someone else?"

10:45   4        Q.    Have you ever had anyone answer

10:45   5   affirmatively to that?

10:45   6        A.    You'd be surprised.  Yes.

10:45   7        Q.    Do they more often than not answer

10:45   8   affirmatively to that?

10:45   9        A.    I can't say that.  I have had them respond

10:45   10  affirmatively.  I've also had them deny anything.

10:45   11       Q.    And you had indicated that's one of the

10:45   12  first things you do, is you ask them straight up if

10:46   13  they're going to harm themselves or others; correct?

10:46   14       A.    Try to, yes.

10:46   15       Q.    Beside asking them that, are there any other

10:46   16  kind of assessing questions that you've been trained to

10:46   17  ask?

10:46   18       A.    The person that's in crises?

10:46   19       Q.    Yes.

10:46   20       A.    No.  We then go into a mode of just trying

10:46   21  to use common words, and talk to them, and make sure

10:46   22  they don't harm themselves, somebody else.

10:46   23       Q.    Excluding HM, since you received your CIT

10:46   24  training, how many calls have you been the CIT officer

10:46   25  on?

OFFICER MICHAEL THOMECZEK, MARCH 11 & 12, 2009                    60

| | | |
|---|---|---|
| 10:46 | 1 | A.    Numerous, is all I can say. |
| 10:46 | 2 | Q.    In the last year, how many calls? |
| 10:46 | 3 | A.    In the last year, I probably handled one. |
| 10:46 | 4 | Q.    That's because you're at the school? |
| 10:46 | 5 | A.    The school.  Uh-huh. |
| 10:46 | 6 | Q.    The year before you became the security |
| 10:47 | 7 | officer at the school, the safety officer at the |
| 10:47 | 8 | school, how many calls were you involved with that |
| 10:47 | 9 | involved your CIT training? |
| 10:47 | 10 |           MS. MERKLIN VON KAENEL:  For the record, can |
| 10:47 | 11 | we identify a year because it's so vague without prior |
| 10:47 | 12 | year, previous year. |
| 10:47 | 13 | Q.    (By Ms. Randles)  You indicated that you |
| 10:47 | 14 | you've been the security officer or the safety officer |
| 10:47 | 15 | at the school for approximately two years; is that |
| 10:47 | 16 | correct? |
| 10:47 | 17 | A.    This is my second year. |
| 10:47 | 18 | Q.    And so your first year would have been the |
| 10:47 | 19 | 2007/2008 school year? |
| 10:47 | 20 | A.    Yeah.  Yes. |
| 10:47 | 21 | Q.    So prior to the 2007/2008 school year, how |
| 10:47 | 22 | many CIT events had you been involved in in the year |
| 10:47 | 23 | prior to that? |
| 10:47 | 24 | A.    So we're talking 2006/2007? |
| 10:47 | 25 | Q.    Yes.  School years are always hard because |

Boyd-Gwinn Reporting

OFFICER MICHAEL THOMECZEK, MARCH 11 & 12, 2009                    61

10:47   1  they aren't calendar years.
10:47   2       A.    Maybe five, and I'm guessing on that.  I'd
10:47   3  have to look at the record.
10:48   4       Q.    Are CIT records kept any differently than
10:48   5  the other police reports that are filed?
10:48   6       A.    I don't believe so.
10:48   7       Q.    Okay.  Is there anyway that you would be
10:48   8  able to look back at the record?
10:48   9       A.    All I could do is look at the police reports
10:48  10  and see which ones are listed as attempted suicides or
10:48  11  suicides.
10:48  12       Q.    Approximately how many police reports would
10:48  13  you have prepared or been involved with in the
10:48  14  2007/2008 time frame?
10:48  15       A.    2007/2008?
10:48  16       Q.    I'm sorry.  2006/2007 because that would
10:48  17  have been the year before your --
10:48  18       A.    Real hard to say.  Probably over a hundred.
10:48  19       Q.    Is the only way to find the CIT records,
10:48  20  would be to look through each and every report that you
10:48  21  had filed during that time frame?
10:48  22       A.    True.
10:48  23       Q.    Are there any data kept on CIT incidents?
10:49  24       A.    The supervisor in charge of CIT for the
10:49  25  precinct has to keep records.  I'm not sure how

OFFICER MICHAEL THOMECZEK - MARCH 11 & 12, 2009

| | | |
|---|---|---|
| 10:49 | 1 | in-depth they are. |
| 10:49 | 2 | Q.   Okay.  Have you seen any of the printouts |
| 10:49 | 3 | from the data kept by the supervisor? |
| 10:49 | 4 | A.   No, I haven't. |
| 10:49 | 5 | Q.   Were any of the CIT events that you were |
| 10:49 | 6 | involved with in the 2006/2007 time frame, were any of |
| 10:49 | 7 | them concerning attempted suicides? |
| 10:49 | 8 | A.   Yes. |
| 10:49 | 9 | Q.   And were any of them completed suicide? |
| 10:49 | 10 | A.   None were successful. |
| 10:49 | 11 | Q.   Now, with regard to the attempted suicide -- |
| 10:49 | 12 | Let me ask you this:  Looking again at Exhibit 54. |
| 10:50 | 13 | A.   Okay. |
| 10:50 | 14 | Q.   Up at the top, it says:  "Offense, attempt |
| 10:50 | 15 | suicide"? |
| 10:50 | 16 | A.   True. |
| 10:50 | 17 | Q.   Is there any other coding that you can use |
| 10:50 | 18 | if someone has made a suicidal threat? |
| 10:50 | 19 | A.   No.  This is the coding that we use. |
| 10:50 | 20 | Q.   So regardless of whether or not there has |
| 10:50 | 21 | been an actual attempt, you would use the code "attempt |
| 10:50 | 22 | suicide"? |
| 10:50 | 23 | A.   Right. |
| 10:50 | 24 | Q.   So even if they just say, "I'm going to kill |
| 10:50 | 25 | myself," with nothing else, it still goes down as |

OFFICER MICHAEL THOMECZEK, MARCH 11 & 12, 2009                    63

10:50    1   "attempt suicide"?

10:50    2        A.    True.

10:50    3        Q.    There would be no way to go back through the

10:50    4   police reports and determine by the police report

10:50    5   whether or not someone had, indeed, attempted suicide

10:50    6   or merely threatened it?

10:50    7        A.    No.   You would have to look at the

10:50    8   narrative, itself.

10:50    9        Q.    Now, with regard to the 5 or 6 incidents,

10:51   10   CIT incidents that you were involved with in the

10:51   11   2006/2007 time frame, do you know if any of those

10:51   12   actually involved suicide attempts?

10:51   13        A.    Nothing that stands out.

10:51   14        Q.    So in the ones that you were involved with,

10:51   15   were any of them threatened suicide?

10:51   16        A.    They would have all been threatened, you

10:51   17   know.

10:51   18        Q.    So every CIT event that you were concerned

10:51   19   with in 2006/2007, concerned suicide in some manner?

10:51   20        A.    True.

10:51   21        Q.    Now, are there CIT events that do not

10:51   22   involve suicide?

10:51   23        A.    No.   Suicide is what we're trained for, the

10:51   24   crises time.

10:51   25        Q.    I had a strange thing happen to me where I

10:52  1    was driving down the road, and a homeless man who was

10:52  2    off his rocker was out in the middle of the street, and

10:52  3    the police were trying to capture him and put him in

10:52  4    the police car.  Have you had events similar to that

10:52  5    that are not necessarily suicide, but have something to

10:52  6    do with mental illness?

10:52  7         A.    Yes, I have.

10:52  8         Q.    And are those considered CIT events?

10:52  9         A.    Not a true CIT event.

10:52  10        Q.    What is the --

10:52  11        A.    However, a CIT officer will usually be

10:52  12   called because of specialized training.

10:52  13        Q.    What's the difference between a CIT event,

10:52  14   and something like a homeless man, who is mentally ill,

10:52  15   wandering in the streets?

10:52  16        A.    The threatening of harm to yourself or

10:52  17   someone else.

10:52  18        Q.    The CIT only becomes involved if there is a

10:52  19   threat of harm to themselves or someone else?

10:52  20             MS. MERKLIN VON KAENEL:  He said the CIT

10:53  21   officer may be involved in the situation you described,

10:53  22   where a person with mental illness is involved on an

10:53  23   attempted crime, suspected crime, without suicide being

10:53  24   present.

10:53  25             MS. RANDLES:  I'm not sure I even described

OFFICER MICHAEL THOMECZEK  MARCH 11 & 12, 2009

10:53  1   a suspected crime.

10:53  2        Q.   (By Ms. Randles)  Okay.  Let me back up.

10:53  3   CIT officers are always called if there is one on duty

10:53  4   when there is a threat to self or others; correct?

10:53  5        A.   True.

10:53  6        Q.   But a CIT officer may be called if there is

10:53  7   a mental health event occurring that doesn't

10:53  8   necessarily involve threat of harm to self or others;

10:53  9   is that also true?

10:53  10        A.   It may be requested, yes.

10:53  11        Q.   Okay.  Have you ever been requested in a

10:53  12   situation where there was not a threat to self or

10:53  13   others?

10:53  14        A.   One that I can remember.

10:53  15        Q.   Can you describe the circumstances of that?

10:53  16        A.   The officer had received a call of a

10:53  17   suspicious person at Butler Hill and I-55.  He

10:54  18   requested a CIT officer because the person was

10:54  19   combative.  And I arrived on the scene.  Talked the

10:54  20   person down.  And was able to talk him into going to

10:54  21   the hospital for a mental health evaluation.  He was a

10:54  22   homeless person.

10:54  23        Q.   Is that the only time that you can recall,

10:54  24   yourself, having been called to a scene that did not

10:54  25   involve risk of harm to self or others?

OFFICER MICHAEL THOMECZEK—MARCH 11 & 12, 2009

| | | |
|---|---|---|
| 10:54 | 1 | A.    Yeah.   That's the only one that I can |
| 10:54 | 2 | recall. |
| 10:54 | 3 | Q.    Okay.   Now, you first became CIT trained in |
| 10:54 | 4 | 2004? |
| 10:54 | 5 | A.    True. |
| 10:54 | 6 | Q.    So 2004/2005 would have been your first year |
| 10:54 | 7 | of CIT training? |
| 10:55 | 8 | A.    True. |
| 10:55 | 9 | Q.    So we're only talking about one more year |
| 10:55 | 10 | beyond -- we were talking about 2005/2006, so one year |
| 10:55 | 11 | prior to -- You've been the safety officer for two |
| 10:55 | 12 | years at the school? |
| 10:55 | 13 | A.    Yes.   This is my second year. |
| 10:55 | 14 | Q.    And prior to that, you were CIT trained for |
| 10:55 | 15 | two years? |
| 10:55 | 16 | A.    Sounds right. |
| 10:55 | 17 | Q.    Okay.   You would have only had -- because |
| 10:55 | 18 | you're now the safety officer, you would have two years |
| 10:55 | 19 | of time frame in which you would have been responding |
| 10:55 | 20 | as a CIT officer to mental health events? |
| 10:55 | 21 | A.    True. |
| 10:55 | 22 | Q.    Do you know how long CIT training had been |
| 10:55 | 23 | available to police officers? |
| 10:55 | 24 | A.    The program was started with St. Louis |
| 10:55 | 25 | County in 2003. |

10:55  1        Q.   Okay.  And do you know if there is any

10:56  2   complication of data as to the number of CIT events

10:56  3   that have occurred from 2003 to 2006 when you were no

10:56  4   longer a CIT officer?

10:56  5        A.   I have no personal knowledge of that.

10:56  6             MS. RANDLES:  Okay.  Considering how well my

10:56  7   questioning has been going in the last five minutes, I

10:56  8   think this is time to take a quick break.

11:12  9             {Short break taken.}

11:12  10        Q.   (By Ms. Randles)  I had previously handed

11:13  11   out what we marked as Exhibit 68, which is the policy,

11:13  12   it is the Crises Intervention Team Policy for St. Louis

11:13  13   County.  Have you seen this policy before?

11:13  14        A.   Yes, I have.  I've read it.

11:13  15        Q.   Okay.  You were indicating to me that --

11:13  16             MS. MERKLIN VON KAENEL:  I'm sorry.  For the

11:13  17   record, we are just talking about 68 right now?

11:13  18        Q.   (By Ms. Randles)  Yes.  Now, are you part of

11:13  19   the Crises Intervention Team, or were you, before you

11:13  20   became the safety officer at the school?

11:13  21        A.   I still am.

11:13  22        Q.   You still are.  Even as safety officer at

11:14  23   the school, can you be called away from the school for

11:14  24   crises intervention?

11:14  25        A.   That would be an extreme circumstance that

OFFICER MICHAEL THOMECZEK   MARCH 11 & 12, 2009                     68

| | | |
|---|---|---|
| 11:14 | 1 | they would try to avoid. |
| 11:14 | 2 | Q.    Okay.  Have you been called to a crises |
| 11:14 | 3 | intervention in the school, itself? |
| 11:14 | 4 | A.    Yes, I have. |
| 11:14 | 5 | Q.    On how many occasions have you been called |
| 11:14 | 6 | for crises intervention in the school, itself? |
| 11:14 | 7 | A.    Over the last two years, probably three. |
| 11:14 | 8 | Q.    And did each of those situations involve |
| 11:14 | 9 | potential harm to self or others? |
| 11:14 | 10 | A.    No.  They were called because we had our |
| 11:14 | 11 | special needs children that were having a bad day. |
| 11:14 | 12 | Q.    Okay.  And in a situation -- But that was |
| 11:14 | 13 | considered a part of the Crises Intervention Team when |
| 11:14 | 14 | you were called for that? |
| 11:14 | 15 | A.    No.  They called me because of my -- |
| 11:14 | 16 | information I can have, the teachers did. |
| 11:14 | 17 | Q.    Are there counselors on -- school counselors |
| 11:14 | 18 | there? |
| 11:14 | 19 | A.    We have two school counselors. |
| 11:15 | 20 | Q.    Were the counselors also called in those |
| 11:15 | 21 | situations? |
| 11:15 | 22 | A.    No, they weren't. |
| 11:15 | 23 | Q.    Was there a reason that the security officer |
| 11:15 | 24 | was called instead of the counselors in that situation? |
| 11:15 | 25 | A.    Because they were violent. |

Boyd-Gwinn Reporting

| | | |
|---|---|---|
| 11:15 | 1 | Q.    Then are those reported as CIT incidents? |
| 11:15 | 2 | A.    No. |
| 11:15 | 3 | Q.    Is there a reason they're not reported as |
| 11:15 | 4 | CIT incidents? |
| 11:15 | 5 | A.    They're not reported at all because it's an |
| 11:15 | 6 | in-school incident.  No one was harmed.  The children |
| 11:15 | 7 | were calmed, and their parents were notified. |
| 11:15 | 8 | Q.    Okay.  If you look at the policy that's |
| 11:15 | 9 | found in Exhibit 68, the first is the definition.  It |
| 11:15 | 10 | talks about a CIT Council. |
| 11:16 | 11 | A.    Yes. |
| 11:16 | 12 | Q.    Can you describe for me what the CIT Council |
| 11:16 | 13 | looks like in real life? |
| 11:16 | 14 | A.    No.  Because I'm not a member of it. |
| 11:16 | 15 | Q.    You're not part of the CIT Council? |
| 11:16 | 16 | A.    I'm not part of the CIT Council. |
| 11:16 | 17 | Q.    Do you know who are members of the CIT |
| 11:16 | 18 | Council? |
| 11:16 | 19 | A.    I can't state positively. |
| 11:16 | 20 | Q.    Do you know any member of the CIT Council? |
| 11:16 | 21 | A.    Sergeant Barry Armfield. |
| 11:16 | 22 | Q.    Barry Armfield? |
| 11:16 | 23 | A.    Barry. |
| 11:16 | 24 | Q.    Do you know what his position is with the |
| 11:16 | 25 | counsel? |

Boyd-Gwinn Reporting

OFFICER MICHAEL THOMECZEK, MARCH 11 & 12, 2009          70

| | | |
|---|---|---|
| 11:16 | 1 | A.    Not specifically. |
| 11:16 | 2 | Q.    And you had indicated that you have seen |
| 11:16 | 3 | this policy before, Exhibit No. 68? |
| 11:16 | 4 | A.    Yes, I've read it. |
| 11:16 | 5 | Q.    So this is the policy that you are familiar |
| 11:16 | 6 | with, with regard to CIT, and CIT training? |
| 11:16 | 7 | A.    Yes, it is. |
| 11:16 | 8 | Q.    Okay.  Now, looking at page 2, it indicates |
| 11:17 | 9 | that there must be 40 hours of specialized CIT |
| 11:17 | 10 | training; correct? |
| 11:17 | 11 | A.    Where are we at, ma'am? |
| 11:17 | 12 | Q.    On page 2, section 4-B? |
| 11:17 | 13 | A.    Yes, ma'am. |
| 11:17 | 14 | Q.    Okay.  And you have had 40 years -- 40 hours |
| 11:17 | 15 | of CIT training? |
| 11:17 | 16 | A.    Yes, ma'am, in 2004. |
| 11:17 | 17 | Q.    And you had indicated that there is some |
| 11:17 | 18 | continuing education with regard to that.  Is there any |
| 11:17 | 19 | requirement that you have continuing education in your |
| 11:17 | 20 | CIT training? |
| 11:17 | 21 | A.    Nothing in writing. |
| 11:17 | 22 | Q.    Can you describe for us the number of hours |
| 11:17 | 23 | that you have had to continue your education concerning |
| 11:17 | 24 | CIT? |
| 11:17 | 25 | A.    Prior to this incident, I had eight hours of |

OFFICER MICHAEL THOMECZEK, MARCH 11 & 12, 2009

11:17  1  additional training.

11:17  2      Q.   Okay.  Prior to this incident, you mean

11:17  3  12/31 of '05?

11:17  4      A.   Yes, ma'am.

11:17  5      Q.   And subsequent to that, have you had any

11:17  6  additional hours of CIT training?

11:17  7      A.   Yes, I have.

11:17  8      Q.   And how many additional hours have you had?

11:17  9      A.   Eight hours.

11:17  10     Q.   Eight hours total?

11:17  11     A.   Yes, ma'am.

11:17  12     Q.   When the call of 12/31 -- Now, moving to

11:18  13  5-A, dispatch of call.  When the call of 12/31 of '05

11:18  14  came in, were you the closest beat officer to the HM

11:18  15  home?

11:18  16     A.   No, I wasn't.

11:18  17     Q.   Was it just by circumstance that you

11:18  18  happened to run across HM, or were you headed toward

11:18  19  the home at the time?

11:18  20     A.   I was headed toward the home as an assist

11:18  21  officer.

11:18  22     Q.   And do you know who was the closest beat

11:18  23  officer?

11:18  24     A.   The officer who had the primary

11:18  25  responsibility was Officer Venable.

Boyd-Gwinn Reporting

OFFICER MICHAEL THOMECZEK MARCH 11 & 12, 2009

| | |
|---|---|
| 11:18 | 1 |  Q.   Is that because he was the closest beat |
| 11:18 | 2 | officer? |
| 11:18 | 3 |  A.   The residence resides in his beat. |
| 11:19 | 4 |  Q.   Okay.  Going down to C-3, it indicates that |
| 11:19 | 5 | admission to a treatment facility should be arranged by |
| 11:19 | 6 | the CIT officer? |
| 11:19 | 7 |  MS. MERKLIN VON KAENEL:   Subsection 5-C? |
| 11:19 | 8 |  Q.   (By Ms. Randles) Yes, Subsection 5, Section |
| 11:19 | 9 | 3; responsibilities of the CIT officer, Subsection 3: |
| 11:19 | 10 | "Admission to a treatment facility should be arranged |
| 11:19 | 11 | by the CIT may require affidavits required by either |
| 11:20 | 12 | the individuals family members or the CIT officer.  CIT |
| 11:20 | 13 | officer shall follow procedures outlined in the |
| 11:20 | 14 | Division of Control Procedure, care and transportation |
| 11:20 | 15 | of the mentally ill when admission to a mental health |
| 11:20 | 16 | facility is required."  Do you see that section. |
| 11:20 | 17 |  A.   Yes, I do. |
| 11:20 | 18 |  Q.   Now, with regard to the affidavits, on any |
| 11:20 | 19 | other occasion beside 12/31 of '05 have you been |
| 11:20 | 20 | required to fill out an affidavit yourself for the |
| 11:20 | 21 | admission of any patient to a mental facility? |
| 11:20 | 22 |  A.   Yes, I have. |
| 11:20 | 23 |  Q.   On how many occasions have you actually been |
| 11:20 | 24 | the individual to fill out the affidavit? |
| 11:20 | 25 |  A.   I can't give you an exact number. |

| | | |
|---|---|---|
| 11:20 | 1 | Q.    You had indicated that there were maybe 4 to |
| 11:20 | 2 | 5 CIT events that occurred in 2006/2007 time frame? |
| 11:20 | 3 | A.    Yes.  Possibly. |
| 11:20 | 4 | Q.    During the 2006/2007 time frame, do you |
| 11:20 | 5 | recall how many affidavits that you actually filled out |
| 11:20 | 6 | to have those individuals placed in a mental health |
| 11:21 | 7 | facility? |
| 11:21 | 8 | A.    I can only say probably in the majority of |
| 11:21 | 9 | the cases. |
| 11:21 | 10 | Q.    That you were the individual who actually |
| 11:21 | 11 | filled out the affidavit? |
| 11:21 | 12 | A.    True. |
| 11:21 | 13 | Q.    Now, when an affidavit is filled out for |
| 11:21 | 14 | placing an individual in a mental health facility, is a |
| 11:21 | 15 | copy kept by the police officer? |
| 11:21 | 16 | A.    No. |
| 11:21 | 17 | Q.    Is it attached to the report in any regard? |
| 11:21 | 18 | A.    No. |
| 11:21 | 19 | Q.    Is that just given to the hospital then, all |
| 11:21 | 20 | copies? |
| 11:21 | 21 | A.    It's given to the charge nurse -- or the |
| 11:21 | 22 | nurses in charge of that patient.  Not the charge |
| 11:21 | 23 | nurse. |
| 11:21 | 24 | Q.    In the case of HM, do you have a copy of the |
| 11:21 | 25 | affidavit that you filled out on 12/31 of '05 for him |

OFFICER MICHAEL THOMECZEK—MARCH 11 & 12, 2009

| | | |
|---|---|---|
| 11:21 | 1 | to be detained at the Highland Center? |
| 11:21 | 2 | A.   No, I don't. |
| 11:21 | 3 | Q.   At the time that you filled it out, did you |
| 11:22 | 4 | maintain a copy? |
| 11:22 | 5 | A.   No, I did not. |
| 11:22 | 6 | Q.   So all copies of that should be with the |
| 11:22 | 7 | Highland Center; is that correct? |
| 11:22 | 8 | A.   I gave it to the nurse. |
| 11:22 | 9 | Q.   Okay.  Have you filled out affidavits for |
| 11:22 | 10 | the Highland Center on more than one occasion? |
| 11:22 | 11 | A.   Yes, I have. |
| 11:22 | 12 | Q.   Are you familiar with what their affidavit |
| 11:22 | 13 | looks like? |
| 11:22 | 14 | A.   Yeah, I've seen them. |
| 11:22 | 15 | Q.   Do they have a form affidavit that you fill |
| 11:22 | 16 | out? |
| 11:22 | 17 | A.   Yes, it's just a standard form. |
| 11:22 | 18 | Q.   And does it delineate what the knowledge is |
| 11:23 | 19 | that you're relying on in order for the individual to |
| 11:23 | 20 | be placed in the Highland Center? |
| 11:23 | 21 | A.   You write a short narrative to explain the |
| 11:23 | 22 | facts in the case. |
| 11:23 | 23 | Q.   In the case of HM, were you the one who |
| 11:23 | 24 | actually filled out the affidavit -- |
| 11:23 | 25 | A.   Yes. |

OFFICER MICHAEL THOMECZEK, MARCH 11 & 12, 2009                    75

11:23  1        Q.      -- to place him at Highland Center?

11:23  2        A.      Yes.

11:23  3                MS. MERKLIN VON KAENEL:  Let her finish her

11:23  4  question.

11:23  5        A.      Okay.

11:23  6        Q.      (By Ms. Randles)  Did officer -- or Sergeant

11:23  7  Lasater have any input into the facts found in the

11:23  8  affidavit that placed HM at the Highland Center?

11:23  9        A.      Just what he had delineated to me at the

11:23  10 scene.

11:23  11       Q.      So the things that he reported to you, you

11:23  12 reported in the affidavit?

11:23  13       A.      True.

11:23  14       Q.      Okay.  And in that affidavit concerning HM

11:24  15 of 12/31 of '05, did you put in your own personal

11:24  16 observations concerning HM?

11:24  17       A.      I don't recall specifically, but I normally

11:24  18 did.

11:24  19       Q.      Do you recall what personal observations

11:24  20 that you may have reported in the affidavit to the

11:24  21 Highland Center concerning HM?

11:24  22       A.      Not precisely.

11:24  23       Q.      Do you have any recollection that you

11:24  24 reported any personal information -- information based

11:24  25 on personal knowledge in the affidavit that you

Boyd-Gwinn Reporting

| 11:24 | 1 | submitted to the Highland Center? |
| 11:24 | 2 | A.    I probably reported it; an agitated state. |
| 11:24 | 3 | Q.    Okay.  Let's go back to your assessment for |
| 11:24 | 4 | a moment.  Can you describe for me what agitation is |
| 11:24 | 5 | when you're talking about mental illness, or assessing |
| 11:25 | 6 | a mental illness? |
| 11:25 | 7 | A.    Moving of limbs in quick manners.  Fast and |
| 11:25 | 8 | rapid speech.  Loud speech, such as trying to be heard |
| 11:25 | 9 | over somebody. |
| 11:25 | 10 | Q.    Anything else? |
| 11:25 | 11 | A.    It pretty much covers it. |
| 11:25 | 12 | Q.    What about pacing? |
| 11:25 | 13 | A.    That can be part of it. |
| 11:25 | 14 | Q.    But it isn't necessarily a part of |
| 11:25 | 15 | agitation? |
| 11:25 | 16 | A.    Not necessarily. |
| 11:25 | 17 | Q.    And how about responding to internal voices, |
| 11:25 | 18 | is that part of agitation? |
| 11:25 | 19 | A.    I don't call that agitation, that's part of |
| 11:25 | 20 | a mental illness; a specific mental illness. |
| 11:25 | 21 | Q.    What about responding to internal stimuli, |
| 11:26 | 22 | not necessarily voices? |
| 11:26 | 23 | A.    That's part of a specific mental illness. |
| 11:26 | 24 | Q.    Okay.  So you indicated that the way you |
| 11:26 | 25 | assess agitation is you look for quick movements of |

OFFICER MICHAEL THOMECZEK, MARCH 11 & 12, 2009

11:26  1    limbs, that you look for rapid speech, loud speech, and

11:26  2    possibly pacing, but not necessarily; is that correct?

11:26  3         A.    True.

11:26  4         Q.    Is there anything else that you can recall,

11:26  5    or that you have encountered that you would describe as

11:26  6    agitation that may establish as some form of mental

11:26  7    illness?

11:26  8         A.    Rapid eye movement.  That's --

11:27  9         Q.    Okay.  To your recollection, did the

11:27  10   affidavit that you filled out differ from the police

11:27  11   report that you subsequently filled out in any

11:27  12   significant manner?

11:27  13        A.    Not that I can recall.

11:27  14        Q.    Is it safe to assume that anything that is

11:27  15   found in the police report would more likely than not

11:27  16   also be found in the affidavit?

11:27  17        A.    Quite possibly.

11:27  18        Q.    Is it also safe to assume that anything

11:27  19   omitted from the police report would likely be omitted

11:27  20   from the affidavit?

11:27  21        A.    Not necessarily.

11:27  22        Q.    Okay.  And why is that?

11:27  23        A.    There may be something in the affidavit that

11:27  24   I did not put in the police report because it was

11:27  25   pertinent to the affidavit, but wasn't necessarily

OFFICER MICHAEL THOMECZEK MARCH 11 & 12, 2009

11:27  1  pertinent to the information related in the police

11:27  2  report.

11:27  3       Q.    In the case of HM, do you have any specific

11:27  4  recollection of having placed anything in the affidavit

11:27  5  that you did not also place in the police report?

11:27  6       A.    No, I don't.

11:28  7       Q.    You had indicated that agitation is one of

11:28  8  the behaviors that you look at -- Well, I take that

11:28  9  back.  What types of behaviors do you look at, or

11:28  10  assess in order to make a determination as to whether

11:28  11  or not you should file an affidavit to place someone in

11:29  12  a 96-hour hold, or 72-hour hold?

11:29  13       A.    Their actions, their verbiage, and they rely

11:29  14  in a large part to what other persons close to the

11:29  15  subject say.

11:29  16       Q.    Typically, is it preferable that the

11:30  17  individual's family members fill out the affidavit for

11:30  18  admission to a mental health facility over that of a

11:30  19  CIT officer?

11:30  20       A.    I can't say it's preferable, but it's nice

11:30  21  sometimes.

11:30  22       Q.    Have you ever had a situation in which

11:30  23  family members filled out the affidavit for admission,

11:30  24  as opposed to the CIT officer?

11:30  25       A.    I don't think I've had one where I didn't do

| | | |
|---|---|---|
| 11:30 | 1 | one, but the family member may have, and I supported |
| 11:30 | 2 | it. |
| 11:30 | 3 | Q.   Are you familiar with the statutes at all |
| 11:30 | 4 | concerning placement into 72-hour holds? |
| 11:30 | 5 | A.   Yes. |
| 11:30 | 6 | Q.   Are you familiar with whether or not the -- |
| 11:31 | 7 | MS. MERKLIN VON KAENEL:   For clarification |
| 11:31 | 8 | purposes, you mean involuntary commitments? |
| 11:31 | 9 | MS. RANDLES:   Yes. |
| 11:31 | 10 | Q.   (By Ms. Randles)   How are you familiar with |
| 11:31 | 11 | the involuntary commitment statutes? |
| 11:31 | 12 | A.   I have read it, and we were familiarized |
| 11:31 | 13 | with it in our training. |
| 11:31 | 14 | Q.   When is the last time you reviewed the |
| 11:31 | 15 | involuntary commitment statutes? |
| 11:31 | 16 | A.   It's been a while.  Probably the last time I |
| 11:31 | 17 | was trained. |
| 11:31 | 18 | Q.   Okay.  And did you rely on your training as |
| 11:31 | 19 | a CIT officer for the actions that you took with regard |
| 11:31 | 20 | to HM on 12/31 of '05? |
| 11:31 | 21 | A.   Yes, I did. |
| 11:31 | 22 | Q.   And is it your understanding that the |
| 11:31 | 23 | training that you received is in conformity with the |
| 11:31 | 24 | statutes of the state of Missouri? |
| 11:31 | 25 | A.   Yes. |

| 11:32 | 1 | MS. MERKLIN VON KAENEL:  To the extent that |
| 11:32 | 2 | it requires a legal determination, I object. |
| 11:32 | 3 | Q.   (By Ms. Randles)  Have you had any |
| 11:32 | 4 | situations in which you have been called as a CIT |
| 11:32 | 5 | officer, but made the independent determination that |
| 11:32 | 6 | the individual was not a danger to himself or to |
| 11:32 | 7 | others? |
| 11:32 | 8 | A.   A few times. |
| 11:32 | 9 | Q.   On how many occasions would you estimate |
| 11:32 | 10 | that as a CIT officer you have made the determination |
| 11:32 | 11 | that the individual in front of you was not a danger to |
| 11:32 | 12 | himself or to others? |
| 11:32 | 13 | A.   2 or 3. |
| 11:32 | 14 | Q.   Okay.  Is that of the entire -- you had |
| 11:32 | 15 | indicated that in 05/06, they were approximately 5 or 6 |
| 11:33 | 16 | events, and then in 04/05 there was something similar |
| 11:33 | 17 | to that? |
| 11:33 | 18 | A.   Yes. |
| 11:33 | 19 | Q.   So between the 10 and 12 events that you |
| 11:33 | 20 | have come upon, would you estimate then that 2 or 3 of |
| 11:33 | 21 | them were situations in which you made the independent |
| 11:33 | 22 | determination that the person was not harmful to |
| 11:33 | 23 | himself or others? |
| 11:33 | 24 | A.   No.  That would be additional.  I don't |
| 11:33 | 25 | consider them CIT incidents, because after |

OFFICER MICHAEL THOMECZEK, MARCH 11 & 12, 2009                    81

11:33    1   investigation, they determined they weren't.

11:33    2        Q.    Okay.  So then you're talking instead of 10

11:33    3   to 12, you may be talking 12 to 15 incidents?

11:33    4        A.    Somewhere around there.

11:33    5        Q.    And that would be the total times that

11:33    6   you've been called as a CIT officer to a scene to make

11:33    7   an assessment as to whether or not an individual was

11:33    8   harmful to self or others?

11:33    9        A.    True.

11:33   10        Q.    Now, in each and every time that you're

11:33   11   called to a scene as a CIT officer, it's your belief

11:34   12   that you're there to assess harmfulness to self or

11:34   13   others and to bring the situation down; correct?

11:34   14        A.    True.

11:34   15        Q.    In those situations in which there is no

11:34   16   harm to self or others, you have excluded those from

11:34   17   your calculations of CIT incidents; correct?

11:34   18        A.    True.

11:34   19        Q.    So the incident, for example, of having a

11:34   20   mentally ill homeless person, that is not included in

11:34   21   your calculations of 12 to 15 incidents?

11:34   22        A.    No.  That's not a true CIT call.

11:34   23        Q.    Okay.  Was then just to be completely clear,

11:34   24   I would like to know every time you've been called as a

11:34   25   CIT the officer to a scene regardless of whether or not

| | | |
|---|---|---|
| 11:34 | 1 | in the end it turned out to be a situation in which |
| 11:34 | 2 | there was harm to self or others.  How many CIT |
| 11:34 | 3 | calls -- How many times have you been called to a scene |
| 11:34 | 4 | as a CIT officer regardless of the outcome? |
| 11:35 | 5 | A.    Estimation is probably about 15, 10 to 15. |
| 11:35 | 6 | Q.    And that would be over the course of two |
| 11:35 | 7 | years, between 2004 and 2006; correct? |
| 11:35 | 8 | A.    That would be over the course of the time |
| 11:35 | 9 | since I was trained, yes. |
| 11:35 | 10 | Q.    And, to be clear, you haven't been called as |
| 11:35 | 11 | a CIT officer since you've been in the school; correct? |
| 11:35 | 12 | A.    I don't believe so. |
| 11:35 | 13 | Q.    But you have been called to events as a |
| 11:35 | 14 | security officer; isn't that also correct? |
| 11:35 | 15 | A.    I've been called to events, yes. |
| 11:35 | 16 | Q.    But those weren't in your role as a |
| 11:35 | 17 | designated CIT officer? |
| 11:35 | 18 | A.    They weren't designated CIT calls, no. |
| 11:36 | 19 | Q.    Okay.  Now, we've been talking some about |
| 11:36 | 20 | calls that ended up not being CIT calls, and calls that |
| 11:36 | 21 | ended up being CIT calls.  At the time that you're |
| 11:36 | 22 | actually called to the scene, are you called as a CIT |
| 11:36 | 23 | officer, and then you make the determination later that |
| 11:36 | 24 | this really wasn't a CIT call, and so you exclude it? |
| 11:36 | 25 | A.    True. |

OFFICER MICHAEL THOMECZEK, MARCH 11 & 12, 2009

| 11:36 | 1 | Q.    That isn't a determination at the time that |
| 11:36 | 2 | you're called? |
| 11:36 | 3 | A.    No. |
| 11:36 | 4 | Q.    Now, do you have any separate reporting that |
| 11:36 | 5 | you're supposed to do if it's an actual CIT call |
| 11:36 | 6 | involving harm to self or others? |
| 11:36 | 7 | A.    We've got a CIT form that we do, that we |
| 11:36 | 8 | complete. |
| 11:36 | 9 | Q.    Did you complete a CIT form with regard to |
| 11:37 | 10 | HM on 12/31 of '05? |
| 11:37 | 11 | A.    Yes, I did. |
| 11:37 | 12 | Q.    Who maintains custody or control of the CIT |
| 11:37 | 13 | forms? |
| 11:37 | 14 | A.    I'm not real sure. |
| 11:37 | 15 | Q.    Who do you hand it to? |
| 11:37 | 16 | A.    It's approved by my immediate precinct |
| 11:37 | 17 | supervisor for CIT, and I'm not sure what happens to it |
| 11:37 | 18 | after that. |
| 11:37 | 19 | Q.    And is it computerized, or is it something |
| 11:37 | 20 | that you have to hand fill out and give to your |
| 11:37 | 21 | supervisor? |
| 11:37 | 22 | A.    It's on the computer. |
| 11:37 | 23 | Q.    And do you know who is responsible for |
| 11:37 | 24 | compiling data concerning CIT? |
| 11:37 | 25 | A.    No, I don't. |

OFFICER MICHAEL THOMECZEK - MARCH 11 & 12, 2009                84

| | | |
|---|---|---|
| 11:37 | 1 | Q.    Do you know how many CIT officers there are |
| 11:37 | 2 | in St. Louis County? |
| 11:38 | 3 | A.    I have no idea. |
| 11:38 | 4 | Q.    Okay.  Do you know how many there are in the |
| 11:38 | 5 | 3rd Precinct? |
| 11:38 | 6 | A.    I would have to guess.  I don't really know |
| 11:38 | 7 | a number. |
| 11:38 | 8 | Q.    Well, what's your best estimate of the |
| 11:38 | 9 | numbers in the 3rd Precinct? |
| 11:38 | 10 | A.    Probably around 20. |
| 11:38 | 11 | Q.    Out of a total of 60 police officers in the |
| 11:38 | 12 | precinct? |
| 11:38 | 13 | A.    That's my best guess. |
| 11:38 | 14 | Q.    So approximately one-third of the police |
| 11:38 | 15 | force -- Your best estimate is approximately one-third |
| 11:38 | 16 | of the police force are CIT trained? |
| 11:38 | 17 | A.    Possibly, yeah. |
| 11:38 | 18 | Q.    Okay.  If you would look at, again, at |
| 11:38 | 19 | Exhibit 68, 5-F found on page 4 of the General Orders, |
| 11:39 | 20 | subsection 2.  This indicates that there are CIT |
| 11:39 | 21 | supervisors.  Do you have a CIT supervisor? |
| 11:39 | 22 | A.    In the precinct, yes. |
| 11:39 | 23 | Q.    Who was your CIT supervisor? |
| 11:39 | 24 | A.    At this present time? |
| 11:39 | 25 | Q.    Yes. |

| | | |
|--|--|--|
| 11:39 | 1 | A.    At this present time, it's Sergeant Joe |
| 11:39 | 2 | McMahan. |
| 11:39 | 3 | Q.    How do you spell it? |
| 11:39 | 4 | A.    How do you spell it?  I think -- I'm |
| 11:39 | 5 | guessing.  I think it's M-c-M-a-h-a-n. |
| 11:39 | 6 | Q.    Okay.  And that's pronounced McMahan? |
| 11:39 | 7 | A.    McMahan. |
| 11:39 | 8 | Q.    And on 12/31/05, was he also the CIT |
| 11:39 | 9 | supervisor? |
| 11:39 | 10 | A.    Not at that date, no. |
| 11:39 | 11 | Q.    Who was the CIT supervisor? |
| 11:40 | 12 | A.    Sergeant Lasater. |
| 11:40 | 13 | Q.    Were you aware that a CIT officer was to |
| 11:40 | 14 | produce monthly statistical reports of CIT incidents |
| 11:40 | 15 | that occurs within the precinct? |
| 11:40 | 16 | A.    You mean, the supervisors? |
| 11:40 | 17 | Q.    Yes. |
| 11:40 | 18 | A.    Yes, I was aware of that. |
| 11:40 | 19 | Q.    And have you ever seen a statistical report |
| 11:40 | 20 | that any CIT supervisor of yours has prepared? |
| 11:40 | 21 | A.    No. |
| 11:40 | 22 | Q.    Okay.  It also indicates under subsection B: |
| 11:41 | 23 | "Supervisors shall forward a copy of the monthly |
| 11:41 | 24 | statistical report to CIT Council for review, and flag |
| 11:41 | 25 | any specific issues that need special attention."  Are |

OFFICER MICHAEL THOMECZEK, MARCH 11 & 12, 2009

11:41  1  you aware of any particular CIT issues that have been

11:41  2  responded to by the CIT Council?

11:41  3          A.    No.

11:41  4          Q.    Okay.  Are you aware of any specific issues

11:41  5  that have been sent to the Council for response?

11:41  6          A.    No.

11:41  7          Q.    And the supervisor at that time would have

11:41  8  been Sergeant Lasater; he would have been the one who

11:41  9  was responsible for the flagging of any special issue?

11:41  10         A.    On the 31st?

11:41  11         Q.    Yes.

11:41  12         A.    Yes, he would have been the one.

11:41  13         Q.    Okay.  I've also previously marked, and you

11:41  14  should have in front of you Exhibit 69, which is the

11:42  15  Care and Transportation of the Mentally Ill."

11:42  16         A.    True.

11:42  17         Q.    Is that a policy that you have seen?

11:42  18         A.    I have read it.

11:42  19         Q.    And was that policy in effect on 12/31 of

11:42  20  '05?

11:42  21         A.    As far as I can tell, it was.

11:42  22         Q.    Do you recall any significant changes in the

11:42  23  policy concerning care and transportation of mentally

11:42  24  ill between 2005 and the present?

11:42  25         A.    No, I don't.

11:42 1    Q.    Can you describe for me what the proper

11:42 2 procedure is for transporting a mentally ill or a

11:42 3 potentially mentally ill individual to an institution?

11:42 4    A.    We normally try to transport them through

11:42 5 ambulance.

11:42 6    Q.    And why is that?

11:42 7    A.    To get them assessed for health reasons

11:42 8 prior to transport, have the paramedics check them out.

11:42 9    Q.    And if for some reason an individual is not

11:43 10 transported through ambulance, what is the next method

11:43 11 that the police officers use to transport someone to --

11:43 12    A.    Family members can transport them, if they

11:43 13 so desire.  They can supercede calling an ambulance, if

11:43 14 it's their desire, or the officer can transport them

11:43 15 with his supervisor's permission.

11:43 16    Q.    Is there any prescribed method for

11:43 17 transporting a potentially mentally ill individual in a

11:43 18 police car?

11:43 19    A.    Just as any other prisoner.

11:43 20    Q.    And how is that?

11:43 21    A.    That is properly handcuffed in the front

11:43 22 seat of the car.

11:43 23    Q.    In the front seat of the car?

11:43 24    A.    In the front seat of the car, unless they

11:43 25 are violent.

| | | |
|---|---|---|
| 11:43 | 1 | Q.    And if they are violent, then what? |
| 11:43 | 2 | A.    We are to use the cage car. |
| 11:43 | 3 | Q.    Is your car a cage car, or was your car on |
| 11:43 | 4 | 12/31 of '05 a cage car? |
| 11:43 | 5 | A.    No. |
| 11:43 | 6 | Q.    To your knowledge, is it the policy of St. |
| 11:44 | 7 | Louis County Police Department to write healthcare |
| 11:44 | 8 | affidavits only in situations where the family is not |
| 11:44 | 9 | available to do so? |
| 11:45 | 10 | A.    I wasn't aware that was a policy. |
| 11:45 | 11 | Q.    To your knowledge, is it the policy of the |
| 11:45 | 12 | St. Louis County Police Department to write affidavits |
| 11:45 | 13 | where healthcare professionals are available to do so? |
| 11:45 | 14 | A.    Where a healthcare professional is -- It's |
| 11:45 | 15 | my understanding that we write affidavits to admit them |
| 11:45 | 16 | into a facility for observation. |
| 11:45 | 17 | Q.    Have you been in a situation in which |
| 11:45 | 18 | healthcare professionals have written the affidavit to |
| 11:45 | 19 | require someone to be on a 96-hour hold? |
| 11:45 | 20 | A.    No. |
| 11:45 | 21 | Q.    That's never happened, in your experience? |
| 11:45 | 22 | A.    No. |
| 11:45 | 23 | Q.    And you indicated that you've written 4 to 5 |
| 11:45 | 24 | affidavits; is that correct? |
| 11:46 | 25 | A.    I probably have written more than that.  I |

Boyd-Gwinn Reporting

OFFICER MICHAEL THOMECZEK - MARCH 11 & 12, 2009                    89

11:46  1  can't give you an exact number.

11:46  2      Q.    Okay.  What's your best estimate of the

11:46  3  number of affidavits that you've written to submit

11:46  4  someone to a 96-hour hold?

11:46  5      A.    Probably the majority of my CIT calls that I

11:46  6  have somebody admitted.

11:46  7      Q.    Is that what you have been instructed by the

11:46  8  St. Louis County Police Department?

11:46  9      A.    It's part of our training, and it's

11:46  10 sometimes more expedient.

11:46  11     Q.    What do you mean by sometimes more

11:46  12 expedient?

11:46  13     A.    Sometimes getting a family member to the

11:46  14 hospital.  Some of the people we deal with it's

11:47  15 difficult, where we're going.  We go with all the

11:47  16 patients anyway.

11:47  17     Q.    In a situation in which you were writing the

11:47  18 affidavit, do you write it on your own personal

11:47  19 knowledge; that is, the assessment that you have made?

11:47  20     A.    Based on all the information I gather from

11:47  21 family members, friends, relatives, other people in the

11:47  22 area.

11:47  23     Q.    Okay.  So it's not just on your personal

11:47  24 knowledge?

11:47  25     A.    Not just my own personal knowledge, no.

Boyd-Gwinn Reporting

OFFICER MICHAEL THOMECZEK, MARCH 11 & 12, 2009

11:47  1      Q.   With regard to the affidavit that was

11:47  2  written concerning HM, was this done at the instruction

11:47  3  of Sergeant Lasater?

11:48  4      A.   No.

11:48  5      Q.   You did it of your own volition?

11:48  6      A.   I did it on my own volition.

11:48  7      Q.   Okay.  And that is true, even though

11:48  8  Sergeant Lasater was the supervisor for CIT officers at

11:48  9  the time in your precinct?

11:48  10      A.   True.  He had input, but I still based the

11:48  11  decision.

11:48  12      Q.   And he was the individual who took over the

11:48  13  scene at the time that he arrived on the scene; is that

11:48  14  correct?

11:48  15      A.   As far as command of the scene, yes.

11:48  16      Q.   As far as command of the scene, he was also

11:48  17  the higher ranging CIT officer; correct?

11:48  18      A.   True.

11:48  19      Q.   So he took command of the CIT portion of

11:48  20  that scene as well?

11:48  21      A.   After conferring with me.

11:48  22      Q.   We talked earlier about the things that you

11:49  23  look at for assessing whether an individual is actually

11:49  24  at risk for harming himself or others.  In the case of

11:49  25  HM, what assessment did you make concerning his mental

OFFICER MICHAEL THOMECZEK MARCH 11 & 12, 2009

11:49  1  health that caused you to write the affidavit?

11:49  2      A.    The very first one was the way the call was

11:49  3  titled when it came out.

11:49  4      Q.    And that is, it was titled attempted

11:49  5  suicide?

11:49  6      A.    Attempted suicide.

11:49  7      Q.    Okay.  What else did you rely on?

11:49  8      A.    The information that I gleaned from the wife

11:49  9  when I gave her a phone call, and the information I got

11:49  10  from the ex-girlfriend when I gave her a phone call.

11:49  11  And his state of -- his actions at the scene.

11:50  12      Q.    Okay.  You indicated that he was agitated.

11:50  13  Can you tell me what made you believe that HM was

11:50  14  agitated in a mentally ill kind of way?

11:50  15      A.    He was talking loudly.  And he was fidgety.

11:50  16  Good way to describe it; fidgety.

11:50  17      Q.    Anything else?

11:50  18      A.    No.  That's basically it.

11:50  19      Q.    And did his talking loudly and acting

11:50  20  fidgety continue the whole time you were at the scene

11:50  21  with him?

11:50  22      A.    Pretty much.

11:50  23      Q.    Now, based on your assessment, did you see

11:50  24  any other indications or indicia of mental illness such

11:51  25  as delusional behavior or psychotic behavior of any

OFFICER MICHAEL THOMECZEK, MARCH 11 & 12, 2009

11:51   1   form?

11:51   2        A.    No.   He exhibited no delusional behavior or

11:51   3   psychotic actions.

11:51   4        Q.    Did you question him concerning his state of

11:51   5   mind?

11:51   6        A.    I believe I did ask him at first if he

11:51   7   wanted to hurt himself.

11:51   8        Q.    And what was his response?

11:51   9        A.    I believe he told me no.

11:51  10        Q.    Is there a reason that that information is

11:51  11   not found in the police report?

11:51  12        A.    No particular reason.

11:51  13        Q.    Is that the kind of information that you

11:52  14   typically place in the police report?

11:52  15        A.    I would have if it was an unfounded case.

11:52  16        Q.    And how do you know if a case is unfounded

11:52  17   or not?

11:52  18        A.    Because I talked to other people who had

11:52  19   knowledge.

11:52  20        Q.    So the only time that you would place in a

11:52  21   report that you questioned someone regarding his state

11:52  22   of mind would be a situation in which you believed that

11:52  23   the charges were unfounded?

11:52  24        A.    Unless they stated, "yes, I want to hurt

11:52  25   myself."

| | | |
|---|---|---|
| 11:52 | 1 | Q.    And then you would place the "yes, I wanted |
| 11:52 | 2 | to hurt myself in the report," as well? |
| 11:52 | 3 | A.    Yes. |
| 11:52 | 4 | Q.    But in a situation where an individual says, |
| 11:52 | 5 | "no, I'm not going to hurt myself," but you have any |
| 11:52 | 6 | other information that would tend to say otherwise, you |
| 11:52 | 7 | do not place in the report that the individual claimed |
| 11:53 | 8 | that he was not going to hurt himself? |
| 11:53 | 9 | A.    Not normally. |
| 11:53 | 10 | Q.    And on how many occasions have you had that |
| 11:53 | 11 | situation arise, where an individual has said, "I am |
| 11:53 | 12 | not going to hurt myself," but you decided not to place |
| 11:53 | 13 | that in the report for one reason or another? |
| 11:53 | 14 | A.    I have no idea. |
| 11:53 | 15 | Q.    Do you have an estimate? |
| 11:53 | 16 | A.    Maybe about half the time. |
| 11:53 | 17 | Q.    About half the time of those that you |
| 11:53 | 18 | actually transport? |
| 11:53 | 19 | A.    Yes.  Those that I actually transported. |
| 11:53 | 20 | Q.    Okay.  Now, to get back to numbers.  You |
| 11:53 | 21 | indicated that you have been called on actual CIT |
| 11:53 | 22 | events, that you have considered CIT events between 10 |
| 11:53 | 23 | and 12 times; is that correct? |
| 11:53 | 24 | A.    True. |
| 11:53 | 25 | Q.    And the majority of those that you have |

OFFICER MICHAEL THOMECZEK 13MARCH 11 & 12, 2009                          94

```
11:53  1  written an affidavit, so that they would be placed in
11:54  2  96-hour hold; correct?
11:54  3      A.    True.
11:54  4      Q.    Of those, at least half of those then that
11:54  5  you have transported, you have not put in the report
11:54  6  that an individual claims they are not suicidal; is
11:54  7  that correct?
11:54  8      A.    Probably.
11:54  9      Q.    So you're talking somewhere around four
11:54  10 maybe five times, you have not put in a report that an
11:54  11 individual claimed to you that they were not suicidal?
11:54  12     A.    Probably.
11:54  13     Q.    Have you ever been as a CIT officer placed
11:55  14 in a situation where you knew going into the situation
11:55  15 that there was a potential of suicide by cop in that
11:55  16 situation?
11:55  17     A.    No.
11:55  18     Q.    Are you familiar with the phraseology
11:55  19 "suicide by cop"?
11:55  20     A.    Very familiar.
11:55  21     Q.    And what, to your understanding, does
11:55  22 suicide by cop mean?
11:55  23     A.    That the person is going to put you in a
11:55  24 situation where you have to be the one to do harm to
11:55  25 them.
```

OFFICER MICHAEL THOMECZEK MARCH 11 & 12, 2009                    95

```
11:55    1           Q.    So going into the situation with HM, no one
11:55    2    had indicated to you that the HM intended to commit
11:55    3    suicide by cop?
11:55    4           A.    No.
11:56    5                 MS. MERKLIN VON KAENEL:  Do you want to take
11:56    6    a break?
11:56    7                 MS. RANDLES:  No.
11:57    8           Q.    (By Ms. Randles)  We had gone over earlier
11:57    9    how often you've had to pull your weapon.  Again, you
11:57   10    haven't had to pull your weapon, except twice since
11:57   11    you've been at St. Louis County; is that correct?
11:57   12           A.    I believe so.
11:57   13           Q.    Now, what kind of holster is that; is it the
11:57   14    kind with the tab over it, or is it the kind that you
11:57   15    can just --
11:57   16           A.    It's just got a thumb release.
11:57   17           Q.    Thumb release.  Okay.  So you don't have to
11:57   18    do a two-step to pull your weapon.  Some officers have
11:57   19    to release the tab over the top of their holster and
11:57   20    then pull their weapon out.  In your situation, you can
11:57   21    do the thumb release and pull it out in one?
11:57   22           A.    True.
11:57   23           Q.    Now, with regard to the vehicle that you had
11:57   24    on 12/31 of '05, was there any videotaping capability
11:58   25    in that vehicle?
```

Boyd-Gwinn Reporting

OFFICER MICHAEL THOMECZEK, MARCH 11 & 12, 2009                    96

11:58    1        A.    No.

11:58    2        Q.    Was there any audiotaping capability in that

11:58    3    vehicle?

11:58    4        A.    No.

11:58    5        Q.    Did you have a recorder in your pocket, like

11:58    6    some officers carry?

11:58    7        A.    No.

11:58    8        Q.    Was there audiotape or videotape of any

11:58    9    kind, to your knowledge, made of that scene on 12/31 of

11:58   10    '05?

11:58   11        A.    Not to my knowledge.

11:58   12        Q.    Did any of the cars in the third precinct

11:58   13    have video or audio capability?

11:58   14        A.    None of the cars in 3rd Precinct.

11:58   15        Q.    Do you know if any of the cars in St. Louis

11:58   16    County had audio or video capability on 12/31 of '05?

11:58   17        A.    I think some did.

11:58   18        Q.    Do you know which precinct those cars with

11:58   19    were located in?

11:58   20        A.    If I recall, it was in the 1st Precinct,

11:58   21    possibly Fenton, and the highway safety cars.

11:58   22        Q.    Okay.  Do you know why the 1st Precinct,

11:59   23    Fenton, and the highway safety were given vehicles with

11:59   24    audio and videotaping, and 3rd Precinct was not?

11:59   25        A.    No, I don't.

Boyd-Gwinn Reporting

OFFICER MICHAEL THOMECZEK, MARCH 11 & 12, 2009

11:59 | 1     Q.    Do you know who is responsible for the

11:59 | 2  giving of cars to the various precincts?

11:59 | 3     A.    No, I don't.

11:59 | 4     Q.    Do you know if Officer Venable's car had the

11:59 | 5  capability of either audio or videotaping?

11:59 | 6     A.    It did not.

11:59 | 7     Q.    Do you know if he had on his person the

11:59 | 8  capability of video or audiotaping?

11:59 | 9     A.    Not positively.

11:59 | 10     Q.    You don't know for sure?

11:59 | 11     A.    I don't know for sure.

11:59 | 12     Q.    And with regard to Sergeant Lasater, did his

11:59 | 13  vehicle have the capability of either audio or

11:59 | 14  videotaping?

11:59 | 15     A.    The vehicle did not.

11:59 | 16     Q.    Do you know if he had the capabilities of

11:59 | 17  audio or videotaping?

11:59 | 18     A.    Not absolutely positive.

11:59 | 19     Q.    Have you seen any other audio or videotape

12:00 | 20  from the stop of the night of 12/31 of '05?

12:00 | 21     A.    No, I have not.

12:00 | 22     Q.    At the time of the incident occurred, did

12:00 | 23  you investigate whether or not the parking lot had any

12:00 | 24  video?

12:00 | 25     A.    No, I did not investigate it.

OFFICER MICHAEL THOMECZEK, MARCH 11 & 12, 2009                    98

| | | |
|---|---|---|
| 12:00 | 1 | Q.    Okay.  Was there any investigation of any |
| 12:00 | 2 | kind done with regard to the incident of 12/31 of '05, |
| 12:00 | 3 | after Mr. HM was placed at Highland Center? |
| 12:00 | 4 | A.    Not that I'm aware of. |
| 12:00 | 5 | Q.    Was there any follow-up by you after Mr. HM |
| 12:00 | 6 | was placed in the Highland Center? |
| 12:00 | 7 | A.    The only follow-up I did was the follow-up |
| 12:00 | 8 | require to check on his well being. |
| 12:00 | 9 | Q.    And what follow-up was that? |
| 12:00 | 10 | A.    It was to go by the residence and talk to |
| 12:00 | 11 | his wife. |
| 12:00 | 12 | Q.    And how long after the incident did that |
| 12:00 | 13 | occur? |
| 12:00 | 14 | A.    I did that the following day. |
| 12:01 | 15 | Q.    And did you actually see or speak with Miss |
| 12:01 | 16 | HM the following day? |
| 12:01 | 17 | A.    Yes, I did. |
| 12:01 | 18 | Q.    At what time the following day did you see |
| 12:01 | 19 | her? |
| 12:01 | 20 | A.    I've got to guess.  I'm thinking it's around |
| 12:01 | 21 | like 11:00, 12:00, somewhere around there. |
| 12:01 | 22 | Q.    And you saw her at her deposition recently? |
| 12:01 | 23 | A.    Yes, I did. |
| 12:01 | 24 | Q.    Did you recognize her as the individual that |
| 12:01 | 25 | you had spoken with on the first of January of '06? |

Boyd-Gwinn Reporting

OFFICER MICHAEL THOMECZEK, MARCH 11 & 12, 2009

12:01  1    A.    Her appearance was slightly different, but

12:01  2  it looked like the same person.

12:01  3    Q.    Okay.  Aside from her deposition, and going

12:01  4  to her house on 1/1 of '06, have you ever had any other

12:02  5  contact, or any other face-to-face conversation with

12:02  6  Miss HM?

12:02  7    A.    Just on the evening of the 31st.

12:02  8    Q.    And is that when she came in to get the car

12:02  9  keys?

12:02 10    A.    Yes.

12:02 11    Q.    Okay.  Going to the day of January 1st of

12:02 12  '06, you indicated that you believed you saw her in

12:02 13  mid-morning or afternoon, 11:00 to 12:00 o'clock?

12:02 14    A.    Yes.  Somewhere around there.

12:02 15    Q.    Can you tell me what was the conversation

12:02 16  that you had with her?

12:02 17    A.    I went to the residence.  She met me at the

12:02 18  front door, came outside.  I asked her if HM was home,

12:02 19  and I don't recall if she said he was or not.  I asked

12:03 20  him how he was doing.  And she said he had been doing

12:03 21  okay.  He had been released from the hospital.

12:03 22    Q.    And this was less than 96 hours after having

12:03 23  taken him to the hospital; correct?

12:03 24    A.    True.

12:03 25    Q.    In fact, it was approximately -- less than

OFFICER MICHAEL THOMECZEK, MARCH 11 & 12, 2009

| | | |
|---|---|---|
| 12:03 | 1 | 24 hours from the time that you had taken him to the |
| 12:03 | 2 | hospital, correct? |
| 12:03 | 3 | A.    True. |
| 12:03 | 4 | Q.    And did this conversation occur before -- |
| 12:03 | 5 | Did you have a conversation with Sergeant -- I mean, |
| 12:03 | 6 | Lieutenant Hodak of the Creve Coeur Police Department? |
| 12:03 | 7 | A.    Never. |
| 12:03 | 8 | Q.    Sergeant Lasater was the one -- Were you |
| 12:03 | 9 | aware of any conversations with Lieutenant Hodak at the |
| 12:03 | 10 | Creve Coeur Police Department? |
| 12:04 | 11 | A.    No, I wasn't. |
| 12:04 | 12 | Q.    Did you report to Sergeant Lasater that you |
| 12:04 | 13 | had followed up with Mrs. Doe HM on January 1st of |
| 12:04 | 14 | 2006? |
| 12:04 | 15 | A.    I think I did.  Because he was a CIT |
| 12:04 | 16 | supervisor for the precinct. |
| 12:04 | 17 | Q.    Would you have made that report the same |
| 12:04 | 18 | day? |
| 12:04 | 19 | A.    As close to it as I could have. |
| 12:04 | 20 | Q.    And did you report to him that Mr. HM was |
| 12:04 | 21 | out of the hospital? |
| 12:04 | 22 | A.    That's what I would have reported to him. |
| 12:04 | 23 | Q.    You said that you would make the report just |
| 12:04 | 24 | as soon as possible.  Is there a reason that you |
| 12:04 | 25 | wouldn't have made the report on the day that you spoke |

Boyd-Gwinn Reporting

OFFICER MICHAEL THOMECZEK, MARCH 11 & 12, 2009

| | | |
|---|---|---|
| 12:04 | 1 | with Mrs. Doe HM? |
| 12:05 | 2 | A.   Only in the event that he wouldn't have been |
| 12:05 | 3 | available for some reason. |
| 12:05 | 4 | Q.   Okay.  Did you have the same at work hours |
| 12:05 | 5 | as Sergeant Lasater at the time? |
| 12:05 | 6 | A.   Mine were slightly different. |
| 12:05 | 7 | Q.   Do you recall the differences? |
| 12:05 | 8 | A.   Yes.  I started a half an hour later, and my |
| 12:05 | 9 | shift ended a half hour later. |
| 12:05 | 10 | Q.   Okay.  Did you have the same days off, that |
| 12:05 | 11 | you recall? |
| 12:05 | 12 | A.   Me and Sergeant Lasater. |
| 12:05 | 13 | Q.   Yes. |
| 12:05 | 14 | A.   I don't believe we did. |
| 12:05 | 15 | Q.   Approximately how many days per week would |
| 12:05 | 16 | you work with Sergeant Lasater in, say, the November to |
| 12:05 | 17 | January, '05 to '06 time frame? |
| 12:05 | 18 | A.   Three. |
| 12:05 | 19 | Q.   Three days per week? |
| 12:05 | 20 | A.   Uh-huh. |
| 12:06 | 21 | Q.   Now, your days per week when you actually |
| 12:06 | 22 | worked, that would be established through the time and |
| 12:06 | 23 | attendance charts? |
| 12:06 | 24 | A.   Sure. |
| 12:06 | 25 | Q.   And the same would be true for Sergeant |

Boyd-Gwinn Reporting

OFFICER MICHAEL THOMECZEK  MARCH 11 & 12, 2009

| | | |
|---|---|---|
| 12:06 | 1 | Lasater? |
| 12:06 | 2 | A.    Yes. |
| 12:06 | 3 | MS. RANDLES:  It is 12:10.  I'm about to |
| 12:06 | 4 | start a new area, a new topic.  Do you want to break |
| 12:06 | 5 | for lunch now, and then come back?  It's totally up to |
| 12:06 | 6 | you.  I can continue on through the topic. |
| 12:06 | 7 | MS. MERKLIN VON KAENEL:  It's your |
| 12:06 | 8 | preference. |
| 12:06 | 9 | MS. RANDLES:  That's fine. |
| 13:12 | 10 | {Lunch break taken.} |
| 13:12 | 11 | {Marked for identification Plaintiff Exhibit |
| 13:12 | 12 | 70, Crises Intervention Team Report, |
| 13:12 | 13 | 3/11/09, cb.} |
| 13:12 | 14 | Q.   (By Ms. Randles)  Officer Thomeczek, we're |
| 13:13 | 15 | back on the record, and you understand you're still |
| 13:13 | 16 | under oath? |
| 13:13 | 17 | A.    Yes. |
| 13:13 | 18 | Q.    I forgot to ask you earlier if you're on any |
| 13:13 | 19 | medication that would impact on your ability to testify |
| 13:13 | 20 | today? |
| 13:13 | 21 | A.    No. |
| 13:13 | 22 | Q.    I've just handed you what has been marked as |
| 13:13 | 23 | Exhibit 70.  Can you describe for us what that document |
| 13:13 | 24 | is? |
| 13:13 | 25 | A.    That's my Crises Intervention Team Report. |

OFFICER MICHAEL THOMECZEK - MARCH 11 & 12, 2009                    103

13:13  1        Q.    Is that something that you filled out?

13:13  2        A.    Yes.

13:13  3        Q.    Okay.  Going to the second page where it

13:13  4  says "additional comments."

13:14  5        A.    Yes.

13:14  6        Q.    Where did you receive the information for

13:14  7  this additional -- for these additional comments?

13:14  8        A.    I received it from the wife, the girlfriend,

13:14  9  and from Sergeant Lasater, who had talked to the

13:14 10  brother.

13:14 11        Q.    Now, do these comments also appear in the

13:14 12  police report?

13:14 13        A.    Not necessarily.

13:14 14        Q.    And why would this differ from the police

13:14 15  report?

13:14 16        A.    I try to get a little more in-depth in my

13:14 17  statements on the CIT report.

13:14 18        Q.    Than you do on the police report?

13:14 19        A.    Yes, I do.

13:14 20        Q.    Okay.  Why is that?

13:14 21        A.    The police report is a matter of public

13:14 22  record, but the CIT report is not released to just

13:14 23  anybody.

13:14 24        Q.    With regard to the CIT report, what is the

13:14 25  purpose of that report?

13:14   1        A.    That is for the compilation of CIT records,

13:14   2   and information, and statistics.

13:14   3        Q.    And when did you fill out this CIT report?

13:14   4        A.    Right after I did the CARE report.

13:14   5        Q.    On the same day?

13:15   6        A.    On the same day.

13:15   7        Q.    At approximately the same time?

13:15   8        A.    It would be a little bit after.

13:15   9        Q.    Okay.  Now, it says "a brother Michael Doe

13:15  10   also said his brother, John Doe HM, had been talking

13:15  11   about suicide by various method, but wanted to go --"

13:15  12   Is there something else?  Is this cut off?

13:15  13        A.    Yes, it is.

13:15  14        Q.    Is there something else that should be

13:15  15   included in the report?

13:15  16        A.    There is more of a narrative, but it didn't

13:15  17   show up on here.

13:15  18        MS. RANDLES:  Is there a way to produce the

13:15  19   remaining?

13:15  20        MS. MERKLIN VON KAENEL:  I have to look at

13:15  21   it right now.  I think it has to -- See if I can get it

13:15  22   printed for the rest.  This is what I got initially.

13:15  23   I'll try to do that.

13:15  24        Q.    (By Ms. Randles)  This report then is

13:15  25   incomplete in the manner that it's reproduced at this

OFFICER MICHAEL THOMECZEK   MARCH 11 & 12, 2009                105

```
13:15   1  moment?
13:15   2       A.    True.
13:15   3            MS. RANDLES:  Okay.  Lorena, we will need a
13:15   4  copy of the complete report.
13:15   5            MS. MERKLIN VON KAENEL:  Sorry.  That's how
13:15   6  I got it, and I will certainly follow-up.
13:15   7       Q.   (By Ms. Randles)  Okay.  Is there someplace
13:15   8  on here that tells the time or the date that the report
13:16   9  was actually generated?
13:16  10       A.    On the CIT report?
13:16  11       Q.    Yes.
13:16  12       A.    I don't believe so.
13:16  13       Q.    Okay.  It's your recollection, though, that
13:16  14  you generated it on the same day?
13:16  15       A.    True.
13:16  16       Q.    Are there ever times that the report is
13:16  17  generated on day different than the police report?
13:16  18       A.    Not that I can recall.
13:16  19       Q.    Okay.  Is it your practice then to generate
13:16  20  the CIT reports on the same day that you generate the
13:16  21  police reports?
13:16  22       A.    Just as soon as I can, yes.
13:16  23       Q.    And, again, the last time you would have had
13:16  24  a CIT report would have been approximately two years
13:16  25  ago?
```

13:16  1    A.    Yes.

13:16  2    Q.    Okay.  Down at the bottom, it indicates a

13:16  3  date of 3/2/09.  I assume that's the date that the

13:16  4  report was pulled off of the computer, as opposed to

13:17  5  any kind of generation date?

13:17  6    A.    I assume.  I don't know.

13:17  7    Q.    Okay.

13:17  8        MS. MERKLIN VON KAENEL:  Don't assume.  Just

13:17  9  tell her if you know or not.

13:17  10    A.    Okay.

13:17  11    Q.    (By Ms. Randles) Now, with regard to the

13:17  12  night of 12/31/05, do you have independent memory of

13:17  13  the events in question that night, or is everything

13:17  14  that you recall found in the reports that were

13:17  15  generated from it?

13:17  16    A.    Some of it is recalled information.

13:17  17    Q.    Okay.  So you do have some independent

13:17  18  recollection?

13:17  19    A.    Yes.

13:17  20    Q.    With regard to the events of 12/31 of '05,

13:17  21  you indicated that you were on your way to Mr. HM's

13:17  22  house at the time that you saw him?

13:17  23    A.    Yes.

13:17  24    Q.    And why is it that you chose to take Tesson

13:18  25  Ferry, as opposed to the Butler Spur to get to his

| | | |
|---|---|---|
| 13:18 | 1 | home? |
| 13:18 | 2 | A.    The Butler Spur will not get me to his |
| 13:18 | 3 | residence. |
| 13:18 | 4 | Q.    On Skyridge.  How about the Butler Hill? |
| 13:18 | 5 | A.    Butler Hill Road does not take you to that |
| 13:18 | 6 | residence. |
| 13:18 | 7 | Q.    It doesn't take you close enough to the |
| 13:18 | 8 | residence that you can then turn onto Skyridge? |
| 13:18 | 9 | A.    No. |
| 13:18 | 10 | Q.    So were you, in your estimation, taking the |
| 13:18 | 11 | shortest route to his residence at the time that you |
| 13:18 | 12 | saw him on Tesson Ferry? |
| 13:18 | 13 | A.    Yes. |
| 13:18 | 14 | Q.    Now, when the affidavit was filed, was there |
| 13:18 | 15 | a reason that you did not call Lisa Doe to come make |
| 13:18 | 16 | the affidavit to the Highland Center? |
| 13:18 | 17 | A.    I was doing the affidavit, so I didn't call |
| 13:18 | 18 | her. |
| 13:18 | 19 | Q.    And that even though she lived just right |
| 13:19 | 20 | down the street from the hospital? |
| 13:19 | 21 | A.    Right. |
| 13:19 | 22 | Q.    Okay.  You chose to make the affidavit |
| 13:19 | 23 | yourself? |
| 13:19 | 24 | A.    Right. |
| 13:19 | 25 | Q.    Now, with regard to personal knowledge, the |

OFFICER MICHAEL THOMECZEK    MARCH 11 & 12, 2009

13:19  1  only personal knowledge you had concerning HM arose

13:19  2  from your discussions and observations of him at the

13:19  3  scene; correct?

13:19  4       A.    True.

13:19  5       Q.    So any affidavit made on your personal

13:19  6  knowledge would have had to have been limited to the

13:19  7  interaction that you had with him at the scene?

13:19  8       A.    Yes.

13:19  9       Q.    Okay.  Now, with regard -- You had talked

13:19  10 earlier about a situation where a Taser had been pulled

13:19  11 at the -- I believe it was St. Anthony's Hospital?

13:19  12      A.    Yes.

13:19  13      Q.    With regard to the policy or procedure of

13:19  14 when a Taser is pulled, is there any requirement, or is

13:20  15 there any practice that an officer on the scene also

13:20  16 pull a gun at the time that the Taser is pulled?

13:20  17          MS. MERKLIN VON KAENEL:  I object.  That is

13:20  18 not relevant to the facts of this case, that are

13:20  19 present in this case, or the issues presented by the

13:20  20 petition, complaint.

13:20  21          MS. RANDLES:  And, again, all objections,

13:20  22 because this is federal court are to be waived until

13:20  23 the time of trial, at which point those objections will

13:20  24 be taken up, except as to form.

13:20  25          MS. MERKLIN VON KAENEL:  You may answer.

| | | |
|---|---|---|
| 13:20 | 1 | A.    Okay.   It is a recommendation, and it |
| 13:20 | 2 | depends upon the situation in question.   If there is a |
| 13:20 | 3 | violent threat that could be harmful to the officers. |
| 13:20 | 4 | Q.    (By Ms. Randles)   In that situation, you had |
| 13:20 | 5 | indicated that you did not pull your weapon; correct? |
| 13:20 | 6 | A.    True. |
| 13:20 | 7 | Q.    Did any of the other officers pull their |
| 13:20 | 8 | weapon at the time that the Taser was pulled? |
| 13:20 | 9 | A.    No. |
| 13:20 | 10 | Q.    And was there a reason that the weapons were |
| 13:20 | 11 | not pulled? |
| 13:20 | 12 | A.    The person did not have a weapon in his |
| 13:20 | 13 | hands. |
| 13:20 | 14 | Q.    Is that one of the variables that you |
| 13:21 | 15 | consider when you pull your weapon? |
| 13:21 | 16 | A.    Yes, it is. |
| 13:21 | 17 | Q.    What other variables do you consider prior |
| 13:21 | 18 | to pulling a weapon? |
| 13:21 | 19 | A.    Is there a chance for harm to yourself? |
| 13:21 | 20 | Does the person have accessibility to a weapon?  Is it |
| 13:21 | 21 | reasonable to have accessibility to a weapon.   Are they |
| 13:21 | 22 | openly displaying a weapon?   Those are several of the |
| 13:21 | 23 | variables. |
| 13:21 | 24 | Q.    Okay.   Anything else? |
| 13:21 | 25 | A.    I'm sure there are others, but I can't |

OFFICER MICHAEL THOMECZEK MARCH 11 & 12, 2009

13:21  1  recall them right now.

13:21  2       Q.    Okay.  And if you have a choice between a

13:21  3  Taser and a gun, is there a difference that you make to

13:22  4  determine whether or not you pull the Taser or the gun?

13:22  5       A.    It depends on the amount of violence that

13:22  6  you could expect.

13:22  7       Q.    Okay.  And what do you mean by that?

13:22  8       A.    Do they have a weapon that can -- do they

13:22  9  have a gun, or do they have a knife, or a club?

13:22  10      Q.    If they have a knife or a club, instead of a

13:22  11 gun, would you typically pull a gun or a Taser in that

13:22  12 situation?

13:22  13      A.    Again, it depends upon the situation at the

13:22  14 time.

13:22  15      Q.    Such as how far away they are?

13:22  16      A.    How far away they are from you.

13:22  17      Q.    So, in other words, in all situations you

13:22  18 take into account all of the -- you take into account

13:22  19 the whole situation that's unfolding in front of you?

13:22  20      A.    Yes.

13:22  21      Q.    I would like you to refer back to the police

13:23  22 report, which I believe was marked as Exhibit 54.  We

13:23  23 had earlier talked about the final approval, which is

13:23  24 the last line on the first page of the police report.

13:23  25 And right above that is a date and time entered.

| | | |
|---|---|---|
| 13:23 | 1 | A.    Yes. |
| 13:23 | 2 | Q.    And that's 5:01; is that correct, 1701, on |
| 13:23 | 3 | Saturday is that 5:01? |
| 13:23 | 4 | A.    P.m., yes. |
| 13:23 | 5 | Q.    You indicated that your duty hours at that |
| 13:23 | 6 | time were 6:30 to 2:30? |
| 13:23 | 7 | A.    2:30. |
| 13:23 | 8 | Q.    Did you have to remain on duty for |
| 13:23 | 9 | additional two and a half hours in order to complete |
| 13:24 | 10 | this police report? |
| 13:24 | 11 | A.    Yes, I did. |
| 13:24 | 12 | Q.    Do you recall what time you returned to the |
| 13:24 | 13 | station following the Highland Center -- taking Mr. HM |
| 13:24 | 14 | to the Highland Center? |
| 13:24 | 15 | A.    No, I don't recall. |
| 13:24 | 16 | Q.    Do you recall what time Mrs. Doe HM came to |
| 13:24 | 17 | the station to pick up the keys to the vehicle? |
| 13:24 | 18 | A.    She didn't come to the station. |
| 13:24 | 19 | Q.    Did she come to the substation? |
| 13:24 | 20 | A.    She came to the substation. |
| 13:24 | 21 | Q.    And were you present at the substation when |
| 13:24 | 22 | she arrived there? |
| 13:24 | 23 | A.    Yes, I was. |
| 13:24 | 24 | Q.    And do you recall what -- I assume, when I |
| 13:24 | 25 | asked you in the previous question, what time did you |

13:24  1  return to the station, let me rephrase that.  What time

13:24  2  after you dropped off Mr. HM to the Highland Center did

13:24  3  you return to the substation?

13:24  4      A.   I don't recall.

13:24  5      Q.   Okay.  And do you recall what time Mrs. Doe

13:25  6  HM came to pick up the vehicle's keys from the

13:25  7  substation?

13:25  8      A.   No, I don't.

13:25  9      Q.   Do you recall whether it was closer to

13:25 10  5:00 o'clock, or whether it was earlier than that?

13:25 11      A.   I don't know.

13:25 12      Q.   Okay.  Do you have any recollection as to

13:25 13  how long you were actually at the Highland Center?

13:25 14      A.   Not absolutely, no, I don't.

13:25 15      Q.   Do you have a best estimate as to how long

13:25 16  you were at the Highland Center?

13:25 17      A.   Just a long time, it felt like.

13:25 18           {Marked for identification Plaintiff Exhibit

13:25 19           71, St. Anthony's Records, 3/11/09, cb.}

13:25 20           {Marked for identification Plaintiff Exhibit

13:26 21           72, Highland Center Records, 3/11/09, cb.}

13:26 22      Q.   (By Ms. Randles)  We're trying to get some

13:26 23  times on when things may have occurred, so kind of

13:26 24  working backwards is what I have done.  If you would

13:26 25  look at Exhibit 72.  I'm going to hold up the portion

OFFICER MICHAEL THOMECZEK, MARCH 11 & 12, 2009

13:27   1   that I've highlighted.  Over to the far right-hand side

13:27   2   is a top third of the page.  It says admission date and

13:27   3   time, 12/31/05 at 1506?

13:27   4       A.   Uh-huh.  Yes.

13:27   5       Q.   Now, 1506, what time would that be?

13:27   6       A.   That would be 3:06 p.m.

13:27   7       Q.   3:06 p.m.  does that correspond with your

13:27   8   recollection of when you took Mr. HM to the Highland

13:27   9   Center?

13:27   10      A.   Possibly.

13:27   11      Q.   Okay.  And if you would look at Exhibit 71.

13:27   12  In approximately the same space, it again shows date

13:27   13  and time, and shows an admission date and time of

13:27   14  12/31/05 at -- what's that 2:45?

13:27   15      A.   No.  That would be 1:45 p.m.

13:27   16      Q.   Okay.  1:45.  Does that correspond with the

13:28   17  time that you believe that you took Mr. HM to St.

13:28   18  Anthony's?

13:28   19      A.   It's possible.

13:28   20      Q.   So then the time at the scene would have

13:28   21  been approximately 40 minutes, is that correct, and to

13:28   22  get to that number, if you would look at Exhibit 54,

13:28   23  the police report.  It indicates that the time of

13:28   24  dispatch was 13:03, and that would be 1:03; correct?

13:28   25      A.   Yes.

OFFICER MICHAEL THOMECZEK-MARCH 11 & 12, 2009

13:28  1      Q.   And then the time of arrival, which I assume

13:28  2  is the time that you arrived at the scene, is that an

13:28  3  appropriate assumption?  It's over to the right-hand

13:28  4  side in the same -- under CAD details?

13:29  5      A.   Oh, okay.  That could be what it was.

13:29  6      Q.   So then from the time that you arrived until

13:29  7  the time that Mr. HM was taken to St. Anthony's, would

13:29  8  have been approximately 34 minutes; correct?

13:29  9      A.   Sounds accurate.

13:29 10      Q.   Okay.  And then from the time he went from

13:29 11  St. Anthony's to the time that he was admitted at

13:29 12  Highland Center, would have been a little over an hour;

13:29 13  correct?

13:29 14      A.   Yes.

13:29 15      Q.   And then from the time that he was admitted

13:29 16  to St. Anthony's, until the time that you wrote the

13:29 17  report would have been a little over an hour, isn't

13:29 18  that also correct?

13:29 19      A.   Sounds accurate.

13:29 20      Q.   Okay.  If you look at the admission date and

13:30 21  time of 1506 on Exhibit 72, I guess it's closer to two

13:30 22  hours.  If you look on Exhibit 54 at the date and time

13:30 23  entered, it would be 1701.

13:30 24      A.   Yes.

13:30 25      Q.   So that would be approximately two hours

OFFICER MICHAEL THOMECZEK - MARCH 11 & 12, 2009

```
13:30   1  from the time the Mr. HM was admitted until the time
13:30   2  that you wrote your report; correct?
13:30   3      A.    Yes.
13:30   4      Q.    Do you know how long you stayed at the
13:30   5  Highland Center from the time of this admission, which
13:30   6  would have been 3:06, until the time that you went back
13:31   7  to the substation?
13:31   8      A.    No, I don't.
13:31   9      Q.    And does the time between going to St.
13:31  10  Anthony's Medical Center and going to Highland Center,
13:31  11  that seems like a long time, an hour 15 minutes.  Is
13:31  12  that your recollection of how long it took, to go from
13:31  13  St. Anthony's to the Highland Center and go through the
13:31  14  evaluation stages there?
13:31  15      A.    It seems feasible.  We were there a while.
13:31  16      Q.    And you were there a while.  Do you mean you
13:31  17  were at St. Anthony's, or you were at the Highland
13:31  18  Center for a while?
13:31  19      A.    We were at the emergency room for a while.
13:31  20      Q.    Okay.  Now, how long does it take you to get
13:32  21  from the parking lot on Tesson Ferry to St. Anthony's,
13:32  22  approximately?
13:32  23      A.    It wouldn't take very long.
13:32  24      Q.    Are they fairly close together?
13:32  25      A.    Fairly close.
```

OFFICER MICHAEL THOMECZEK, MARCH 11 & 12, 2009                    116

13:32  1          Q.    And if you were to put an estimate on

13:32  2    distance, approximately about how far would you say it

13:32  3    is from the parking lot on Tesson Ferry to St.

13:32  4    Anthony's?

13:32  5               MS. MERKLIN VON KAENEL:  Can we get some

13:32  6    foundation on which parking lot we're talking about?

13:32  7          Q.    (By Ms. Randles)  The parking lot in which

13:32  8    the incident occurred on 12/31/05 at the Medical

13:32  9    Center, on the left-hand side of Tesson Ferry Road as

13:32 10    you're going south.

13:32 11          A.    Maybe a quarter of a mile.

13:32 12          Q.    Quarter of a mile.  Okay.

13:32 13          A.    Maybe.

13:32 14          Q.    Do you know how many stop lights there are

13:32 15    between Schuessler Road -- Schuessler Road was the

13:32 16    stoplight just before you got to the parking lot, if

13:32 17    you were headed south; isn't that correct?

13:33 18          A.    True.

13:33 19          Q.    From the Schuessler Road stoplight to St.

13:33 20    Anthony's, do you know how many stop lights there were?

13:33 21          A.    It depends on which way you go.

13:33 22          Q.    If you're going straight down Tesson Ferry?

13:33 23          A.    Well, you can take Schuessler into the back

13:33 24    lot, or you can go up Kennerly to the main lot.

13:33 25          Q.    And which way did you do on that night; did

Boyd-Gwinn Reporting

OFFICER MICHAEL THOMECZEK MARCH 11 & 12, 2009

| | | |
|---|---|---|
| 13:33 | 1 | you go Kennerly? |
| 13:33 | 2 | A.   I would have taken Kennerly because the ER |
| 13:33 | 3 | is on the Kennerly side. |
| 13:33 | 4 | Q.   And how many stop lights is it? |
| 13:33 | 5 | A.   Two. |
| 13:33 | 6 | Q.   Two stop lights.  So they're fairly close |
| 13:33 | 7 | together then? |
| 13:33 | 8 | A.   True. |
| 13:33 | 9 | Q.   Going to the afternoon -- Actually, I keep |
| 13:33 | 10 | saying the night.  Going to the afternoon, on 12/31/05, |
| 13:34 | 11 | involving HM, I would like to start in reverse order. |
| 13:34 | 12 | What is the last thing you did before leaving the |
| 13:34 | 13 | parking lot on Tesson Ferry Road? |
| 13:34 | 14 | A.   Going to hospital? |
| 13:34 | 15 | Q.   Uh-huh.  The last thing you did before you |
| 13:34 | 16 | left to go to the hospital? |
| 13:34 | 17 | A.   I don't recall what the last thing was I |
| 13:34 | 18 | did. |
| 13:34 | 19 | Q.   Okay.  Did you put Mr. HM in the front seat |
| 13:34 | 20 | of the vehicle? |
| 13:34 | 21 | A.   Yes. |
| 13:34 | 22 | Q.   Did you make any dispatch calls following |
| 13:34 | 23 | the time that you placed him in the vehicle? |
| 13:34 | 24 | A.   I would have told the dispatch where I was |
| 13:34 | 25 | going. |

13:34   1       Q.     And would you have done that before or after

13:34   2   you placed him in the front of the vehicle?

13:34   3       A.     That would have been after he was in the

13:34   4   vehicle.

13:34   5       Q.     Okay. Do you recall who the dispatcher was

13:34   6   on duty at that time?

13:34   7       A.     No, I don't.

13:34   8       Q.     And do you recall what you told the

13:35   9   dispatcher at that time?

13:35   10       A.     I would have told him that I was

13:35   11   transporting the subject to St. Anthony's Hospital

13:35   12   emergency room.

13:35   13       Q.     Now, when you make that kind of dispatch

13:35   14   call, is that something that is just between you and

13:35   15   the dispatcher, or does it go out on all of the air

13:35   16   waves?

13:35   17       A.     Well, the cars can hear me, the cars in my

13:35   18   precinct.

13:35   19       Q.     All of the precinct cars can hear you?

13:35   20       A.     Yes.

13:35   21       Q.     And can cars in other precincts hear you?

13:35   22       A.     They could, if they were monitoring it.

13:35   23       Q.     And could other municipalities hear it?

13:35   24       A.     I'm not sure.

13:35   25       Q.     And why aren't you sure?

13:35  1          A.    I don't know what their capabilities are on

13:35  2   their radios.

13:35  3          Q.    Do they use the same police -- the same

13:35  4   channel?

13:35  5          A.    No.

13:35  6          Q.    So each of you have different channels that

13:35  7   you use?

13:35  8          A.    Yes.

13:35  9          Q.    Now, you indicated that you placed Mr. HM in

13:36  10  the front seat of the vehicle; correct?

13:36  11         A.    Correct.

13:36  12         Q.    And is that usual to place suspects in the

13:36  13  front of the vehicle?

13:36  14         A.    It is policy.

13:36  15         Q.    And I'm surprised by that.  I would have

13:36  16  thought that you always placed them in the back seat.

13:36  17         A.    Not St. Louis County's policy.

13:36  18         Q.    Is there a reason, that you know of?

13:36  19         A.    I didn't set the policy.  I don't know.

13:36  20         Q.    Are there any safety issues that are raised

13:36  21  by placing a subject in the front seat?

13:36  22         A.    I haven't heard of any.

13:36  23         Q.    Okay.  At the time that Mr. HM was placed in

13:36  24  the front seat, was he violent?

13:36  25         A.    No.

13:36  1        Q.   And, in fact, if he had been violent, then

13:36  2   you would have been required to have a second officer

13:36  3   in the car; is that correct?

13:36  4        A.   I would have been required to go get a cage

13:36  5   car.

13:36  6        Q.   And you did not get a cage car?

13:36  7        A.   No, I did not get a cage car.

13:36  8        Q.   So at that time, you discerned that he was

13:37  9   not a risk to you, or to any other officer that was on

13:37 10   the scene; is that correct?

13:37 11        A.   He wasn't exhibiting any violent behavior at

13:37 12   the time.

13:37 13        Q.   Okay.  Now, there was at one point in time

13:37 14   three police cars on the scene; isn't that correct?

13:37 15        A.   Correct.

13:37 16        Q.   First, I would like you to just tell me with

13:37 17   words where the police cars ended up; where were they?

13:37 18        A.   My car ended up in front of the suspect's

13:37 19   vehicle.  Officer Venable's car ended up to the rear of

13:37 20   the suspect's vehicle.  And I'm not sure where Sergeant

13:37 21   Lasater had his parked at.

13:37 22        Q.   Okay.  Now, we've been trying to come up

13:38 23   with good pictures, and that is not -- it's a difficult

13:38 24   thing to do.

13:38 25             MS. MERKLIN VON KAENEL:  Can we go off the

OFFICER MICHAEL THOMECZEK—MARCH 11 & 12, 2009

| | | |
|---|---|---|
| 13:38 | 1 | record? |
| 13:38 | 2 | MS. RANDLES:  Sure. |
| 13:39 | 3 | {Off the record discussion.} |
| 13:39 | 4 | {Marked for identification Plaintiff Exhibit |
| 13:39 | 5 | 73, Arial Photograph of Scene, 3/11/09, cb.} |
| 13:39 | 6 | Q.   (By Ms. Randles)  Officer Thomeczek, I'm |
| 13:39 | 7 | going to hand you what has been marked as Exhibit 73. |
| 13:39 | 8 | And I believe the way I'm handing it to you, it's at a |
| 13:39 | 9 | north-south orientation; is that correct? |
| 13:39 | 10 | A.   Yes. |
| 13:39 | 11 | Q.   Okay. |
| 13:39 | 12 | MS. MERKLIN VON KAENEL:  For the record, the |
| 13:39 | 13 | exhibit sticker is in the northeast corner of the |
| 13:39 | 14 | exhibit when he's discussing its orientation. |
| 13:39 | 15 | Q.   (By Ms. Randles)  I'm going to hand you two |
| 13:39 | 16 | markers.  Would you, please, with the black Sharpie, |
| 13:40 | 17 | indicate on the white section of the paper, the |
| 13:40 | 18 | north -- which way is north? |
| 13:40 | 19 | A.   (Indicating.) |
| 13:40 | 20 | Q.   Would you please mark it with an "N". |
| 13:40 | 21 | A.   (Indicating.) |
| 13:40 | 22 | Q.   Is that a view of the parking lot that was |
| 13:40 | 23 | the place where the incident on 12/31 of '05 occurred? |
| 13:40 | 24 | A.   Yes, it is. |
| 13:40 | 25 | Q.   Now, do you recall on 12/31/05 at |

OFFICER MICHAEL THOMECZEK—MARCH 11 & 12, 2009                                    122

```
13:40    1  1:00 o'clock in the afternoon whether there were any
13:40    2  vehicles in that parking lot?
13:40    3       A.   There were no vehicles in the parking lot.
13:40    4       Q.   There were none whatsoever?
13:40    5       A.   None at all.
13:40    6       Q.   Have you ever measured that parking lot to
13:40    7  determine how wide that parking lot is?
13:40    8       A.   No.
13:40    9       Q.   Okay.  Would you consider it, looking at the
13:40   10  orientation of it, would you consider that to be a
13:41   11  fairly narrow parking lot?
13:41   12       A.   Yes.
13:41   13       Q.   Where did you first see HM?
13:41   14       A.   Just want me to point to it?
13:41   15       Q.   No.  You can just tell me.
13:41   16       A.   First saw him southbound on 21.
13:41   17       Q.   Was he south of the Schuessler Road stop
13:41   18  lights?
13:41   19       A.   He was right at the Schuessler Road stop
13:41   20  light.
13:41   21       Q.   Was he stopped at the time you saw him, or
13:41   22  was he proceeding through the light?
13:41   23       A.   He was stopped at the time.
13:41   24       Q.   Now, if you would go to the parking lot,
13:41   25  itself.  And the orange marker may show up a little bit
```

| | | |
|---|---|---|
| 13:41 | 1 | better on the black asphalt of the parking lot.  I'm |
| 13:41 | 2 | not entirely sure.  But would you please mark where Mr. |
| 13:41 | 3 | HM's car stopped.  Well, the black one may be better. |
| 13:42 | 4 | MS. OWENS:  I have a blue pen, if that would |
| 13:42 | 5 | show up better. |
| 13:42 | 6 | MS. MERKLIN VON KAENEL:  I have a smaller |
| 13:42 | 7 | black Parker, or a blue pen.  What would you prefer on |
| 13:42 | 8 | your exhibit? |
| 13:42 | 9 | MS. RANDLES:  I don't care.  Just something |
| 13:42 | 10 | that shows. |
| 13:42 | 11 | Q.   (By Ms. Randles)  Would you please draw it |
| 13:42 | 12 | in kind of a square, or rectangle, so we can see. |
| 13:42 | 13 | A.   (Indicating.) |
| 13:42 | 14 | Q.   Okay.  And would you mark that in some way |
| 13:42 | 15 | to show that that is Mr. HM's car.  Now, where was your |
| 13:42 | 16 | vehicle? |
| 13:43 | 17 | A.   (Indicating.) |
| 13:43 | 18 | Q.   Where did Officer Venable's vehicle end up? |
| 13:43 | 19 | A.   (Indicating.) |
| 13:43 | 20 | Q.   And do you have any recollection now that |
| 13:43 | 21 | you've drawn it where Sergeant Lasater's vehicle was |
| 13:43 | 22 | located? |
| 13:43 | 23 | A.   I can't recall. |
| 13:43 | 24 | Q.   May I see the drawing for a moment?  I'm |
| 13:43 | 25 | going to mark with a blue pen, I'm going to draw over |

|       |    |
|-------|----|
| 13:43 | 1  | the line that you just drew for Officer Venable because
| 13:43 | 2  | it's not showing up.
| 13:44 | 3  |         A.    Okay.
| 13:44 | 4  |         Q.    And mark it with a "V".  And I'm going show
| 13:44 | 5  | it back to you, and confirm that, yes, I drew over the
| 13:44 | 6  | lines that you had drawn?
| 13:44 | 7  |         A.    Yes, you did.
| 13:44 | 8  |         Q.    And those are exactly the same lines that
| 13:44 | 9  | you had previously drawn?
| 13:44 | 10 |         A.    Yes.
| 13:44 | 11 |         Q.    Now, have you gone back to look at that
| 13:44 | 12 | parking lot at all?
| 13:44 | 13 |         A.    One time.
| 13:44 | 14 |         Q.    Okay.  When did you do that?
| 13:44 | 15 |         A.    About a week ago.
| 13:44 | 16 |         Q.    You've drawn Officer Venable's car at an
| 13:44 | 17 | angle to the rear of Mr. HM's car.  In order to do
| 13:44 | 18 | that, did he have to go over the curb, or around the
| 13:44 | 19 | fire hydrant that is located there?
| 13:44 | 20 |         A.    I don't know if he did or not.
| 13:44 | 21 |         Q.    Do you recall there being a curb and a fire
| 13:44 | 22 | hydrant there to the right, as you turn into that
| 13:44 | 23 | parking lot?
| 13:44 | 24 |         A.    There is a curb there.
| 13:44 | 25 |         Q.    And do you recall whether there is a fire

OFFICER MICHAEL THOMECZEK MARCH 11 & 12, 2009                 125

13:44  1  hydrant there?

13:44  2      A.   I don't recall the fire hydrant.

13:44  3      Q.   Do you recall a bush or tree there, a small

13:44  4  tree?  I don't know if it's a bush or a shrub?

13:45  5      A.   I think there is some shrubbery there.

13:45  6      Q.   And after the incident, was there any damage

13:45  7  to any part of that parking lot?

13:45  8      A.   Not that I'm aware of.

13:45  9      Q.   So is it your testimony then that you had

13:45 10  not fully entered the parking lot at the time that Mr.

13:45 11  HM stopped?

13:45 12      A.   Not into the parking lot, itself.

13:45 13      Q.   You were still partially on the private

13:45 14  road?

13:45 15      A.   Sure.

13:45 16      Q.   Now, is there a rise from the private road

13:45 17  to the parking lot?

13:45 18      A.   Not that I'm aware of.

13:45 19      Q.   There is no slant up to the blacktopped area

13:45 20  of that parking lot?

13:45 21      A.   Not that I'm aware of.

13:45 22      Q.   And, again, you went and looked at it about

13:45 23  a week ago?

13:45 24      A.   Yes.

13:45 25      Q.   And did you drive it?

13:45  1      A.    I drove onto the adjoining parking lot, not

13:45  2  onto that parking lot, specifically.

13:45  3      Q.    So you -- Instead of turning left onto it,

13:45  4  you turned right?

13:45  5      A.    Right.

13:45  6      Q.    And went into what is now, I believe, a Taco

13:45  7  Bell parking lot?

13:45  8      A.    Correct.

13:45  9      Q.    And you looked across to the parking lot

13:46  10 across the way?

13:46  11     A.    Correct.

13:46  12     Q.    Do you have an estimate as to how wide the

13:46  13 entrance to the parking lot is between the two

13:46  14 planters?

13:46  15     A.    No.

13:46  16     Q.    Can two cars going straight fit within that

13:46  17 entrance?

13:46  18     A.    Yes.

13:46  19     Q.    Can three cars going straight fit within

13:46  20 that entrance?

13:46  21     A.    I don't think so.

13:46  22     Q.    So it's essentially a two-car lane that

13:46  23 would go between the parking spots; is that correct?

13:46  24     A.    True.

13:46  25     Q.    Now, you've done traffic investigations;

Boyd-Gwinn Reporting