

ORIGINAL

RECEIVED
MAR 24 2009
COUNTY COUNSELOR

*IN THE MATTER OF:*

# JOHN DOE HM, AN INDIVIDUAL
## vs.
# CITY OF CREVE COEUR, ET AL.

*Cause No. 4:07-CV-00946-ERW*

*Deposition of Lisa Kay Doe*
*3/3/2009*

**Gore Perry Gateway Lipa Baker Dunn & Butz**
**Certified Court Reporters & Legal Videographers**
**1-800-878-6750**

DepoScript3



EXHIBIT

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  EASTERN DISTRICT OF MISSOURI

 3

 4

 5    JOHN DOE H.M., AN INDIVIDUAL,

 6         PLAINTIFF,

 7

 8    V.                         NO. 4:07-CV-00946-ERW

 9

10    CITY OF CREVE COEUR, MISSOURI,

11    ETC., ET AL.,

12         DEFENDANTS.

13

14

15

16

17         DEPOSITION OF LISA KAY DOE, produced, sworn

18    and examined on the 3rd day of March, 2009 at the St.

19    Louis County Government Center, 41 South Central Avenue,

20    in the City of Clayton, State of Missouri, before Traci

21    Butz, Certified Shorthand Reporter in and for the State

22    of Missouri.

23

24

25
```

DepoScript3

```
1                    A P P E A R A N C E S

2

3    ON BEHALF OF THE PLAINTIFF:

4            RANDLES, MATA & BROWN, LLC

5            Rebecca M. Randles, Esq.

6            406 West 34th Street, Suite 623

7            Kansas City, Missouri  64111

8

9

10   On Behalf Of Defendants City Of Creve Coeur, Missouri

11   AND JOHN BEARDSLEE:

12           SANDBERG, PHOENIX & von GONTARD, P.C.

13           Stacie Owens, Esq.

14           One City Centre, Suite 1500

15           St. Louis, Missouri  63101

16

17

18   On Behalf Of Defendants St. Louis County, Police Officer

19   Michael Thomeczek, And Sergeant Thomas Lasater:

20           ST. LOUIS COUNTY, MISSOURI

21           Lorena V. Merklin von Kaenel, Esq.

22           Lawrence K. Roos County Government Building

23           41 South Central Avenue

24           Clayton, Missouri  63105

25
```

4

1    ALSO PRESENT:

2            John Beardslee (telephonically)

3            P.O. Michael Thomeczek

4            Sgt. Thomas Lasater

5

6

7

8                    I N D E X

9

10   Examination by Ms. Merklin von Kaenel      Page   5

11   Examination by Ms. Owens             Page 110

12   Further Examination by Ms. Merklin von Kaenel Page 137

13

14

15

16

17

18

19

20

21

22

23

24

25

DepoScript3

S T I P U L A T I O N

IT IS HEREBY STIPULATED AND AGREED by and

between counsel for the parties that this deposition may

be taken in shorthand by Traci Butz, Certified Shorthand

Reporter, Certified Realtime Reporter, and afterwards

transcribed into printing, and signature by the witness

is not waived.

LISA KAY DOE,

of lawful age, being first duly sworn to tell the truth,

the whole truth and nothing but the truth, deposes and

says as follows:

EXAMINATION BY MS. MERKLIN von KAENEL:

Q:   I'm Lorena Merklin von Kaenel, and I represent

St. Louis County Police Officers Thomeczek and Lasater

and the Chief of Police, Chief Lee.  I represent what

I'm going to call the St. Louis County defendants, and I

have Officer Lasater and Officer Thomeczek here with me.

MS. OWENS:  I'm Stacie Owens.  I represent the

City of Creve Coeur and the former Chief, John

Beardslee.

Q:   (By Ms. Merklin von Kaenel) We're going to ask

you a bunch of questions, but I'm going to ask you some

preliminary questions to start.  Depositions are a way

for us to get to know the facts or things that you know,

and we do it by asking questions, so I'm going to ask

1    you a question, and you're going to answer.  Because

2    this is being taken down by a court reporter, you have

3    to answer with a word as opposed to a nod, an uh-huh, or

4    yeah.  Well, yeah, I guess that counts, but a word as

5    opposed to a gesture.  It's hard for her to otherwise

6    take down a gesture.

7            Have you ever had a deposition before?

8        A:   No.

9        Q:   Okay.  Well, we'll try to make it as easy as

10   possible.  If you don't understand something that I'm

11   asking you, if you want me to repeat it, I'll do so.

12   Just -- just state that.  Otherwise, I'm going to assume

13   you understand what I'm asking you, and the record is

14   going to reflect that.  If there's any time you need a

15   break or you want to get some water, just let me know

16   and we'll certainly -- we can certainly pause the

17   deposition for that.  If there's -- is there anything

18   that -- any kind of medication or anything else that

19   would prevent you from being able to give testimony

20   today under oath?

21       A:   No.

22       Q:   Okay.  So there's nothing you're aware of that

23   would impede that?

24       A:   No.

25       Q:   Great.  And I know that may sound like a

7

```
 1    strange question, but those are the kind of questions we
 2    have to ask.  I don't want to get too much into your
 3    business, but these are important questions.
 4              Are you represented an attorney -- have you
 5    engaged an attorney to represent you today?
 6         A:   Yes.  Rebecca Randles.
 7         Q:   Okay.  So you've hired her to represent you
 8    for this deposition?
 9         A:   Yes.
10         Q:   All right.  Why don't we start from the
11    beginning?  Please state your full name for the record.
12         A:   Lisa Kay Doe.
13         Q:   And your date of birth?
14         A:   7/29/69.
15         Q:   And your current residence?
16         A:   Yes.
17         Q:   What is your current residence?
18         A:   Oh.  I'm sorry.
19         Q:   No problem.
20         A:   4608 Skyridge Meadows Court.
21         Q:   Is that the residence you had on 12/31 of
22    2005?
23         A:   Yes.
24         Q:   Okay.  And do you have three daughters?
25         A:   Yes.
```

DepoScript3

8

1      Q:   And they live with you at that residence?

2      A:   Yes.

3      Q:   What is your -- what is your cell phone --

4   what is your cell phone number for 12/31 of 2005?  What

5   was your cell phone number at that time, if you

6   remember?

7      A:   I'm thinking it was like 471-3339.

8      Q:   And do you remember what your home phone was

9   at that time, your land line?

10      A:   Let's see.  We had things changed.  Let me

11   think about this, please.

12      Q:   No problem.

13      A:   314-487-5472 is what I believe it was.  It's

14   not that presently because we switched.

15      Q:   Have you changed your line since then?

16      A:   Since that number I just gave you, yes.

17      Q:   Okay.  And do you remember who your carrier

18   was for the 487-5472 number, the company that was your

19   carrier?

20      A:   I don't recall.

21      Q:   And do you remember who your carrier was for

22   the cell phone number 471-3339?

23      A:   That was Sprint.

24      Q:   Sprint.

25      A:   Did Verizon switch to Sprint?  It was Verizon.

*Gore Perry Gateway Lipa Baker Dunn & Butz*
*St. Louis 314.241.6750    St. Charles 636.940.0926*

DepoScript3

1   I apologize.  They switched their name.  I think it was

2   Verizon.

3       Q:   Tell me what you do for a living, ma'am.

4       A:   I'm an RN.

5       Q:   Do you have a particular field of

6   concentration?

7       A:   I work at an outpatient surgery center.

8       Q:   What does that entail?

9       A:   That entails working in a surgery unit for

10  people who have had surgery doing their care before and

11  after their surgery procedures.

12      Q:   Who are you employed by now?

13      A:   Ballas Outpatient Surgery Center.

14      Q:   And by whom were you employed on 12/31 of

15  2005?

16      A:   St. John's Mercy Medical Center.

17      Q:   And why did you leave your employment with

18  St. John's?

19      A:   I accepted this new position which was a

20  full-time day position that I had been looking for.

21      Q:   I'm going to ask you personal questions during

22  this deposition, and while I'm apologetic to get into

23  your personal business, it has -- at certain times it

24  becomes relevant for whatever reason I'm going to ask

25  you.  I don't relish it, but I have to ask some personal

questions.  What is your -- are you currently married?

Are you presently married?

A:   Yes.

Q:   And to whom?

A:   John Doe.

Q:   And how long have you been married to him?

A:   It will be 17 years.

Q:   Did there come a time when you two separated?

A:   Yes.

Q:   And when was that?

A:   I'm sorry.  Let me get these dates.   2003.

Q:   Do you remember what month in 2003?

A:   June.

Q:   How long were you separated for?

A:   Two years.  You know what?  Let me reframe that.  Maybe it was -- I'm so sorry.  These aren't dates that you put in your head.

Q:   I understand.

A:   I'm questioning now.  Maybe it was in 2004.  No.  Hold on.  I'm sorry.  Let me think.  I'm trying to find a landmark in my head that -- once again, it's not a date that I have remembered in my head.

Q:   Well, sometimes it's -- it's not pleasant to crop up --

A:   It's not.

11

1    Q:   -- events like this, and I apologize.  What

2    about in relation -- are you familiar with the event of

3    December 31st of 2005?

4    A:   Yes.

5    Q:   Okay.  So in relationship to that event, for

6    how long were you separated in?

7    A:   That's what I'm trying to put together.  Hold

8    on.

9    Q:   All right.

10   A:   With that being said, I'm going to say it was

11   2004 that we were separated.

12   Q:   So it would have been two summers before that

13   event?

14   A:   Correct.  That sounds right.

15   Q:   And when did you reconcile?

16   A:   In 2006.

17   Q:   And do you remember what month?

18   A:   I'll say that spring; May or June of that

19   year.

20   Q:   Okay.  And was there -- during this separation

21   did you live in separate places?

22   A:   Yes.

23   Q:   Okay.  Where did you live during the

24   separation?

25   A:   At the address that I gave you.

DepoScript3

1      Q:   On Skyview?

2      A:   Skyridge.

3      Q:   Skyridge?

4      A:   Yes.

5      Q:   And where did John Doe -- what do you call

6  him, John Doe?

7      A:   John Doe.

8      Q:   Where did John Doe live, your husband?

9      A:   On -- he had gotten an apartment at one time.

10     Q:   Where was the apartment?

11     A:   I couldn't give you the address.  I was -- I

12  couldn't tell you.

13     Q:   Did you ever go there?

14     A:   I did.  It was -- I'm just not familiar with

15  the area.  It was off Olive, I believe.  I probably

16  couldn't tell you how to get there at this point.

17     Q:   That's fine.  You were separated for two

18  years, I'm going to recap, from roughly June of 2004

19  through about May or June of 2006?

20     A:   Correct.

21     Q:   And during that time did you file for divorce?

22     A:   Yes.

23     Q:   And when was that?

24     A:   In January of 2006.

25     Q:   And why did you file for divorce?

DepoScript3

1      A:   We had been separated for a while.  It seemed

2   like we needed to make a choice at that point.

3      Q:   And was that your choice?

4      A:   It was mutual.

5      Q:   And what about your separation?  Was that also

6   mutual?

7      A:   Not at first.

8      Q:   Whose choice was it at first?

9      A:   John Doe's.

10     Q:   And what was -- why did he want to separate?

11     A:   He was not happy with things that were just

12  going on.

13     Q:   And then when did it become also your choice

14  to be separated?

15     A:   I think it just -- once it happened, that's

16  how it was, you know.

17     Q:   Okay.  So shortly after 6 of 2004 you also

18  wanted to be separated?

19         MS. RANDLES:  Objection; mischaracterizes the

20  testimony.

21     Q:   (By Ms. Merklin von Kaenel) Is that -- is that

22  correct, or you can correct me.

23     A:   That's how it was.  I don't know how to answer

24  that question.

25     Q:   That's fine.  How would you describe your

DepoScript3

1    relationship with him when you were separated?

2         A:   We talked all the time.

3         Q:   Every day?

4         A:   Probably.

5         Q:   Okay.  And did you talk about personal things?

6         A:   Yeah.

7         Q:   Did you talk about the kids?

8         A:   Most definitely.

9         Q:   You talked about the finances?

10        A:   Yeah.

11        Q:   Anything else?

12        A:   No.

13        Q:   And are you aware of John Doe's sexual abuse

14   when he was a child?  Did you become aware that he was

15   sexually abused when he was a child?

16        A:   Yes.

17        Q:   And how did you become aware of that?

18        A:   He told me.

19        Q:   And when did he tell you?

20        A:   A couple months after we separated.

21        Q:   And what did he tell you about it?  Let me

22   just say for the record don't tell me who it was.  If he

23   told you who sexually abused him, don't -- you don't

24   have to tell that.  What did he tell you about his

25   sexual abuse?

1     A:   Just that it happened, and I don't remember

2 many details.  I'm not so sure he was detailed; just

3 this is what happened.

4     Q:   Have you come to know what the details are of

5 the sexual abuse?

6     A:   I'm not sure to what extent.

7     Q:   Has he told you anything about the details of

8 the sexual abuse?

9     A:   Probably not details.

10     Q:   What has he told you about it, again, without

11 saying who did it?

12     A:   I would have to say no details then, no.  I

13 mean, just what happened, maybe a time frame.  Of

14 course, I know who.

15     Q:   I don't want to know that.

16     A:   I'm not going to tell you that, but I mean, I

17 knew this is what happened to him at what ages, the time

18 frame it was.

19     Q:   What ages was it?

20     A:   I wouldn't be able to give you dates; 9, 10,

21 11, 10, 11, 12.

22     Q:   Okay.

23     A:   I'm going to go for that.

24     Q:   He just said sexual abuse, or he described it?

25     A:   Just that he was sexually abused.

DepoScript3

1    Q:   Nothing more?

2    A:   No more details.

3    Q:   You said this was shortly after you were

4  separated in June of 2004 that he told you this for the

5  first time, is that correct?

6    A:   Correct.

7    Q:   Did he describe or talk to you about how he

8  felt about it?

9    A:   I think when someone says that to you, you

10  already kind of know what that feels like.

11    Q:   What does that feel like?

12    A:   I can't --

13    Q:   What does it feel like?

14    A:   I don't know what it feels like.  I've never

15  been in that situation.

16    Q:   Well, how did -- how was John Doe?  Was he --

17  I hate to be glib about this.  Was he happy about it?

18  Was he sad about it?  How would you describe him with

19  respect to the sexual abuse?

20    A:   Definitely sad, concerned.

21    Q:   Was he depressed?

22    A:   I don't know that I can tell you how he felt.

23  I just know if someone's -- I can only tell you what I

24  saw when he's talking to me about it, but I can't tell

25  you what he was truly feeling.

1      Q:  Well, tell me what you saw.

2      A:  I mean, it was wow.  I mean, this has happened

3  to me, and -- and there's a lot of feelings that go with

4  that.

5      Q:  What did you see?

6      A:  I saw a grown man who was very disturbed by

7  what had gone on and what he was having to recall.

8      Q:  And do you know if he sought any kind of

9  psychological help for that?

10      A:  I believe he did.

11      Q:  Would you have helped him -- would you have

12  been part of that in any way?

13      A:  No.

14      Q:  Did you refer him to a psychologist or help

15  him find one?

16      A:  No.

17      Q:  Okay.  Tell me -- tell me if I'm wrong.  At

18  one point -- let's strike that.

19      Did he have any -- at any point -- let's give

20  you a date.  Up until December 31st, let's say, of 2005,

21  did he ever cry about what happened?

22      MS. RANDLES:  Objection; calls for speculation

23  as it's phrased.

24      Q:  (By Ms. Merklin von Kaenel) Did you ever see

25  him cry about -- did you ever see him cry?

1      A:   Yes.

2      Q:   Did he talk to you why -- did he tell you why

3  he was crying?

4      A:   Yes.

5      Q:   And why did he tell you he was crying?

6      A:   That he had a lot going on, a lot of things

7  that -- that he was being faced with.

8      Q:   What kind of things?

9      A:   When it came to the abuse, he was going --

10  that was all coming out.  All the feelings, I guess, the

11  emotions that he had, you know, resurfaced.

12      Q:   And when did you see this happen?

13      A:   I wouldn't tell -- I wouldn't be able to tell

14  you a date.  I -- I don't --

15      Q:   It was sometime -- well, is it fair to say

16  sometime -- did it happen --

17      A:   I mean, it didn't happen yesterday and started

18  today.  I mean, this was a whole thing that just went

19  on.  Once you open something like that, it just doesn't

20  turn off and on.  It was a process.  I couldn't --

21      Q:   And I appreciate that.  When I'm asking this

22  question, can you explain the process to me because I'm

23  not familiar with it, and you went through it.

24      A:   Yeah.  I couldn't tell you that actual process

25  for me.  I wasn't the one necessarily going through with

DepoScript3

1  it.

2     Q:   I guess I'm just asking what you were able to

3  observe.

4     A:   Yeah.

5     Q:   Okay?

6     A:   Okay.

7     Q:   So what else -- with respect to this process

8  with John Doe, what else did you observe?

9     A:   That was a big part of it.  The crying, that

10  was a whole big part of what was going on with him at

11  that time, going through with the abuse.

12     Q:   Would you say -- is it fair to say it was

13  going through from 6 -- June of 2004 through December

14  31st of 2005?

15     A:   Yes.

16     Q:   Okay.  And had he ever expressed any -- during

17  that period of time that I just described, had he

18  expressed any desires to commit suicide or kill himself?

19     A:   No.

20     Q:   Had he ever talked about any desires to run

21  away or get away from all of it?

22     A:   No.

23     Q:   And during his -- are you aware of the sexual

24  abuse lawsuit he filed?

25     A:   Yes.

DepoScript3

1    Q:   And do you know when that was?

2    A:   No.

3    Q:   And do you remember John Doe -- do you

4    remember his demeanor or his feelings or whatever you

5    observed when he filed that lawsuit?  Did he talk to you

6    about it, how he felt?

7    A:   No.  I don't recall that specifically.

8    Q:   Well, did it make him nervous, if you know?

9        MS. RANDLES:  Objection; asked and answered.

10   Q:   (By Ms. Merklin von Kaenel) I'm sorry.

11   A:   I don't know.

12   Q:   Did it -- was he particularly sad around that

13   time, if you know?

14   A:   I don't know.

15   Q:   Okay.  Did you help him -- are you aware that

16   he was on Zoloft for a while?

17   A:   Yes.

18   Q:   What is Zoloft?

19   A:   An anti-depressant.

20   Q:   And were you -- were you part of helping him

21   seek a prescription for Zoloft?

22   A:   No.

23   Q:   You had not suggested it, had you?

24   A:   No.

25   Q:   So do you know if John Doe came up with it on

DepoScript3

1    his own or if a doctor suggested it?

2        A:   I don't know.

3        Q:   So at some point you knew he was on this

4    anti-depressant?

5        A:   Yes.

6        Q:   Do you know when he started?

7        A:   No.

8        Q:   And just -- I mean, is it something you can

9    only get by prescription, if you know?

10       A:   I thought so, yes.

11       Q:   Okay.  I'm going to -- I'm going to turn your

12   attention to December 31st since that's what this is

13   about, really, of 2005.  Will you tell me the first

14   thing that happened that morning?  What did you do?

15       A:   Actually, I had came home from work that

16   morning.

17       Q:   Had you worked that night?

18       A:   Correct.

19       Q:   And what were your hours?

20       A:   7 p.m. to 7 a.m.

21       Q:   So you came home -- when do you get home?

22   What time do you get home?

23       A:   8:00.

24       Q:   And what did you do when you got home?

25       A:   Said hi to my kids, probably ate breakfast,

DepoScript3

1    fixed them breakfast, I don't recall, but then went to

2    lay down.

3        Q:   And who watched your kids while you were at

4    work?

5        A:   Different people did.  I mean, I had

6    babysitters.

7        Q:   What about on that night?

8        A:   That night Matt, a cousin, watched the kids.

9        Q:   Matt?

10       A:   Matt.

11       Q:   Last name?

12       A:   Jackson.

13       Q:   Jackson.  Is he your cousin or John Doe's

14   cousin?

15       A:   It's John Doe's cousin.

16       Q:   Who is his mother or father in relation --

17   strike that.

18            He is related to John Doe how?

19       A:   His mother and John Doe are cousins.

20       Q:   They're cousins?

21       A:   Uh-huh.

22       Q:   And his mother is -- what's her name?

23       A:   Sharon.

24       Q:   And what was the first contact you had that

25   day with John Doe?

1      A:   Him coming to the house.

2      Q:   Had you spoken on the phone before?

3      A:   No.

4      Q:   Had you made arrangements for him to come that

5  day?

6      A:   No.

7      Q:   He just showed up?

8      A:   Correct.  Yes.

9      Q:   And is that normal that he would just show up?

10     A:   Oh, yes.

11     Q:   Okay.  And what time did he show up?

12     A:   I don't have an exact time.

13     Q:   Had you been home for a couple hours?

14     A:   I would say maybe a couple of hours later.

15     Q:   So sometime a couple hours after 8:00?

16     A:   Correct.

17     Q:   Before noon; would that be fair?

18     A:   Yes.

19     Q:   And tell me what happened when he was at your

20  house.

21     A:   We had a conversation.  He --

22     Q:   What did you talk about?  I'm going to

23  interrupt you.

24     A:   Okay.  He -- he was upset and commenting that

25  he was going to leave.

```
 1        Q:   Why was he upset?

 2        A:   I don't think I know.  He was just visibly

 3   upset.

 4        Q:   And would you describe how he looked, like

 5   visibly upset?

 6        A:   Wow.  I don't know if I can do that other than

 7   I just knew that he was upset.

 8        Q:   Was he raising his voice?

 9        A:   No.  No.

10        Q:   Was he crying?

11        A:   No.

12        Q:   Okay.

13        A:   The tone of his voice, maybe.  I mean, this is

14   my husband.  I know when he's upset.

15        Q:   I understand.  And why was he upset?

16        A:   I don't know.

17        Q:   And then you said he was -- he said he was

18   going to leave?

19        A:   Uh-huh.

20        Q:   What does that mean?

21        A:   I didn't know, and that's what I was asking

22   him, and I never got a straight answer other than he was

23   saying he was going to say goodbye.

24        Q:   And what does -- what does that mean?  He said

25   he was going to say goodbye; is that what he said?  I'm
```

25

| 1 | going to say goodbye? |
|---|---|
| 2 | A:   No. |
| 3 | Q:   I'm trying to figure it out.  Help me. |
| 4 | A:   He said he was leaving. |
| 5 | Q:   Okay.  So he said I'm going to leave? |
| 6 | A:   Yes. |
| 7 | Q:   Anything else? |
| 8 | A:   He told me that -- that the girls and I would |

be fine.  He told me that he had things set up

financially, and we would be okay.

11      Q:   What kind of things were set up?

12      A:   That wasn't --

13      Q:   He didn't say that?

14      A:   Correct.

15      Q:   Anything else?

16      A:   No.

17      Q:   I know it's been a long time, and I know this

may not have been the most comfortable event to rehash

today, and again, I apologize for it, but I need to go

into it.  It's important that we find out what happened.

Tell me.  You said -- you said he said he was going to

leave.  He said you guys will be fine, he had set things

up.  Anything else?

24      A:   No.  I feel like there was a lot of

repeating --

1      Q:   And what were you --

2      A:   -- of what I just said.  I mean, it was a back

3   and forth type, you know, conversation.

4      Q:   And did you -- what kind of things -- did you

5   ask him anything?

6      A:   I don't recall my word for words.  I don't.

7      Q:   Do you remember or recall generally what you

8   said to him?

9      A:   I'm sure I said why or what, and I just kept

10   on getting you're going to be okay.

11      Q:   And were you guys -- were you just talking?

12   Were there loud voices?  How would you describe your

13   voices?

14      A:   At one point I got upset, and I was probably

15   the one crying.

16      Q:   And were you crying because you didn't want to

17   lose him?

18      A:   Yes.  I didn't know what was kind of going on.

19      Q:   And did he talk about -- okay.  Did he talk

20   about anything else with respect to this?

21      A:   I don't recall anything else.

22      Q:   And did he talk about getting a divorce?

23      A:   No.

24      Q:   Did he talk about his lawsuit?

25      A:   No.

DepoScript3

27

1      Q:   Did he talk about the sexual abuse?

2      A:   No.

3      Q:   Did he talk about -- were you at that time

4 aware that he had been -- he had lived on and off with

5 Crystal Marshall?

6      A:   Yes.

7      Q:   So on 12/31 you knew that he had been with

8 her?

9      A:   Yes.

10      Q:   Did he talk about his girlfriend?

11      A:   No.

12      Q:   No?

13      A:   No.

14      Q:   How -- how did you find out that he was with

15 Crystal Marshall, if I may ask?

16      A:   He told me.

17      Q:   When did he tell you?

18      A:   I don't have a date.

19      Q:   Was it near the time you guys separated?

20      A:   Yeah.  I'll say yeah.  Yeah.

21      Q:   Okay.  And had he been with her before you

22 separated?

23         MS. RANDLES:  Objection.

24      Q:   (By Ms. Merklin von Kaenel) Had he been with

25 Crystal Marshall?

DepoScript3

1        MS. RANDLES:  Objection.  It calls for

2   speculation.

3        Q:   (By Ms. Merklin von Kaenel) If you know.

4        A:   No.

5        Q:   Did you suspect he was with her before you

6   separated?

7        A:   No.

8        Q:   So -- so you two -- where are you two talking

9   when you're in your -- when you're in your home that

10   day?  I'm going to go back to 12/31/05.

11        A:   In the bedroom.

12        Q:   And so have you told me the sum of the

13   conversation that you remember?

14        A:   Yes.

15        Q:   Okay.  There's nothing else that you remember?

16        A:   No.

17        Q:   Okay.  What happens next?

18        A:   Well, he leaves.  He -- he leaves.

19        Q:   And how do you know he leaves?

20        A:   I was -- I think I went to the bathroom, and

21   he walked out of the bedroom and he left.  He walked out

22   the door.

23        Q:   Do you know if he left immediately?

24        A:   I -- I know -- yeah.  I don't know.  Yeah.

25   I'm sure he did.  I mean, he went from the bedroom to

DepoScript3

1    the living room and out the door.

2         Q:  Do you know if he said goodbye to the girls?

3         A:  The girls were in the living room.  I don't

4    know.

5         Q:  Did they tell you anything about what their

6    father told them, if anything?

7         A:  No.

8         Q:  Okay.  And did he say anything else to you

9    before he leaves?

10        A:  No.

11        Q:  And tell me what was -- do you remember what

12   car he was driving that day?

13        A:  The Ford Explorer.

14        Q:  Is it white?

15        A:  Yes.

16        Q:  Okay.  And only if you know, are the plates

17   520YLF?

18        A:  No.

19        Q:  That doesn't sound right?

20        A:  I know that's not correct now.  That's not

21   what his plates are now.  I don't remember --

22        Q:  You don't remember looking at the time?

23        A:  -- what they were at the time.  I know that's

24   not what they are now.

25        Q:  Okay.  Does he still drive the white Ford

1    Explorer?

2       A:   Yes.

3       Q:   So he's changed his plate number?

4       A:   Yes.

5       Q:   Okay. And did you -- did you then call 9-1-1?

6       A:   No. I came in the house or I came back into

7    the bedroom and actually called my sister-in-law.

8       Q:   Who is that?

9       A:   Shelly Doe.

10       Q:   The telephone number -- this is on 12/31 of

11    '05. You stated -- and just tell me if I'm right. The

12    telephone number was 314-487-5472. That was your land

13    line at home?

14       A:   Yes.

15       Q:   I just wanted to make sure. We've talked

16    about a lot of phone numbers. So you call your --

17    Shelly from that number?

18       A:   Yes.

19       Q:   And what do you talk about?

20       A:   I guess I need to go back, if you will.

21       Q:   Sure.

22       A:   When John Doe was talking with me --

23       Q:   Uh-huh.

24       A:   -- one of my children came to the door and

25    said Aunt Shelly's on the phone.

DepoScript3

1    Q:   Which child was that?

2    A:   I don't remember.

3    Q:   That's okay.

4    A:   And I said tell her I'll call her back.  I

5    can't talk now, I can't talk now or whatever I said.

6    But I -- in my head I was thinking I had to call.  It

7    was -- I just felt like I needed to call her.

8    Q:   Okay.  So what did you talk about when you

9    called her?

10   A:   She asked me if I knew where John Doe was, and

11   I told him he -- I told her he had just left, and I'm

12   upset at this point.  I'm crying and I'm upset, and

13   that's when she informed me that there was apparently

14   this suicide letter.

15   Q:   And you who did -- what did she say about

16   that?

17   A:   Just what I said.

18   Q:   She said there was a suicide letter that John

19   Doe wrote?

20   A:   I don't remember her exact words.

21   Q:   Well, generally.

22   A:   Yeah.  Just that there was -- obviously -- she

23   said there was a suicide -- apparently a suicide letter.

24   Q:   Did she seem concerned?

25   A:   She was very concerned.

DepoScript3

32

Q:   And why is that, did she say?

A:   I don't recall the whole conversation.

Q:   So she told -- she asks where John Doe was, she tells you there's a suicide letter, and she's very concerned.  Anything else happen between the two of you in the conversation?

A:   Yes.  I asked her what do I do, and she said you need to call the police.

Q:   And why did you ask what do I do?

A:   I was pretty frazzled, emotional.

Q:   Because the -- the suicide note made you concerned, the idea of a suicide note?

A:   Correct.

Q:   And why is that?

A:   Because he had left.

Q:   Do you know if he had any weapons with him that day?

A:   I -- because he was a police officer, I know he had his -- his weapon with him.

Q:   Did he normally have -- carry weapons with him?

A:   I -- I mean, I don't know if I can answer that.  I mean, he wasn't with me every day.

Q:   That you observed; when you observed him.

A:   At times, yes.  At times.

DepoScript3

1    Q:   And so did that play into your concern, the

2 weapons?

3    A:   Yes.

4    Q:   Okay.  Why else were you concerned?

5    A:   I -- I was concerned just because of the

6 situation.

7    Q:   Were you -- were you concerned because he was

8 upset when you two were having that conversation in your

9 home?

10    A:   Yes.

11    Q:   And the conversation -- the conversation you

12 had, did it link up to suicide, or could it have linked

13 up to suicide?

14    A:   No.  It wasn't -- it wasn't until I spoke with

15 Shelly and she mentioned this possible suicide letter

16 that I was like whoa.  It was just like whoa.

17    Q:   So it made you worried when you found out

18 about it?

19    A:   It did.

20    Q:   Okay.  And then -- so you said what should I

21 do, right?

22    A:   Yes, I did.

23    Q:   Okay.  Then what does Shelly tell you?

24    A:   To call the police.

25    Q:   And did she say why or anything like that?

1      A:  I remember her commenting that they lived too

2  far away.  There was nothing that they could do.  I was

3  the one that was here.

4      Q:  Meaning Shelly lived too far away?

5      A:  Correct.

6      Q:  Okay.

7      A:  Yeah.

8      Q:  So she was trying to urge you to do something?

9      A:  Yes.

10     Q:  And how did she find out?  Do you know how she

11 found out about this?  When you're talking to her, does

12 she say how she finds out about the suicide note?

13     A:  Once again, I -- I could not quote any of the

14 whole conversation.

15     Q:  I understand.

16     A:  My mind, of course, at that time was a little

17 bit overwhelmed.  I believe it was mentioned that it was

18 through Shawn.

19     Q:  Who is Shawn?

20     A:  Shawn is John Doe's nephew who was in that --

21 who was with them at that time.

22     Q:  Was with whom?

23     A:  With Shelly, was staying there.  I think he

24 was out there for the summer or something.

25     Q:  What's his last name?

DepoScript3

1    A:   It wasn't summer.

2    Q:   Do you know?

3    A:   Doe.

4    Q:   So he was living with Shelly?

5    A:   I think he was just out there for vacation.

6    He wasn't -- he was with her at that time.  I know his

7    name was mentioned and Crystal's name was mentioned when

8    it came to the letters.

9    Q:   So Shelly said she had gotten it from them?

10   MS. RANDLES:  Objection; mischaracterizes the

11   testimony.

12   Q:   (By Ms. Merklin von Kaenel) Just tell me what

13   Shelly said.

14   A:   I can't quote what Shelly said.  I know she

15   said suicide letters, suicide letter, that was from --

16   Crystal's name was brought up.

17   Q:   Uh-huh.  And was it clear that the suicide

18   letter was by John Doe?  Was that your impression?

19   A:   That was my impression.

20   Q:   And then -- I know it's hard to remember, but

21   have you told me pretty much what you remember of this

22   conversation with Shelly?

23   A:   Yes.

24   Q:   Okay.  So she says call the police.  What's

25   the next thing that happened?

1    A:   I hung up the phone, and I called the police.

2    Q:   So did you -- how did you call the police?

3    A:   I called 9-1-1.

4    Q:   Okay.  I know it sounds silly, but I've gotta

5    ask you how you did it.

6    A:   I called 9-1-1.

7    Q:   You just dialed 9-1-1.  What -- what happens?

8    A:   Once again, forgive me for probably not being

9    able to repeat what I said at the moment, that -- I'm

10   sure I mentioned that my husband was upset, had left,

11   and that his sister had told me there apparently was a

12   suicide letter.  I was concerned.  I was worried.  I

13   knew that, you know, he was a police officer and would

14   have, you know, a weapon.

15   Q:   Did you -- do you remember if it was a male or

16   female dispatcher that you spoke to?

17   A:   I don't remember.

18   Q:   That's fine.  Do you remember that they --

19   they identified themselves as St. Louis County?

20   A:   I'm sorry.  I couldn't even tell you that at

21   this point.

22   Q:   That's fine.  It's a question.  If you -- if

23   you don't remember, you don't remember.  I understand.

24        You said my husband left, sister said suicide

25   letters, you were concerned, worried, knew he was a

1    police officer and had weapons.  Anything else that you

2    may have said?

3         A:   I don't recall.

4         Q:   Do you remember anything the dispatcher told

5    you?

6         A:   No.

7         Q:   And do you remember describing what vehicle he

8    was driving?

9         A:   I don't remember.  I don't recall that, but

10   I'm sure if they asked, I would have told them at that

11   time --

12        Q:   Okay.

13   .    A:   -- but I don't remember.

14        Q:   Do you remember describing what police

15   department he worked for?

16        A:   Once again, if they would have asked me, I

17   would have told them.

18        Q:   Uh-huh.  So you could have, is that right?

19        A:   Yeah.

20        Q:   Okay.  Anything else that you remember or --

21   those may not be the words or the topic, the impression.

22        A:   The impression I was getting from the 9-1-1

23   call or just anything?

24        Q:   Your impression of what you may have said or

25   -- to the 9-1-1 dispatcher.

DepoScript3

1    A:   No.

2    Q:   Okay.  So what is the next thing that happens

3    after -- you hang up with 9-1-1?

4    A:   Correct.

5    Q:   Okay.  So tell me something.  You think --

6    would you -- I know it's hard to remember these things,

7    but do you think this may have occurred around 1:00 in

8    the afternoon?

9         MS. RANDLES:  Objection.  It calls for

10   speculation in the manner it's phrased.

11   Q:   (By Ms. Merklin von Kaenel) Could you have

12   called 9-1-1 around 1:00, 1 p.m.?

13        MS. RANDLES:  Same objection. .

14        You can answer.  Those are just for the

15   record.

16   A:   Yeah.  Yes.

17   Q:   (By Ms. Merklin von Kaenel) Okay.  Tell me

18   what was the -- after you hung up with 9-1-1, tell me

19   what's the next thing that happens.

20   A:   I got a phone call from John Doe.

21   Q:   And do you know if he called you from his cell

22   phone?

23   A:   Yes.

24   Q:   And what does he -- how -- just after the

25   9-1-1 call?

DepoScript3

1          A:   Brief -- yeah.  A brief time.

2          Q:   Okay.  And what did -- what is said in that

3     conversation?

4          A:   That he was heading down to the farm or down

5     to the ranch.

6          Q:   Did you guys own a ranch?

7          A:   No.

8          Q:   So do you know what he meant by that?

9          A:   I believe it was a place that his mother used

10    to go or --

11         Q:   This is his deceased mother?

12         A:   Correct.

13    .     Q:   And this was a place that she owned?

14         A:   I don't believe she owned it.  I believe she

15    used to go.

16         Q:   It was a place that was particularly

17    meaningful to her, if you know?

18         A:   I'll say yes.

19              MS. RANDLES:  Objection; calls for

20    speculation.

21         Q:   (By Ms. Merklin von Kaenel) Okay.  Did he go

22    there often?

23         A:   I don't know.

24         Q:   And what -- do you know what he would do there

25    if he went?

DepoScript3

```
 1        A:   No.

 2        Q:   Okay.  So he said he was going to the farm or

 3   ranch.  Anything else?

 4        A:   And then he asked me if I had called the

 5   police.

 6        Q:   And why would he have said -- asked you that?

 7             MS. RANDLES:  Objection --

 8        Q:   (By Ms. Merklin von Kaenel) Do you know?

 9             MS. RANDLES:  -- calls for speculation.

10        Q:   (By Ms. Merklin von Kaenel) You may answer.

11        A:   Well, I know now.  I mean --

12        Q:   Okay.  Well, what do you know now?  Tell me.

13        A:   I know that he was on the -- he was on the

14   phone with me telling me this as the police had, you

15   know, spotted him, was pulling him over.

16        Q:   Could you hear sirens when you were talking to

17   John Doe?

18        A:   I don't recall.

19        Q:   Fair enough.  What did you tell him -- what

20   was your response when he said he was going to the farm

21   or the ranch?

22        A:   I don't think I -- I don't think I had a

23   verbal response.

24        Q:   Okay.  What did he -- then you said the next

25   thing he said, he asked you if you called the police.
```

DepoScript3

1   What was your response to that?

2       A:   Yes.

3       Q:   What else was said between the two of you?

4       A:   It was kind of him saying did you call the

5   police.  I probably hesitated, and he said you called

6   the police on me and he hung up.  That was the end of

7   the conversation.

8       Q:   And have you described everything you remember

9   that happened during that conversation?

10      A:   Yes.

11      Q:   Okay.  So what's -- what's the next thing that

12  happens in this story, in this event?

13      A:   Things just get so fuzzy.  I remember -- I

14  remember one of the police officers then coming to the

15  house.

16      Q:   Okay.  Is that on the 31st?

17      A:   Yes.

18      Q:   Okay.  So a police officer comes to your

19  house.  Do you -- do you see him in the room today?

20      A:   No.

21      Q:   Can you describe him?

22      A:   No.

23      Q:   Okay.  Do you remember his name?

24      A:   No.

25      Q:   Do you remember what time this was?

DepoScript3

42

1      A:    No.

2      Q:    Was it after the -- the phone call you had

3   with John Doe?

4      A:    Yes.

5      Q:    Okay.  And was it before nightfall?

6      A:    Yes.

7      Q:    Would it have been shortly after you spoke

8   with John Doe?

9      A:    Yes.

10     Q:    And what happens when the police officer comes

11  to your house?

12     A:    He asked -- he asked me what was going on,

13  what had happened.

14     Q:    What did you tell him?

15     A:    Everything I just probably said to you; he

16  left, the phone call, the possible suicide letter, me

17  calling 9-1-1.

18     Q:    What else -- if you remember, what happened

19  between the two of you?

20     A:    I also at some point in time, and I -- I don't

21  remember if it was before or after this officer came.  I

22  had gotten another phone call from -- from Crystal, or I

23  had gotten a phone call from Crystal.

24     Q:    So you got a phone call from Crystal Marshall.

25  Do you remember, was it -- would it have been before you

1  and John Doe talked to each other on the phone?

2      A:   No.

3      Q:   Okay.  So after you and John Doe speak, you

4  speak to Crystal Marshall?

5      A:   Correct.

6      Q:   And what happens during that conversation?

7  What is said during that conversation?

8      A:   She was informing me that she's on her way to

9  see John Doe and she has these letters, the letter.

10     Q:   Well, is it letter or letters?

11     A:   I'm going to say letter.  The letter.

12     Q:   Are you a hundred percent sure of that?

13     A:   Yes.

14     Q:   Okay.  I'm just curious.  So she says she has

15 a letter, and she's going to see John Doe.  What else

16 does she say?

17     A:   That was -- that was probably it.

18     Q:   What did you say to her?

19     A:   I don't know that I quite said anything.

20     Q:   Had you spoken with her before on the phone?

21     A:   One other time.

22     Q:   About what?  What did you talk to her about on

23 the phone at that time?

24     A:   She had called me about a week before.

25     Q:   And do you mean a week before 12/31 of '05?

44

1     A:   Correct.

2     Q:   Why did she call you?

3     A:   To apologize to me for interfering with my

4   family.

5     Q:   How did she interfere with your family?

6     A:   She had called John Doe when he was at the

7   house.

8     Q:   At --

9     A:   Our house.

10     Q:   -- Skyview?

11     A:   Skyridge.

12     Q:   Skyridge.  I'll remember that one day.  I

13   don't know why I have this block.        .

14        So he was at your house at one point?

15     A:   Uh-huh.   Yes.

16     Q:   And she calls him or you?

17     A:   Him.

18     Q:   Okay.  And what happened then?

19     A:   I got a phone call.  John Doe left, and she --

20   I got a phone call from her saying -- apologizing that

21   she had called and was disruptive.

22     Q:   How was she disruptive?

23     A:   That was her words.

24     Q:   Okay.  Fair enough.

25     A:   Once again, I kind of sat there going -- I was

DepoScript3

1    complexed (sic) myself by why I was getting the phone

2    call.

3        Q:   Is that the only other time you talked to her?

4        A:   Correct.  Yes.

5        Q:   So you talked to her one time when she calls

6    to apologize, and then you have a phone call with her

7    where she tells you she's got this note and she's going

8    to see John Doe.  Do you know where she was going?

9        A:   To St. Anthony's.

10       Q:   Had you known by that time that he was going

11   to St. Anthony's?

12       A:   I -- I don't recall how I got that

13   information, but I -- I think maybe I did ask the

14   officer that had came.

15       Q:   Do you know if you did ask that officer, the

16   officer that physically came to your house?

17       A:   Correct.

18       Q:   Do you know if you asked him whether --

19       A:   You know, I'm going to say I don't know

20   whether I asked or if he just told me this is what

21   happened.  I don't remember.

22       Q:   That's okay.  Do you remember talking to any

23   other police officers?

24       A:   Not at that time, no.

25       Q:   Okay.  Could you have spoken to any other

DepoScript3

46

1    police officers?

2        A:   Not at that time.

3        Q:   And did you get -- did you go to

4    St. Anthony's?

5        A:   No.

6        Q:   Why didn't you go to St. Anthony's?

7        A:   I didn't.  I don't know.  I didn't.

8        Q:   Were you worried about him?

9        A:   Yes.

10       Q:   Did he call you from St. Anthony's?

11       A:   Yes.  He did call me.

12       Q:   How many times did he call you from

13   St. Anthony's?                      .

14       A:   Yes.

15       Q:   More than once?

16       A:   Yes.

17       Q:   I hate to do this to you.  More than twice?

18       A:   Yes.

19       Q:   More than three times?

20       A:   Yes.

21       Q:   More than four times?

22       A:   Yes.  He called me, yes.

23       Q:   I guess I'm trying to figure out how many

24   times.

25       A:   I don't -- I don't know.

1       Q:   More than five?

2       A:   Yeah.  Yes.

3       Q:   More than ten?

4       A:   I don't know what his transition was from how

5   long he was at St. Anthony's, so I don't know if your --

6   how specific.  He did call me a lot.  I don't know where

7   he was each time he called me.

8       Q:   I just asked how many times he called you.

9       A:   I don't know.  I don't have an exact number.

10      Q:   Okay.  Do you think he called you more than

11  five?

12      A:   Yes.

13      Q:   More or less than ten?

14      A:   Are you -- over the course of how long?  I

15  mean, where are you --

16      Q:   The end of 1/1/2006.

17          MS. RANDLES:  He was moved from St. Anthony's

18  to Hyland.  The question is did he call you from

19  St. Anthony's?  That's the confusion.

20      A:   Yeah.

21      Q:   (By Ms. Merklin von Kaenel) Okay.  How many

22  times did he call you from the time after the

23  conversation with him on the cell phone where he tells

24  you did you call the police, so after that time to the

25  end of 1/1/of '06, the next day?

DepoScript3

1    A:   To the end of the whole next day?

2    Q:   Uh-huh.

3    A:   More than ten.

4    Q:   More than ten?

5    A:   Uh-huh.

6    Q:   Do you know how many of those phone calls took

7    place while he was either in St. Anthony's or in Hyland

8    Center?

9    A:   I don't know.  I couldn't tell you how many.

10   Q:   Half of them?

11   A:   I don't know.  I don't know.

12   Q:   Okay.  So during those conversations -- we can

13   just take them one at a time in order.  Can you tell me

14   what was said during those -- each of those

15   conversations?

16   A:   I could not tell you everything that was said

17   at each one of those conversations.

18   Q:   Why don't you tell me generally what was said

19   during those conversations, what you remember.

20   A:   That this -- he -- that it wasn't right.  He

21   didn't belong there.  He wanted me to help him.

22   Q:   How could you help him?  How did he ask you to

23   help him?

24   A:   I don't think he did.  I don't remember that.

25   Q:   It wasn't right that he was there.  I'm sorry.

1    He asked you if you could help him?

2         A:   Yeah.  You have to help me.  This isn't right.

3         Q:   Did he suggest how you could help him?

4         A:   I don't recall.

5         Q:   Okay.  What else did he say?

6         A:   It was a lot of just that.

7         Q:   So he repeated --

8         A:   Yeah.  A lot of repetition.

9         Q:   Did he talk about the suicide help --

10             MS. RANDLES:  Objection; mischaracterizes the

11   testimony.

12        Q:   (By Ms. Merklin von Kaenel) -- or the suicide

13.  letter?

14             MS. RANDLES:  Same objection.

15        A:   No.

16        Q:   (By Ms. Merklin von Kaenel) Did he talk about

17   Crystal Marshall?

18        A:   No.

19        Q:   Did he blame you?

20        A:   No.

21        Q:   Did he talk about the phone call you made to

22   the St. Louis County Police Department or 9-1-1?

23        A:   No.

24        Q:   Did he talk about the St. Louis County police

25   officers?

DepoScript3

1    A:  No.

2    Q:  Did he talk about any of his family members?

3    A:  No.

4    Q:  Did he talk about his children?

5    A:  No.

6    Q:  So essentially he said it wasn't right that he

7    was there, and he was asking you to help him?

8    A:  Yes.

9    Q:  That's the sum of your conversations with him?

10   A:  Uh-huh.

11   Q:  Okay.  And you don't remember anything else?

12   A:  No.

13   Q:  Okay.  Do you remember -- .do you know when he

14   was released?

15   A:  I know it was January 1st.

16   Q:  Do you know if it was the afternoon, the

17   evening?

18   A:  I don't know the exact time.

19   Q:  Okay.  Did he come to your house after he was

20   released?

21   A:  Yes.

22   Q:  Okay.  Anything else that happened before he

23   comes to your house when he's released, anything else

24   that occurs that you can remember between you and John

25   Doe?

DepoScript3

1      A:   No.

2      Q:   And you've described you had a couple of

3   contacts with the police officer.  You had contact with

4   Crystal Marshall.  Is there anybody else you talked to

5   during that time period?

6      A:   Other than the people you mentioned.  I did

7   speak with his sister Shelly.

8      Q:   You said you spoke to her initially.  Did you

9   speak to her again?

10      A:   Yes.

11      Q:   You spoke to her again?

12      A:   Yes.  There was more conversation with her.

13      Q:   Why don't you tell me about that conversation?

14      A:   The conversation --

15      Q:   May I interrupt?

16      A:   Sure.

17      Q:   Would that have been on 12/31 or on 1/1?

18      A:   The conversation I'm -- I'm thinking of was on

19   1/1 --

20      Q:   What was --

21      A:   -- that I can tell you about.

22      Q:   What can you tell me about it?

23      A:   The conversation I had with Shelly on 1/1 was

24   -- well, I guess to back up for a minute, I had had

25   other conversation with Crystal who was wanting me to --

DepoScript3

well, I had to go pick up John Doe's car, and I had his

keys.

Q:   When was that?

A:   This was on 12/31.

Q:   Why did you have to go pick up John Doe's car

and keys?

A:   Because they told me to.

Q:   Who did?

A:   I guess it was one of the officers --

Q:   Okay.

A:   -- you know.

Q:   A police officer had called you and asked you

to go pick up his car and keys?   .

A:   Well, I don't know if they called me or if it

was the one -- I was just instructed this is what you

need to do.

Q:   You don't remember who it was?

A:   I -- no.

Q:   That's fine.  Okay.  So at one point somebody

tells you you need to go pick up his car and keys.  Did

they tell you where it was?

A:   Yes.

Q:   Tell me what happened.

A:   Well, I went and did that.

Q:   How does it relate to the conversation you had

DepoScript3

1  with Crystal?

2      A:   Because I guess I had his keys.  I guess my

3  point is I had his keys at this point because I went and

4  got his car and brought it back to our house.  Crystal

5  wanted -- had called me and wanted the keys to John

6  Doe's apartment.

7      Q:   Uh-huh.  Go ahead.  Sorry.

8      A:   Okay.  She wanted the keys for his apartment.

9      Q:   Why did she want the keys for his apartment,

10  do you know?

11      A:   She told me she wanted to get her things out

12  of there.

13      Q:   What else did she say?

14      A:   She told me that John Doe had guns in his

15  apartment and that she would make sure that those would

16  be out of there.

17      Q:   What did you say?

18      A:   I guess I -- I was just listening.  This

19  wasn't just a -- a two-sentence -- I mean, she kind of

20  went on, this is what I need to do type of thing.

21      Q:   And did you meet with her --

22      A:   No.

23      Q:   -- to give her the keys?

24      A:   This is where I -- at one point I again spoke

25  with Shelly --

1      Q:   Okay.

2      A:   -- and she at that point said things are

3  not --

4      Q:   Who said that?

5      A:   Shelly is -- is talking to me.

6      Q:   Thank you.

7      A:   I'm sure I'm telling her that Crystal wants me

8  to meet with her and give her the keys, and at that

9  point Shelly was like something is not right.  I don't

10 like what's going on here.  I think we've been misled.

11 We need to stick together as a family, and we are not

12 going to do any -- Crystal needs to be out.  Do not give

13 her those keys.  We need to just stick together and talk

14 amongst us.

15     Q:   And may I ask you if I can?  Do you know when

16 you're having this conversation with Shelly?  I know you

17 said it was -- is this the 1/1 conversation, or this was

18 12/31?

19     A:   No.  This is -- I'm -- I'm thinking it was the

20 -- the day after.

21     Q:   Okay.  So the day after you're having this

22 conversation with Shelly --

23     A:   Uh-huh.

24     Q:   -- where she says something is not right, we

25 have been misled, Crystal Marshall needs to be out, we

*Gore Perry Gateway Lipa Baker Dunn & Butz*
*St. Louis 314.241.6750    St. Charles 636.940.0926*

DepoScript3

1    need to stick together --

2        A:   Uh-huh.

3        Q:   -- anything else she says?

4        A:   Other than do not -- do not give her those

5    keys.

6        Q:   Did you ever meet with her on 12/31, Crystal

7    Marshall, that is?

8        A:   Yes, I did.

9        Q:   Where did you meet with her?

10       A:   At the Bread Company.

11       Q:   Where is that?

12       A:   Off of Manchester Road.

13       Q:   What would be a good cross street for that

14   one?

15       A:   Manchester and 270.

16       Q:   Okay.  And why did you meet with Crystal

17   Marshall -- this is on 12/31 of 2005?

18       A:   Correct.

19       Q:   Do you remember around what time you met with

20   her?

21       A:   It was evening, early evening.  I don't recall

22   the exact time.

23       Q:   Why did you meet with her?

24       A:   She was going to hand me, show me, give me the

25   letter.

DepoScript3

1    Q:   Did she?

2    A:   No.

3    Q:   She told you she was going to give you the

4    letter?

5    A:   Yes.

6    Q:   What happened when you got there and you met

7    her?

8    A:   She didn't give me the letter.  She just

9    continued -- she talked regarding her relationship with

10   her and John Doe.

11   Q:   What did she say about that?

12   A:   I don't remember details.  I probably didn't

13   want to hear them, but I don't remember the details.

14   Q:   I understand it's an uncomfortable time.

15   A:   I don't remember the details.

16   Q:   Did she talk about having the letter?

17        MS. RANDLES:  Do you mean when they met?

18   Q:   (By Ms. Merklin von Kaenel) When you met with

19   her at the Bread Company at Manchester and 270, did she

20   talk about having this suicide letter, if you remember?

21   A:   I don't remember.

22   Q:   But that was the purpose?

23   A:   That was the purpose of me going --

24   Q:   Uh-huh.

25   A:   -- when we -- I don't remember.

1    Q:   Did you ask her for it?

2    A:   Yes.

3    Q:   And what did she say, if you remember?

4    A:   I don't remember what she said.  I don't

5    remember what she said.  She showed me another letter

6    that was written that had nothing to do with it, but it

7    wasn't --

8    Q:   What did that letter have to do with?

9    A:   It was a letter that John Doe had written to

10   her at one point, I guess.

11   Q:   Like a love letter?

12   A:   It talked about how he felt.  I didn't really

13   read it word to word.

14   Q:   So does she -- I'm sorry.  Did you say you

15   asked her for the suicide letter?

16   A:   I would like to think I did.  That's why I

17   went.  I don't -- I -- I didn't get it, so I don't --

18   Q:   And do you -- and you don't remember whether

19   she said I'm not giving you the suicide letter, I'm

20   keeping it or anything like that?

21   A:   I don't remember that.

22   Q:   Okay.  Anything else you guys talked about

23   that you haven't described yet?

24   A:   I don't think so.

25   Q:   Okay.  So I guess I'm going to recap some of

1    this.  You get a phone call from Crystal Marshall after

2    -- after John Doe calls you on his way -- when he left

3    your house.  So John Doe calls you first --

4        A:   Correct.

5        Q:   -- and then you get a call from Crystal

6    Marshall.  Then you meet with Crystal Marshall later

7    that evening at the Bread Company.

8        A:   Uh-huh.

9        Q:   Any other contacts with Crystal Marshall that

10   day?

11       A:   No.

12       Q:   And then with respect to Shelly, I know Shelly

13   initiated, first called you before you called 9-1-1.

14   Any other conversations with Shelly on 12/31 of '05?

15       A:   I don't -- I don't recall.

16       Q:   Okay.  Is there anybody else you spoke to on

17   12/31 of '05?

18       A:   No, other than -- I mean, my kids, my -- you

19   know.  I mean, nothing --

20       Q:   What did you tell your kids?

21       A:   My kids -- I did -- my kids were -- went with

22   my cousin.  I just called my cousin and said I need you

23   to come pick up the kids for me, and so they, you know,

24   went to their house.

25       Q:   Were they -- were they there for -- were your

1    children at your home when you called 9-1-1?

2        A:   Yes, they were.

3        Q:   And where were -- where were they in relation

4    to you when you made that phone call?

5        A:   I was in the bedroom.  They were not in the

6    bedroom with me.

7        Q:   Could they hear you?

8        A:   I don't believe so.

9        Q:   Did they talk to you about it?

10       A:   No.  I -- after I made the 9-1-1 call, I had

11   them go over to the neighbor's.

12       Q:   Okay.  And then what -- who -- strike that.

13            You said you then spoke to Shelly on 1/1 of

14   '06 where you described your conversation with her, is

15   that right?

16       A:   Yes.

17       Q:   The conversation about sticking together and

18   you think you've been misled, when would that have

19   occurred on 1/1 of '06, morning, afternoon, night?

20       A:   It would have been either morning or

21   afternoon.  I don't recall the exact time.

22       Q:   Do you have any other conversations with

23   anyone else on 1/1 of '06 with respect to these

24   incidences?

25       A:   I spoke with John Doe -- one of John Doe's

DepoScript3

1    other sisters.

2        Q:   Who is that?

3        A:   Cindy --

4        Q:   Uh-huh.

5        A:   -- Doe.

6        Q:   That's Shawn's mother?

7        A:   Correct.

8        Q:   And what did you talk about?

9        A:   I don't -- I don't remember the exact

10   conversation.  I just know it was Cindy and her husband

11   Paul who were the ones that picked John Doe up when he

12   was released, so that was probably -- anything with our

13   conversation maybe had to do with that.  I mean, I don't

14   recall.

15       Q:   You said something about Shelly getting some

16   information from Shawn that may have started -- started

17   this with respect to Shelly.  Shelly gets some

18   information from Shawn.  Am I mistaken about that?

19       A:   No.

20       Q:   When Shelly called you the first time before

21   you called 9-1-1, did he mention she had a conversation

22   with Shawn?

23       A:   Shawn's name was mentioned.  At the time I --

24   I -- I mean, I don't know what that conversation was or

25   anything.

61

Q:   Meaning you don't remember what she said about Shawn?

A:   I -- I believe that the -- no.  I don't remember what she said.  I know his name was mentioned.

Q:   Uh-huh.

A:   I know he was out there, and I believe it was the fact that Shawn's the one that had the interaction with Crystal.

Q:   And do you know how he could have had that?

A:   No.

Q:   Okay.  So is it -- is it your impression that Shawn found out about the suicide note or letter?

A:   From Crystal and then spoke --

Q:   With Shelly?

A:   Yes.  That's --

Q:   Is that your impression now?

A:   That's -- if I think about it.

Q:   Well, was it your impression then?  Did you know how that worked?

A:   I guess I didn't think -- I wasn't thinking it through.  I just heard -- I was talking to Shelly.  I heard Shawn.  I heard Crystal's name --

Q:   Uh-huh.

A:   -- so I would have probably put that together.

Q:   Okay.  And have you since found out more

1    information about how that transpired, now the

2    information was passed?

3        A:   Not real details, no.

4        Q:   Okay.

5        A:   No.

6        Q:   What -- did you talk to anybody else other

7    than Cindy Doe and Shelly on 1/1 of '06 about this?

8            MS. RANDLES:  You mean telephone calls?

9        Q:   (By Ms. Merklin von Kaenel) Yes, or in person.

10   Did you talk to anybody else about this on 1/1 of '06?

11       A:   As I said, my -- no, other than my family, you

12   know, my kids.  Of course, not what was truly going on,

13   but I mean, I talked to people, but regarding this, not

14   that I -- not that I recall.

15       Q:   Okay.  So there was no one else other than

16   Shelly and Cindy that you talked to about John Doe, the

17   suicide note and John Doe being in the hospital?  Nobody

18   else?

19       A:   I don't recall.  I don't recall.

20       Q:   Okay.  Did there come a time when you spoke to

21   someone at the hospital?

22       A:   No.

23       Q:   You didn't speak to a nurse at the hospital?

24       A:   No.

25       Q:   I guess let me ask you a different question.

DepoScript3

1      Could you have spoken to a nurse at the hospital?

2          A:   I don't know.

3          Q:   Could you have told someone at the hospital

4    that you were concerned about a suicide letter or, you

5    know, you would try to bring it to the hospital or

6    something like that?

7              MS. RANDLES:  Objection; calls for

8    speculation.

9          Q:   (By Ms. Merklin von Kaenel) Does that sound

10   familiar?

11         A:   No.

12         Q:   No.  Okay.  And did you have a conversation

13   with Crystal Marshall that day, 1/1 of '06?

14         A:   Yes.

15         Q:   And when was that conversation?

16         A:   I don't recall the exact time.  It was -- I

17   don't recall.

18         Q:   Morning, afternoon?

19         A:   I would go for morning or early afternoon.

20         Q:   What did you guys talk about then?

21         A:   It was just regarding the -- the keys.

22         Q:   What did you talk about?

23         A:   Oh.  The conversation with respect to her

24   wanting to get the keys?

25         Q:   Correct.  That happens on 1/1 of '06?

1    A:   Yes.

2    Q:   Got it.  Any other conversations you had with

3 her that day?

4    A:   I don't recall.

5    Q:   Did John Doe keep any guns at your house?

6    A:   Yes.

7    Q:   How many guns did he keep at your house?

8    A:   I don't know.

9    Q:   More than one?

10   A:   I don't know.

11   Q:   Do you know where he kept them?

12   A:   He had a locked cabinet.

13   Q:   Did you have the key?

14   A:   No.

15   Q:   Were you concerned about the guns in your

16 home?

17   A:   No.

18   Q:   Did you and Crystal have a conversation about

19 the guns in your home?

20   A:   No.

21   Q:   So the only conversation you had about guns

22 with Crystal is the conversation you had on 1/1 of '06?

23   A:   Correct.

24   Q:   Who else have you -- okay.  Let me strike

25 that.

DepoScript3

1        Other than John Doe, is that every

2   conversation you had on 1/1 of '06 with respect to the

3   events of 12/31?

4       A:   Yeah.

5       Q:   Okay.  You've described every conversation

6   you've had with respect to his hospitalization and his

7   -- his being taken to the hospital on 12/31 of '06?

8           MS. RANDLES:  Objection.

9       Q:   (By Ms. Merklin von Kaenel) '05.  12/31 of

10  '05.

11          MS. RANDLES:  Objection.  You just made it

12  ambiguous because you changed the date.

13          MS. MERKLIN von KAENEL:  Well --

14          MS. RANDLES:  You said 1/1 and then you went

15  back to 12/31.

16      Q:   (By Ms. Merklin von Kaenel) With respect to

17  the events of 12/31 of '05 and that his hospitalization

18  that continued into 1/1 of '06, is that every

19  conversation -- you have you described every

20  conversation you've had on 1/1 of '06?

21      A:   I believe so, yes.

22      Q:   Okay.  So then you said John Doe gets released

23  on 1/1 of '06, is that correct?

24      A:   Yes.

25      Q:   And did he call you?  Strike that.

DepoScript3

1        You said you had somewhere between five and

2   ten conversations with H.M. John Doe.  Is that while he

3   was -- between 12/31 of '06 -- '05 and 1/1 of '06, is

4   that right?

5        A:   Yes.

6        Q:   And did some of those occur on 12/31 of '05?

7        A:   The conversations, yes.

8        Q:   And did some -- and the rest of them occurred

9   on 1/1 of '06?

10       A:   Yes.

11       Q:   And you described your conversations with them

12  as amounting to it wasn't right that he was there and

13  could you help me, is that correct?

14       A:   Yes.

15       Q:   At one point does he call you to tell you he's

16  -- he's going to be released?

17       A:   Yes.

18       Q:   So you talked to him about -- you also talked

19  about his getting released?

20       A:   I don't think there was much of a

21  conversation.  I was aware.  He told me that Cindy and

22  Paul were there.

23       Q:   Okay.  And did you make arrangements to meet

24  that day?

25       A:   Yes.  I was to meet him back at our house.  I

1    was not at our house.  I was still with my kids at my

2    cousin's house, so --

3        Q:  Why did you make arrangements to meet with

4    him?

5        A:  He was being released, and he asked.  He asked

6    me, or it was -- I guess I was going to meet him back at

7    the house.

8        Q:  Why did he want to meet with you back at the

9    house?

10       A:  I don't know if I have a direct answer to

11   that.  I know when we did get back to the house, he was

12   showing Paul and Cindy that his guns were still where

13   they were downstairs and locked with a key.

14       Q:  Anything else that happened while he was at

15   your house?

16       A:  No.  I don't recall anything.

17       Q:  Did he say anything while he was at your

18   house?

19       A:  I don't remember anything detailed.  I mean,

20   it was --

21       Q:  What did you talk about?

22       A:  I'm sure there was conversation.  I don't

23   remember.  I don't recall the exact conversation.  I

24   know that showing that the guns were at our house still

25   was an issue.

DepoScript3

1    Q:   Uh-huh.

2    A:   That's the thing I remember.

3    Q:   Do you remember any conversation with him when

4    he was at the your house with respect to Crystal

5    Marshall?

6    A:   No.  We did go to his apartment after our

7    house.

8    Q:   You went to his apartment --

9    A:   Yes.

10   Q:   -- with Cindy and Paul?

11   A:   Correct.

12   Q:   And what -- well, why don't we just stick to

13   the conversation you had at your house first before we

14   move to his apartment?  Did you talk about anything else

15   with respect to Crystal Marshall there?

16   A:   I don't recall anything specific.

17   Q:   Okay.  Did you talk about your calling 9-1-1?

18   A:   No.  No.

19   Q:   Did you talk about St. Louis County at that

20   time?

21   A:   No.

22   Q:   Did you talk about Creve Coeur at that time?

23   A:   No.

24   Q:   Did you talk about your kids at that time?

25   A:   No.

1    Q:   So the main idea was to show his guns were

2    locked to Cindy and Paul when you were at your house?

3    A:   Yes.  That's how I perceived it.  When I came,

4    they were already there.

5    Q:   What was the purpose of going to his

6    apartment?

7    A:   To show, to prove that we had just been misled

8    and that the things Crystal had said were -- were not

9    true.

10    Q:   And how did he prove that to you?

11    A:   By going to his apartment.

12    Q:   And what was there was proof that you guys had

13    been misled by what she said?

14    A:   There was absolutely nothing there of hers,

15    and there were no guns anywhere in that apartment.

16    Q:   That would be his apartment, is that right?

17    A:   Correct.

18    Q:   And so he was trying to prove that Crystal

19    Marshall had lied to you about the suicide note?

20    MS. RANDLES:  Objection; calls for

21    speculation.

22    Q:   (By Ms. Merklin von Kaenel) Is that your

23    understanding of what he was trying to do?

24    A:   At the moment?

25    Q:   At that moment, yes.

DepoScript3

```
 1        A:   It was several of those things.  There was

 2   nothing in his apartment of hers, that there were no

 3   guns in his apartment --

 4        Q:   Uh-huh.

 5        A:   -- and yes, regarding the letter.

 6        Q:   Okay.  So his -- he was trying to prove to you

 7   these three things that you just --

 8        A:   Correct.

 9        Q:   -- listed for us?

10        MS. RANDLES:  Objection; calls for

11   speculation.

12        Q:   (By Ms. Merklin von Kaenel) And how would

13   these -- did he try to -- was he trying to prove to you

14   that she had been lying about the suicide note?

15        MS. RANDLES:  Same objection.

16        A:   Yes.

17        Q:   (By Ms. Merklin von Kaenel) And how did he

18   prove it to you at the apartment?

19        A:   He had showed his sister and brother-in-law it

20   on the computer.

21        Q:   Showed what on the computer?

22        A:   Showed -- with an explanation.  It was on the

23   computer, a -- what had been logged in on the computer,

24   a paper that he -- it was like a -- lack of words.  A

25   paper he was told to do through one of his counseling
```

1   sessions to reflect on his family.

2      Q:   Uh-huh.  Did you read it at that time?

3      A:   I do not recall reading it at that time.  I

4   recall Cindy reading off of it --

5      Q:   Uh-huh.

6      A:   -- and they were in the other room reading off

7   of it on the computer.

8      Q:   Uh-huh.

9      A:   John Doe and I were in another room, and he

10  was -- they were like back and forth talking regarding

11  what was said.

12     Q:   Have you ever read it?

13     A:   I believe I did get to see it at one point..

14     Q:   When did you get to see it?  When did you get

15  to read the letter?

16     A:   I believe it was that day or that evening.

17     Q:   What did it say?

18     A:   It was -- I couldn't tell you exactly.  I

19  couldn't tell you.  I couldn't quote you what it said.

20  It said -- it mentioned different brothers and sisters

21  and just things from maybe their childhood.

22     Q:   Did it describe abuse?

23     A:   No.

24     Q:   Did it describe his sexual abuse?

25     A:   No.

DepoScript3

1    Q:   Did it describe the loss of his mother?

2    A:   No.

3    Q:   Did describe anything -- did it just describe

4  happy times?

5    A:   Yes.

6    Q:   There was nothing sad about it?

7    A:   No.

8    Q:   Did it talk about his -- did it only talk

9  about his childhood, or was it more than that?

10    A:   I don't recall the whole letter.

11    Q:   Uh-huh.

12    A:   I don't.

13    Q:   Okay.  So you only remember that it talked

14  about or described his family --

15    A:   His -- yes.

16    Q:   -- and his upbringing?

17    A:   I don't know if I would -- I don't know if I'd

18  say that.  Just --

19    Q:   But there was no mention of sexual abuse --

20    A:   No.

21    Q:   -- or his mother, his mother's death?

22    A:   I don't remember it saying anything regarding

23  even his mom or dad.  I -- I just remember his brothers

24  and sisters.

25    Q:   Had they been subject to any kind of abuse,

DepoScript3

1    his brothers and sisters?

2           MS. RANDLES:  Objection; calls for

3    speculation.

4           Q:   (By Ms. Merklin von Kaenel) Did letter

5    describe any kind of abuse?

6           A:   No.

7           Q:   Okay.  So do you know where that -- where this

8    paper or letter exists, if it still exists?

9           A:   No.

10          Q:   You've never seen it since?

11          A:   No.

12          THE WITNESS:  Can we take a break, please?

13          MS. MERKLIN von KAENEL:  Sure.  We're going to

14   go off the record.  Take a break, please.

15          I'm going to remind you you're still under

16   oath, and all the questions that I asked you in the

17   beginning of the deposition continue, the same rules

18   continue into this part of the deposition.

19          (A short break was taken.)

20          Q:   (By Ms. Merklin von Kaenel) Okay.  We were

21   talking about -- the last thing we were talking about is

22   you went to his apartment with Cindy and Paul --

23          A:   Yes.

24          Q:   -- is that right?  So tell me -- and we talked

25   about his proving that he wasn't suicidal or proving

1    that there wasn't a suicide note or letter, is that

2    right?

3        A:   Yes.

4        Q:   Is there anything else that was said with

5    respect to that issue?

6        A:   No.

7        Q:   Okay.  And then he -- you said that he wanted

8    to prove there was nothing of hers at his apartment, is

9    that right?

10           MS. RANDLES:  Objection; calls for

11    speculation.

12        Q:   (By Ms. Merklin von Kaenel) You told me a

13    list; prove nothing of hers was at his apartment, prove

14    there were no guns at the apartment, and prove that

15    there was no suicide letter or note.  Were those the

16    three main things?

17        A:   Yes.

18        Q:   And tell me how he -- we talked about how to

19    prove the no suicide note, no letter.  Tell me how he

20    proved -- why did he prove that there was nothing of

21    hers there?

22        A:   Well, that it was from her.  I mean, if I need

23    to go back -- when she was trying to get the keys, it

24    was because she kept on telling me she had all her stuff

25    there.  She wanted to get all her stuff out.

DepoScript3

1    Q:   Okay.  So that's why he was showing you she

2    had nothing at his apartment?

3    A:   Correct.

4    Q:   What about the proof there were no guns in his

5    apartment?  Why did he have to show you that?

6    A:   Just to prove that she was lying about a lot

7    of things.

8    Q:   Okay.  Because at that point until you talked

9    to Shelly, you guys believed her, but Shelly on 1/1 says

10   hey, we need to rethink this whole thing, is that -- and

11   then John Doe takes you through why she's not

12   believable.  Is that the sequence?

13   A:   Yes.

14   Q:   And is there anything else that he showed you

15   or proves to you -- proves while you guys are at his

16   apartment that day?

17   A:   No.

18   Q:   So what's the next thing that happens after

19   you guys go to his apartment?

20   A:   I think that was it.

21   Q:   Pardon me?

22   A:   I think that was it.  Those things were kind

23   of proven, you know.  That was it.  That was kind of the

24   end of it.

25   Q:   Where did you go after that?

1  A: We went back to Paul and Cindy's house.

2  Q: All four of you?

3  A: Yes.

4  Q: And what did you do there?

5  A: That's where we stayed the night.

6  Q: And where are your kids?

7  A: They are at my cousin's house.

8  Q: So it was only you, John Doe, Paul and

9 Cindy --

10  A: Yes.

11  Q: -- that go to Cindy's house?

12  A: Uh-huh.

13  Q: And you stay the night?

14  A: Uh-huh.

15  Q: Why did you do that?

16  A: Everybody was exhausted at this point.

17  Q: And then what happened -- so you went back to

18 Paul and Cindy's and stayed the night.  What happened

19 after that with respect to you?  What did you do next?

20  A: The next day I got up, and I guess I -- I went

21 and got my kids and started the week, I guess.  Who

22 knows?

23  Q: Did you part ways with John Doe?  Did he go

24 with you back home?

25  A: No, he did not.

1    Q:   Okay.  Where did he go?

2    A:   I'm sorry.  My focus at that point was just to

3  go -- it was obviously a long weekend.  A lot of things

4  -- my focus was to go get the kids, you know, and get

5  them to school or whatever.  I guess I had my -- this is

6  what I need to do now.

7    Q:   You don't know where John Doe was?

8    A:   No, I didn't.

9    Q:   That's okay.  So what about -- you went

10  through 1/1 of '06.  Was there anybody else that you

11  spoke with or met with on 1/1 of '06 that you haven't

12  told me yet?

13    A:   No.

14    Q:   Okay.  Did a police officer come to your house

15  that day?

16    A:   On 1/1?

17    Q:   Yes.

18    A:   No.

19    Q:   Could he have come and you don't remember?

20    A:   I wasn't at home on 1/1 other than when I met

21  with John Doe and Paul and Cindy that early evening.

22    Q:   So I guess maybe let me go back to that.  When

23  did you go to your cousin's house?  Did you go on 12/31

24  of '05 or 1/1 of 06?

25    A:   I -- on 12/31 I spent the -- I -- I didn't

DepoScript3

```
 1    stay at home.  I -- I went there on 12/31 and spent the

 2    night.

 3         Q:   So 12/31 of '05 you spent that night with your

 4    cousin?

 5         A:   Yes.

 6         Q:   And you don't go back to your house until you

 7    meet with John Doe, Cindy, and Paul?

 8         A:   Correct.

 9         Q:   That's the house on Skyridge?

10         A:   Yes.

11         Q:   And approximately what time do you go back

12    home?

13         A:   I don't remember.  It was -- it was early

14    evening.  Maybe it was dark.  I recall it being dark.

15         Q:   Okay.  Have you ever met with -- and maybe

16    we'll go -- on 12/31 of '05 you describe a police

17    officer coming to your house?

18         A:   Yes.

19         Q:   And that was on 12/31 of '05 after your 9-1-1

20    phone call, correct?

21         A:   Yes.

22         Q:   This officer physically comes to your house?

23         A:   Yes.

24         Q:   How long was he there for?

25         A:   I don't know.  I mean, I don't recall it being
```

1    a long time.

2        Q:   Okay.  And remind me.  Do you remember what he

3    looked like?

4        A:   I do not.

5        Q:   Did he -- do you know what a St. Louis County

6    police officer uniform looks like?

7        A:   Yes.

8        Q:   Okay.  Was he wearing that?

9        A:   Yes.

10       Q:   Other than that, did you have any other

11   contacts -- other than your 9-1-1 phone call and the

12   police officer coming to your house, did you have any

13   contacts with St. Louis County or anyone from St. Louis

14   County?

15       A:   Just when I went and picked up his keys later

16   that day --

17       Q:   And how did that --

18       A:   -- when they called me.

19       Q:   Who called you?

20       A:   Okay.  I don't know if they called me.  When

21   the officer -- someone told me I needed to go get his

22   car and his keys.  I don't remember how that all came

23   about.

24       Q:   Did someone drive you to go get his cars?

25       A:   Yes.  My cousin did.

1    Q:   Whose -- the name of the cousin, please?

2    A:   Kathy Rensing.

3    Q:   Kathy Rensing?

4    A:   Uh-huh.

5    Q:   So Kathy drove you to go get his car?

6    A:   Yes.

7    Q:   And was someone there?  Did someone meet you

8  at his car?

9    A:   No.  I went into the little police station.

10   Q:   Do you know where that was?

11   A:   On Tesson Ferry.

12   Q:   And someone handed you the car keys --

13   A:   Yes.

14   Q:   -- and directed you -- was the vehicle there

15  at the substation?

16   A:   No.

17   Q:   Where was the vehicle?

18   A:   It wasn't right there at that location.  It

19  was where they had pulled him over at.

20   Q:   Where was that?

21   A:   It was in the same general area but not

22  exactly -- I mean, it wasn't right there.

23   Q:   So it was on Highway 21?

24   A:   It was off in a parking lot.  I mean, it

25  wasn't off the side of the road.  It was in a parking

DepoScript3

1    lot.

2        Q:   Okay.  We've had a couple depositions in this

3    case, and we have -- we have exhibits in this case, so

4    I'm going to hand you what's been previously marked as

5    Exhibit No. 47.  Would you do me a favor?  Would you

6    take a look at it?

7        A:   Uh-huh.

8        Q:   Okay.  If I told you the big X on the upper

9    right corner represents the hospital --

10       A:   Okay.

11       Q:   -- and there's a marking that says 270.

12       A:   Uh-huh.

13       Q:   That represents generally where 270 is.

14       A:   Uh-huh.

15       Q:   The circle with the FB is a bank, and then

16   what you see towards the left side of the paper, towards

17   the bottom is a parking lot.  Is that relatively laid

18   out where the parking lot was in relation to the

19   hospital and 270 and the bank?

20           MS. RANDLES:  Objection to the form of the

21   question in that we had already stipulated that this was

22   not to scale, but subject to that objection, go ahead

23   and answer.

24       Q:   I'm talking about is that relatively where the

25   parking lot would be, somewhere south of there?

DepoScript3

1    A:   Correct.

2    Q:   Okay.  And to your memory, if you remember, is

3  that generally how that parking lot is laid out with

4  what may have been a Wendy's or a former Wendy's over

5  there in that bottom left-hand corner?

6    A:   I don't remember the exact parking lot.

7    Q:   That's fine.  It's off 21?

8    A:   Yes.

9    Q:   That's what you mean by Tesson Ferry Road?

10    A:   Yes, it is.  It's the same thing.

11    Q:   Okay.  Thank you very much.

12    A:   Uh-huh.

13    Q:   .When you went to the parking lot, were there

14  any cars there other than John Doe's?

15    A:   I don't recall.

16    Q:   Were there any police officers there?

17    A:   No.

18    Q:   And then on -- did you have any contact with

19  any St. Louis County employee police officer on 1/1 of

20  '06?

21    A:   No.

22    Q:   Could you have had or you had none?  Could you

23  have had a contact and forgotten it, or you had none?

24    A:   I had none.

25    Q:   Okay.  What -- did you have any other contacts

1    with St. Louis County Police or St. Louis County after

2    this with respect to this incident?

3         A:   After this incident?

4         Q:   Uh-huh.

5         A:   Yes, I did.

6         Q:   And what was that?

7         A:   One of them came to my -- came to the house.

8         Q:   Do you know when that was?

9         A:   No.  I -- I do not.

10        Q:   Do you know if it was close in time to the --

11   to 12/31 of '05?

12        A:   Depending on what you call close in time, I

13   honestly don't know.  Maybe a couple months.  I don't

14   know.

15        Q:   So someone may have come to your house a

16   couple months later?

17        A:   Yeah.

18        Q:   All right.  Do you remember who it was?

19        A:   Yes.

20        Q:   And do you see the person in this room?

21        A:   Yes.

22        Q:   And there are two men in this room.  Is it one

23   of them?

24        A:   Yes.

25        Q:   Is it the gentleman with the glasses or the

DepoScript3

1    gentleman without the glasses?

2        A:   With the glasses.

3        Q:   Okay.  And you're identifying Officer

4    Thomeczek?

5        A:   Yes.

6        Q:   Okay.  And tell me what happened during that

7    conversation.

8        A:   I remember him just inquiring about John Doe.

9        Q:   And what did he say?

10       A:   I don't recall everything.  I remember him

11   asking where -- if he -- I'm going to assume he asked me

12   if he was there because I remember telling him he did

13   not -- he was not -- he was not living at this address

14   still.

15       Q:   Okay.

16       A:   So --

17       Q:   Do you remember anything else, any other part

18   of your conversation with Officer Thomeczek?

19       A:   Not details, no.  I just know he was inquiring

20   about John Doe, and I really didn't have the

21   information.  I felt like John Doe wasn't there, was not

22   living with me, and I really didn't have the information

23   he was asking, so I felt like I was -- I couldn't

24   answer.

25       Q:   Was -- did he ask you for the suicide note --

1     A:   No.

2     Q:   -- or letter?

3     A:   No.

4     Q:   Do you remember it, or he didn't ask you at

5  all?

6     A:   No.  He did not ask.

7     Q:   Okay.  Was he asking -- was he inquiring into

8  John Doe's well being?  Was it that kind of a

9  conversation?

10     A:   It probably would have appeared to go that

11  way, yes.

12     Q:   Anything else that you remember him asking

13  about John Doe's well being?  Anything else?  .

14     A:   Not specifically.

15     Q:   Okay.  Do you remember anything you told him?

16     A:   Other than that he didn't live here and I was

17  unsure of the things that he was asking me he.

18     Q:   Okay.  And you don't -- and you said -- I'll

19  ask you again.  When did this conversation occur with

20  Police Officer Thomeczek?

21     A:   I don't have -- I don't know the exact date.

22  It was after this incident of December 31st.

23     Q:   Okay.  Could it have been the next day?

24     A:   No.  No.

25     Q:   Could it have been the next week?

1    A:   No.  It seemed to be a little bit longer than

2  that.

3    Q:   Okay.  And then you stated that you -- you

4  mentioned Shelly.  Can you tell me her full name for the

5  record?  We talked about Shelly, but we never really

6  identified her.

7    A:   Rachel Doe.

8    Q:   Doe?

9    A:   Yes.

10    Q:   And where does she reside?

11    A:   She presently resides in Shreveport,

12  Louisiana.

13    Q:.  And where did she reside on 12/31 of '05?

14    A:   I believe she was in Phoenix or Scottsdale,

15  Arizona.

16    Q:   And is that where your father-in-law lived at

17  that time as well?

18    A:   Correct.

19    Q:   Was John Doe going to Phoenix?  Did John Doe

20  to Phoenix after this event?

21    A:   He -- he did go.  He did go to Phoenix.  He

22  did.

23    MS. RANDLES:  Scottsdale.

24    A:   I'm sorry.  It's Scottsdale.

25    Q:   (By Ms. Merklin von Kaenel)  Why did he go to

1    Scottsdale?

2        MS. RANDLES:   Objection; calls for

3    speculation.

4        Q:   (By Ms. Merklin von Kaenel) If you know.  You

5    don't know why he went?

6        A:   No.

7        Q:   Do you know when he went?

8        A:   I'm sorry.  I don't have a date.  I don't -- I

9    don't know.

10       Q:   If you don't know, you don't know.

11       A:   I don't know.

12       Q:   I appreciate that.

13           When did you reconcile with John Doe?

14           MS. RANDLES:   Objection; asked and answered.

15       A:   In 2006.

16       Q:   (By Ms. Merklin von Kaenel) Okay.  Why did you

17   reconcile?

18       A:   We just talked about some things and decided

19   that we would, you know, like to re -- try to be a

20   family again and move forward.

21       Q:   And did you go see a therapist or a

22   psychiatrist or social worker or some -- someone in

23   that --

24       A:   Yes.

25       Q:   -- field?  Who did you see?

DepoScript3

88

1    A:   She has a very strange last name.  I -- I

2  wouldn't be able to spell it or even probably pronounce

3  it.  Her first name is Marty.  It began with an S.  I

4  don't know.

5    Q:   And about how many times did you see Marty?

6    A:   I believe twice.

7    Q:   And both times with John Doe?

8    A:   Yes.

9    Q:   And a normal session, like an hour each time?

10    A:   Yes.

11    Q:   Okay.  So you went to see Marty twice for

12  about an hour each time, is that right?

13    A:   Yes.

14    Q:   And is it -- I'm going to screw it up.  Is it

15  Sensencovich or something like that?

16    A:   I know it starts with an S.  It's a different

17  name.

18    Q:   And do you remember where the office is?

19    A:   Yes.  It's on Tesson Ferry.

20    Q:   And who -- how did you find Marty, the

21  therapist?

22    A:   I probably just looked it up.

23    Q:   So you found the therapist?

24    A:   Yeah.

25    Q:   Okay.  Who else did you go see, if anybody

DepoScript3

1   else?

2      A:   Nobody.

3      Q:   So the only person you've ever seen after you

4   reconciled was this Marty on Tesson Ferry road?

5      A:   Yes.

6      Q:   Twice?

7      A:   Yes.

8      Q:   And was there anybody that you two saw when

9   you were separated?

10     A:   No.

11     Q:   What happened to your divorce lawsuit?

12     A:   It was dropped.

13     Q:   You both agreed to drop it?

14     A:   Yes.

15     Q:   Did you ever consult a lawyer?

16     A:   No.

17     Q:   With respect -- so you just did the divorce

18   papers yourselves?

19     A:   Yes.

20     Q:   And you worked together on those?

21     A:   Yes.

22     Q:   Either before or during -- before or during

23   your separation, had he ever threatened to take the

24   girls away from you?

25     A:   No.

DepoScript3

1    Q:   So you were always in agreement about who

2  would get the girls?

3    A:   Yes.

4    Q:   Okay.  And had -- had he during your marriage

5  or during your separation ever hit you?

6    A:   No.

7    Q:   And that means any kind of hit, slap, punch,

8  push, anything.

9    A:   No.

10    Q:   Okay.  And then had he -- had you always lived

11  at Skyridge?  Did you ever move out of Skyridge?

12    A:   That was not our first home.  Are you asking

13  prior or just talking right now?

14    Q:   No.  Very good.  I apologize.  During your

15  separation or during marriage, had you ever lived

16  outside of Skyridge?

17    A:   No.

18    Q:   You never moved out?

19    A:   No.

20    Q:   Even temporarily?

21    A:   No.

22    Q:   So you were always there?

23    A:   Yes.

24    Q:   What has -- what has Mr. -- what has John Doe,

25  Mr. Doe, told you -- how has he described the events of

1  12/31 with respect to St. Louis County?  What has he

2  said about the events with respect to St. Louis County,

3  12/31 of '05?

4        A:  I don't know if I can answer that.

5        Q:  Has he talked to you about what happened on

6  12/31 of '05 with respect to the St. Louis County police

7  officers?

8        A:  Not -- no, not specifically.  No.

9        Q:  Well, I hate to ask the flip side meaning how

10 not specifically?  Has he said anything about them?

11       A:  No.

12       Q:  Has he said anything about what they did or

13 what happened to him on 12/31 of '05?           .

14       A:  Obviously we have discussed things that have

15 gone on but nothing -- nothing outside of a husband and

16 wife talking about what happened that day.

17       Q:  Well, tell me what happened.  Tell me what he

18 said.

19       A:  Everything I just told you.

20       Q:  So there's nothing other than what you've told

21 me?

22       A:  No.

23       Q:  There's nothing else at all that happened?

24       A:  No.

25       Q:  That's all I'm trying to get to, believe me.

DepoScript3

1    Everything you said in this deposition is everything

2    he's told you with respect to St. Louis County, is that

3    correct?

4         A:   Yes.

5         Q:   Okay.  Is there anything else he's told you

6    with respect to his employment at Creve Coeur?

7         A:   No.

8         Q:   So he hasn't talked about his being

9    terminated, his -- his employment being terminated with

10   Creve Coeur?

11        A:   Well, I -- yes.  I mean, I'm aware of that.

12        Q:   Okay.  So what has he said about his being

13   terminated with Creve Coeur, why he was terminated?

14        A:   I don't know if I have that exact answer.

15        Q:   Well, just tell me generally what was said.

16        A:   I don't know.  I mean, I don't know.

17        Q:   Has he said anything more than he was

18   terminated by Creve Coeur?

19        A:   No.

20        Q:   Has he told you why he thinks he was

21   terminated by Creve Coeur?

22        A:   I guess I'm going to speculate the fact that

23   it was -- he was on that fine line or was on still

24   probation, his probational period.

25        Q:   So you don't remember specifically anything he

DepoScript3

1    said about why he was terminated by Creve Coeur?

2        A:   No.

3        Q:   Okay.  Did you have any -- did you partake --

4    were you involved in any way in the sexual abuse

5    lawsuit, from the preparation of it or in filing it?

6        A:   No.

7        Q:   And are you -- did you have discussions about

8    this lawsuit, the lawsuit we've filed today?

9        A:   No.

10       Q:   You've never talked about it?

11       A:   No.

12       Q:   Okay.  And I don't want to know the substance

13   of your conversations with his attorney, but have you

14   met with his attorney with respect to this lawsuit?

15       A:   This morning.  This morning.

16       Q:   And again, I don't want to know what was said,

17   but will you tell me how many times -- have you met with

18   anybody or spoke on the phone with anybody in her

19   office?

20       A:   No.

21       Q:   Okay.  What has Mr. Doe, John Doe done to find

22   a job since his termination with Creve Coeur?  What do

23   you know?

24       A:   I don't know specifics about that.

25       Q:   Did you guys ever talk about hey, are you

DepoScript3

1    looking for a job, who did you apply with?

2        A:   No.  I don't ask details.  I mean, I don't

3    have that information.

4        Q:   Okay.  Do you know -- you don't know who he's

5    applied for employment with?

6        A:   No, I don't.

7        Q:   And do you -- you know that he was employed

8    after he was terminated from Creve Coeur?

9        A:   Yes.

10       Q:   Okay.  And was that with Enterprise?

11       A:   Yes, it was.

12       Q:   Okay.  And what did he -- has he told you why

13   he left that employment?

14       A:   Nothing other than he said it didn't seem to

15   work out.

16       Q:   Is that what he said; it didn't work out?

17       A:   That's not what John Doe always wanted to do.

18   Is that a better statement?

19       Q:   No.

20       A:   That's not what John Doe has always wanted to

21   do.

22       Q:   Is that what he told you?

23       A:   Yes.  This isn't what I want to do.

24       Q:   Is that the only reason he gave you for

25   leaving that employment?

DepoScript3

1     A:   Yes.

2     Q:   Okay.  And has he done any computer work at

3 home for anybody?

4     A:   He does do computer work, yes.

5     Q:   Has he done it since he was -- since his

6 termination with Creve Coeur?

7     A:   Yes.

8     Q:   And what kind of computer work is that?

9     A:   Oh.  I --

10    Q:   If you know.

11    A:   I'm illiterate when it comes to computers.  I

12 couldn't tell you exactly what he does.  He has that

13 ability.

14    Q:   Do you know if he's done it for pay for

15 someone else from his termination to the present day?

16    A:   Yes.

17    Q:   Do you know who he would have worked for?

18    A:   I know maybe one of the things.  He did work

19 for Vogel Veterinary which he had -- this was an ongoing

20 thing.  He's known this man probably for 15, 20 years,

21 so this has just been an ongoing thing.  He's done work

22 for him for many years before.

23    Q:   And this is since he was terminated from Creve

24 Coeur, is that right?

25    A:   Yes.

1    Q:   And was he paid for the work that he did for

2    Vogel?

3    A:   Yes.

4    Q:   And has he been paid by anybody else since his

5    termination other than Enterprise for any work he did?

6    A:   No.

7    Q:   Do you two do the financial books together for

8    your household?

9    A:   It's usually me.

10   Q:   So you do it?

11   A:   It's me, yeah.

12   Q:   So you know what income comes in --

13   . A:   Yes.

14   Q:   -- and what goes out?

15   A:   Correct.

16   Q:   So you're not aware -- other than Vogel,

17   you're not aware of any other income after his

18   termination from Creve Coeur other than Enterprise?

19   A:   Yeah.  Correct.

20   Q:   Okay.  And do you remember how much he made

21   with Vogel?

22   A:   No.

23   Q:   Could you find out if you looked at your

24   books?

25   A:   No.

DepoScript3

1    Q:   Okay.  You don't keep any records?

2         MS. RANDLES:  Objection.  She didn't say that;

3    mischaracterizes testimony.

4         Q:   (By Ms. Merklin von Kaenel) Well, do you keep

5    records, past records?

6         A:   I would not have records of that.  I would not

7    have records of that.  When you're doing your own

8    business like that, you have different things you have

9    to buy, and so I wouldn't have records of that, no.

10        Q:   Would he have had a separate bank account for

11   that business, or would he have worked through your

12   family's bank accounts?

13        A:   He has his own bank account anyway, and he

14   uses that when it comes to his business things.

15        Q:   And would he have had a separate tax return

16   for that business, or is it part of your family tax

17   return?

18        A:   It would be part of our family.

19        Q:   Because he doesn't file a separate tax return

20   with respect to his computer business?

21        A:   Correct.  It's just --

22        Q:   Okay.  And then -- but he has a separate

23   account -- he has his own account, or the business has a

24   separate account?

25        A:   No.  He does.

1     Q:  He has his own separately?

2     A:  He does.

3     Q:  And do you also have a separate checking

4 account or bank account?

5     A:  No.  No, I do not.  He has his own account,

6 and then we have an account together.

7     Q:  That's your family account?

8     A:  Correct.

9     Q:  Okay.  And you only manage the family bank

10 account, is that correct?

11     A:  Correct.

12     Q:  Okay.  Did you -- did you within the last --

13 since his termination from Creve Coeur, did you remodel

14 your house?

15     A:  Yes.

16     Q:  Okay.  Is that the -- and out of that

17 remodeling, were you then -- you got involved in a

18 lawsuit?

19     A:  Yes.

20     Q:  And how much money did you spend remodeling

21 your house?

22     A:  I don't know.

23     Q:  Can you guess?  More than $10,000?

24     A:  I honestly do not know.

25     Q:  Okay.

1       A:   He --

2       Q:   Were there contracts involved to engage those

3    services?

4       A:   I did not handle any of that.

5       Q:   Who would have done that?

6       A:   John Doe was taking care of that.  I did not.

7       Q:   So John Doe would have all that information?

8       A:   Yeah.

9       Q:   Okay.  Would the -- would the checks for the

10   remodeling have been written off the family account or

11   his personal account?

12      A:   I don't know.  I mean, I don't recall.  It

13   could have been a little bit of both.  I don't know.

14      Q:   Okay.  And since John Doe's termination, you

15   -- you stated that you two went twice to Marty for

16   marital counseling.  Do you know if John Doe went to a

17   counselor on his own?

18      A:   I do not believe so.

19      Q:   Okay.

20      A:   And I mean, you're talking about since, after

21   we -- because I had mentioned to you before John Doe did

22   go on his own during the time we were separated.

23      Q:   And how long -- do you know how long he went

24   to see that counselor?

25      A:   I do not.

Q:   Do you know why he didn't -- why he stopped going to her?

A:   I do not know.

Q:   And would you recognize the name if I told you Carol Niedermeyer?

A:   That does sound familiar.

Q:   Uh-huh.  And did he say why he wasn't going to a counselor any more?

A:   No.

Q:   Did he talk about his sexual abuse lawsuit to you?

A:   No.

Q:   Did you have any conversations about his sexual abuse lawsuit?

A:   Minimal.

Q:   What did he say about it?

A:   That this -- I mean, that there was one, I guess.

Q:   And that's it?  He didn't say anything more than that?

A:   No.

Q:   Did he let you know when he filed it?

A:   I wouldn't know, no.

Q:   Okay.  And were you ever called by any attorneys in that case?

DepoScript3

1      A:   I don't recall.

2      Q:   Okay.  And do you know -- when you reconciled

3   with him, was that case still going on?

4      A:   I don't know the dates.  I don't know.

5      Q:   Okay.

6      A:   I don't know.

7      Q:   And do you know how that case ended?

8           MS. RANDLES:  She can't talk about that.

9           MS. MERKLIN von KAENEL:  She signed the

10   confidentiality agreement --

11          MS. RANDLES:  Yes.

12          MS. MERKLIN von KAENEL:   -- in the court case?

13          MS. RANDLES:  Yes.  Absolutely..

14          MS. MERKLIN von KAENEL:  Okay.

15      Q:   (By Ms. Merklin von Kaenel) Is that correct?

16   Did you sign a confidentiality agreement?

17          MS. RANDLES:  You know, we can't even say that

18   exists until after we see the judge.  We can't talk

19   about it.

20          MS. MERKLIN von KAENEL:  I didn't realize she

21   was part of that as well.

22          MS. RANDLES:  Yes.

23          MS. MERKLIN von KAENEL:  Okay.

24          MS. RANDLES:  Even if she weren't, it would

25   violate the protective order in the case.

1      MS. MERKLIN von KAENEL:  We'll leave it for

2    the judge's determination after he decides on St. Louis

3    County's motion to compel.

4      MS. RANDLES:  And I've been letting you have

5    substantial leeway.  I'm not going to agree for her to

6    come back.  She doesn't know anything, so I mean, that's

7    why I'm giving you the leeway to talk all about the

8    issues that she knows about concerning the lawsuit, and

9    you're welcome to do that.

10      MS. MERKLIN von KAENEL:  Well, what I'm trying

11    to say is have you stopped me from asking her any

12    questions with respect to the settlement?

13  .    MS. RANDLES:  She cannot answer any questions

14    with regard to any potential resolution of the lawsuit

15    that may have occurred.

16      MS. MERKLIN von KAENEL:  And you're also

17    stopping me from asking her any questions with respect

18    to whether she may or may not have signed a

19    confidentiality agreement, is that correct?

20      MS. RANDLES:  On the record we can't even --

21    we can't admit that anything of the sort could exist,

22    although there is something that is preventing me from

23    saying that.

24      MS. MERKLIN von KAENEL:  I understand.  I want

25    to know what you're limiting me to.

DepoScript3

1          MS. RANDLES:  Yeah.

2          Q:   (By Ms. Merklin von Kaenel) I know this is a

3    big question, but I'm going to ask it anyway.  Is there

4    any other conversation you would have had that you

5    haven't described up until now with someone from

6    St. Louis County, either a St. Louis County police

7    officer or a St. Louis County employee?

8          A:   No.

9          Q:   Okay.  Is there -- had you ever met or known

10   of Police Officer Lasater and Police Officer Thomeczek

11   before 12/31 of 2005?

12         A:   No.

13         Q:   Okay.  And had you ever met or known about the

14   police officer that came to your house on 12/31 of '05?

15         A:   No.

16         Q:   Okay.  Had you been involved with any

17   St. Louis County police before that incident?

18         A:   No.

19         Q:   You had never -- had you ever called 9-1-1

20   before then?

21         A:   No.

22         Q:   Had -- had any police ever come to your house

23   before then?

24         A:   No.

25         Q:   And had any police come to your house since

1    then other than what you've described -- what you've

2    described in your deposition?

3        A:   No.

4        Q:   So you've had no contact with the St. Louis

5    County Police Department other than with respect to this

6    incident?

7        A:   Yeah.  Not -- yeah, when it pertains to that,

8    no.

9        Q:   Just what you've described --

10       A:   Correct.

11       Q:   -- in your deposition --

12       A:   Correct.

13       Q:   -- so far?

14       A:   Correct.

15       Q:   But other than that, you've had no contact

16   with the St. Louis County Police Department?

17       A:   Correct.

18       Q:   And is there anything -- you stated you never

19   called 9-1-1, is that right?

20       A:   Yes.

21       Q:   And is it your understanding that you call

22   9-1-1 if there's an emergency or you need the police

23   department?  Is that your understanding?

24       A:   Yes.

25       Q:   And do you know if John Doe had ever called

1    9-1-1 before then?

2        A:   I don't know.

3        Q:   And do you know if the police department had

4    ever responded to your home before then?

5        A:   Oh, I'm sure they have.  We've had alarms go

6    off before.  I mean, yeah, you know.

7        Q:   So they would have just responded because one

8    of your --

9        A:   Correct.

10       Q:   -- burglar alarms --

11       A:   Yeah.

12       Q:   -- could have gone off?

13       A:   Yeah.  That could have happened.

14       Q:   Is there anything about those interactions

15   that were negative?

16       A:   No.

17       Q:   Okay.  Any other contact with the St. Louis

18   County Police Department --

19       A:   No.

20       Q:   -- that you can remember?

21       A:   No.

22       Q:   And with Officers Thomeczek or Lasater in

23   particular?

24       A:   No.

25       Q:   Are you familiar with Police Officer Scott

1  Venable?

2      A:  No.

3      Q:  Have you ever had any contact with him?

4      A:  I don't even know the name.  No.

5          MS. MERKLIN von KAENEL:  All right.  I'm going

6  to take a five-minute break.

7          (A short break was taken.)

8      Q:  (By Ms. Merklin von Kaenel) I have a couple

9  more questions, and then I'll leave you alone.  Tell me

10  something.  Have you had -- other than with John Doe,

11  have you had conversation with anybody else about the

12  events of 12/31 of '05 to 1/1 of '06?

13          MS. RANDLES:  You mean aside from those that

14  she's talked about?

15          MS. MERKLIN von KAENEL:  That she mentioned in

16  the deposition; Shelly, a police officer that comes to

17  your house, John Doe, Paul, Cindy.

18      Q:  (By Ms. Merklin von Kaenel) Anybody else you

19  talked to about this?

20      A:  I think you named them all.

21      Q:  There would be nobody else you spoke with?

22      A:  No.

23      Q:  Have you ever spoken to either -- have you

24  ever spoken to Mark Doe about this?

25      A:  No.

DepoScript3

```
1        Q:   Have you ever spoken to Michael Doe about

2   this?

3        A:   No.

4        Q:   Do you know if John Doe has spoken to Michael

5   Doe about this?

6        A:   I don't know that answer.

7        Q:   And do you know if he spoke to Mark Doe about

8   this?

9        A:   I don't know.

10       Q:   Do you -- is Michael Doe -- is John Doe the

11  closest with Michael Doe of all his brothers and

12  sisters?

13       A:   I don't know if I can answer that.  I mean, I

14  don't know.  I don't know how I can answer that.

15       Q:   Who would you say he's closest with of his

16  siblings?

17       A:   I don't know.  I don't know.  I mean --

18       Q:   Who are you closest with of the siblings?  Who

19  are the ones you're closest with?

20       A:   They're all considered my family.

21       Q:   Of course.

22       A:   I don't know if there's one specifically.  I

23  mean --

24       Q:   Do you talk to any of them on a regular basis?

25       A:   Maybe.  I mean, yes, I do talk to Cindy
```

DepoScript3

1  because she does live here in St. Louis, and she is the

2  God parent for our children, so any time the kids are

3  doing something, she's involved and knows and attends

4  their events.

5      Q:  Uh-huh.

6      A:  He also has a sister, Tracey, that's somewhere

7  in the area, lives like two hours away, so the kids are

8  very close with her because she has a son that's one of

9  their ages.

10      Q:  Uh-huh.

11      A:  I mean -- Shelly, yeah.  Shelly has not lived

12  in the area in a long time.

13      Q:  Had you -- before you got a phone call from

14  her on 12/31 of '05, had you spoken to Shelly on a

15  regular basis?

16      A:  I don't remember specifically.

17      Q:  Well, was it an out-of-the-blue phone call

18  from her, or you had been talking to her all along?

19      A:  No.  It was a little bit out -- probably a

20  little bit out of the blue recently.

21      Q:  Had you ever spoken to any of his siblings

22  with respect to John Doe and his sexual abuse lawsuit?

23      A:  No.

24      Q:  Had you spoken to any of his siblings with

25  respect to these events of 12/31 of '05, 1/1 of '06?

1   A: No. Not with respect to what we've already

2 spoke about, no.

3   Q: Right. Other than what we've talked about.

4   Do you have any knowledge that Michael Doe

5 visited John Doe sometime before this event, 12/31 of

6 '05?

7   A: Michael, I believe, was in town for that

8 Christmas, that -- that Christmas before this, I

9 believe.

10   Q: Michael came to St. Louis sometime near 12/25

11 of '05?

12   A: I believe he was here for that Christmas.

13   Q: Any other siblings come for that Christmas?

14   A: No, not that I recall.

15   Q: Did you see him at that time?

16   A: Did I see him?

17   Q: Did you see Michael at that time?

18   A: Yes.

19   Q: In what context?

20   A: The girls and I -- I know met -- well, I guess

21 we saw him Christmas, and we met him, had breakfast with

22 him and his wife, myself and my -- the girls.

23   Q: With John Doe?

24   A: I -- I think -- I don't believe John Doe was

25 there at the breakfast.

1     Q:   Does Michael have any children?

2     A:   Yes.  One.

3     Q:   And did he have any children at the time you

4  met him?

5     A:   No.  In fact, she was pregnant, so we all went

6  shopping and bought some things for them to take home.

7  The girls were, like, so excited, so --

8     Q:   Okay.

9     A:   -- that was kind of the meaning or going to

10  breakfast and shopping.

11     Q:   And just how pregnant was she?

12     A:   Well, that was at Christmas time, and I

13  believe he was born -- May is his birthday.

14          MS. MERKLIN von KAENEL:  All right.  I have

15  nothing -- nothing further subject to questions that are

16  asked.

17          EXAMINATION BY MS. OWENS:

18     Q:   I just have a few questions.  Again, my name

19  is Stacie Owens.  I'm the attorney that represents the

20  City of Creve Coeur and the Chief of Police -- the

21  former Chief of Police, John Beardslee, in the lawsuit

22  that your husband has brought against them.  A couple of

23  questions, and I'm kind of jumping around because when I

24  have to go second, I have to fill in blanks as they come

25  to me; not that Lorena left blanks, but things that

DepoScript3

1    relate specifically to my lawsuit.

2           First of all, I know that you had talked about

3    you -- you handled the family -- paying the bills and

4    things of that nature.  Other than the one time that

5    John Doe did some work for this veterinarian, does he

6    contribute in any way financially to the household?

7           MS. RANDLES:  Objection.  That

8    mischaracterizes her testimony concerning the vet.

9           Go ahead.

10       Q:   (By Ms. Owens) Is there any other income that

11   he's had other than the work he did through his

12   computing business for the veterinarian?

13       A:   I guess are you then including also the -- the

14   job that he had with Enterprise?

15       Q:   Okay.

16       A:   Other than that, the answer would be no.

17       Q:   Okay.  When did he work for Enterprise?

18       A:   I -- I don't have dates.  I'm sorry.

19       Q:   Okay.

20       A:   I don't have dates.

21       Q:   Was he working for Enterprise when you

22   reconciled, when you moved back in together?

23       A:   Yes.

24       Q:   Okay.

25       A:   Yes.

DepoScript3

1    Q:   If I told you that the records indicate he

2   left Enterprise in the fall of -- the late summer or

3   fall of 2006, would that sound correct to you?

4    A:   Yes.

5    Q:   Okay.  And so since the time he left

6   Enterprise in 2006, has he held any employment?

7    A:   No.

8    Q:   Okay.  Since that time in the fall of 2006,

9   other than the work that he did for the veterinarian

10   with regard to the computer stuff, has he in any way

11   contributed financially to the -- to the family?

12    A:   No.

13    Q:   So you're the sole support for -- for both

14   John Doe and all the children?

15    A:   Yes.

16    Q:   Okay.  Has -- and Lorena may have talked to

17   you about this, but I want to explore a little more.

18   Has John Doe told you that he's applied for any

19   positions since he left the City of Creve Coeur other

20   than Enterprise?

21    A:   No.

22    Q:   Okay.  Has he talked to you about having

23   applied with any police departments for jobs?

24    A:   No.

25    Q:   Okay.  So you don't know one way or the other

1   whether he's attempted to find work?

2       A:   I know he's attempted.  I know he said I've

3   looked.

4       Q:   Okay.  He's told you he looked for work?

5       A:   Yes.

6       Q:   Okay.  Has he told you how he's looked for

7   work?

8       A:   I don't question that.

9       Q:   Okay.  You work days currently?

10      A:   Yes, I do.

11      Q:   How old are your daughters?

12      A:   They are 15, 13, and 9.

13      Q:   Okay.  So they're in school during the day?

14      A:   Yes.

15      Q:   Do you work on the weekends during the day as

16  well or just Monday through Friday?

17      A:   Just Monday through Friday.

18      Q:   Okay.  And what does your husband do while

19  you're at work and the children are at school?

20      A:   I'm not there.  I don't know specifically how

21  his day goes.  He takes care of the kids, I mean, takes

22  them to school, picks them up, is involved with all of

23  that.

24      Q:   Do you as a family have dinner together

25  certain nights of the week?

DepoScript3

1      A:   Yeah.  Usually every night.

2      Q:   Okay.  Does John Doe ever discuss with you

3  what he's done during the day?

4      A:    It's not usually our table talk or the

5  conversation at that time, no.

6      Q:   Okay.  So you're not aware of any --

7  specifically any applications for jobs that he's put in?

8      A:   I'm not, no.

9      Q:   And you're not aware that he's specifically

10  spoken to any police departments regarding employment?

11      A:   I'm not aware.

12      Q:   Okay.  With regard to the remodeling that was

13 . done on the home, I think you've indicated you're not

14  sure whether the money came out of your account or his

15  account, is that correct?

16      A:   Correct.

17      Q:   Okay.  Do you recall whether or not you cashed

18  in your 401K to pay for some of that remodeling?

19      A:   I don't -- I don't recall.

20      Q:   Do you give John Doe money to put in his

21  account since you're the sole --

22      A:   No.

23      Q:   -- breadwinner?

24      A:   No.

25      Q:   Do you know how he comes by income to put in

1    that account?

2         A:   Well, I'm not -- no.  I'm not sure, but you

3    know, we still have our account that is --

4         Q:   Does he contribute money to your joint

5    account?

6         A:   It's for our groceries.

7         Q:   Okay.  Does he contribute any money to your

8    joint account?

9         A:   He has, I mean, when -- on those few things

10   you mentioned, that you've already gone over, his

11   computer, you know.

12        Q:   Okay.  Do you know when he did the work for

13   the veterinarian?          .

14        A:   I do not know --

15        Q:   Okay.

16        A:   -- exactly.

17        Q:   Can you give me a year?

18        A:   Probably within the year.  It's probably been

19   within the year.

20        Q:   Okay.  Do you know about how much money he

21   made doing that work?

22        A:   No, I do not.

23        Q:   Did you report it on your taxes?

24        A:   I don't even know what was on there.  I don't

25   remember.

DepoScript3

1    Q:   Who fills out your tax forms?  Who files your

2  taxes for you?

3    A:   Like the company or like --

4    Q:   Well, do you file the taxes or does John Doe?

5    A:   John Doe usually does.

6    Q:   Okay.  Have you guys done your taxes yet for

7  2008?

8    A:   No.

9    Q:   Did you file taxes in 2007?

10    A:   Yes.

11    Q:   Can you give me an estimate?  I mean, did he

12  make a hundred thousand dollars doing the work for the

13  veterinarian?

14    A:   I -- I mean, no.  I could not give you an

15  estimate --

16    Q:   I mean, was it --

17    A:   -- at all.  I could not.

18    Q:   Did John Doe tell you how much he made from

19  them --

20    A:   No.

21    Q:   -- and you just can't remember?  He just

22  didn't share that information with you?

23    A:   I didn't ask.  I didn't ask.

24    Q:   Okay.  But other than that, he hasn't

25  contributed any money to the joint checking account?

1    A:   If there's money that he did have, for

2    example, with the computer, he would have put it or

3    given it to me to put to the joint checking account

4    because that's where I take it from, you know, to pay

5    bills and food and groceries or whatever.  Just from the

6    way you asked me, I mean, he does -- in the past he's

7    given me money to put in or he'll do it himself.

8    Q:   Okay.  Was the job with the veterinarian an

9    ongoing job?  Did it last a year?  Did it last less than

10   a year?

11   A:   Oh, no.  Less than a year.

12   Q:   Okay.  I'm kind of unclear.  Other than that

13   money, has he put any money in your joint checking

14   account since then?

15   A:   Yes.  Here and there, and I guess when I say

16   ongoing, when I was talking about the vet meaning that

17   he's known this man for probably 15, 16 years, you know,

18   and before when he did do computer stuff and other

19   things, so this man knows if he has a problem or needs

20   something, he calls John Doe because he knows.  That's

21   what I meant when I kind of said ongoing when it comes

22   to that specific --

23   Q:   Okay.

24   A:   -- vet.

25   Q:   Do you know if in 2008 John Doe did any work

1    for that veterinarian?

2        A:   What year are we in?

3        Q:   It's 2009.

4        A:   I think it occurred within 2008.

5        Q:   Okay.  Do you know if in 2007 John Doe did any

6    work for that veterinarian?

7        A:   I don't know.  Not that I recall.

8        Q:   Has he done any work in 2009 for the

9    veterinarian?

10       A:   Not that I know of.

11       Q:   Okay.  Has he put any money in your joint

12   checking account in 2009?

13       A:   I couldn't tell you.  I couldn't tell you.

14       Q:   Okay.  You indicated -- and again, I'm going

15   to jump around a little bit.  Prior to the events of

16   12/31, John Doe had been -- and correct me if I'm

17   misquoting, but he had been sad during that time going

18   through the issues with regard to his other lawsuit and

19   the -- the underlying issues related to that, is that

20   correct?

21       A:   Yeah.

22       Q:   Okay.  About how long had that -- had that

23   mood been going on for John Doe prior to 12/31.

24            MS. RANDLES:  Object to the form of the

25   question.  It calls for speculation.

1    Q:   (By Ms. Owens) You observed him on an almost

2    daily basis, you said?

3    A:   Of course it affected him, I mean, probably

4    for that whole time.

5    Q:   Okay.  The whole time meaning up to 12/31?

6    A:   I think we was going through that whole

7    process during that whole time.

8    Q:   Had you seen -- you indicated that on 12/31 he

9    was -- he was upset when he arrived at your house that

10   day.

11   A:   Correct.

12   Q:   Okay.  Had you seen him that upset before?

13   A:   Yes.

14   Q:   Have you seen him that upset since?

15   A:   Yes.

16   Q:   Can you tell me on what occasions you've seen

17   him that upset since then?

18   A:   Probably not.  He was -- he was upset

19   regarding his termination with Creve Coeur.

20   Q:   So he did discuss that with you?

21   A:   Well, I knew it happened.  Yes.  He told me it

22   happened.

23   Q:   Okay.  So did you have a conversation with him

24   where you observed that he was upset about it?

25   A:   Yeah.  I knew he was upset about it.  I mean,

DepoScript3

1    that's all he ever wanted to do and to be was a police

2    officer.

3         Q:   So he told you that in the course of a

4    discussion that you and he had about his employment with

5    Creve Coeur?

6         A:   About being a police officer.

7         Q:   About his employment with Creve Coeur.

8         A:   I'm sorry.  Can you repeat --

9         Q:   Sure.

10        A:   -- what you're trying to ask?

11        Q:   Sure.  I'm trying to find out did you and he

12   ever have a discussion of the termination of his

13   employment with Creve Coeur?

14        A:   We did not have a discussion.  He told me that

15   it happened.

16        Q:   Okay.  How do you know he was upset about it?

17        A:   The look in his eyes.  He was upset.

18        Q:   Okay.

19        A:   I mean, also me knowing because I do know him,

20   and I knew that this was, you know, devastating.  It's

21   what he always wanted to do.  That's all he ever talked

22   about.

23        Q:   But you ever -- you and he never sat down and

24   discussed at which point you were talking about his

25   employment as a police officer ending, and that's when

1   you observed him being upset?

2       A:   Say that one more time.

3       Q:   You never sat with him and had a conversation

4   about him no longer being a police officer in which you

5   observed him being upset?

6           MS. RANDLES:   It mischaracterizes her

7   testimony.   I object.

8       Q:   (By Ms. Owens) I'm asking that question.

9       A:   I don't remember the conversation.   It was

10  this is what's happened.   Of course, I knew he was

11  upset.   Yes, he was very upset.   I knew that.

12      Q:   During this time were he and Crystal Marshall

13  still seeing each other --

14      A:   No.

15      Q:   -- after 12/31?

16      A:   I don't know.   Not that I know of.

17      Q:   Did he ever share with you whether he was

18  upset at the end of that relationship?

19      A:   I never -- no.   I never talked to him.

20      Q:   During this time in the -- in the spring of

21  2006, are you aware that his lawsuit was still

22  continuing with regard to the molestation lawsuit?

23      A:   I don't remember dates.   I don't remember -- I

24  don't know.

25      Q:   You don't have any idea whether that was still

DepoScript3

1    ongoing?

2         A:   I don't remember, no.  I do not recall.

3         Q:   Okay.  And again, did he indicate to you what

4    he was upset about on 12/31?

5         A:   No.

6         Q:   Do you know whether or not he and Crystal

7    Marshall were still dating at that time?

8         A:   No.

9         Q:   No, they weren't, or no, you don't know?

10        A:   No.  I -- no, they weren't.

11        Q:   Do you know whether he was attempting to get

12   back together with her after the events of 12/31?

13        A:   I mean, I don't know.  I mean, I don't know.

14        Q:   Okay.  That's fine.  I'm just asking if you're

15   aware or not.

16             When John Doe shared with you the fact that he

17   had been molested as a child, did he indicate to you how

18   long he had known about that?

19        A:   No.

20        Q:   Okay.  Did you ask him how long he had been

21   aware of it?

22        A:   No.  I don't believe I -- I did.

23        Q:   Were you surprised by the revelation?

24        A:   Yeah, I was.  Yes.

25        Q:   But you didn't ask him to share any details

1    about it?

2        A:   Oh, no.

3        Q:   And at the time he told you, were you already

4    separated?

5        A:   Yes.  I believe we were, yes.

6        Q:   Other than the time that he told you

7    specifically that it had occurred, did you ever talk

8    about it again?

9        A:   No.

10       Q:   I think you indicated to Miss Merklin von

11   Kaenel that you had seen John Doe cry on occasion prior

12   to the events of 12/31.

13       A:   Yeah.    .

14       Q:   Were those occasions related to -- did he

15   indicate to you that he was upset with regard to the

16   molestation suit or the underlying molestation?

17       A:   I don't know if I can answer that.  I mean, I

18   don't know.

19       Q:   Did he -- strike that.

20           At the time that you had seen him cry, was it

21   in the course of a conversation that you and he were

22   having?

23           MS. RANDLES:  I object to the form of the

24   question.  Are you talking about the times she saw him

25   cry?

DepoScript3

1      Q:   (By Ms. Owens) The times you saw John Doe cry,

2    did those occur during the course of the conversation

3    you had with John Doe?

4           MS. RANDLES:  During her entire marriage; is

5    that what you're asking?

6      Q:   (By Ms. Merklin von Kaenel) We'll limit it to

7    the period that you were separated; from the time you

8    were separated to the events of 12/31.

9      A:   If you're asking -- I'm not sure I'm

10   necessarily the one that brought it on.  I think he had

11   a lot going on.  Obviously not necessarily because we

12   were in a conversation; maybe just a release every now

13   and then because he had so much going on.

14     Q:   Did John Doe appear upset over your

15   separation?

16     A:   Yeah.

17     Q:   Was -- was the fact that you were separated an

18   ongoing discussion during -- from the time that you

19   separated until 12/31, whether that would continue?

20     A:   Yes, it was.  Yeah.

21     Q:   How often would you say on a weekly basis you

22   talked about the separation and whether you would

23   continue to be separated?

24     A:   I don't -- I don't know.  I don't know.  I

25   don't know.

1    Q:   Were the conversations upsetting for you?

2    A:   Not -- not always.  I mean, a lot of time did

3  go by.

4    Q:   I'm sorry?

5    A:   Not always.  There was always a lot of time

6  that went by.

7    Q:   When did you first become aware that he and

8  Crystal Marshall were seeing each other?

9    A:   I -- are you asking -- I don't know a date.  I

10  mean, I don't know.

11    Q:   Let me see if we can narrow the time down.

12  You indicated you separated in approximately June of

13  2004.  In relation to the time that you separated, about

14  how long after that did -- did you find out that he was

15  seeing Crystal Marshall?

16        MS. RANDLES:  Objection; asked and answered.

17        MS. OWENS:  Not answered.

18    Q:   (By Ms. Owens) About how long after --

19        MS. RANDLES:  Miss von Kaenel asked that

20  earlier.

21    Q:   (By Ms. Owens) You can answer it again,

22  though.  How long after the -- after the separation?

23    A:   I don't know.  John Doe did tell me.  I mean,

24  John Doe himself told me.  I don't -- I don't know when

25  the time frame was.

DepeScript3

1    Q:   Okay.  Do you know if it was in 2004?

2    A:   Yes.

3    Q:   It was in 2004?

4    A:   My years are now -- yes.

5    Q:   Okay.  And again, I'm jumping around, so I

6    apologize.  We're going to the events of 12/31 now.  You

7    indicated while John doe was at your house, he said to

8    you I'm going to leave, and he told you that the girls

9    -- that you and the girls would be fine and he had set

10   things up financially, is that correct?

11   A:   Yes.

12   Q:   Okay.  Did you ask him what he meant by any of

13   that?

14   A:   No.

15   Q:   Okay.  Where were the girls while you were

16   having this conversation?

17   A:   Well, I know we were in the bedroom.  They

18   were not in there with us.

19   Q:   Okay.  Did the girls ever discuss with you

20   that they had heard this conversation?

21   A:   No.

22   Q:   Have they ever discussed any of the events of

23   12/31 with you?

24   A:   No.

25   Q:   And how old were the girls at the time?

DepoScript3

1      A:   I have to do the math.   Okay.   So this was

2   2005, so four years ago, so where does that put me?

3   Well, depending on where their birthdays fell, I guess

4   11, 9, and 5 --

5      Q:   Okay.

6      A:   -- depending on birthdays.

7      Q:   Okay.

8      A:   Somewhere in that area.

9      Q:   I understand.   During the course of the

10   conversation that you and John Doe were having, were

11   your voices raised?

12      A:   No.

13      Q:   I mean, .were you arguing with each other?

14      A:   No.

15      Q:   You indicated that you were crying at the

16   time.

17      A:   Yes, at one point.

18      Q:   What about the conversation caused you to cry?

19      A:   Because he was -- he said he was leaving.

20      Q:   But you didn't ask him where he was going?

21      A:   I guess I don't recall, or if I did, he didn't

22   answer.   There was not an answer for that.

23      Q:   How long do you think you guys had this

24   conversation in the bedroom?

25      A:   I don't know.   Just knowing from the other

1   time line, it appears it could have been maybe an hour.

2   I don't know.  I was not looking at my watch.  I don't

3   know.

4        Q:   And during the course of the conversation, you

5   didn't discuss getting divorced?

6        A:   No.

7        Q:   Did you discuss Crystal Marshall at all?

8        A:   No.

9        Q:   You talked about John Doe calling you on the

10  phone.  This is later after he left and calls you back

11  on his cell phone which reminds me.  Do you know what

12  his cell phone number was at the time?

13       A:   Whatever I told you I thought mine was, I

14  think his last digits were like 3072.

15       Q:   And was his provider the same provider?

16       A:   Yes, it would have been.

17       Q:   Were you guys on the same plan?  In other

18  words, did you get one bill for both phones?

19       A:   Yes.

20       Q:   Did that bill come to your home, or did it go

21  to John Doe's apartment?

22       A:   Our home.

23       Q:   Okay.  Was that bill in your name or John

24  Doe's name?

25       A:   I don't remember.

DepoScript3

1    Q:   Who would pay the bill each month?

2    A:   Me.  I was thinking if he was the one who

3    bought the phones and got the plan, it was probably in

4    his name.

5    Q:   I understand.  Okay.  During the course --

6    I'll get back on what I was originally going to ask you.

7    During the course of this call while he was in the car

8    after he left the home, he said he was heading down to

9    the ranch.  Does the ranch have a name?

10   A:   I do not -- I -- I wouldn't know.  I wouldn't

11   know it if you --

12   Q:   Have you ever been there with him?

13   A:   No.     .

14   Q:   Has he ever taken the girls there?

15   A:   Not that I know of.  I'm going to say no.  I

16   don't believe so.

17   Q:   Has he ever described it to you?

18   A:   No.

19   Q:   Do you know if there's a home on the property?

20   A:   I know nothing.  I don't know.

21   Q:   When he told you he was heading to the ranch,

22   you understand where he went?

23   A:   Correct.

24   Q:   And do you know generally where it's located,

25   north of St. Louis or south of St. Louis?

DepoScript3

1    A:   I think it's south.  I believe it's south.

2    Q:   Do you know how far away it is?

3    A:   I do not.

4    Q:   Is it a half an hour drive or a three-hour

5    drive?

6    A:   I don't know.  I do not know.

7    Q:   When you were married prior to your

8    separation, is this a place that he would go?

9    A:   No.

10   Q:   Had you been aware of him going there during

11   the time of your separation?

12   A:   No.

13   Q:   Okay.  So is this the first time he told you

14   he was going there?

15   A:   I guess that's the first time he said it to

16   me.  Obviously -- I guess I did know he had gone there.

17   Exactly when, no, but yeah, I mean, I knew he had gone

18   there.  I don't know when.  That's the first time he

19   said it to me.

20   Q:   And the other times that you were aware that

21   he had gone there, was it some place he would go when he

22   was upset?

23   A:   I mean, I don't know because he wasn't -- I

24   mean, he wasn't residing with me, so I don't know what

25   his -- you know what I mean?

DepoScript3

1     Q:    I understand.

2     A:    I mean, I don't know.

3     Q:    Prior to your separation had you ever been

4  aware or heard from somebody else that he had gone

5  there --

6     A:    No.

7     Q:    -- or heard him talk about the place?

8     A:    I've not heard of him going there.

9     Q:    In the course of the phone calls that John Doe

10  made to you, and I think there were approximately maybe

11  10 of them, 5 to 10 of them from 12/31 to 1/1 from

12  St. Anthony's and the Hyland Center.  In any of those

13  phone calls, did he indicate he was angry with you?

14     A:    No.

15     Q:    During the phone call that he made to you

16  while you were -- while he was driving prior to being

17  pulled over by St. Louis County, did he indicate during

18  that phone call that he was angry with you?

19     A:    No.

20     Q:    Okay.  You indicated that while he was in the

21  hospital, he asked you to help him, is that correct?

22     A:    Yes.

23     Q:    Okay.  I may be repeating.  I can't quite

24  remember everything Lorena asked you.  Did he indicate

25  to you how he wanted you to help him?

DepoScript3

1         MS. RANDLES:  Objection; asked and answered.

2         Go ahead.

3     Q:  (By Ms. Owens) Go ahead.

4     A:  No.

5     Q:  Okay.  Is there any particular reason that you

6   didn't go visit him at the hospital?

7     A:  No.

8     Q:  Were you afraid of him?

9     A:  No.

10    Q:  Were you afraid that he was angry with you?

11    A:  No.

12        MS. RANDLES:  I have a quick question.  Are we

13  running into Michael's time?

14        MS. MERKLIN von KAENEL:  Off the record.

15      (A discussion was held off the record.)

16    Q:  (By Ms. Owens) When you and Crystal Marshall

17  met at The Bread Company, did John Doe call you while

18  you were there?

19    A:  I -- I don't recall.  No.

20    Q:  Do you know whether Crystal Marshall took a

21  call while you were there?

22    A:  I don't recall.

23    Q:  What's the name of the neighbor who took care

24  of your kids on 12/31 when you sent them over?

25    A:  Jean Devanney.

DepoScript3

1    Q:   And did you explain to her why you needed her

2    to watch the children?

3    A:   No.

4    Q:   Okay.  When the St. Louis County officer

5    arrived, was he in a patrol car --

6    A:   Yes.

7    Q:   -- on 12/31?

8    A:   Yes.

9    Q:   Did your neighbor ever ask you why the police

10   had been there?

11   A:   No.

12   Q:   At what point, then, did you retrieve the

13   children from your neighbor's house on 12/31?

14   A:   I -- it was a short time after -- a short time

15   after the police officer had left.

16   Q:   And did the kids indicate that they had been

17   aware that a police officer had been there?

18   A:   I don't think they did.  I'm going to say no.

19   That was the whole point of me getting them out of the

20   house.

21   Q:   Did they -- well, were you upset at the time

22   that this was all going on on 12/31?

23   A:   Oh, yes.

24   Q:   Did the children inquire what was wrong?

25   A:   Yeah.  I mean, I don't recall any -- I mean,

1    they're kids but I really tried to, like I said, not put

2    them in the situation.  That's why they went pretty much

3    from there -- I said oh, we're going to your cousin's,

4    and I really kept them out of the whole situation.

5        Q:   All right.  So you didn't give them any

6    explanation --

7        A:   No.

8        Q:   -- for what was going on?

9        A:   No.

10       Q:   When you and Paul and Cindy and John Doe went

11   back to Paul and Cindy's house on the night of 1/1 --

12       A:   Uh-huh.

13       Q:   -- did you and John Doe have any other

14   discussions that night with regard to the events of

15   12/31?

16       A:   Yeah.  We both were there.  We both knew what

17   happened.  I don't remember going back in and discussing

18   it.  I mean, it was -- they were pretty much fresh in

19   the air.

20       Q:   Was there a period of time at Paul and Cindy's

21   house that you were alone?

22       A:   Yes.

23       Q:   Okay.  Did Paul and Cindy and John Doe as far

24   as you're aware have any more discussions about it when

25   you arrived back at their house?

DepoScript3

1      A:   I don't believe so.

2      Q:   Okay.

3      A:   Everybody was pretty worn out at this point.

4      Q:   Okay.  Your husband was terminated from Creve

5   Coeur on January 4th.  Did he share with you -- did he

6   contact you that day and share with you that he had been

7   terminated?

8      A:   Yes.

9      Q:   Do you know what time of day he called you?

10   Well, let me ask you.  Did he call you, or did he come

11   by the house?

12     A:   I believe it was a phone call.

13     Q:   And what did he tell you?

14     A:   That he was terminated.

15     Q:   Did he seem surprised?

16     A:   I mean, I don't remember.  I'm sorry.

17     Q:   Did he share with you any -- anything that had

18   happened during the termination meeting?

19     A:   No.

20     Q:   So he just told you he was terminated?

21     A:   Yes.

22     Q:   Did he tell you the reason why?

23     A:   I don't think I asked.  I mean, no.

24     Q:   Did you have an understanding of why he had

25   been terminated?

1    A:   I think like I -- I had mentioned, my

2    understanding kind of that I had was the whole

3    probationary guidelines or time line.

4    Q:   Okay.

5    A:   That was it.

6    Q:   Did you believe that it related to the events

7    of 12/31?

8    A:   Yes.

9    Q:   Did John Doe ever tell you that he thought it

10   related to any other earlier events with the city?

11   A:   No.

12   Q:   Okay.  Did he indicate to you that he had ever

13   shared with anyone at the City of Creve Coeur any     .

14   information regarding his molestation suit?

15   A:   I don't know.

16   Q:   He never -- did he ever --

17   A:   He never talked to me about that, no.

18   Q:   Okay.  So you weren't aware of whether he ever

19   informed the city of that or not?

20   A:   Correct.

21   Q:   Did he ever tell you that he thought the

22   molestation suit was the basis for his termination?

23   A:   No.

24   Q:   Did anybody from Creve Coeur ever contact you

25   after the events of 12/31?

DepoScript3

1      A:   No.

2      Q:   Okay.  Did you ever contact anybody with the

3  City of Creve Coeur after the events of 12/31?

4      A:   No.

5      Q:   Did you ever attempt to contact anyone at the

6  City of Creve Coeur after the events of 12/31?

7      A:   No.

8      Q:   And so you never discussed with John Doe or

9  anyone else the reasons for his termination?

10      A:   No.

11      MS. OWENS:  I don't think I have anything

12  further.

13                .FURTHER EXAMINATION BY MS. MERKLIN von KAENEL:

14      Q:   I just have a couple of questions to follow up

15  on some things she asked you.

16      When you were talking about the 12/31 of 2005

17  event, I think Miss Owens asked you did you know if John

18  Doe was dating Crystal Marshall, and I believe you said

19  they were not dating.  Is that correct?

20      A:   I'm sorry.

21      Q:   Did you know --

22      A:   During what time?

23      Q:   On 12/31 of 2005 --

24      A:   Okay.

25      Q:   -- did you know if they were dating or not?

DepoScript3

1    A:   Did I -- did I know if they were dating?

2    Q:   Or not.

3    A:   No.  I did not as -- no, I did not.

4    Q:   You did not know?

5    A:   I did not know.

6    Q:   Okay.  Thank you.  I had to clear the record.

7  I had a different answer.

8         And you stated that you -- on 12/31 of '05,

9  that evening, you stayed with your cousin, Kathy

10 Rensing?

11   A:   Yes.

12   Q:   And where does she live?

13   A:   In Waterloo, Illinois.

14   Q:   Do you know her address?

15   A:   No, I do not.

16   Q:   Do you know her phone number?

17   A:   No.  I do not know her phone number.  No, I

18 don't.

19   Q:   What time did you go to Kathy Rensing's on

20 12/31 of '05?

21   A:   It would have been in the evening, late.

22   Q:   And what time did you return from Kathy

23 Rensing's on 1/1 of '06?

24   A:   It would have been that evening when I met

25 John Doe and Paul and Cindy back at our house.

DepoScript3

1   Q:   And since 1/1 of '06 -- I'm sorry.  Strike

2   that.

3        Who else was present at Kathy Rensing's home

4   on 12/31 of '05?

5   A:   Her husband, myself, and the kids.

6   Q:   What is his name?

7   A:   Scott.

8   Q:   Same name, last name?

9   A:   Yes.

10   Q:   R-E-N-S-I-N-G?

11   A:   Yes.

12   Q:   And do they have children?

13   A:   Yes.

14   Q:   How many kids do they have?

15   A:   They have one.

16   Q:   And the age of that child on 12/31 of '05?

17   A:   At that time?

18   Q:   Yeah.

19   A:   You're really going to make me do math.

20   Q:   I'm sorry.

21   A:   Let me think.  Six.  Around six years old.

22   Q:   Okay.  I've got to ask you one more question

23   about something that you testified to earlier.  You

24   stated -- and I want to understand what you said.  You

25   stated you did not speak to a St. Louis county police

DepoScript3

1    officer on -- other than the officers that came to your

2    house on 12/31 of '05.

3        MS. RANDLES:  Objection; mischaracterizes her

4    testimony.

5        Q:  (By Ms. Owens) Well, you tell me.  Other than

6    the 9-1-1 phone call?

7        A:  Correct.

8        Q:  And other than the police officer that shows

9    up to your house physically?

10       A:  Yes.

11       Q:  Did you not speak to a police officer on 12/31

12   of '05?

13       A:  And then when I went and got his keys.

14       Q:  Okay.  That was on 12/31.  Before that did you

15   speak to a police officer either on the phone, a cell

16   phone?

17       A:  Before 12/31?

18       Q:  No.  I'm sorry.  After you speak to John Doe

19   H.M. on the cell phone after he leaves your house on

20   12/31 --

21       A:  Yes.

22       Q:  -- but before you go pick up keys -- pick up

23   the keys to his car.

24       A:  I'm sorry.  I'm confused on what you're asking

25   me.

DepoScript3

1    Q:   And I apologize.  I'll try to clarify it for

2    you.  After you spoke on -- this is all on 12/31.

3    A:   Okay.  Okay.

4    Q:   After you spoke with John Doe H.M. on the cell

5    phone, that was just after he left your house, is that

6    right?

7    A:   Yes.

8    Q:   Okay.  So between that time and the time that

9    you pick up the car keys, John Doe H.M.'s car keys, do

10   you speak to a police officer on a cell phone or on your

11   land line?  Do you speak to a St. Louis County police

12   officer by phone?

13   A:   No.  I had the 9-1-1 call --

14   Q:   Uh-huh.

15   A:   -- the one that came to the house --

16   Q:   Uh-huh.

17   A:   -- and then to pick up the keys.  That's all

18   that I recall.  And I know you were asking well, who

19   told you to pick up the keys, and I don't remember --

20   not that I don't remember.  I don't remember if it was

21   the officer that came to the house.  I don't remember

22   that part, but I know I was instructed or told I could

23   go get the keys and so I did.

24   Q:   Could you have had a telephone conversation

25   either by cell phone or land line with an officer from

1     when John Doe was pulled over, when he was stopped?

2          A:   No.  I don't remember --

3          Q:   Okay.

4          A:   -- any call like that.  No.

5          Q:   So if a police officer were to say when they

6     were on the scene that they spoke to you, you're saying

7     that they would be lying?

8          A:   I'm saying I don't -- I don't recall talking

9     to a police officer other than what I've told you.

10         Q:   Well, I understand that.  I appreciate that.

11    So would he be lying if he said he spoke to you?

12         A:   Other than what I've said, yes.  I don't

13    remember talking to a police officer other than what

14    I've already said.

15         Q:   I understand that.  So if he testified that he

16    spoke to you that day from the pull-over, you're saying

17    he would be lying?

18              MS. RANDLES:  Objection.  That's been asked

19    and answered twice now.

20              MS. OWENS:  I have not gotten a straight

21    answer.  I'd like a yes or no.

22              MS. RANDLES:  She said yes.

23         A:   Yes.

24         Q:   (By Ms. Owens) He would be lying.  And if he

25    -- if he stated to you that he came the next day to talk

DepoScript3

1    to you on 1/1 of '06, you're saying he would be lying as

2    well?

3        A:   Yes.

4            MS. OWENS:  Okay.  Thank you.  We're done.

5            MS. RANDLES:  You have the right to read and

6    sign your deposition.  What will happen is she'll send

7    it to me, and I'll get it to you to read.  We'll have a

8    chance to look over the deposition and make sure she's

9    taken down everything you said accurately.

10           THE WITNESS:  Okay.

11           MS. RANDLES:  If you find any errors in the

12   transcript, you can make the changes to the transcript.

13           THE WITNESS:  Okay.

14

15

16

17

18

19

20

21

22

23

24

25

DepoScript3

```
1                    C E R T I F I C A T I O N

2

3        I, Traci Butz, Certified Shorthand Reporter within

4    and for the State of Missouri, DO HEREBY CERTIFY that

5    pursuant to notice/agreement between the parties, the

6    aforementioned witness came before me at the time and

7    place hereinbefore mentioned, and having been duly sworn

8    to tell the whole truth of her knowledge touching upon

9    the matter in controversy aforesaid; that she was

10   examined on that day, and her examination was taken in

11   shorthand and later reduced to printing; that signature

12   by the witness is not waived and said deposition is

13   herewith forwarded to the taking attorney for filing

14   with the Court.

15       IN WITNESS WHEREOF, I have hereunto subscribed my

16   name this 20th day of March, 2009.

17

18

19

20       _____

21       Traci Butz
             Certified Shorthand Reporter

22

23

24

25
```

DepoScript3

```
1    Gore Perry Gateway & Lipa Reporting

2

3

4    Randles, Mata & Brown LLC

5    Rebecca M. Randles, Esq.

6    406 West 34th Street, Suite 623

7    Kansas City, Missouri   64111

8

9    Enclosed please find the Original Signature pages

10   and errata sheets for the deposition of:

11   Lisa Kay Doe taken 3/3/2009 in the case of:

12   JOHN DOE HM, AN INDIVIDUAL vs. CITY OF CREVE COEUR, ET AL.

13   Please read your copy of the transcript, noting

14   any corrections on the enclosed erratta sheets,

15   and return all pages for filing in court to:

16   St. Louis County Counselor's Office

17   Lorena V. Merklin von Kaenel, Esq.

18   41 South Central Avenue

19   Your prompt cooperation will be appreciated.

20   Sincerely,

21

22   Gore Perry Gateway & Lipa Reporting

23

24
```

DepoScript3

149

1    COURT MEMO

2    UNITED STATES DISTRICT COURT

3    EASTERN DISTRICT OF MISSOURI

4    EASTERN DIVISION

5    JOHN DOE HM, AN INDIVIDUAL vs. CITY OF CREVE COEUR, ET AL.

6    4:07-CV-00946-ERW

7

8    CERTIFICATE OF OFFICER AND

9    STATEMENT OF DEPOSITION CHARGES

10

11   DEPOSITION OF LISA KAY DOE

12   TAKEN ON BEHALF OF THE DEFENDANT

13    3/3/2009

14   Name and address of person or firm having custody of

15    the original transcript:

16   Lorena Merklin von Kaenel

17   St. Louis County Counselor's Office

18   41 South Central, 8T,

19   Clayton, MO 63105

20

21

22

23

24

25

*Gore Perry Gateway Lipa Baker Dunn & Butz*
*St. Louis 314.241.6750    St. Charles 636.940.0926*

DepoScript3

150

```
 1    ORIGINAL TRANSCRIPT TAXED IN FAVOR OF:

 2    Lorena Merklin von Kaenel

 3    St. Louis County Counselor's Office

 4    41 South Central, 8T,

 5    Clayton, MO 63105

 6    Total:

 7    1 ONE COPY - TAXED IN FAVOR OF:

 8    Stacie Owens

 9    Sandberg, Phoenix & von Gontard

10    One City Centre, 15th floor

11    St. Louis, MO 63101

12    Total:

13    1 ONE COPY - TAXED IN FAVOR OF:

14    Rebecca M. Randles

15    Randles, Mata & Brown, L.L.C.

16    406 West 34th Street,

17    Kansas  City, MO 64111

18    Total:

19

20    Upon delivery of transcripts, the above

21    charges had not been paid.  It is anticipated

22    that all charges will be paid in the normal course

23    of business.

24    GORE PERRY GATEWAY & LIPA REPORTING COMPANY

25    515 Olive Street, Suite 700
```

DepoScript3

151

1   St. Louis, Missouri 63101

2   IN WITNESS WHEREOF, I have hereunto set

3   my hand and seal on this _____ day of _____

4   Commission expires

5   _____

6   Notary Public

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DepoScript3