

COPY

RECEIVED

MAY 1 8 2009

COUNTY COUNSELOR

*IN THE MATTER OF:*

# JOHN DOE HM, AN INDIVIDUAL
## *vs.*
# CITY OF CREVE COEUR, ET AL.

*Cause No. 4:07-CV-00946-ERW*

*Deposition of Grace Renee Jones*
*4/23/2009*

*Gore Perry Gateway Lipa Baker Dunn & Butz*
*Certified Court Reporters & Legal Videographers*
*1-800-878-6750*

,

EXHIBIT

S

DepoScript3

```
 1
 2                IN THE UNITED STATES DISTRICT COURT
 3                   EASTERN DISTRICT OF MISSOURI
 4
 5
 6    JOHN DOE H.M., AN INDIVIDUAL,
 7            PLAINTIFF,
 8
 9    V.                          NO. 4:07-CV-00946-ERW
10
11    CITY OF CREVE COEUR, MISSOURI,
12    ETC., ET AL.,
13            DEFENDANTS.
14
15
16
17
18
19
20            DEPOSITION OF GRACE R. JONES, produced, sworn
21    and examined on the 23rd day of April, 2009 at the St.
22    Louis County Government Center, 41 South Central Avenue,
23    in the City of Clayton, State of Missouri, before Traci
24    Butz, Certified Shorthand Reporter in and for the State
25    of Missouri.
```

DepoScript3

3

```
1                  A P P E A R A N C E S

2

3    On Behalf Of The Plaintiff (telephonically):

4          RANDLES, MATA & BROWN, LLC

5          Rebecca M. Randles, Esq.

6          406 West 34th Street, Suite 623

7          Kansas City, Missouri  64111

8

9

10   On Behalf Of Defendants City Of Creve Coeur, Missouri

11   AND JOHN BEARDSLEE:

12          SANDBERG, PHOENIX & von GONTARD, P.C.

13          Stacie Owens, Esq.

14          One City Centre, Suite 1500

15          St. Louis, Missouri  63101

16

17

18   On Behalf Of Defendants St. Louis County, Police Officer

19   Michael Thomeczek, And Sergeant Thomas Lasater:

20          ST. LOUIS COUNTY, MISSOURI

21          Lorena V. Merklin von Kaenel, Esq.

22          Lawrence K. Roos County Government Building

23          41 South Central Avenue

24          Clayton, Missouri  63105

25
```

ALSO PRESENT:

      Sgt. Thomas Lasater

      Police Officer Michael Thomeczek

      St. Louis County Police Department

I N D E X

Examination by Ms. Merklin von Kaenel          Page  5

Examination by Ms. Randles                     Page 29

Further Examination by Ms. Merklin von Kaenel Page 37

Examination by Ms. Owens                       Page 41

Further Examination by Ms. Randles             Page 42

Further Examination by Ms. Merklin von Kaenel Page 42

E X H I B I T S

Exhibit 92                                     Page 27

   (Print from Our Lady of the Snows

   Website)

S T I P U L A T I O N

IT IS HEREBY STIPULATED AND AGREED by and between counsel for the parties that this deposition may be taken in shorthand by Traci Butz, Certified Shorthand Reporter, Certified Realtime Reporter, and afterwards transcribed into printing, and signature by the witness is not waived.

GRACE R. JONES,

of lawful age, being first duly sworn to tell the truth, the whole truth and nothing but the truth, deposes and says as follows:

EXAMINATION BY MS. MERKLIN von KAENEL:

Q: Will you please state your full name for the record?

A: Grace Renee Jones.

Q: Grace Renee Jones. How would you like me to call you? I can call you Miss Jones or Grace. What do you prefer?

A: Grace is fine.

Q: Grace is fine. Okay. This is a deposition. She's taking down your testimony, and it is important for her to have words to take down rather than inflections or uh-uhs or uh-huhs. If you would just please respond with a word like a yes or a no or something so she can take it down, that would be

terrific.

Is there anything that -- either medication or otherwise that would impede your being able to give testimony today?

A:   No.

Q:   Okay.  And if there's a problem with any question I ask, either you don't understand it or it's confusing in some way, please ask me to repeat it.

A:   Okay.

Q:   Wait until I finish my question and then you can answer because she's taking down our testimony, and it's very difficult when you and I start overlapping each other.  She'll also give us dirty looks when we're doing that, so it works out nicely.  I represent St. Louis County.  I represent Police Officers Lasater who is on my left and Thomeczek who is on my far left, St. Louis County, and the Chief of Police for St. Louis County, so I'm their attorney, and I represent them in this lawsuit.  The lawsuit was filed by John Doe H.M. I'm going to -- before I go into the plaintiff, I'm going to ask you a couple questions about yourself. Just a couple questions.

What is your present employment?

A:   City of Creve Coeur.

Q:   And how long have you been employed by Creve

Coeur?

A: Almost five years.

Q: And when did you start with them?

A: I'm sorry. Correction. I've been an officer for five years. I -- I've worked for Creve Coeur three years and some months.

Q: Okay. Where did you work before Creve Coeur?

A: Maplewood.

Q: Okay. So you worked for Maplewood for two years and then Creve Coeur for three, about?

A: About.

Q: About. Okay. And please correct me. I don't mean to put any -- any words in your mouth.

So when did you -- approximately when did you start working for Creve Coeur?

A: I believe November 28th of '05.

Q: So just after Thanksgiving?

A: Yes, ma'am.

Q: What did you do? Are you a road officer, a Sergeant? What do you do for Creve Coeur?

A: Currently I'm a road officer. As of January I was a road officer.

Q: And that includes enforcing the ordinances of Creve Coeur and the statutes of St. Louis County, is that right?

1          A:   Yes, ma'am.

2          Q:   I'm going to turn your attention to December

3     31st of 2005.  The lawsuit concerns an incident that

4     occurred on December 31st of 2005, so I'm going to bring

5     you back to that time, okay?

6          A:   Okay.

7          Q:   I'm going to specifically bring you back to

8     the time that just preceded that.

9          A:   Okay.

10          Q:   We're talking about what happened before

11     December 31st of 2005 --

12          A:   Okay.

13          Q:   -- and that's New Year's Eve, 12/31, right?

14     Do you -- are you familiar with John Doe H.M.?

15          A:   Yes.

16          Q:   Okay.  And how are you familiar with John Doe

17     H.M.?

18          A:   I believe we worked together at the City of

19     Creve Coeur for a short period of time which was, of

20     course, how I met him initially.

21          Q:   Did you -- were you on the same platoon, or

22     how were you -- how did you work together?

23          A:   We were not on the same platoon, but during

24     shift change I believe I relieved his shift.  My shift

25     relieved his shift.

DepoScript3

```
 1        Q:   Okay.  So you would -- your shift overlapped

 2   while you came on?

 3        A:   Correct.

 4        Q:   And how would you describe your relationship

 5   with Mr. Doe?  Well, why don't we start at the

 6   beginning?  You came on on 11/28, so about -- a little

 7   bit more than a month before the event I'm talking to

 8   you about.

 9        A:   Correct.

10        Q:   Would you describe your relationship during

11   that time with Mr. Doe?

12        A:   I would describe it as brief.  It's hard to

13   recall back then, but I remember that we talked on a

14   couple different occasions.  It's a hard question to

15   answer.

16        Q:   Okay.  I'll help you.  I appreciate that.

17        A:   Okay.

18        Q:   Were you friends?

19        A:   Yes.

20        Q:   Were you friends from the beginning, from

21   11/28 of 2005?

22        A:   I'm not sure I met him on that day, but

23   approximately.

24        Q:   Okay.  So you were friends.  Did you talk on

25   the phone?
```

1   A:   I cannot recall a specific phone conversation,

2   but I would not say that we didn't.

3   Q:   And you talked between shift changes?

4   A:   Yes.

5   Q:   And did you go out socially with him?

6   A:   Yes.

7   Q:   Okay.  What kind of -- where did you go with

8   him socially?

9   A:   I'm not quite sure where we went, but I could

10   describe it to you.  I remember one incident where we

11   went out specifically.  I can't remember if we did any

12   other time.

13   Q:   Okay.  And so you remember one social event,

14   one social thing that you did with him?

15   A:   Correct.

16   Q:   Is that before December 31st of 2005?

17   A:   Yes.

18   Q:   Okay.  And 11/28 of 2005 is when you started

19   with Creve Coeur, right?

20   A:   Yes.

21   Q:   Okay.  So can you tell me what was -- how did

22   you go out?  How did you go out with him on this one

23   social occasion?  How did it start?

24   A:   I remember that I -- I remember the feeling

25   that he was persistent.  I can't tell you specifically

DepoScript3

1    how.  I want to say that he begged to go out over and

2    over again.  When I agreed to go out, I remember we went

3    to --

4         Q:   Can I stop you for a second?

5         A:   Yes, ma'am.

6         Q:   So his asking you to go out, begging you to go

7    out, did that occur over a couple of days?

8         A:   Probably.

9         Q:   Go on.  So after he begs you, do you

10   eventually agree to go out with him?

11        A:   Yes.

12        Q:   Okay.  And what makes you agree to go out with

13   him?

14        A:   I don't recall.

15        Q:   Okay.  So what do you do?

16        A:   So we went out to this -- maybe like a park.

17   I can't remember.  I remember it had a statue of Mary,

18   so I'm assuming it was a Catholic place.  It was a place

19   where you can tell that people went to think because

20   there was benches and little trails, and you could walk

21   on the trails.  I don't remember the name of it.

22        Q:   If I told you some names, would they sound

23   familiar or not familiar?

24        A:   Yes.

25        Q:   Okay.  There's a shrine in Belleville called

DepoScript3

1    Our Lady of Snows.  Does that sound familiar?

2         A:   Yes, it does.  I would rather if -- if there

3    was a picture, per se, I could point at the picture and

4    say a definite.

5         Q:   Okay.  And so you went -- when did you go to

6    John Doe H.M. to this place with Catholic statues of

7    Mary?

8         A:   I can't recall a date.

9         Q:   If you can try, let's try to pinpoint a date.

10   Do you think it was before or after Christmas?

11        A:   I think it was after Christmas.

12        Q:   Okay.  And do you think it was before or after

13   New Year's Eve?

14        A:   I think it was before.

15        Q:   Okay.  So sometime between 12/25 of 2005 to

16   12/31 of 2005, you go with John Doe H.M. to this place

17   with statues of Mary, is that right?

18        A:   Correct.  Yes.

19        Q:   Okay.  So tell me what -- how does it start?

20   Does he come to pick you up?  What happens?

21        A:   I cannot recall.

22        Q:   Okay.  Do you drive there?

23        A:   I don't think I did.

24        Q:   Okay.  So do you think he drove there?

25        A:   I think I rode with him, yes.

DepoScript3

1    Q:   Okay.  In his car?

2    A:   I don't know whose car.  I'm assuming.

3    Q:   Are you -- are both of you off duty at this

4    point?

5    A:   Yes.

6    Q:   And what do you do when you -- what does he

7    say, if anything, to you on your trip before you get to

8    this -- this shrine?

9    A:    I don't remember any specific topics or words.

10   What I do recall from that night in general, the whole

11   night, including the trip there, the trip from, was that

12   he was obviously upset, and the reason I got that

13   feeling was because I believe he did most of the

14   talking.

15   Q:   Okay.  Do you remember what he was talking

16   about?

17   A:   No.

18   Q:   Do you remember if he was talking about his

19   marriage?

20   A:   No.

21   Q:   Do you remember if he was talking about his

22   wife?

23   A:   No.

24   Q:   Do you remember if he was talking about his

25   kids?

DepoScript3

1       A:   No.

2       Q:   Okay.  Do you remember if he was talking about

3  his girlfriend?

4       A:   No.

5       Q:   Okay.  You said he was obviously upset.  What

6  kind of -- why do you come to that conclusion?  What was

7  he doing that would make you think that?

8       A:   I remember he would walk around.  There was a

9  little trail next to the statue or close to it, and he

10  would walk up and down the trail.  He -- he did all the

11  talking.  He was constantly talking.  He wasn't

12  screaming, crying, or yelling, but he was just talking.

13      Q:   Okay.

14      A:   I just can't remember what he said.

15      Q:   Okay.  Was he -- did he look upset?  I'm

16  sorry.  You said obviously upset.  Did he look

17  disturbed?

18      A:   Yes.

19      Q:   Did he --

20           MS. RANDLES:  Objection.  That calls for --

21           MS. MERKLIN von KAENEL:  I'm sorry.  You have

22  to repeat that.

23           MS. RANDLES:  I object that it's vague.  What

24  does disturbed mean?

25      Q:   (By Ms. Merklin von Kaenel) Well, how would

DepoScript3

1    you describe him?

2        A:   I would describe him as upset.  He was

3    disturbed about something, an event or something that

4    was happening to him.  It was dark during this event.

5        Q:   So he was disturbed and upset about -- about

6    something that was happening what, in his life?

7        A:   Yes.

8        Q:   Okay.  Was he talking at a normal pace, or was

9    he talking fast or slow?

10           MS. RANDLES:  Objection; no foundation.

11       Q:   (By Ms. Merklin von Kaenel) When you were with

12   John Doe H.M., what was his pace of conversation?

13           MS. RANDLES:  Same objection.

14       Q:   (By Ms. Merklin von Kaenel) You may answer.

15       A:   He spoke consistently.  I don't remember if he

16   was speaking fast or slow, but he just consistently kept

17   talking.

18       Q:   Did you respond to what he was saying?

19       A:   I can't recall.  I'm sure I did as a normal

20   person would, but I can't remember.

21       Q:   Okay.  What do you remember about the place

22   that you were in, this place that you were in, the

23   location?

24       A:   I remember the statue.  It was lit up with a

25   color.  I believe it was blue.  I don't know why I

DepoScript3

16

1  remember that.  I remember getting the feeling that it

2  was a Catholic place, a statue of Mary.  It reminded me

3  of a park.  I don't know if it is a park or not.  I

4  remember the trail and a cement bench in front of the

5  statue.

6      Q:   Is this a place you chose, or is this a place

7  Mr. Doe chose?

8      A:   He chose it.

9      Q:   Okay.

10     A:   I have never been there before.

11     Q:   And what did you do -- have you described

12  everything that happened at this place, this shrine with

13  Mary, the statue of Mary?  Have you described everything

14  that happened between the two of you?

15     A:   Yes.

16     Q:   Okay.  So what happened next?  Did you leave?

17     A:   I'm sure we left.

18     Q:   Okay.

19     A:   I can't recall specifics.

20     Q:   Do you remember where you went?

21     A:   No.

22     Q:   And does this describe this social event with

23  Mr. Doe?

24     A:   This describes this specific memory of this

25  specific part.

1      Q:   Did you have an occasion to go out with Mr.

2  Doe after you went to the shrine?

3      A:   I'm not sure if we went out, but we did meet

4  again.

5      Q:   And would it have been just after this -- this

6  -- your going to the shrine?

7      A:   I'm not sure if we met -- I'm not sure if that

8  night continued or if they were two separate events.

9  I'm not clear.

10      Q:   Were they close in time?

11      A:   They were very close in time.

12      Q:   When was the next time you saw Mr. Doe or you

13  were with Mr. Doe?

14      A:   He came to my apartment.

15      Q:   Where do you live ma'am?

16      A:   Where I lived back then?

17      Q:   Yes.

18      A:   I lived in an apartment in Maryland Heights

19  off of Bennington.

20      Q:   And if I can ask you, did you have a cell

21  phone at that time?

22      A:   Yes.

23      Q:   Did you two talk by cell phone, or did you --

24  did you receive phone calls from Mr. Doe on your cell

25  phone at the time?

DepoScript3

1    A:   I can't specifically recall.  It would not be

2    an out of the ordinary behavior for me.

3    Q:   Did you -- did you call him on his cell phone,

4    if you remember?

5    A:   I -- I want to -- I want to side on saying no,

6    I didn't, but I can't recall specifically.

7    Q:   Do you remember what cell phone number you

8    have?

9    A:   The same as I have now.

10   Q:   What is that?

11   A:   Area code 573-270-2490.

12   Q:   Before I got more specifics about where you

13   lived and the cell phone number, you said that John Doe

14   H.M. came to your house sometime close in time to when

15   you went to the shrine.  What happened at your house or

16   apartment?

17   A:   I can't -- okay.  I can't recall specifically.

18   I do remember that we slept together, and I do remember

19   that he stayed the night, but when I woke up the next

20   morning, he was gone.

21   Q:   Okay.  Do you remember any of your

22   conversations with him that night?

23   A:   No.

24   Q:   Do you remember having any impressions about

25   John Doe H.M.'s demeanor, his state of mind at the time?

1    A:   I remember I felt sorry for him.

2    Q:   Why is that?

3    A:   I can't recall specifically.  There was some

4    kind of a feeling to where -- I'm a very empathetic

5    person.  My heart went out to him.  I felt sorry for

6    whatever situation he was in.  I knew it back then.  I

7    knew what he was going through, but I can't remember

8    right now.

9    Q:   Okay.  So how would you describe the situation

10   he was going through?  Was it a stressful situation to

11   him?

12   A:   Yes.  He was stressed.

13   Q:   Okay.  How else would you describe him other

14   than stressed?

15   A:   As I described him earlier, upset.  I could

16   tell he was going through a hard time.

17   Q:   Uh-huh.

18   A:   His demeanor did not change between the two

19   events.  It was the same.

20   Q:   Okay.  And you stated that you two slept

21   together, he stayed the night, and then when did he

22   leave, if you know?

23   A:   I don't.

24   Q:   Okay.

25   A:   He could have left in the night.  I don't

*Gore Perry Gateway Lipa Baker Dunn & Butz*
*St. Louis 314.241.6750    St. Charles 636.940.0926*

DepoScript3

1      know.

2          Q:   Did you have any other contact after that with

3      him?

4          A:   No, not that I recall.

5          Q:   The night you two were together, the night you

6      described, were you both off duty then?

7          A:   Yes.

8          Q:   So when is the --

9              MS. RANDLES:  I'm sorry.  I didn't hear that

10     answer.

11             THE WITNESS:  Yes.  I was off duty.

12         Q:   (By Ms. Merklin von Kaenel) Is there a time,

13     then, after that that you go back to work?

14         A:   Yes.

15         Q:   Okay.  And is this before or after New Year's

16     that you go back to work?

17         A:   I can't recall.

18         Q:   Okay.  And then is -- when you get back to

19     work, do you know if Mr. Doe is employed with Creve

20     Coeur, or he's not employed with Creve Coeur?

21         A:   He was not employed with Creve Coeur.

22         Q:   Did you -- did you learn that he was not

23     employed from your employment, from your employer?

24         A:   Yes.

25         Q:   Did you learn that he was not employed from

DepoScript3

1    anybody else?

2         A:   Yes.

3         Q:   And who did you learn that from?

4         A:   I'm sorry.  You said did I learn he was not

5    employed from anyone else?  I apologize.

6         Q:   That's all right.  I'll repeat.  You learned

7    that Mr. Doe was not employed by some sources, is that

8    right?

9         A:   Correct.

10        Q:   And who were those sources?

11        A:   It was a commander.  I think I might know

12   which commander, but I'm not sure.  I remember we were

13   in roll call, and they made an announcement that he was

14   no longer with the department.  This was my first day

15   back from my days off.

16        Q:   Okay.  So there was a roll call.  Did you

17   learn that he was not employed from anybody else other

18   than your commander?

19        A:   No.

20        Q:   Do you remember a safety alert being put maybe

21   on a bulletin board or published somewhere in Creve

22   Coeur?

23        A:   Yes.

24        Q:   Do you remember the content of the safety

25   alert?

DepoScript3

1      A:   The only thing I remember from the safety

2   alert probably was what related to me the most, that if

3   I saw John Doe H.M. on the premises of the department or

4   the station that I was supposed to notify my commander

5   or boss as soon as possible.

6      Q:   And did you see Mr. Doe on the premises of

7   your employment?

8      A:   No.

9      Q:   Do you remember whether -- do you remember

10  police officers talking about -- let me give you a date.

11  After you got back on the force in January of 2005

12  (sic), do you remember police officers talking about

13  John Doe H.M. being terminated?

14      MS. RANDLES:  Objection.  You said after she

15  got back on the force.

16      Q:   (By Ms. Merklin von Kaenel) When you got back

17  -- when you went back to work in January of 2005 --

18  2006, do you remember police officers talking about John

19  Doe H.M.'s termination?

20      A:   I can't recall actual conversations held

21  between officers.  I was still very new at this time.

22      Q:   Okay.

23      A:   No one really talks to you about these kinds

24  of things when you're new.

25      Q:   So you don't remember anyone talking to you

1    about it?

2        A:   I don't remember.

3        Q:   Do you remember anybody -- do you remember any

4    dispatchers talking about it?

5        A:   No.

6        Q:   Okay.  Outside of Creve Coeur, have you heard

7    anybody talk about John Doe H.M.'s termination or the

8    reasons for his termination?

9        A:   No.

10       Q:   Have you -- either at work or outside of work,

11   have you heard anybody talk about his involuntary

12   commitment?  Are you familiar that he was involuntarily

13   committed?

14           MS. RANDLES:  Objection.  That assumes facts

15   that are not in evidence.

16       Q:   (By Ms. Merklin von Kaenel) For purposes of

17   this question, let's assume that he was involuntarily

18   committed at St. Anthony's or Hyland Center.  Do you

19   remember hearing anything about that?

20           MS. RANDLES:  Same objection.

21       Q:   (By Ms. Merklin von Kaenel) Go ahead.  Answer.

22       A:   I remember that I knew that he was in

23   something like that.

24       Q:   In something like what?

25       A:   In something like a -- a mental hospital, but

DepoScript3

1   I cannot recall when or who I heard that from, but I did

2   know that before this -- whatever this is.

3       Q:   This deposition?

4       A:   Deposition.

5       Q:   So you found out, but you don't know who it

6   was from?

7       A:   Correct.

8       Q:   And then do you -- do you remember what was

9   said about his being in a mental hospital or facility?

10      A:   No.  I didn't know very much.

11      Q:   Okay.  Have you had -- since you went back

12  that day in January, since then have you had any contact

13  with John Doe H.M. to today?

14      A:   No.  He left -- I think he left a voice mail

15  on my phone, I'm guessing, maybe last year.

16      Q:   And if I can interrupt, would that have been

17  2008, sometime in 2008?

18      A:   Or maybe '07.  I can't remember because I did

19  not respond to it.

20      Q:   Do you remember what the content of the voice

21  mail was?

22      A:   I remember he said something along the lines

23  of I was probably wondering why there was no more

24  contact between us after that night that I slept with

25  him and that he wanted to explain, but that's all I

DepoScript3

1    remember.

2         Q:   And just to repeat, you said you did not

3    return his phone call?

4         A:   Correct.

5         Q:   And that's the last time you had contact with

6    John Doe H.M.?

7         A:   Correct.

8         Q:   Have you described to me everyone who said

9    something to you or -- or that you heard with respect to

10   John Doe H.M.'s involuntary commitment?

11        A:   There was a lot of I don't knows.  There was a

12   lot of people that didn't know what was going on.

13        Q:   Okay.  So people -- does that mean that people

14   were talking about it in the sense -- I guess I'm -- I'm

15   trying to understand what that means.  What do you mean

16   there were a lot of I don't knows?

17        A:   I -- I can't recall if this was directly after

18   this happened or if it was just later on last year or

19   '07, but there was a lot that I didn't know before this

20   case got started.  There's a lot that people just don't

21   know in the department.

22        Q:   Did anybody -- other than what you described

23   before, is there anything anybody said to you maybe in

24   either the department or outside your department that's

25   talked to you about John Doe H.M.'s involuntary

DepoScript3

1   commitment in a mental facility or a hospital or

2   something like that?

3        A:   I don't think so.

4        Q:   Okay.  And about his termination -- other than

5   what you said, what you told me a commander told you

6   during roll call, anybody else talk about his

7   termination?

8        A:   Not that I can remember.

9        Q:   Okay.  And is there -- is there anybody you've

10  talked to outside of Creve Coeur, not inside your

11  employment, about John Doe H.M. and his -- either his

12  involuntary commitment or his termination?  Have you

13  told anybody?

14       A:   I am very close with my mom.

15       Q:   Okay.

16       A:   My mother.  She knows everything that happens

17  with me.  I'm pretty sure I told her.  She would know.

18       Q:   And may I ask you, what is her name?

19       A:   Dedra Christy.

20       Q:   Okay.  Did you tell anybody else other than

21  your mother?

22       A:   No.

23       Q:   Okay.  I'm going to hand you what I am marking

24  as Exhibit No. 92.

25            MS. MERKLIN von KAENEL:  Rebecca, I do not

1   have a copy for you, but I can tell you --

2           Why don't we go off the record.

3           (A discussion was held off the record, and

4   Exhibit 92 was marked for identification.)

5       Q:   (By Ms. Merklin von Kaenel) I'm going to hand

6   to you what I'm marking as Exhibit 92.  It consists of

7   eight pages.  Would you do me a favor and look at that?

8       A:   Okay.

9       Q:   For the record, I printed it from the Our Lady

10  of Snows website, and it consists of text and pictures.

11  Would you look through it and tell me if any of this

12  looks familiar with respect to the place John Doe H.M.

13  took you?

14      A:   Yes, it does.

15      Q:   Okay.  And will you please, if you can, tell

16  me by page, the first page, second page, third page,

17  what -- what looks familiar?

18      A:   The first page does not look familiar.  The

19  second page does not look familiar.

20      Q:   Uh-huh.

21      A:   The third page does look familiar.

22      Q:   Okay.  And what on that page looks familiar?

23      A:   There are two pictures in the middle of the

24  page.  The top picture that's in the middle looks like

25  it's a picture that is wider than the picture below it.

28

```
 1    The picture below it is zoomed in, but it's a picture of
 2    a Mary statue and an angel, and this is the Mary statue
 3    that I remember.  I'm not sure.  I think I see some
 4    benches, too, but I remember a bench somewhere near the
 5    statue.  This is the statue I was referring to earlier.
 6        Q:   Okay.  And had you ever been to this place
 7    before?
 8        A:   No.
 9        Q:   Okay.  Are you -- have you heard anybody talk
10    about Our Lady of Snows?  It's in Belleville.  Does that
11    ring a bell?
12        A:   No.
13        Q:   Okay.  So the first time you were here was
14    with John Doe H.M., is that right?
15        A:   Yes.
16        Q:   And if I can ask you, this is page 3.  Past
17    page 3 would you look at it and see if anything else
18    looks familiar to you?
19        A:   Page 4 looks familiar, if I could ask a
20    question.
21        Q:   Uh-huh.
22        A:   Is this where they keep Christmas lights?  Is
23    this where people go also to see Christmas lights?  I
24    might recall this from a different instance other than
25    the visit with John Doe H.M.
```

1    Q:   Okay.

2    A:   This looks familiar, but I can't remember if

3  it's the visit with John Doe H.M.

4    Q:   Okay.  Page 3 you remember from the visit with

5  John Doe H.M.?

6    A:   Specifically, yes.

7    Q:   All right.  So page 4 is maybe the visit with

8  John Doe H.M.?

9    A:   Maybe.

10    Q:   Okay.  Anything else?

11    A:   Page 5 is blank.  Page 6 has two other

12  pictures I do not recognize.

13    Q:   Okay.

14    A:   Page 7, two more pictures I do not recognize,

15  and page 8 is blank.

16        MS. MERKLIN von KAENEL:  Okay.  Thank you very

17  much.  That's all I have.

18             EXAMINATION BY MS. RANDLES:

19    Q:   Okay.  I have some followup questions.  This

20  is Rebecca Randles, and I represent John Doe H.M.  Can

21  you hear me?

22    A:   Yes, ma'am.

23    Q:   Okay.  Great.  Thank you.

24        John Doe H.M. has indicated that the date that

25  you went out with him occurred on 12/30/2005.  Do you

DepoScript3

1    have any reason to disbelieve that was the date?

2         A:   No.

3         Q:   Okay.  Do you have any reason to believe it

4    was some day besides 12/30 of 2005?

5         A:   No.

6         Q:   Do you have any recollection at all whether it

7    was the night before New Year's Eve?

8         A:   No.

9         Q:   Okay.  You had indicated that he was obviously

10   upset and that he was talking a lot, correct?

11        A:   Yes.

12        Q:   Okay.  You also said he was not yelling, is

13   that right?

14        A:   Correct.

15        Q:   And he didn't cry?

16        A:   Correct.

17        Q:   And he didn't scream?

18        A:   Correct.

19        Q:   And would you say he was able to carry on a

20   conversation that made sense?

21        A:   Yes.

22        Q:   Okay.  And at the time that you were with him,

23   at any point in time did he ever mention or threaten

24   suicide of any kind?

25        A:   No.

```
 1        Q:   Nothing indicated to you that he was mentally
 2   ill, just upset, correct?
 3            MS. MERKLIN von KAENEL:  And I'm just going to
 4   object to the foundation that she can make that
 5   qualification.
 6        Q:   (By Ms. Randles) Did you ever see any
 7   indication that you believed he was mentally ill?
 8        A:   No.
 9        Q:   Okay.  But you did believe he was upset?
10        A:   Yes.
11        Q:   And you in no way felt threatened during this
12   date, correct?
13        A:   Correct.
14        Q:   Do you recall going back to your apartment and
15   sitting and playing music?
16        A:   No.
17        Q:   Okay.  Do you recall John Doe H.M. playing a
18   guitar?
19        A:   No.
20        Q:   Is that something that -- that you do?
21        A:   I have a guitar, and I used to play, yes.
22        Q:   Okay.  Now, he also indicated that he believed
23   he spoke to you by cell phone the next morning.  Do you
24   recall any conversation with him on the morning of 12/31
25   of '05?
```

1        A:   No.

2        Q:   Okay.  Do you have any reason to doubt that

3    there was a brief conversation the following morning?

4        A:   No.  I have no reason to doubt.  There's a lot

5    that I don't recall.

6        Q:   Okay.  And at no time did it cross your mind

7    at any time that he was going to leave you and go kill

8    himself?

9        A:   No.

10       Q:   Did you know Crystal Marshall?

11       A:   No.

12       Q:   Okay.  Have you ever heard any rumors

13   regarding Crystal Marshall at the Creve Coeur Police

14   Department?

15       A:   Yes.

16       Q:   What rumors have you heard?

17            MS. MERKLIN von KAENEL:  I'm going to object.

18   It's not relevant, there's no foundation, and there's

19   certainly no foundation to the veracity.

20       Q:   (By Ms. Randles) You can go ahead and answer.

21   Those are for the record.  What rumors did you hear

22   about Crystal Marshall at the Creve Coeur Police

23   Department?

24       A:   I heard that she slept around with a lot of

25   cops.  I also heard that she was the type of person that

DepoScript3

1    was not afraid to fight.  That's about it.

2         Q:   Okay.  What do you mean by not afraid to

3    fight?

4         A:   There's another female officer in our police

5    department.  I believe she knows her, and I confided in

6    this other female officer.  Can I give a name or --

7         Q:   Yes.

8              MS. MERKLIN von KAENEL:  You can give a name.

9         A:   Nicole Beibel.  I confided in her.  We used to

10   be very close.  I told her what I did because of all of

11   the things that were happening, and she said -- she

12   warned me that Crystal Marshall was his girlfriend, I

13   don't believe I knew that, and that I should be careful

14   if I ever see her because she probably would be upset.

15        Q:   (By Ms. Randles) Okay.  Did you ever hear

16   anything about Crystal Marshall being involved in any

17   incidents accusing anyone of suicide or suicide

18   attempts, any police officers of suicide or suicide

19   attempts besides John Doe H.M.?

20        A:   No.

21        Q:   Is that all that you heard about Crystal

22   Marshall?

23        A:   Yes.

24        Q:   Okay.

25        A:   I'm sorry.

DepoScript3

1      Q:   Now, with regard to the -- the safety alert,

2    were you surprised when the safety alert was issued?

3      A:   I have never heard -- again, I'm a newer

4    officer.  I had never heard of a safety alert like this

5    before, so yes, I was surprised.

6      Q:   Okay.  Have you ever seen a safety alert like

7    that since?

8      A:   Not with -- not with a police officer but with

9    criminals.

10      Q:   Okay.  How about anyone terminated from the

11    police department?  Have you ever heard of any safety

12    alert being issued with regard to any officer or

13    civilian that was terminated by the police department?

14      A:    I believe any time a police officer is

15    terminated from our department that if we see them on

16    the premises or inside the building, we're supposed to

17    notify a commander because we change codes on our doors

18    after somebody is terminated.

19      Q:   Okay.

20      A:   Security codes.

21      Q:   Do you recall which commander indicated that

22    John Doe H.M. was no longer employed by Creve Coeur?

23      A:   I can't say to be sure.

24      Q:   Okay.  And have you ever seen that happen

25    before?  Has anyone -- any time anyone is terminated,

DepoScript3

1     does the commander announce that at roll call?

2         A:   I believe so.

3         Q:   Do you recall anyone besides John Doe H.M. --

4     there being an announcement -- strike that.  Let me

5     start that one over again.

6              Do you have any specific recollection of any

7     other police officer who has been terminated having

8     their name announced at roll call?

9         A:   We also had a case --

10             THE WITNESS:  Again, I'm allowed to say names,

11    correct?

12             MS. MERKLIN von KAENEL:  Uh-huh.

13        A:   Neal Coors.  There was several roll call

14    announcements with his case in the department.

15        Q:   (By Ms. Randles) What kind of roll call

16    announcements were made regarding Neal Coors?

17        A:   I believe they announced his termination, and

18    then I don't know specifics, but a big lawsuit was going

19    on with him and the department, and then he regained

20    employment, and when he did that, they made more

21    announcements.

22        Q:   Okay.  What were the nature of the

23    announcements they made when he regained employment?

24        A:   The nature was very tense.  They made him make

25    a statement, an apology of things that he did or did not

DepoScript3

1   do, I'm not sure, and they -- they yelled at him while

2   he stood up there making the apology, so it was very

3   tense.

4        Q:   Oh, okay.  Aside from Neal Coors and John Doe

5   H.M., do you recall anyone else's names who were

6   announced at roll call that they had been terminated?

7        A:   Anybody that leaves the department they

8   announce in some way most of the time at roll call

9   unless I missed that specific announcement.  When an

10  officer retires, they make the announcement, or if they

11  just leave and go to a different department, they also

12  make the announcement.  There's been several people that

13  have left, so --

14       Q:   Okay.  But you specifically recall with regard

15  to Neal Coors and John Doe H.M., they didn't just say he

16  left the department; they said he had been terminated?

17       A:   There was another officer that was terminated,

18  and they announced it.

19       Q:   Okay.  Is that Matt -- well, who was that?

20       A:   It was not Matt Levine.  It was Shawn.  He

21  worked there a very short time.  I can't remember his

22  last name.  He was an African-American officer, Shawn.

23  Used to work in the city.  I can't remember his last

24  name.

25       Q:   Okay.  Do you know either Officer Thomeczek or

1    Sergeant Lasater?

2         A:   No.

3              MS. RANDLES:   Okay.  I have no further

4    questions.

5              MS. MERKLIN von KAENEL:   I probably have like

6    two questions, but let me just look at my notes.

7              FURTHER EXAMINATION BY MS. MERKLIN von KAENEL:

8         Q:   Prior to -- prior to your finding out -- did

9    you find out through Nicole Beibel that John Doe H.M.

10   was dating Crystal Marshall?  Is that how you found out?

11        A:   I believe so.

12        Q:   So you had not heard that she had been

13   sleeping with him or dating him before that?

14        A:   Before what?

15        Q:   I'm sorry.  Before you talked to Nicole

16   Beibel.

17        A:   I don't believe so.  There's another really

18   good friend, I think, of Crystal Marshall's; I think

19   Amanda Lancaster.  I was also talking with her at the

20   time.  She might have mentioned Crystal Marshall as

21   well.

22        Q:   In the context of her dating John Doe H.M.?

23        A:   Yes, I believe so, or just that she used to be

24   a dispatcher at Creve Coeur.

25        Q:   Okay.  And are these conversations with Nicole

1    Beibel and Amanda Lancaster, are these conversations

2    that occur after 1/1 of 2006?

3        A:   Yes.  I did not tell Amanda that I slept with

4    him.  I only told that to Nicole Beibel.

5        Q:   Okay.  And you said that you heard a rumor

6    that she was -- that Crystal Marshall was a person who

7    was not afraid to fight.  Do you mean physically because

8    she would be upset if she found out somebody was with

9    her boyfriend?

10       A:   I mean that she would be upset if she would

11   find out that John Doe H.M. and I did sleep together.

12   I'm not sure if she meant that she was going to come

13   and, you know, fight me.

14       Q:   It was likely that she would have been upset

15   because you would have been sleeping with her --

16   presumably with her boyfriend?

17       A:   Yes.

18       Q:   And did you know that John Doe H.M. was

19   married at the time?

20       A:   No.

21       Q:   Okay.  Did you know that he had a family, a

22   wife, three kids?

23       A:   I don't think that I knew he was still

24   married, but I think that I might -- it's hard to

25   recall.

39

1    Q:  Did you know -- did you know whether he was

2  separated from his wife?

3    A:  I can't remember.

4    Q:  Okay.  And when Miss Randall -- when Miss

5  Randles asked you some questions about a safety alert,

6  and you talked about specifically there was a safety

7  alert with respect to John Doe H.M.  Do you remember --

8  and you said the department has issued other safety

9  alerts, is that right?

10    A:  Yes.

11    Q:  Okay.  And you stated yes with criminals.

12  Does that mean the safety alerts would identify certain

13  criminals?

14    A:  Yes.

15    Q:  All right.  So certain defendants or suspects?

16    A:  Yes.

17    Q:  And why would they do that?

18    A:  Well, for example, we just got a safety alert

19  on a subject that has been threatening the lives -- the

20  lives or reputation of several officers in our

21  department including me, so they put out a big bulletin

22  as a safety alert.  If you see him, just be aware he's

23  very volatile.

24    Q:  Are safety alerts intended to give notice and

25  attempt to protect the officers and the employees of

1    Creve Coeur?

2        A:   Yes.

3        Q:   Okay.  So is it -- are they usually about a

4    suspect that's a potential danger to the department or

5    its employees?

6        A:   Yes.

7        Q:   Okay.  And you stated that it was -- the

8    termination of John Doe H.M. was stated at roll call.

9    That was her next line of questions.  Is that right?

10       A:   Yes.

11       Q:   And at roll call they also announced police

12   officers that have retired, have moved to other

13   departments, or have left for other reasons.

14       A:   Yes.

15       Q:   Okay.  And who attends those roll calls?

16       A:   Everyone.

17       Q:   So every police officer, every employee?

18       A:   Every police officer.  However, when they make

19   certain announcements like Neal Coors -- I can't

20   remember if John Doe H.M. -- maybe with John Doe H.M.,

21   too.  Sometimes the dispatchers will come in.  I think

22   it's just dispatchers and police, though.

23       Q:   Okay.  So they're employees of Creve Coeur?

24       A:   Yes.

25       Q:   And you stated -- I have Sergeant Lasater on

1    my left and Officer Thomeczek on his left.  You stated

2    you don't know these police officers, correct?

3         A:   Correct.

4         Q:   I'm going to ask you about another police

5    officer, ask you if you know his name.  Do you know

6    Scott Venable?

7         A:   No.

8         Q:   Did you talk to anybody that is employed by

9    St. Louis County with respect to John Doe H.M. or any of

10   the events we've talked about, either his involuntary

11   commitment or his termination?

12        A:   No.  I don't know any county officers.

13             MS. MERKLIN von KAENEL:  That's all I have.

14             EXAMINATION BY MS. OWENS:

15        Q:   I have just one followup.

16             At the time that you were employed there at

17   Creve Coeur while John Doe H.M. was also still employed,

18   had you been made aware or heard from anyone that Mr.

19   Doe had been involved in another lawsuit?

20        A:   No.

21        Q:   Okay.  Since that time other than from

22   counsel, have you heard from anybody that Mr. Doe was

23   involved in another lawsuit pending around that same

24   time period?

25        A:   No.

42

1    Q:   No announcement was ever made by any command

2    staff regarding any underlying lawsuit that Mr. Doe was

3    involved in?

4    A:   No.

5         MS. OWENS:   Okay.   I don't have anything else.

6              FURTHER EXAMINATION BY MS. RANDLES:

7    Q:   Just one followup to that, if you don't mind.

8         No one ever indicated any names of anyone that

9    -- well, I can't even ask that.   You weren't aware of

10   any lawsuit, but you weren't aware of any names of

11   anyone involved in any lawsuit, correct?

12   A:   No.

13        MS. RANDLES:   Okay.

14             FURTHER EXAMINATION BY MS. MERKLIN von KAENEL:

15   Q:   Well, I guess I'll ask the followup question

16   to make sure it's certain.

17        While you were employed with Creve Coeur, had

18   you heard that John Doe H.M. was involved in a sexual

19   abuse lawsuit?

20   A:   No.

21        MS. MERKLIN von KAENEL:   Okay.   That's it.

22        Rebecca, followup?

23        MS. RANDLES:   No.   I don't have anything.

24        MS. MERKLIN von KAENEL:   Okay.   You're

25   represented by counsel.   Your counsel will get a copy of

DepoScript3

1    the transcript, and you'll be asked to review it for any

2    transcription errors.  Your job is to look at what the

3    court reporter took down, if she took down what you

4    said, you know, accurately.  If there's a mistake,

5    you'll have an opportunity and your lawyer will tell you

6    how to make the corrections so the record is clean.

7            THE WITNESS:  Okay.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DepoScript3

44

```
 1                    C E R T I F I C A T I O N

 2

 3          I, Traci Butz, Certified Shorthand Reporter within

 4      and for the State of Missouri, DO HEREBY CERTIFY that

 5      pursuant to notice/agreement between the parties, the

 6      aforementioned witness came before me at the time and

 7      place hereinbefore mentioned, and having been duly sworn

 8      to tell the whole truth of her knowledge touching upon

 9      the matter in controversy aforesaid; that he was

10      examined on that day, and his examination was taken in

11      shorthand and later reduced to printing; that signature

12      by the witness is not waived and said deposition is

13      herewith forwarded to the taking attorney for filing

14      with the Court.

15          IN WITNESS WHEREOF, I have hereunto subscribed my

16      name this 5th day of May, 2009.

17

18

19

20                    Traci Butz
                      Certified Shorthand Reporter
21

22

23

24

25
```

*Gore Perry Gateway Lipa Baker Dunn & Butz*
*St. Louis 314.241.6750    St. Charles 636.940.0926*

DepoScript3

1   Gore Perry Gateway & Lipa Reporting

2

3

4   Sandberg, Phoenix & von Gontard, P.C.

5   Stacie Owens, Esq.

6   One City Centre, Suite 1500

7   St. Louis, Missouri  63101

8

9   Enclosed please find the Original Signature pages

10   and errata sheets for the deposition of:

11   Grace Renee Jones taken 4/23/2009 in the case of:

12   JOHN DOE HM, AN INDIVIDUAL vs. CITY OF CREVE COEUR, ET AL.

13   Please read your copy of the transcript, noting

14   any corrections on the enclosed erratta sheets,

15   and return all pages for filing in court to:

16   St. Louis County Counselor's Office

17   Lorena Merklin von Kaenel, Esq.

18   41 South Central Avenue

19   Your prompt cooperation will be appreciated.

20   Sincerely,

21

22   Gore Perry Gateway & Lipa Reporting

23

24

DepoScript3

1    Page      Line      Should Read:

2    Reason for change:

3

4    Page      Line      Should Read:

5    Reason for change:

6

7    Page      Line      Should Read:

8    Reason for change:

9

10   Page      Line      Should Read:

11   Reason for change:

12

13   Page      Line      Should Read:

14   Reason for change:

15

16   Page      Line      Should Read:

17   Reason for change:

18

19   Page      Line      Should Read:

20   Reason for change:

21

22   Page      Line      Should Read:

23   Reason for change:

24

25

47

1   Page     Line     Should Read:

2   Reason for change:

3

4   Page     Line     Should Read:

5   Reason for change:

6

7   Page     Line     Should Read:

8   Reason for change:

9

10   Page     Line     Should Read:

11   Reason for change:

12

13   Page     Line     Should Read:

14   Reason for change:

15

16   Page     Line     Should Read:

17   Reason for change:

18

19   Page     Line     Should Read:

20   Reason for change:

21

22   Page     Line     Should Read:

23   Reason for change:

24

25

48

1  Comes now the witness, Grace Renee Jones,

2  and having read the the foregoing transcript

3  of the deposition taken on the 4/23/2009,

4  acknowledges by signature hereto that it is a

5  true and accurate transcript of the testimony given

6  on the date hereinabove mentioned.

7

8

9  _____

10  Grace Renee Jones

11

12  Subscribed and sworn to me before this

13  _____ day of _____,2009.

14  My Commission expires

15

16

17  _____

18  Notary Public

19

20

21

22

23

24

25

DepoScript3

```
 1    COURT MEMO

 2    UNITED STATES DISTRICT COURT

 3    EASTERN DISTRICT OF MISSOURI

 4    EASTERN DIVISION

 5    JOHN DOE HM, AN INDIVIDUAL vs. CITY OF CREVE COEUR, ET AL.

 6    4:07-CV-00946-ERW

 7

 8    CERTIFICATE OF OFFICER AND

 9    STATEMENT OF DEPOSITION CHARGES

10

11    DEPOSITION OF GRACE RENEE JONES

12    TAKEN ON BEHALF OF THE DEFENDANT

13     4/23/2009

14    Name and address of person or firm having custody of

15     the original transcript:

16    Lorena Merklin von Kaenel

17    St. Louis County Counselor's Office

18    41 South Central, 8T,

19    Clayton, MO 63105

20

21

22

23

24

25
```

*Gore Perry Gateway Lipa Baker Dunn & Butz*
*St. Louis 314.241.6750    St. Charles 636.940.0926*

DepoScript3

```
 1   ORIGINAL TRANSCRIPT TAXED IN FAVOR OF:

 2   Lorena Merklin von Kaenel

 3   St. Louis County Counselor's Office

 4   41 South Central, 8T,

 5   Clayton, MO 63105

 6   Total:

 7   1 ONE COPY - TAXED IN FAVOR OF:

 8   Rebecca M. Randles

 9   Randles, Mata & Brown, L.L.C.

10   406 West 34th Street,

11   Kansas  City, MO 64111

12   Total:

13   1 ONE COPY - TAXED IN FAVOR OF:

14   Stacie Owens

15   Sandberg, Phoenix & von Gontard

16   One City Centre, 15th floor

17   St. Louis, MO 63101

18   Total:

19

20   Upon delivery of transcripts, the above

21   charges had not been paid.  It is anticipated

22   that all charges will be paid in the normal course

23   of business.

24   GORE PERRY GATEWAY & LIPA REPORTING COMPANY

25   515 Olive Street, Suite 700
```

DepoScript3

51

1  St. Louis, Missouri 63101

2  IN WITNESS WHEREOF, I have hereunto set

3  my hand and seal on this _____ day of _____

4  Commission expires

5  _____

6  Notary Public

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DepoScript3