UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION



RECEIVED

MAR 5 2009

COUNTY COUNSELOR

JOHN DOE HM, an individual,    )
                               )
            Plaintiff,         )
                               )
vs.                            )   Case No. 4:07CV00946 ERW
                               )
CITY OF CREVE COEUR, et al.,   )
                               )
            Defendants.        )


DEPOSITION OF CAPTAIN GEORGE MICHAEL HODAK

Taken on behalf of Plaintiff
February 26, 2009


COPY



EXHIBIT
tabbies
V

---



Catherine E. Boyd
P.O. Box 190601
St. Louis, MO 63119
314.918.8265
Fax: 314.918.0429

**Boyd-Gwinn Reporting**

David J. Gwinn
6459 Arsenal
St. Louis, MO 63139
314.645.5229
Fax: 314.644.3579

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

## INDEX OF QUESTIONERS

| QUESTIONS BY: | PAGE NO. |
|---|---|
| Ms. Randles | 6 |
| Ms. Merklin von Kaenel | 170 |
| Ms. Randles | 195 |
| Ms. Owens | 202 |

## INDEX OF EXHIBITS MARKED/REFERENCED

| NO. | DESCRIPTION | PAGE(s) |
|---|---|---|
| 3 | (NO CLEAR DESCRIPTION) | 132 |
| 14 | Lt. Hodak's periodic review sent to sergeants | 161 |
| 15 | quarterly coaching forms | 108, 109 |
| 16 | quarterly coaching forms | 108, 110 |
| 17 | quarterly coaching forms | 108, 110 |
| 18 | six-month evaluation of Plf. | 148-151 |
| 19 | six-month evaluation of Plf. | 149-151 |
| 20 | Captain Hodak's recommendation Plf. could be taken off probationary status | 64, 100 |
| 22 | transcript of termination meeting | 117-119 |
| 23 | internal investigation complaint form | 68, 79, 86, 171, 172 |
| 24 | employee safety alert | 89, 90, 181 |
| 29 | position statement filed with the EEOC | 155, 174 |
| 30 | notice to post | 180 |
| 47 | drawing of parking lot prepared by Plf. during deposition | 182, 183, 188, 196 |

BOYD-GWINN REPORTING

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

INDEX OF EXHIBITS MARKED/REFERENCED CONTINUED

| NO. | DESCRIPTION | PAGE(s) |
| --- | --- | --- |
| 48 | CCPD 1/4/06 memo, re: termination notice | 61 |
| 49 | email to Lt. Hodak from Steve DeGhelder | 112, 113, 117, 177 |
| 50 | personnel action form, re: 1/4/06 discharge | 159 |
| 51 | final evaluation, re: probationary officer's performance assessment, field training document | 160 |
| 52 | sick leave report | 164 |
| 53 | request for permission to engage in outside employment | 166 |
| 54 | St. Louis County Police Department Investigative Report | 172, 182 |

(Exhibits marked on 2/26/09
  attached to original
  transcript and copies;
  Exhibits previously marked
  retained by Counsel for
  Plaintiff, Ms. Randles)

BOYD-GWINN REPORTING

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JOHN DOE HM, an individual,       )
                                  )
          Plaintiff,              )
                                  )
vs.                               )  Case No. 4:07CV00946 ERW
                                  )
CITY OF CREVE COEUR, et al.,      )
                                  )
          Defendants.             )

          DEPOSITION OF CAPTAIN GEORGE MICHAEL HODAK,
produced, sworn and examined on February 26, 2009, on
behalf of Plaintiff, between the hours of nine o'clock in
the forenoon and five o'clock in the afternoon of that
day, at the law firm of Chackes, Carlson & Spritzer, LLP,
230 South Bemiston, Suite 800, Clayton, Missouri 63105,
before TAMI L. MOSS, a Registered Professional Reporter,
Certified Court Reporter and a Notary Public within and
for the State of Missouri.

                    A P P E A R A N C E S

     For the Plaintiff:

               Rebecca M. Randles, Esquire
               RANDLES, MATA & BROWN, LLC
               406 West 34th Street, Suite 623
               Kansas City, Missouri 64111

     For the Defendants City of Creve Coeur, etc.:

               Stacie A. Owens, Esquire
               SANDBERG, PHOENIX & von GONTARD, P.C.
               One City Centre, 15th Floor
               St. Louis, Missouri 63101-1880

     For the Defendants St. Louis County Police, etc.:

               Lorena V. Merklin von Kaenel, Esquire
               ST. LOUIS COUNTY COUNSELOR'S OFFICE
               41 South Central Avenue, Ninth Floor
               Clayton, Missouri 63105

               (Appearances continued)

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

APPEARANCES CONTINUED

Also present:

        Plaintiff John Doe HM

        Defendant John Beardslee (telephonically)
          Former Chief of Police
        Defendant Chief of Police Glenn Eidman
        Defendant Sergeant Thomas Lasater
        Defendant Police Officer Michael A. Thomeczek

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1        IT IS HEREBY STIPULATED AND AGREED, by and

2   between counsel for the Plaintiff and counsel for the

3   Defendants, that this deposition may be taken in shorthand

4   by Tami L. Moss, a Notary Public, Registered Professional

5   Reporter and Certified Court Reporter, and afterwards

6   transcribed into typewriting; and the signature of the

7   witness is expressly reserved.

8                        *   *   *   *   *

9              CAPTAIN GEORGE MICHAEL HODAK,

10  of lawful age, produced, sworn and examined on behalf of

11  the Plaintiff, deposes and says:

12                    DIRECT EXAMINATION

13  QUESTIONS BY MS. RANDLES:

14        Q.    Good morning, Captain.  My name --

15        A.    Good morning.

16        Q.    -- my name is Rebecca Randles, and I

17  represent John Doe HM, who is the plaintiff John Doe in

18  this matter.  Have you given a deposition before?  I

19  assume you have.

20        A.    Yes.

21        Q.    Okay.  Then just so that we're clear, I'll go

22  through the rules of deposition, but we'll do it rather

23  quickly.  First, as you know, everything is being taken

24  down and you are under oath.  You understand that?

25        A.    I understand.

1    Q.    Okay.  And if you would, during the course of

2  the deposition, please say yes or no as opposed to uh-huh

3  or huh-uh, because it makes the record clearer.

4    A.    Yes.

5    Q.    Okay.  And if you would avoid using a nod of

6  the head, because, again, the court reporter, it will just

7  show in the record nod of the head, and it's hard to tell

8  whether that's an affirmative nod or a negative nod.

9    A.    Okay.

10    Q.    So if you will say yes or no, --

11    A.    Yes.

12    Q.    -- great.  And the other thing is, during the

13  course of a typical conversation, we tend to step on each

14  others sentences, as we understand what the person is

15  asking or -- or where the conversation is going, but for

16  purposes of clarity on the record, if you would wait until

17  my question is completely finished and I will wait until

18  your answer is completely finished before we start the

19  next -- the next piece, if we start stepping on each

20  other, I will probably have to say something like, Excuse

21  me, sir, but can you wait until I finish the question, and

22  I am not trying to be rude, it's just we're trying to get

23  a clean record.  Do you understand that?

24    A.    I understand.

25    Q.    Okay.

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1          MS. OWENS:  Can I pause you just for a

2   second?

3          MS. RANDLES:  Sure.

4          MS. OWENS:  Mr. Beardslee is not on the phone

5   yet.

6          MS. RANDLES:  Oh, okay.

7          MS. OWENS:  Let me make sure that he can get

8   into this conference, if you don't mind.

9          MS. RANDLES:  Not a problem.

10          MS. OWENS:  We can go off the record for a

11   second.

12      [Defendant John Beardslee is now attending the

13            deposition via speaker phone.]

14      Q.   (By Ms. Randles)  During the course of the

15   deposition today, if for any reason at all you need to

16   take a break, feel free to do so.  The only thing that we

17   would ask is that the question before you be answered

18   unless you need to consult with your -- your counsel prior

19   to answering the question, and I assume you are

20   represented today by counsel?

21          MS. OWENS:  Yes.

22      Q.   (By Ms. Randles)  Okay.  Do you have any

23   special concerns that we should be aware of before taking

24   the deposition that would in any manner impede your

25   ability to answer questions today?

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1       A.      No.

2       Q.      Okay.  We're in the room with Chief Eidman,

3   and Chief Beardslee is on the phone.  Is Chief Eidman now

4   the chief of police at Creve Coeur?

5       A.      Yes.  He is.

6       Q.      And John -- Chief Beardslee is the former

7   chief for Creve Coeur?

8       A.      Yes.  He is.

9       Q.      I am going to start first with a little bit

10  of background information, and for this section, because

11  we will be asking some personal information, he's a police

12  officer, if we can have this confidential, for attorneys'

13  eyes only.

14          Would you please state your full name?

15      A.      George Michael Hodak.

16      Q.      Okay.  And, Captain Hodak, are you married?

17      A.      Yes.

18      Q.      How long have you been married?

19      A.      Thirty years in May.

20      Q.      Congratulations.  Do you have children?

21      A.      Yes.

22      Q.      How many children do you have?

23      A.      One.

24      Q.      And what is the age of your child?

25      A.      Twenty-nine.

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1    Q.    It is male or female?

2    A.    Female.

3    Q.    Is she in this area?

4    A.    Yes.

5    Q.    Does she work with you as a police officer --

6    A.    No.

7    Q.    -- in any regard?

8    A.    No.  She does not.

9    Q.    Okay.  And what is her first name?

10   A.    Amanda.

11   Q.    Okay.  If you would, would you tell us some

12   about your -- oh, what is your address?

13   A.    Home address?

14   Q.    Yes.

15         MS. RANDLES:  We can always reach Captain

16   Hodak through counsel, though, so --

17         MS. OWENS:  Yeah, and as a supervisor

18   employee, you can only reach him through counsel.

19         MS. RANDLES:  So we probably don't need his

20   home address.

21   Q.    (By Ms. Randles)  We don't need your home

22   address, we don't need your phone number, because we can

23   always reach you through counsel.

24   A.    Okay.  That's fine.

25   Q.    If you would, would you tell us a little bit

BOYD-GWINN REPORTING

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1  about your education beginning with high school?  Where

2  did you attend high school?

3  　　　　A.　　Vianney High School in Kirkwood, graduated in

4  1972.  I went to University of Missouri-St. Louis, UMSL,

5  administration of justice degree in 1977.

6  　　　　Q.　　Is that a four-year degree?

7  　　　　A.　　Yes.  And went to the FBI National Academy in

8  2005.

9  　　　　Q.　　What is the FBI National Academy?

10  　　　　A.　　It's a -- about a ten-week course on police

11  leadership.

12  　　　　Q.　　Have you had any other training through the

13  FBI besides the leadership course?

14  　　　　A.　　Through the FBI?

15  　　　　Q.　　Yes.

16  　　　　A.　　I have, but I couldn't tell you which ones

17  right now.

18  　　　　Q.　　Are those in the nature of like continuing

19  education?

20  　　　　A.　　Yes.  Continuing education.

21  　　　　Q.　　Okay.  And I assume you have periodically

22  undergone continuing education to --

23  　　　　A.　　Yeah.  Police officers have a three-year post

24  cycle.  You have to have 48 hours of training in a

25  three-year cycle, so every police officer, to keep their

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1    certification, has to have at least that.

2         Q.    Okay.   And I assume that you have been fully

3    current on all of your --

4         A.    Yes.

5         Q.    -- continuing education?

6         A.    I'm actually the training coordinator for the

7    police department, so --

8         Q.    Which leads us right next to the next topic,

9    and that is, how long have you been a police officer?

10        A.    Thirty years.

11        Q.    And can you tell us where you worked -- where

12   you have worked as a police officer?

13        A.    Creve Coeur Police Department for·30 years,

14   and prior to that, I was a dispatcher for about a year at

15   Glendale Police Department.

16        Q.    Did you start off on patrol at Creve Coeur?

17        A.    Yes.

18        Q.    Okay.   And how long were you on patrol?

19        A.    About eight and a half years.

20        Q.    Then where did you go?

21        A.    Was a detective.

22        Q.    Did you have any particular specialty as a

23   detective?

24        A.    We're general assignment detectives.   We do

25   whatever comes in, every crime.

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1      Q.    Okay.  And how long were you a detective?

2      A.    About eight and a half years.

3      Q.    And then what was your next --

4      A.    Sergeant.

5      Q.    -- assignment?  And again, did you have any

6  specific duties or specific --

7      A.    I was in charge of a watch, patrol watch.

8      Q.    Which one was that?

9      A.    I -- well --

10     Q.    Well, did they change over a period of time?

11     A.    Well, we had the same people all the time,

12  but -- you know, until someone got transferred or

13  promoted, but essentially it's you just -- we had a --

14  different shifts, you know, so I had the same seven or

15  eight people for a couple of years, three years or so.

16     Q.    Okay.  And how long were you in charge of a

17  patrol watch?

18     A.    About three years.

19     Q.    What did you do next?

20     A.    I was lieutenant, in charge of

21  investigations.

22     Q.    Approximately what year did you become a

23  lieutenant in charge of investigations?

24     A.    1999.

25     Q.    As lieutenant in charge of investigations,

BOYD-GWINN REPORTING

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1   what were your duties?

2          A.      I assigned cases to the detectives,

3   investigated cases, did admin duties, liquor licenses,

4   massage licenses.  For the most part, we investigated all

5   the crimes that occurred in the city.  We did background

6   investigations on prospective employees.

7          Q.      Okay.  During that time frame, would you have

8   been the one who was in charge of the background

9   investigation of John Doe HM when John Doe HM was --

10         A.      I don't believe so.

11         Q.      -- brought in?

12         A.      I don't think I did that.

13         Q.      Okay.  How long were you the lieutenant in

14  charge of investigations?

15         A.      Until 2004.

16         Q.      Okay.  Approximately when in 2000 --

17         A.      About -- about 2000 -- probably May, when

18  Chief Beardslee was activated to Iraq, and I think that

19  was 2004, May 2004.  I was then transferred to patrol

20  division.

21         Q.      Okay.  What were your duties at patrol

22  division?

23         A.      Same things that I do now, is in charge of

24  all the patrol officers, the sergeants, you know, actually

25  quality control for everything that we do, training, just

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1    a whole bunch of responsibilities.

2        Q.    Okay.  And so essentially, are you the

3    supervisor for the sergeants and then the second line

4    supervisor for the patrol officers?

5        A.    Well, I have a deputy commander, who is

6    currently at The National Academy, Lieutenant Funkhouser,

7    and prior to that, Chief Eidman was the deputy commander,

8    so I had help, but, essentially, yes, I'm in charge of the

9    sergeants.

10       Q.    Okay.  When you say you're in charge of the

11   sergeants, what are your duties with regard to the

12   sergeants?

13       A.    · Well, it's to, you know, provide their --

14   feedback on their performance, so I do their evaluations,

15   I set the direction as to where patrol is supposed to go,

16   what they're supposed to do.  When I say quality control,

17   if something comes up that -- a complaint or something of

18   that nature, would assign those, or I take -- I would look

19   into them myself, even the public's complaints, and then

20   occasionally we do internal investigations and --

21       Q.    And so do you have some duties with regard to

22   internal affairs, or is this --

23       A.    Occasionally, yes.

24       Q.    Okay.  Can you describe the duties that you

25   would have with regard to internal affairs?

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1    A.    It depends on how the complaint is received

2  and what -- what it is.  If it's from the public, from the

3  general public, usually the -- a sergeant will take the

4  initial complaint and then forwards it to me and then I

5  make the determination as to whether or not he

6  investigates it or somebody else investigates it, and

7  occasionally I will investigate it.

8    Q.    Okay.  And if the complaint comes internally,

9  is there a different process?

10    A.    Again, I guess it depends on how -- how it

11  comes in internally.  I -- I have occasionally done the

12  initial complaint, and then if it's serious enough,

13  forward it to the chief and have the chief decide who does

14  the internal investigation.

15    Q.    What kinds of complaints -- well, let me

16  strike that.

17    When -- are there certain types of complaints that

18  come to you, or is it again a general thing that whatever

19  the complaint is, it will come to the sergeant and then if

20  necessary you become involved?

21    A.    Well, currently, what happens is every

22  complaint, every telephone complaint, every email

23  complaint or anything that we get, the sergeant sends me a

24  notification that he's gotten a complaint, and

25  occasionally a sergeant can take care of the complaint

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1   himself without any further investigation, you know, but

2   occasionally the sergeant also makes the determination

3   that this is beyond him and that it's something -- some --

4   you know, it is possibly a violation of the rules and

5   sometimes even the law, and then he'll send that up to me,

6   and then depending on the seriousness of that, I will

7   either assign it to someone to investigate it or I will

8   notify the chief and the chief will then make the

9   determination of how it will be investigated.

10       Q.   Okay.  Now, do you have certain protocols

11  that are to be followed whenever you're investigating a

12  complaint that comes in to you about an officer?

13       A.  ·  Well, I think I just explained that, but,

14  again, when --

15       Q.   Well, I'm actually talking about the

16  investigation itself as opposed to how the investigation

17  comes in and who takes the investigation.  Once an

18  investigation is begun with regard to a complaint that is

19  made against an officer, are there certain protocols or

20  SOPs that are followed with regard to investigating those

21  complaints?

22       A.   Yes.

23       Q.   Okay.  And can you tell me, is there a

24  standard SOP for all investigations or does it depend on

25  the nature of the investigation, and again I'm talking

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1  about complaints against officers?

2      A.    There -- there's a -- I guess there's a -- a

3  point where certain policies kick in and certain

4  procedures kick in, --

5      Q.    Okay.

6      A.    -- but, initially, the investigation doesn't

7  necessarily -- the officer may not even be aware that he's

8  being investigated for something initially.  It gets to a

9  certain point where it becomes necessary to inform the

10 officer that there's an internal investigation being

11 conducted and then he's presented with a form that says

12 he's being investigated.

13     Q.    Okay.  Once -- well, prior to an individual

14 learning that they're being investigated, what is your

15 standard practice for dealing with those kinds of

16 complaints, who do you talk to, where do you go, what kind

17 of information --

18     A.    Well, again, it depends on the nature of the

19 complaint.  If it's a minor complaint, like rude,

20 discourteous or something like that, it probably is either

21 handled by the sergeant or by me, but if it has something

22 that's a lot -- you know, that borders on criminal or even

23 a serious violation of the SOP, we may talk to the chief

24 of police first to determine our course of action.

25     Q.    Okay.  Now, once an investigation goes to the

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1   point where you have to tell the officer that you are

2   being investigated, are there certain standard operating

3   procedures that are followed at that point?

4        A.     Well, at that point, the officer is given a

5   memo that says he's under investigation and he's -- I

6   believe he signs it and he's told not to discuss the

7   investigation with anybody.

8        Q.     Okay.  And is there any protocol with regard

9   to the types of materials that will be gathered for any

10  investigation into a complaint against an officer?

11       A.     I would say the standard, you know, whatever

12  a normal investigation entails.  I mean, evidence is where

13  you find it, so -- I don't really understand.

14       Q.     Okay.  I'm a lawyer, so sometimes when we're

15  investigating a case, we say, Okay, let's pull together

16  these records, the medical records, the employment

17  records, the Social Security history records, and

18  whatever, and we'll do that for virtually every case that

19  comes in.

20       A.     Mm-hm.

21       Q.     Do you have a standard set or practice of

22  records or materials that you pull together whenever a

23  police officer is undergoing an investigation?

24       A.     Again, it depends on the type of complaint,

25  but if it's a complaint concerning a citizen, the officer

BOYD-GWINN REPORTING

19

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1   has a -- has his audio tape, his videotapes.  We would

2   request a statement, probably a memo, from the officer.

3   If it involves a criminal nature, we would probably get a

4   copy of the police report from the other jurisdiction

5   where it occurred.  We may talk to people who are involved

6   in the investigation at the other police agencies, and

7   maybe even a complainant is there, too.

8          Q.     Okay.  In a situation where you talk to --

9   let's go to the criminal situation where you have a police

10  report that you have gotten from another jurisdiction, and

11  you indicated that you may talk to the people involved.

12  Is that documented in some way?

13         A.     If we talk to them, most of the time, it

14  would be, yes.

15         Q.     Okay.  And how is that documented?

16         A.     Probably in the internal investigation

17  report.

18         Q.     Do you keep separate witness contact

19  information sheets?  For example, if you talk to a police

20  officer over in Olivette and take information from the

21  police officer, is that a separate document from the final

22  report?

23         A.     I don't believe so.

24         Q.     Okay.

25         A.     It would probably be all contained in the

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1   same report --

2         Q.    Okay.

3         A.    -- in the report itself.

4         Q.    And are there standards for reporting

5   internal investigation reports?

6         A.    Yes.

7         Q.    Okay.  What types of material are supposed to

8   always appear in an internal affairs investigation report?

9         A.    We have a format that we -- that we go by.

10  We probably would talk to the complainant.  Obviously that

11  would be in there.  Witnesses would be in there.  Any

12  evidence that was gathered would be in there, and if you

13  talked to·the officer, I'm sure that would be in there,

14  probably the officer's personnel file.  We would check his

15  personnel file to see what prior discipline would have

16  been.  I think those are all in the -- in the standard

17  document that we have.

18        Q.    Okay.  With regard to the in-car reporting,

19  is that pulled if you have an internal affairs

20  investigation going on with regard to an officer?

21        A.    In-car video?

22        Q.    Yeah.  In-car video.

23        A.    If it's -- if it's germane to the situation,

24  sure.

25        Q.    Sure.  Okay.  We'll come back to some of the

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

```
 1    standard operating procedures concerning investigations,

 2    but in order to fully understand, I would like to know who

 3    is the command staff at Creve Coeur by title, not

 4    necessarily by name, because I know that can change at any

 5    time.

 6         A.    Currently?

 7         Q.    Yes.

 8         A.    Currently?

 9         Q.    Yes.

10         A.    Chief Glenn Eidman.

11         Q.    Okay.  And who is below the chief in the --

12         A.    Well, there's three captains, me, George

13    Hodak, Captain Dennis Spoerry, Captain Don Kayser.

14         Q.    Okay.

15         A.    And then there's Lieutenant Bill Funkhouser.

16         Q.    And the lieutenants, do they report to a

17    specific captain or do they report to any captain?

18         A.    Lieutenant Funkhouser reports to me.

19         Q.    Okay.

20         A.    Lieutenant.  And currently, that's it, unless

21    you want to go down to the sergeants.

22         Q.    Okay.  And who -- sergeant would be the next

23    line?

24         A.    Mm-hm.

25         Q.    How many sergeants do you have?
```

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

 1        A.    Eight.

 2        Q.    And do they report to Funkhouser or do they

 3   report to --

 4        A.    Well, we're in a little bit of a transition

 5   period, and Lieutenant Funkhouser for the most part has

 6   been at The National Academy since this transition has

 7   occurred, so, essentially, yes, they are supposed to.

 8   Sergeants are supposed to report -- six of the patrol

 9   sergeants are supposed to report to Lieutentant

10   Funkhouser, but currently they report to me because

11   Lieutenant Funkhouser is not available.

12        Q.    Okay.

13        A.    And then there's two sergeants who are

14   supervisors over investigations and the COPS unit, and

15   they report to me directly.

16        Q.    Do -- is it Spoerry?  Is that the way it's

17   pronounced?

18        A.    Captain Spoerry.  Yes.

19        Q.    Spoerry.  Do any of the sergeants report to

20   either Captain Spoerry or to Captain Kayser?

21        A.    No.

22        Q.    Okay.  What is Spoerry's position?

23        A.    He's the admin commander and he is in charge

24   of the dispatchers.

25        Q.    So all of the dispatchers then would report

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1    to Spoerry?

2           A.    Yes.

3           Q.    Okay.  And Captain Kayser?

4           A.    Captain Kayser is currently in charge of

5    special projects.

6           Q.    Okay.  Does he have anyone who reports to

7    him?

8           A.    Lisa Hahn is his admin aide.

9           Q.    And what are examples of special projects?

10          A.    CALEA, --

11          Q.    Okay.  How -- do you know --

12          A.    -- recodification and changing the evaluation

13   or upgrading the evaluation.  .

14          Q.    You mean the forms?

15          A.    The whole process.

16          Q.    Has he also been responsible for IT?

17          A.    I think in the past, he was, but I'm not sure

18   -- I believe that's been turned over to Captain Spoerry.

19          Q.    Okay.  Okay.  And you said CALEA?

20          A.    CALEA.

21          Q.    What is that?

22                DEFENDANT EIDMAN:  Commission Accreditation

23   for Law Enforcement Agencies.  C-A-L-E-A are the initials.

24          A.    Standardizing procedures and policies.

25                THE WITNESS:  I could have got it if you gave

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1    me a chance.

2          Q.    (By Ms. Randles)  Okay.  So is it safe to say

3    then that -- then all the patrolmen would report to the

4    eight sergeants; is that correct?

5          A.    Well, all the patrolmen report to the six --

6    well, yeah.  Essentially, you're correct, with the

7    exception of the supervisory, the sergeant investigations;

8    those are detectives that report to him.

9          Q.    Okay.  Now, do you have any breakdown among

10   the -- the police officers that some are patrol and some

11   are something else, or are they --

12         A.    Yes.

13         Q.    -- before you reach detective?  And what are

14   the areas that --

15         A.    Oh, in patrol?  There's -- there's three

16   watches of eight, one relief officer, and then in the COPS

17   unit, they're actually traffic safety officers, three

18   traffic safety officers, one crime prevention officer, and

19   one crime prevention/D.A.R.E. officer, and an SRO -- I'm

20   sorry -- I missed the SRO, the school resource officer

21   there, too.

22         Q.    Okay.  Are these -- the COPS unit, are these

23   essentially those that interface the most with the public

24   in terms of doing outreach to the public and that kind of

25   thing?

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1    A.    I think you can say that.  Yes.

2    Q.    Okay.  Do they also have responsibility --

3  the COPS unit, do they also have responsibility for

4  day-to-day enforcement, law enforcement?

5    A.    Traffic safety officers do.  They're the

6  traffic officer.

7    Q.    Okay.

8    A.    Normally, the -- the other two COPS officers

9  have programs that they have to run and the SROs in

10  school.

11   Q.    Okay.  And the COPS unit, who does the COPS

12  unit report to?

13   A.    Sergeant Williams.

14   Q.    And is Sergeant Williams one of the sergeants

15  that you have primary responsibility --

16   A.    Yes.

17   Q.    -- for?

18   A.    Yes.

19   Q.    Okay.  Thank you for that.

20   A.    Mm-hm.  Oh, yes.

21   Q.    Now, you indicated that you had a four-year

22  degree in was it criminal justice?

23   A.    Administration justice.  Mm-hm.  Yes.

24   Q.    Did you also go to academy?

25   A.    To the police academy, yes, I did.  I

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1    probably forgot to say that, but, yes, I did.

2         Q.    Where did you go?

3         A.    St. Louis Metropolitan Police Academy.

4         Q.    Okay.  And when did you graduate there?

5         A.    1979.

6         Q.    And then Creve Coeur was your first position

7    after you graduated the academy?

8         A.    Yes.

9         Q.    Okay.  Have you ever taught at the academy?

10        A.    No.

11        Q.    Is it safe to -- Creve Coeur is a fairly

12   small force, correct?

·13        A.    We're authorized to have 51, --

14        Q.    Okay.

15        A.    -- so I would say medium, but probably

16   bordering on smaller.

17        Q.    When you say authorized to have 51, what do

18   you mean by that?

19        A.    We're authorized to have 51 people, 51

20   officers.

21        Q.    Authorized by whom?

22        A.    By the city, but occasionally we are

23   short, --

24        Q.    Okay.

25        A.    -- you know.

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1      Q.    Now, I would assume that having a police

2  force of 51, that you pretty well know everyone who is on

3  the force?

4      A.    Yes.

5      Q.   And that as you come to know them, you also

6  get to know kind of about their families and some of their

7  -- their personal life and things like that; is that --

8      A.    Some.

9      Q.    -- correct?

10     A.    Some.

11     Q.    Okay.  And I would assume that this is kind

12  of a family atmosphere because of the size of the force;

13  is that fair to say?

14     A.    I would say in the past, it was, but I'm not

15  so sure it is today.

16     Q.    Okay.  And what do you mean by that?

17     A.    Well, I was in a different position, in a

18  different time, and it seemed like that many years ago, we

19  did a lot more things together than people do now.  Of

20  course, now I'm in a different position and I don't see

21  what people do together anymore.

22     Q.    Okay.

23     A.    And so, you know, we used to have softball

24  teams and have nights, you know, where we got together for

25  other things, but I don't do that anymore, so it's hard

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1   for me to say what other people do.  I'm not a part of

2   that group anymore.

3        Q.    Okay.  Okay.  At what point in time did you

4   move away from that group to where you are now?

5        A.    Probably when I got promoted to sergeant, I

6   started getting away from that.

7        Q.    Okay.  Has it traditionally been the

8   environment at Creve Coeur that the -- that police

9   officers would tend to support each other in times of

10  crisis?

11       A.    I really don't know how to answer that.

12       Q.    Okay.  Well, I'm just trying to get a sense

13  of the -- the environment.  Is it a highly competitive

14  environment or is it a more supportive environment?

15       A.    Again I -- I -- I don't know -- are you

16  talking from my own personal standpoint?

17       Q.    From your own personal standpoint.

18       A.    I would say it's pretty supportive.

19       Q.    Okay.  And I assume that you interact with

20  the officers on a fairly regular basis?

21       A.    The police officers?

22       Q.    Yes.

23       A.    I would have to ask you how you mean

24  interact.

25       Q.    Well, that you have daily contact with almost

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1   all of the police officers.

2         A.    Yes.   I see a lot of the police officers, not

3   all of them, but I see a lot of them, yes.

4         Q.    Okay.   And when John Doe HM was working

5   there, is it true that you also saw John Doe HM a fair

6   amount, while he was at the police --

7         A.    Sure.   Yes.

8         Q.    Okay.   And did you have the opportunity to

9   observe him just as he's going about his business on a

10  regular basis?

11        A.    Fairly regular.   I wouldn't say regular, but

12  -- because if they're on the midnight watch, I never see

13  them, --

14        Q.    Sure.

15        A.    -- so --

16        Q.    Sure.

17        A.    And --

18        Q.    By fairly regular, with regard to John Doe

19  HM, what would fairly regular basis be for you?

20        A.    If he was on the day watch, I would probably

21  see him almost every day.   If he was on the afternoon

22  watch, I would probably -- well, every day that he works

23  -- that he worked.   If he was on the afternoon watch, I

24  may see him half a -- half of the time, because I usually

25  work until about 5:00, so I might miss some of the

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1  afternoon watch.  Midnight watch, I wouldn't see him at

2  all.

3        Q.    Okay.  Okay.  Did you feel like while John

4  Doe HM was on the force that -- did you -- strike that.

5  During the time that John Doe HM was on the force, did you

6  come to know him as a person?

7        A.    I don't know if I knew him as a person.  I

8  had my own thoughts about what type of person John Doe HM

9  might be, yeah.

10        Q.    Okay.  And what were your thoughts about the

11  kind of person that John Doe HM was at the time he was on

12  the force?

13        A.    He seemed fairly -- I mean, we didn't have

14  that many problems with him.  He was highly intelligent

15  when it came to IT matters.  I believe we -- we used him

16  for a lot of IT stuff.  He was a decent officer.  I don't

17  want to say -- he was still new to our police department

18  and still trying to kind of find ways of doing things with

19  the Creve Coeur Police Department.  He was -- he was a

20  competent police officer at that time.

21        Q.    Okay.  Prior to December of 2005 -- well,

22  just for the record, he was terminated in January of

23  2006, --

24        A.    Mm-hm.

25        Q.    -- just so we can have that.  Prior to

BOYD-GWINN REPORTING

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1    December of 2005, did you ever observe anything about John

2    Doe HM that you thought to be odd or unstable in any

3    manner?

4           A.    Please ask that one again.

5           Q.    Okay.  Prior to December of 2005, --

6           A.    Okay.

7           Q.    -- in your observation of John Doe HM, did

8    you ever observe anything that caused you concern about

9    his stability?

10          A.    No.

11          Q.    Did you ever concern -- did you ever observe

12   any personal habits of John Doe HM that raised concern for

13   you about his ability to be a police officer?

14          A.    No.

15          Q.    Do you recall whether you had any personal

16   conversations with John Doe HM?

17          A.    I don't recall any, no.

18          Q.    Okay.  Do you ever recall about -- talking to

19   him about guns, for example?

20          A.    No.

21          Q.    Okay.  Speaking of guns for a minute, is

22   there a process for allowing an officer to have an

23   authorized weapon?

24          A.    Yes.

25          Q.    And what is the process that one goes about

BOYD-GWINN REPORTING

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1   to -- for an authorized weapon?

2          A.    Are you talking about on duty or off duty?

3          Q.    Let's do both.  Let's -- on duty first.  If

4   you have an on duty weapon that is authorized, I assume

5   that's given to them by the police --

6          A.    Yes.

7          Q.    -- force, correct?

8          A.    Mm-hm.

9          Q.    Okay.  And do they have to undergo any type

10  of training or --

11         A.    Initially, they have to do a -- a -- oh,

12  shoot, I'm forgetting the word -- they have to be

13  familiarized with the weapon.  It depends on where they've

14  come from and where they were -- where they were police

15  officers before.

16         Our duty weapon is a nine millimeter Beretta

17  currently, so there's usually a two-day training period to

18  familiarize them -- that's the word I was looking for --

19  familiarize themselves with the -- with the Beretta, and

20  they qualify with the Beretta two times a year after that,

21  in January and June.

22         Q.    Okay.  Have you ever --

23         A.    I'm sorry.  It might be -- it's December and

24  June.  Sorry.  December and June.

25         Q.    Okay.  Have you ever had a police officer

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1  fail to qualify with the Beretta?

2       A.    Not in the time I've been the training

3  coordinator.

4       Q.    Okay.  How long have you been training

5  coordinator?

6       A.    Since 2004.

7       Q.    Okay.  Do you know of -- prior to 2004, do

8  you know of any police officers that failed to qualify

9  with their police-issued weapon?

10      A.    Well, she's not a police officer.  She was

11  terminated, but she didn't -- she couldn't qualify.

12      Q.    Was that the reason for the termination, that

13  she couldn't qualify?

14      A.    There was a whole bunch of reasons.

15      Q.    Okay.  Is that -- can -- is that only -- is

16  there only one that you can think of that failed to

17  qualify with their police-issued weapon?

18      A.    Since I've been the training coordinator,

19  that's the only one that I recall.

20      Q.    Okay.

21      A.    I'm not saying -- that's not the only one,

22  but that's the only one that I recall.

23      Q.    Okay.  Do you know if -- prior to becoming

24  training coordinator, do you know of any other police

25  officers who failed --

BOYD-GWINN REPORTING

34

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1        A.    I don't know of any.

2        Q.    -- to qualify?  Okay.  So then I assume that

3   you don't know what happened to them if they failed to

4   qualify?

5        A.    Well, if they failed to qualify, they

6   wouldn't be police officers --

7        Q.    Okay.

8        A.    -- with Creve Coeur.

9        Q.    So I take it from your answer that being able

10  to qualify with a weapon, being able to handle a weapon,

11  is one of the primary -- is a core responsibility for a

12  police officer with Creve Coeur?

13       A.    It's pretty important.

14       Q.    Okay.  You had indicated that first they have

15  to be familiarized with the weapon, go through a two-day

16  training period and then qualify.  Are those two different

17  steps, to become familiar and then to qualify?

18       A.    Well, they're all -- initially, they're all

19  the same step.

20       Q.    Okay.

21       A.    I mean, they're all -- they're all when you

22  get hired or, you know, when you're -- when we bring you

23  on, is that you familiarize -- it's a continuous process,

24  familiarization, and then you qualify.  You're familiar

25  with the gun, and then you qualify with the gun.  After

1  you have become a police officer, you're actually on the

2  force, then twice a year you have to qualify.

3          Q.    Okay.  And to qualify, I assume you mean you

4  have to go to the -- the -- shoot -- you have to shoot the

5  gun?

6          A.    Yeah.  You have to -- we have a range.

7          Q.    Mm-hm.

8          A.    In our range.

9          Q.    And do you have standards that people have to

10  meet in order to qualify?

11          A.    Yes.

12          Q.    And what are those?

13          A.    I'm going to have to defer those to the

14  armorers, --

15          Q.    Okay.

16          A.    -- because I'm not all -- I mean, I believe

17  it's 80 percent, but I can't tell you for a fact on that.

18          Q.    Okay.  Then going to secondary weapons,

19  first, can you describe for me what a secondary weapon is?

20          A.    Well, secondary weapon would be -- I always

21  somewhat mix these up.  We have backup guns, then we have

22  off duty weapons, that's what I call them, and I believe

23  secondary is -- I think the secondary is the gun that the

24  officer can -- second gun that the officer can carry with

25  him.  He has his -- he has his Beretta, and then he is

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1    allowed to carry one other gun on his person, concealed,

2    for -- for self-protection, and then the other gun, the

3    backup -- that's probably the backup gun.

4         The secondary gun then is the one where he -- off

5    duty -- an off duty weapon.

6         Q.    Okay.

7         A.    I call them off duty and backup, and I don't

8    know why I do that, but those are the terms I always use,

9    but the back -- the off duty gun is -- you also have to

10   qualify with those.

11        Q.    Okay.  So is it possible then that a police

12   officer may have three weapons that are authorized by the

13   force?

14        A.    Three of his personal weapons or --

15        Q.    The -- well, the Beretta, which would be

16   the --

17        A.    Right.

18        Q.    -- police issued, --

19        A.    That's one.

20        Q.    -- and then he may have two others as well --

21        A.    Yes.

22        Q.    -- that are authorized?

23        A.    Yes.  Yes.

24        Q.    Okay.  What -- the off duty weapon, does it

25   have a particular purpose?

1      A.     It's the gun that the officers carry when

2  they're not working, --

3      Q.     Okay.

4      A.     -- and they can carry it concealed.

5      Q.     The Beretta that is assigned to the police

6  officer, are they allowed to carry that off duty?

7      A.     Yes.

8      Q.     Okay.

9      A.     Yeah.

10      Q.     So the off duty weapon then would be a

11  weapon that --

12      A.     Other than the nine millimeter Beretta, yeah.

13  If they want to carry anything more -- other than a nine

14  millimeter Beretta, then they must qualify with that

15  weapon also.

16      Q.     Okay.  And what is the process for qualifying

17  for a backup or a -- an off duty weapon?

18      A.     Both of those other guns that are not the

19  duty guns, they have to present those guns to one of the

20  armorers, range officers, and they have to be inspected to

21  make sure that the weapon is functional.  The officer then

22  has to prove that he can break it down and that he knows

23  how to use it, and then he has a standard course of fire,

24  I believe it's 20 to 25 rounds, at a target.  The -- the

25  armorer then certifies that the officer knows how to use

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1  it and it's within standards, too.

2        I think the -- we have -- our standards are within

3  a .22 -- .22 to nine millimeter at this time.  I don't

4  believe we allowed the .40s yet.  So it has to meet those

5  criteria also.  And then the armorer then signs off on the

6  fact that the officer has qualified with the weapon.

7        There is a standard form that is filled out which

8  lists the weapons that the officers are authorized to

9  carry off duty or secondary.  It is then sent to me, being

10 the training coordinator.  I look the form over to make

11 sure everything has been taken care of.  I sign the form,

12 which then goes to the chief's office.  The chief then

13 signs the form.

14       Q.    At what point in time is a --

15       A.    Oh, I'm sorry.  If I might, --

16       Q.    Sure.

17       A.    -- then at the end of the qualification

18 period, which I'm -- I believe we have just opened up --

19 after John Doe HM had left, the standard off duty

20 qualification period at that time I believe was the month

21 of December to maybe January 15th, and since I believe

22 John Doe HM has left, we have opened up -- opened it up,

23 the qualification period, from about November 15th to

24 January 15th, because we found it was -- there was a lot

25 of guns, and a lot of people who qualified with them were

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1  having a difficult time getting it done in that amount,

2  and then after January 15th, somewhere in that area, the

3  guns or the officers are certified to carry those guns and

4  a list then is generated that indicates which guns the

5  officers can use.

6      Q.    The generated list, is that something that

7  was done at the time that John Doe HM was on the force?

8      A.    I believe so.

9      Q.    Okay.  At what point in the process can a --

10  an officer begin carrying a -- their off duty weapon?

11      A.    Once it's okayed by the chief.

12      Q.    Okay.  And not before that?

13      A.    No.

14      Q.    Has that always been the procedure for the

15  force that you know of?

16      A.    Since I've been the training coordinator.  I

17  can't speak before that.

18      Q.    Do you know of any officers who have been

19  disciplined for using an off duty weapon other than one

20  that was listed for them?

21      A.    No.

22      Q.    Okay.  Do you know if that has occurred?

23      A.    Not since I've been the training coordinator,

24  but then you wouldn't know that unless the officer used

25  his weapon in some kind of situation where -- so you

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1  really wouldn't know.

2       Q.    Yeah.  So it's never come to your

3  attention --

4       A.    No.

5       Q.    -- in any manner?

6       A.    No.

7       Q.    Okay.  Did you know Crystal Marshall?

8       A.    Yes.

9       Q.    And how did you know Crystal Marshall?

10      A.    She worked as a dispatcher for the Creve

11 Coeur Police Department.

12      Q.    How long did she work as a dispatcher for

13 Creve Coeur?

14      A.    I just would be guessing.  I really don't

15 know.

16      Q.    Okay.  To your knowledge, was it more than

17 three or four years, or was it -- was it long -- was she

18 here for a long time, or was she just here for a little

19 while?

20      A.    I would have to say just a little while.  It

21 wasn't five, six years, I don't think.

22      Q.    Okay.  Did you have any day-to-day

23 interaction with Miss Marshall?

24      A.    Yes.

25      Q.    Okay.  How did you happen to have day-to-day

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1  interaction with her?

2      A.   She was a dispatcher, and I have

3  conversations with the dispatchers.  I sometimes go up to

4  the records room to -- I'm sorry -- to the dispatch area

5  to listen to a -- you know, if a call comes in, it's a hot

6  call or something, I might go up there and listen to

7  what's happening, especially if we have a pursuit or

8  something.  So I see them on a day-to-day basis.

9      Q.   Okay.  Did you have an opportunity to observe

10 her on a regular basis?

11     A.   Whenever she worked.

12     Q.   Okay.  Did -- and it's kind of the same

13 series of questions that I asked with regard to John Doe

14 HM.  Did you have an opportunity to observe her ability as

15 a dispatcher?

16     A.   I mean, I've seen her work, but I don't -- I

17 wasn't the person who for the most part evaluated her

18 work.

19     Q.   Okay.

20     A.   So I really didn't pay a lot of attention.

21 The only time I would know about any dispatcher's work is

22 if I got a complaint from a police officer or I happened

23 to catch something on the radio that was -- you know, that

24 I questioned, like why would they say that, --

25     Q.   Okay.

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1      A.    -- but it wasn't my job to evaluate the

2  dispatchers on a day-to-day basis.

3      Q.    Sure.  To your recollection, do you ever

4  recall having any issues with Crystal Marshall in the

5  manner that she worked as a dispatcher?

6      A.    Yes.  I did.

7      Q.    Okay.  Can you describe for me the -- that

8  situation?

9      A.    I was working a surveillance, and I can't

10 remember exactly what day it was, but it seems to me it

11 was like a Friday night.  I was working the night

12 surveillance of a car clouder.  I observed an auto

13 accident occur on Olive Street Road while I was in an

14 unmarked car.  I called for dispatcher, I called

15 emergency, you know, 1033 traffic.  She didn't answer me.

16 I called 1033 traffic again.  She didn't answer me.  I got

17 upset, handled the auto accident, finally got an officer

18 there, went into the police station and had a

19 confrontation with Dispatcher Marshall about why she

20 didn't answer me.

21     Q.    Okay.  And what was the -- describe for me

22 the confrontation that you had.

23     A.    I yelled at her.

24     Q.    Okay.  And what was her response to that?

25     A.    She called the chief.

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1      Q.    Okay.  And was that Chief Beardslee?

2      A.    Yes.

3      Q.    And what was the outcome of that situation?

4      A.    The outcome was that I was suspended for two

5  days.

6      Q.    Did you agree with the decision that the

7  chief --

8      A.    Oh, I agreed the fact that I was wrong, but I

9  didn't agree with the suspension.

10     Q.    Did -- at some point, did Crystal Marshall

11 file any kind of grievance or complaint against you?

12     A.    Well, I would assume she did.  That's

13 probably -- that's why we had an investigation and I was

14 suspended.

15     Q.    Okay.  With regard to the investigation --

16 strike that.  I'm having trouble getting my words

17 together.  With regard to the investigation that was

18 conducted concerning the incident that you and Crystal

19 Marshall had together, what kind of information was pulled

20 during the course of that investigation?

21     A.    I wasn't part of that investigation, so I

22 don't know.

23     Q.    Do you know who --

24     A.    I didn't investigate myself, --

25     Q.    Okay.

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1        A.      -- but I'm --

2        Q.      And you weren't told?

3        A.      I am going to guess that my personnel file

4   was looked at to determine how much -- if I was ever

5   disciplined before and what for.

6        Q.      Did anyone take your statement?

7                MS. OWENS:  Don't guess.  Only tell her if

8   you know.

9                THE WITNESS:  Oh, okay.

10               MS. OWENS:  That's okay.

11       A.      You would have to ask the person who did the

12  investigation.

13       Q.      (By Ms. Randles)·  Do you know who that was?

14       A.      I believe it was Chief Beardslee.

15       Q.      Okay.  And were you ever talked to?  I mean,

16  did he ever ask you questions concerning what happened?

17       A.      Yes.

18       Q.      Do you know if any other individuals were

19  called in to discuss this situation?

20       A.      There were, but I couldn't tell you who.

21       Q.      Okay.

22       A.      I don't know.

23       Q.      Okay.  Were you ever -- did you ever

24  investigate any complaints against Crystal Marshall?

25       A.      Not to my knowledge.

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1       Q.     Were you ever called as a witness in any

2  complaints against Crystal Marshall?

3       A.     I don't recall any.

4       Q.     Were you ever aware of any complaints or

5  grievances filed against Crystal Marshall?

6       A.     In the police department?

7       Q.     Yes.

8       A.     No.

9       Q.     Did you ever become aware or familiar with an

10 incident involving Crystal Marshall and an Officer

11 McIntyre of one of the surrounding police units, one of

12 the surrounding areas?

13      A.     That name doesn't sound familiar to me at

14 all.

15      Q.     Okay.  Now, with regard to Miss Marshall, did

16 -- at any point in time on the 31st of December, 2005,

17 that would be the day that John Doe HM was picked up, did

18 you have any conversation with Crystal Marshall --

19      A.     No.

20      Q.     -- concerning John Doe HM?

21      A.     No.

22      Q.     Okay.  On January 1st of 2006, did you ever

23 have any conversation with Crystal Marshall?

24      A.     No.

25      Q.     Did you have any conversation with Crystal

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1   Marshall between the time John Doe HM was detained and the

2   time that he was terminated?

3       A.   No.

4       Q.   Do you recall suggesting to John Doe HM that

5   perhaps an ex parte order of protection against Miss

6   Marshall might be an appropriate move for him?

7       A.   Do I recall saying that?

8       Q.   Sure.

9       A.   No.

10      Q.   Okay.  Do you have to be an employee to

11  receive benefits from the city or a family member of an

12  employee to your knowledge?

13           MS. OWENS:  As opposed to who else?

14      A.   My guess would be -- well, I'm not supposed

15  to guess.

16      Q.   (By Ms. Randles)  Is that --

17      A.   I don't know.

18      Q.   -- out of your area of expertise?

19      A.   Yes.  I believe so.

20      Q.   Okay.  All right.  Okay.  Do you -- are you

21  familiar with vacation policy?

22      A.   Mostly.

23      Q.   Okay.  At what point in time does a new

24  officer become entitled to any vacation?

25      A.   Now, after -- I am probably going to have to

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1   go back on what I said, because when I was -- I was doing

2   it after -- on my own experience, is that after six

3   months, you got a week of vacation.  Now, I'm going to

4   have to tell you I'm really not sure of that, because

5   there are accrued vacation times.

6       I can say pretty confidently that since we don't --

7   since police officers -- new police officers, until

8   they're off probation, I don't believe get, yeah, vacation

9   time, because it's accrued now.

10      Q.   Okay.

11      A.   Back -- back in -- when I was a patrolman, it

12  was after six months you got a week, but I don't know --

13  now that it's accrued, I can't tell you, so I am going to

14  have to go back on what I said.  I'm probably not as

15  familiar as I should be.

16      Q.   Okay.  At the time that John Doe HM was on

17  the force, do you know whether -- do you know -- what the

18  vacation policy --

19      A.   No.

20      Q.   -- at that point in time --

21      A.   No.  I would just be guessing.

22      Q.   Okay.  Now, in your position as essentially

23  second line or third line supervisor for some of the

24  police officers, are you familiar with the or have you

25  ever been in a situation where any of the officers have

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1  been referred out for a medical evaluation?

2        A.    A medical is a fairly broad term.  Are you

3  talking for health reasons, too, or psychological?

4        Q.    Well, let's split it up.  Let's go to the

5  mental evaluation.

6        A.    Mental, yes.

7        Q.    Okay.  Are there situations that a mental

8  health evaluation is a required stipulation?  For example,

9  if there's been a shooting, is a mental health evaluation

10  something that is required after --

11        A.    The only -- currently, the only mandate for

12  critical incident debriefing is if an officer is involved

13  in a shooting.  The city --- city policy has -- or the city

14  personnel code has some remedies in there for -- for --

15  but I'm not all that familiar with those, but for police

16  officers, the only thing that we mandate that they have

17  critical incident is when they're involved in a shooting.

18        Q.    Okay.  Now, are there -- in your experience

19  in the position that you're in now, have you had any other

20  officers who have been referred for mental evaluations?

21        A.    Yes.  Mm-hm.

22        Q.    Can you describe for me, without giving any

23  identifying information -- well, first, how many officers

24  are you aware of that have been referred for mental

25  evaluations?

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1          MS. OWENS:  Can you give a time period?

2          Q.     (By Ms. Randles)   Let's say from 2004 to the

3     present.

4          A.     Two come to mind.

5          Q.     Without giving any identifying information,

6     can you describe for me the circumstances that caused

7     their referral for a mental evaluation?

8          A.     Fit for duty.  We were trying to determine

9     whether they were fit for duty.

10          Q.     Was there any particular issue that had

11     arisen that caused you to question their fitness for duty?

12          A.     Yeah.  The actions that -- whatever they had

13     done.

14          Q.     Okay.  Can you describe for me those

15     circumstances?

16          A.     Let's see.  One officer had an issue with a

17     person that he worked with, and the other one had an issue

18     with his family.

19          Q.     Were these violent situations or was it

20     something else?

21          A.     Could be construed as.

22          Q.     When you say could be construed as, in those

23     situations, was there physical touch involved in either

24     situation?

25          A.     Yes, alleged.

BOYD-GWINN REPORTING

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1     Q.    And what was the procedure for getting this

2  police officer to the mental evaluation?

3     A.    The chief of police set up -- in one

4  instance, the chief of police set it up, and the other one

5  was the acting chief of police set it up, set it up with

6  the mental health professional.

7     Q.    Okay.  And to your knowledge, is there an

8  organization or a person who has a contract with the city

9  to provide evaluations?

10     A.    I don't -- I don't think there's a contract.

11  I don't know.

12     Q.    Did each of these people go to the same

13  person to your knowledge?  ·

14     A.    I don't know.

15     Q.    Okay.  Were you one of the individuals who

16  made the recommendation that these two individuals --

17     A.    On one of them --

18     Q.    -- be sent for a mental evaluation?

19     A.    On one of them, I was a part of, yes.

20     Q.    Okay.  Was it the individual who had the

21  issue with the person at work or the one who had the issue

22  with a family --

23     A.    A person at work.

24     Q.    Again, without giving any information

25  concerning the identity of these individuals, can you give

BOYD-GWINN REPORTING

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1   us a brief description of what happened that caused you to

2   refer him for mental evaluation?

3          A.     It was alleged that he had inappropriately

4   touched a co-worker.

5          Q.     In a sexual or sexualized manner?

6          A.     No.

7          Q.     In an angry or abusive manner?

8          A.     That was the alleged, angry.

9          Q.     Okay.  And in that situation, was it the

10  co-worker who made the allegation?

11         A.     Yes.

12         Q.     After you learned of the allegation, then

13  what was the process for referring him for an evaluation,

14  and I say him, him or her?

15         A.     Well, we -- we made other recommendations

16  besides that also, but the recommendation was again the

17  fit for duty with a medical health professional, and the

18  acting chief at that time set up the -- the meeting with

19  the mental health professional, and at that point, I was

20  out of whatever -- you know, depending on this guy's --

21  the doctor's recommendation, and so the chief would have

22  -- the acting chief at that time would have taken care of

23  that.

24         Q.     Okay.  And who was the acting chief at the

25  time?

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1        A.    Captain Kayser.

2        Q.    You indicated that you made other

3    recommendations as well.   What were the other

4    recommendations?

5        A.    He was in a specialized assignment.   We

6    transferred him immediately out of the specialized

7    assignment so that he wouldn't have contact with that

8    individual anymore.   He was also given some parameters of

9    what he could and could not do, where he could and

10   couldn't go.

11       Q.    Was this individual --

12       A.    And I -- excuse me.   But I also believe he

13   eventually received a suspension, too.

14       Q.    But he was not terminated?

15       A.    No.

16       Q.    Okay.   Was this a full-time, regular police

17   officer, or was it a probationary officer?

18       A.    No.   He was a full-time officer.   He had

19   served his probationary period years before.

20       Q.    Are you aware of any probationary officer who

21   has ever been sent for any kind of fitness for duty

22   examination of a mental health kind?

23       A.    Probationary officer?   No.

24       Q.    Yes.   Okay.   How long is a probationary

25   period with the --

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1    A.    One year.

2    Q.    At the end of the one-year probation, what

3  happens?

4    A.    The officer is evaluated, given a last

5  evaluation by his direct supervisors, which in a

6  patrolman's case is the sergeants.  Sergeant then makes a

7  recommendation based on their rating as to whether or not

8  the officer should be taken off probation.  I review it,

9  also usually with the deputy commander, review the

10  officer's performance, and then I either concur with their

11  recommendation or I don't, and I send either finding to

12  the chief of police, who then must also agree or disagree,

13  and, obviously, if they disagree -- if people disagree,

14  there has to be reasons.

15    Q.    What kind of documentation is filled out with

16  regard to that?

17    A.    The sergeants fill out a regular evaluation,

18  which I think is like 12, 15 pages, and then I usually

19  fill out a memo to the chief of police stating my

20  opinion --

21    Q.    Are your --

22    A.    -- and my recommendation.

23    Q.    Do you have a standard form?

24    A.    It's a Creve Coeur police memo --

25    Q.    Okay.

BOYD-GWINN REPORTING

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1          A.    -- memo form.

2          Q.    And I know when we do pleadings, sometimes

3    we'll pull up a different pleading and just change the

4    names, dates and the serial number, so to speak.  When you

5    do evaluations that you're sending up to the chief of

6    police, do you -- do you use the same form every time?

7          A.    I have a template that I use, yeah.

8          Q.    Okay.  So the verbiage is essentially the

9    same?

10         A.    I try not to make it exactly the same for

11   everybody, --

12         Q.    Okay.

13         A.    -- because that's pretty obvious and it means

14   I'm not really taking a look at what the guy is doing, so,

15   no, I don't.  I try to make it a little bit different --

16         Q.    Okay.

17         A.    -- based on this -- you know, whatever the

18   officer has done.

19         Q.    Do you know if there was a reason -- we were

20   talking about mental exam evaluations.  Do you know if

21   there was a reason why John Doe HM was not referred for a

22   mental evaluation?

23         A.    I wouldn't know that specifically.

24         Q.    Okay.  Was that ever a recommendation that

25   you made?

BOYD-GWINN REPORTING

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1          A.     No.

2          Q.     Okay.  And was there a reason you didn't

3    recommend John Doe HM be given a mental evaluation?

4          A.     No.  It didn't occur to me.

5          Q.     This is an unusual question and I know it,

6    but do you know what the standard operating procedure

7    number is regarding probation or if there's more than one?

8          A.     I don't know what it is.

9          Q.     Now, with regard to terminations, you have

10   been involved in more than one termination, I assume?

11         A.     I haven't been involved in many.

12         Q.     Okay.  Approximately how many termination

13   processes would you estimate that you have been involved

14   with?

15         A.     I would say less than -- less than five.

16         Q.     And I would assume one of those would include

17   John Doe HM?

18         A.     Yes.

19         Q.     Okay.  And one of them the woman who couldn't

20   qualify with her handgun?

21         A.     Actually, I wasn't here for that, so I wasn't

22   really involved in that other than by telephone.

23         Q.     Okay.  Aside from John Doe HM, were any of

24   the individuals that you were involved in their

25   termination probationary officers?

BOYD-GWINN REPORTING

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1          A.     I can't think of one.

2          Q.     Okay.  Do you know the difference --

3          A.     This other -- excuse me.

4          Q.     I'm sorry.

5          A.     This other -- this one lady was, yes, the one

6   that -- but, again, I was -- I wasn't physically here for

7   that.  I was just on the phone with what was going on.

8          Q.     Okay.  Were -- did -- were you in a position

9   where you could recommend either way?

10         A.     Not -- no.  It was already a done deal.

11         Q.     Okay.  Did anyone contact you with regard to

12  your -- your input on the matter?

13         A.     Yeah.

14         Q.     Okay.

15         A.     Yes.

16         Q.     And what -- what was the purpose for their

17  contact with you?

18         A.     Well, because I was actually in training, I

19  was at the FBI Academy when it all occurred, and Chief

20  Eidman was actually the -- the commander, the acting

21  commander at that time, and it was between him and Chief

22  Beardslee, or mostly, but I was in the loop as to what was

23  going on, but I really didn't have -- you know, I wasn't

24  there to observe all this, so I couldn't really give an

25  opinion.

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1        Q.    Okay.  Had you been -- was this while you

2    were in the position that you currently hold so that you

3    would have been second or third line supervisor over the

4    individual who was involved?

5        A.    Had I been here, yes, but I wasn't here.

6        Q.    Okay.  At any point during her tenure with

7    the force, were you her supervisor?

8        A.    Briefly.

9        Q.    Okay.  And is that why you were involved in

10   the process?

11       A.    Yes.  Well, that's why I was consulted about

12   what was going on, yes.

13       Q.    Okay.  Are you familiar with the differences·

14   in due process that are available to probationary officers

15   and nonprobationary officers, if any?

16       A.    The due process?

17       Q.    Mm-hm.  Is it easier to terminate a

18   probationary employee than it is a nonprobationary

19   employee --

20       A.    Yes.

21       Q.    -- in your experience?

22       A.    Yes.

23       Q.    Can you tell me what the difference in the

24   process is for probationary employee versus a

25   nonprobationary employee?

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1        A.      Probationary employee can be terminated for

2    any reason, I believe, at will.  An officer who's off

3    probation has various remedies, grievances.  At times, I

4    believe a personnel hearing board can hear his -- his

5    grievances, reasons why he shouldn't be terminated, but a

6    probationary officer has -- I don't believe has any of

7    that.

8        Q.      With regard to probation, does probation

9    begin at the moment that the individual first --

10       A.      I have no idea what -- it's my phone.

11       Q.      Do you need to check it?

12       A.      No.  I'll let it go.

13       Q.      If you can --- you are welcome to.

14       A.      No.  I'll let it --

15       Q.      I forgot what I was going to ask.  Oh.

16   When -- does probationary status start the moment an

17   employee is hired?

18       A.      Yes.

19       Q.      Okay.

20       A.      Because it's one year.

21       Q.      And if their status changes, for example,

22   from a temporary hire to a permanent hire, does the

23   probation start anew or does it just run from the time

24   that they were temporarily hired?  I'll give you an

25   example.

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1          A.     I don't know.

2          Q.     Okay.  Fair enough.  I'll give you the

3    example anyway.  You just started to say it on the record.

4    John Doe HM was hired because someone had been called up

5    to go to Iraq, and then later he was -- became a permanent

6    employee.  In his situation, are you aware as to what

7    period of time his probation would have started?

8          A.     No.

9          Q.     Okay.

10          MS. RANDLES:  And for purposes of the

11    deposition numbering, I am just starting from where we

12    left off at the end of John Doe HM's deposition and

13    carrying forward.

14               MS. OWENS:  As far as exhibits go?

15               MS. RANDLES:  Mm-hm.

16               MS. OWENS:  I guess that's fine.

17               MS. MERKLIN VON KAENEL:  That's fine with me.

18               MS. RANDLES:  That way, we can refer back to

19    the old exhibit numbers.

20          Q.     (By Ms. Randles)  Okay.  With regard to John

21    Doe HM, were you aware that he had been recommended for

22    his probationary status to end prior to his termination?

23          A.     Yes.  I was.

24          Q.     Okay.  And how did you become aware of that?

25          A.     The sergeants, I believe, had done his

1  evaluation, and they had forwarded it to me, and at that

2  time, based on what I knew and the rating that they had

3  given him, he would have been recommended to come off

4  probation.

5       Q.    Okay.

6            MS. RANDLES:  Let's see.  Our last exhibit

7  number was 47.  Would you please mark this as Exhibit 48?

8            [Reporter marked Exhibit 48.]

9       Q.    (By Ms. Randles)  Okay.  I have just --

10           MS. MERKLIN VON KAENEL:  Can we just go off

11 the record for a second?

12           MS. RANDLES:  Sure.

13           [Discussion was held off the record.]

14                [Break was taken.]

15           MS. OWENS:  John, we're going to go back on

16 the record.  Okay?

17           DEFENDANT BEARDSLEE:  Yes.

18      Q.    (By Ms. Randles)  Okay.  Captain Hodak, I'm

19 interested in the procedure for the termination with

20 regard to John Doe HM, and then we'll talk about the

21 substance of what occurred, but, first, I really want to

22 talk about the procedure.

23      Now, I have handed you what's been marked as

24 Deposition Exhibit 48?

25      A.    Yes.

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1    Q.    And that is a police department memorandum,

2  correct?

3    A.    Yes.

4    Q.    Okay.  It says Creve Coeur Police Department

5  memorandum for record.  What does that mean?

6    A.    I don't know.

7    Q.    Okay.

8    A.    I mean, that -- that's probably the first

9  time I have really noticed it.  I am not saying I haven't

10 seen it before.  It's the first time I have noticed it.

11   Q.    Okay.  Is this something that is placed in

12 the personnel file of the individual who's being

13 terminated?

14   A.    I would have to say yes, but I don't know

15 that for a fact.

16   Q.    Okay.  All right.  Not your bailiwick then?

17   A.    No.

18   Q.    Okay.  I notice down at witness signature

19 that -- is that your --

20   A.    Yes.

21   Q.    -- signature?

22   A.    Yes.  It is.

23   Q.    Okay.  Do you know why you were asked to

24 witness this particular document?

25   A.    I don't know the reason other than a witness

BOYD-GWINN REPORTING

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1   was needed.

2          Q.    Okay.  Did this document -- was it made and

3   executed at the time that John Doe HM was terminated?

4          A.    Yes.

5          Q.    Okay.  And --

6          A.    Well, excuse me.  I don't know if it was made

7   at that time.  Okay.  Let me -- because I -- I don't know

8   if it was exactly made at the time that we were sitting

9   there.  I'm sure it was made before that.

10         Q.    Okay.

11         A.    So it was made prior to me getting there --

12         Q.    Oh, --

13         A.    -- and then it was executed.

14         Q.    -- okay.  And so it was executed on the day

15   that John Doe HM was terminated?

16         A.    Yes.

17         Q.    Are you familiar with personnel policy and

18   procedure sections 7.11 and 7.12?

19         A.    Not without looking at it.

20         Q.    Okay.  Where are these found?  Is there like

21   a book or a notebook that's kept?

22         A.    Yes.  Yes.  Yes.  The city has a personnel

23   policy code book.

24         Q.    Okay.  And does each individual --

25         A.    Manual.

BOYD-GWINN REPORTING

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1    Q.    -- does each individual who works there get a

2    copy of it, or are there just copies that are found at the

3    department for people to go and look at?

4    A.    I would only have to speak from my own

5    experience, but at the time, we all got copies of it.

6    Since that time, I don't know.

7    Q.    Okay.

8    A.    But I do know they're on line in an intranet

9    where everybody has access to them.

10    Q.    Okay.  On intranet?

11    A.    Intranet.

12    Q.    So that's something that's internal?

13    A.    Internal.  Yes.

14    Q.    Okay.  All right.  And it was your

15    understanding from the meeting with John Doe HM that his

16    termination was effective that moment, correct?

17    A.    Yes.

18    Q.    Okay.  And I think I have given you what's

19    been previously marked as Exhibit 20.  Did I give that to

20    you?

21    A.    It's over here.

22    Q.    I have an extra copy.

23    A.    Okay.

24    Q.    Okay.  Is this the recommendation that you

25    made indicating that John Doe HM could be taken off of

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1   probationary status?

2        A.    Yes.

3        Q.    If you will look to the second sentence, it

4   says, Subsequently, I can find no compelling reason to

5   keep Officer John Doe HM on probationary status?

6        A.    Yes.

7        Q.    Is that the kind -- is that the language that

8   you typically employ with regard to recommendations for

9   being taken off of probationary status?

10        A.    Yes.

11        Q.    And you had indicated subsequently.  Is there

12   any meaning to the word subsequently, or is that verbal

13   filler, and what I mean by that is, was there an

14   investigation that you conducted on yourself -- you

15   conducted by yourself on John Doe HM after McCrary and

16   Kellogg had said he should be taken off of probationary

17   status?

18        A.    That refers to the fact that I re -- that I

19   reviewed Kellogg's and McCrary's recommendations and

20   evaluations and I had nothing else in my own files that

21   would determine otherwise.

22        Q.    Okay.  And the terminology no compelling

23   reason to keep Officer John Doe HM on probationary status,

24   is -- is there a reason that you use the word compelling,

25   no compelling reason?

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1      A.    Yes.

2      Q.    And what is that?

3      A.    That is because there are always, on

4  probationary police officers, some reasons that some

5  people could say why does this office -- you know, this

6  officer hasn't learned this or this officer doesn't do

7  this well or other elements that the officer can learn and

8  get proficient at, so an officer coming off probation

9  isn't the top of the line police officer, there's a lot of

10 things that the person still needs to learn, and that's

11 what that means.

12     Q.    Okay.

13     A.    A compelling reason would be qualification,

14 he can't qualify.  That would be compelling.

15     Q.    Okay.  So as of the 27th of December of '05,

16 you were aware of no reason that was compelling for

17 Officer John Doe HM to be kept on probationary status?

18     A.    As of when did you say?

19     Q.    As of the 27th --

20     A.    27th?

21     Q.    -- of December.

22     A.    Correct.

23     Q.    Okay.  Now, did your assessment with regard

24 to John Doe HM change?

25     A.    Yes.

BOYD-GWINN REPORTING

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1       Q.      Okay.  Can you describe for me when that

2   changed?

3       A.      That changed at the time that this incident

4   occurred.  I would consider that compelling.

5       Q.      Okay.  And describe for me what your

6   understanding of the incident was.

7       A.      My understanding is that John Doe HM made

8   some suicidal type threats to his wife, who then called

9   the St. Louis County Police.  St. Louis County Police

10  while en route to Mrs. John Doe HM's house observed John

11  Doe HM driving down the street, pulled him over, at which

12  time John Doe HM made a U-turn, facing the officers, which

13  is very unusual on a car stop and typically unusual for a

14  police officer to do, knowing that he's armed, pulled --

15  pulled in front, U-turned, facing the officers, and then

16  had two weapons in his car as opposed to just carrying

17  one, one of the weapons being a weapon that I cannot find

18  on the list that we allowed him to qualify with, and then

19  his subsequent reactions to the officer's commands.

20      Q.      Okay.  Did you review anything in coming to

21  your -- your conclusions about Mr. John Doe HM?

22      A.      I read the police report.

23      Q.      Was there anything else that you reviewed?

24      A.      That I viewed?

25      Q.      Reviewed.

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1      A.   Reviewed.  I don't believe so.

2      Q.   Did you speak to anyone?

3      A.   I spoke to Sergeant Lasater, I spoke to the

4  chief of police, I spoke to Sergeant Chellis.  I don't

5  believe there was anybody else at that time.

6      Q.   Okay.  Did you speak to Crystal Marshall?

7      A.   No.

8      Q.   Did you speak to Lisa Doe?

9      A.   No.

10      Q.   Did you speak to any members of John Doe HM'S

11  family?

12      A.   No.

13      Q.   Did you take notes of your conversations with

14  Sergeant Lasater?

15      A.   If I did, I put them in the internal

16  investigation report and got rid of the notes.

17      Q.   Okay.

18      A.   I don't typically keep notes of

19  investigations.

20      Q.   Okay.  I am going to hand you what's

21  previously been marked as Exhibit 23.  Is this the

22  internal investigation that you were referring to?

23      A.   This is the internal investigation complaint

24  form, correct.

25      Q.   Okay.  Is there something else that you would

1   have prepared besides this internal investigation

2   complaint form?

3          A.    Not me, no.

4          Q.    Okay.  If you would, take a minute to look it

5   over.  I'm sure it's been a while since you have seen it.

6   Well, did you have an opportunity to review this before

7   your deposition today?

8          A.    Yes.

9          Q.    Okay.  Can you tell us who Sergeant Jeff

10  Chellis is?

11         A.    He's one of the six patrol sergeants that we

12  discussed earlier.

13         Q.    Okay.  And how is it that Sergeant Jeff

14  Chellis came to contact you?

15         A.    I would just be guessing, but I'm sure the

16  St. Louis County Police called him.

17         Q.    Would he have --

18         MS. OWENS:  I'm sorry.  Don't guess.

19         THE WITNESS:  Well, okay.

20         Q.    (By Ms. Randles)  Well, what I'm really

21  looking for is for process.  What would normally be the

22  process --

23         A.    Well, he was --

24         Q.    -- if you have a -- a police officer who is

25  detained or taken into custody in some manner?

BOYD-GWINN REPORTING

69

1       A.    The process would be that the sergeant or the

2   on duty watch commander who got the call would then

3   probably call me at home if I wasn't on duty.

4       Q.    Okay.  And then what would your duties be

5   with regard to that incident?

6       A.    I would probably document whatever the

7   sergeant told me and then call the chief of police and

8   tell him what was going on.

9       Q.    Okay.  And then after that, what is the next

10  step in -- in what happens, and again I'm looking for

11  process?  What's the process if an incident occurs with a

12  police officer?

13      A.    Well, then I would probably have a discussion

14  with the chief on where we were going to go from there and

15  write a complaint.

16      Q.    Okay.  And then what happens to the complaint

17  after you write it?

18      A.    In this particular case, the complaint went

19  to the chief's office.

20      Q.    Is that what would typically happen?

21      A.    In an office -- in a situation where an

22  officer is involved in a potential -- in an incident with

23  another police department, probably.

24      Q.    Okay.  And then after it goes to the chief,

25  what is your role following that?

1    A.    Well, the chief decides where the course of

2  the investigation goes.

3    Q.    Okay.

4    A.    And there have -- you know, occasionally

5  there would be in times -- the incident we talked about

6  the other officer, I investigated that one.  In this

7  particular case, I didn't investigate this one.

8    Q.    Do you know if anyone investigated this

9  incident?

10   A.    Someone must have, but I don't know who.

11   Q.    Okay.

12   A.    Again, the --

13   Q.    When you say someone must have, why do you

14  draw that conclusion?

15   A.    Because all complaints are investigated.

16   Q.    Okay.

17   A.    Someone investigates officer complaints.

18  Now, the complaint -- an investigation doesn't have to be

19  gigantic.

20   Q.    Sure.

21   A.    It doesn't have to be every nook and cranny,

22  and -- but there's some type of investigation that's

23  always done on officer-involved complaints.

24   Q.    Sure.  Sure.  And to the best of your

25  knowledge, where there's an officer-involved complaint,

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1  what form does the investigation take?  Are witnesses

2  contacted?

3       A.    Not always.  Police -- you know, there's --

4  police report here indicates that certain witnesses were

5  contacted, and those officers filed an official police

6  report, which is included in here somewhere, and they did

7  an investigation.

8       Q.    Okay.  So then would Creve Coeur -- in a

9  situation like this, would Creve Coeur rely on the

10 investigation of the surrounding -- of the surrounding

11 community, for example, St. Louis County, in their

12 internal affairs investigation?

13      A.    Each case is different.  Some you would, some

14 you wouldn't.

15      Q.    Okay.  Okay.  Now, let's take the case of

16 John Doe HM so that we're out of the hypothetical and into

17 real world.  If you had investigated John Doe HM's

18 complaint, what processes would you have -- what would you

19 have done?

20           MS. OWENS:  Objection.  Hypothetical --

21 hypothetically I assume you're asking him?

22           MS. RANDLES:  Mm-hm.

23           MS. OWENS:  If you can answer, you can try.

24      A.    What would I have done in this?

25      Q.    (By Ms. Randles)  Yes.

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1        A.    I have got a police report from St. Louis
2   County Police --
3        Q.    Mm-hm.
4        A.    -- that spells out what happened and what
5   they did.  I probably would have talked to the officers,
6   one of the two officers involved, find out what their take
7   was on it, what happened.  I may have just gone with
8   that --
9        Q.    Okay.
10       A.    -- in this particular instance.
11       Q.    Would you have spoken with Mr. John Doe HM?
12       A.    In this particular case, since he's on
13   probation, I don't think I need to.
14       Q.    Okay.  When you say since he was on
15   probation, it was not necessary to speak with Mr. John Doe
16   HM, what -- why is that true?
17       A.    Because, as we spoke of before, an officer on
18   probation is -- can be terminated for will, and in this
19   particular case, the incident described, with the way
20   Officer John Doe HM responded to police officers pulling
21   him over, the way he was I don't want to say combative,
22   but the tactical situation which caused other officers
23   alarm, a police officer should know how to respond in
24   those situations, and I think it was a stressful event,
25   and officers -- police officers carry guns and have to

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1   respond to stressful events all the time, and, you know,

2   it's just a chance that I wouldn't want to take.

3        Q.   Okay.  Explain what you mean, that that was a

4   chance you would not want to take?

5        A.   Well, once a police officer has -- has been

6   taken off probation, it is very difficult to -- to

7   terminate him for -- there's a lot of -- a lot of things

8   that have to be done in order for an officer to be

9   terminated, and there's a lot of responsibilities that he

10  has when he is a police officer, so if he's on probation

11  and he does something like this on probation, then if he's

12  not on probation, if he's an actual officer and he does

13  this, then we would have a difficult time changing his

14  demeanor.

15       Q.   Okay.  Now, you indicated that you didn't

16  investigate this case, correct?

17       A.   I just did the internal -- the complaint.

18       Q.   The complaint.  And if in fact the

19  allegations were untrue with regard to what Mr. John Doe

20  HM allegedly had done, would that change your opinion as

21  to whether or not he was an inappropriate individual?

22       A.   Not really, --

23       Q.   Okay.

24       A.   -- because the way he responded to police

25  officers pulling him over caused me concern from there.

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1   The fact that he had two weapons, one on him and one in

2   his car and one that had not yet been certified for the

3   police department, that concerns me also.

4        Q.   Okay.  Now, let's talk about the one that had

5   not yet been certified.  Are you aware that he had in fact

6   gone through the process where he had passed the

7   qualification?

8        A.   Yes.

9        Q.   Okay.  When an individual passes

10  qualification, then do they receive something back that

11  tells them you can now carry a weapon?

12       A.   There's the list that is generated that says

13  that these are the authorized weapons that the officer can

14  carry, and that comes out of the chief's office.

15       Q.   Okay.  And does that come out once a year?

16       A.   Yes.  Once a year.

17       Q.   So if someone qualifies, and you indicated

18  that there are two times a year that officers go through

19  mandatory qualification --

20       A.   With their duty weapon, --

21       Q.   Okay.

22       A.   -- but only once with their off duty weapon.

23       Q.   And that was between November and January?

24       A.   Currently, it's November 15th to January

25  15th.  Back then, I can't tell you the exact dates, but it

BOYD-GWINN REPORTING

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1   would have been in December sometime.

2       Q.    So is it your testimony then that no police

3   officer can carry a weapon that they have qualified for on

4   the range until that list comes out?

5       A.    Yes.

6       Q.    But with regard to the forms that are signed

7   that authorize the carrying of the weapons, that is never

8   then sent back to the officer, correct?

9       A.    These forms?

10      Q.    Yes.

11      A.    No.  Those forms are not sent back to the

12  officers.

13      Q.    So the only form of notification that they

14  would receive that they had passed every hurdle and that

15  everyone had signed off would be that list?

16      A.    That is -- yes.

17      Q.    Okay.  Now, with regard to the -- the two

18  handguns, if an individual has been qualified and has

19  their name on the list for having qualified so that they

20  have all authorizations to carry their secondary weapon,

21  are they allowed off duty to carry two weapons?

22      A.    If the guns are on the list and they have

23  qualified with both of them?

24      Q.    Yes.

25      A.    Well, one -- it depends on whether it's

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1  broken down into a secondary gun or a backup gun.  If it's

2  a secondary gun, then -- the one that they carry secondary

3  to their Beretta, no, they can't carry that as a backup

4  gun.  They're distinctly different, which is the same

5  thing.  They're different.  You can carry one.  You can

6  carry -- they could be the same, but they could also be

7  different.

8          So if you qualified with your secondary gun, you

9  can't carry it as a backup -- as your -- as your off duty

10 gun.  All right.  But you could if you qualified with it.

11 Does that make sense at all?

12         Q.    No.

13         A.    No.  Okay.

14         Q.    I'm lost.  I'm sorry.

15         A.    Again, there's two distinct types of gun.

16         Q.    Sure.  Off duty and backup?

17         A.    There's an off duty gun and your backup gun.

18 It's possible that you could qualify with your one gun and

19 not be able to carry it on the other situation.

20         Q.    Okay.

21         A.    It's possible.

22         Q.    Okay.  But --

23         A.    But most people don't do that.  So if you

24 have qualified with the one for the one, you qualified it

25 for the second one also, --

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1    Q.    Okay.

2    A.    -- for both instances.

3    Q.    Okay.

4    A.    But there are people who qualify with many,

5  many guns.  There's people who shoot five to six different

6  guns, but your question was whether or not you can carry

7  both at the same time, and I don't think that's ever

8  really addressed.  It all depends on whether you have

9  qualified with it or not.

10    Q.    Okay.  Now, if an officer has two guns in his

11 vehicle, does that count -- for example, he's going

12 hunting or he's going target practicing with his brother.

13 In that situation, is.it required that he do something to

14 notify the police department that I have two guns in my

15 vehicle because I'm going to go shooting with my brother?

16    A.    No.

17    Q.    Okay.  Then what is the difference between

18 being an off duty police officer who happens to have two

19 guns to go shooting with his brother and being an off duty

20 police officer who has an authorized weapon and a backup

21 weapon on his person?

22    A.    Well, you're taking the totality of the

23 circumstances out of this.  It's not the fact that he had

24 two guns in his car per se.  It's the fact that he had two

25 guns in his car and that he had -- one of them wasn't --

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1   hadn't officially gone through the chain of command to be

2   certified yet, that he had went to his exwife's or his

3   wife's house and said something that caused her alarm to

4   call the police, that the police pulled him over, and that

5   he took a tactical situation.  That is uncommon, to say

6   the least.  Most people, I think everybody will agree,

7   when they get pulled over by the police, don't make a

8   U-turn to face them.  I would say 99 percent of the time,

9   that doesn't happen.

10          All right.  So bear -- putting all of that in the

11  totality, yeah, I got a problem with him having two guns

12  in the car.

13          Q.    Okay.  But taking -- taking it separately,

14  apart, that -- I understand that -- your concern with the

15  totality of the situation, but it's not illegal per se to

16  have two --

17          A.    No.

18          Q.    -- for an officer to have two guns in his

19  car?

20          A.    No.  It is not.

21          Q.    Okay.  Now, looking at Exhibit No. 23, --

22          A.    Yes.

23          Q.    -- up at -- the third paragraph down, it

24  says, Description of allegation, or the third box down?

25          A.    Yes.

CAPTAIN GEORGE MICHAEL CHODAK, 2/26/09

1        Q.     And then the third one is carrying an

2    unauthorized secondary weapon.  In the situation of John

3    Doe HM, I understand the totality of the circumstances,

4    but in his situation, had he violated an SOP by having two

5    weapons in his car?

6        A.     This is a complaint.  This isn't the final

7    findings.

8        Q.     Okay.

9        A.     Okay?  This is just a complaint that's

10   alleged.  Okay?  This would be similar to a citizen coming

11   in off the street and making a complaint against a police

12   officer.  These are the alleged -- it says description of

13   the allegation.  I am not saying that that was formulated

14   in the final determination.  That wasn't mine to make.

15       Q.     Okay.

16       A.     So --

17       Q.     To your knowledge, was there ever a final

18   determination made with regard to --

19       A.     I don't know.

20       Q.     -- with regard to --

21       A.     I don't know.

22       Q.     Let me finish the question --

23       A.     Oh, I'm sorry.

24       Q.     -- so it's complete on the record.

25       A.     I'm sorry.

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1       Q.    I realize it stopped with a prepositional

2   phrase.

3       With regard to -- do you know whether or not there

4   was a final report made with regard to any violations of

5   any SOP that John Doe HM may have engaged in?

6       A.    I don't know if there was one.

7       Q.    Okay.  Now, looking at the description of

8   allegations, the first one is conduct unbecoming an

9   officer.  In the situation that you were investigating,

10  which conduct were you concerned was conduct unbecoming an

11  officer in violation of SOP 121.02?

12      A.    The -- the allegation would point to -- in my

13  belief, it would point to the fact that he showed up at

14  his wife's house, made some statements of suicidal type

15  threats, and -- and then confronted the officers in the

16  way he did.  That would be unbecoming to a police officer.

17      Q.    Okay.  Let's deal first with the suicidal

18  statement.  Is the making of a suicidal statement alone

19  considered conduct that is unbecoming an officer?

20      A.    Oh, I would think so.

21      Q.    Okay.  But do you know if there have been any

22  other officers on the force who have made suicidal

23  statements?

24      A.    No.  I do not.

25      Q.    Okay.  Do you know if there are any other

BOYD-GWINN REPORTING

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1  officers on the force who have been disciplined or

2  terminated for suicidal ideation or suicidal statements?

3        A.    I don't know.

4        Q.    Okay.  Okay.  In this particular complaint,

5  this particular complaint does not indicate that Mr. John

6  Doe HM made a U-turn.  At the time, you had -- in front of

7  police, or that he had engaged in any kind of action with

8  the police that was potentially damaging.  At the time

9  that you wrote this, had you actually seen the report of

10 St. Louis County?

11       A.    I can't say with certainty.

12       Q.    Okay.  Then assuming at that point in time

13 that you had not yet seen the report, what in the details

14 of incident here do you believe supports the conduct

15 unbecoming an officer?

16             MS. OWENS:  I am going to object, because he

17 didn't say he didn't see the report.  He said he doesn't

18 know whether he had seen the report.

19       Q.    (By Ms. Randles)  Okay.  Well, taking away

20 the predicate.  Looking at what you have specifically

21 written, what that you have specifically written do you

22 believe supports the idea that Mr. John Doe HM engaged in

23 conduct unbecoming an officer?

24       A.    Again, the suicidal type threats, but, again,

25 this is a complaint --

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1   Q.   Sure.

2   A.   -- and complaints are investigated.

3   Q.   And again, you have no -- no understanding of

4  who investigated this complaint or how they investigated

5  it; --

6   A.   Well, that's --

7   Q.   -- is that correct?

8   A.   An understanding?

9   Q.   You don't know who did it?

10   A.   I don't know specifically who did it, but I

11  -- I have never seen the paperwork on it, but I believe I

12  know who did it.

13   Q.   Okay.  Who do you believe --

14   A.   I would believe that the chief did it.

15   Q.   Okay.  Now, any time that there is an

16  investigation into an internal affairs complaint, into

17  this complaint specifically, when -- would there be

18  paperwork that would arise from the investigation?

19   A.   If I did one, yes.

20   Q.   Okay.  And what paperwork would you be

21  required to complete as part of this investigation?

22   A.   We have a disciplinary form that I file.  I

23  don't remember the specific name of it right now.

24   Q.   Okay.  In this situation, you have never seen

25  any document that establishes what the investigation was?

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1      A.    I have never seen any.  No.

2      Q.    Okay.  Do you have any recollection as to the

3  first time you saw the St. Louis County Police report?

4      A.    It was in this period, but I can't tell you

5  exactly when.

6      Q.    And did you have any direct contact with

7  either Sergeant Lasater or Officer Thomeczek?

8      A.    Yes.

9      Q.    And what was your direct contact with them?

10     A.    A telephone conversation with Sergeant

11 Lasater.

12     Q.    Okay.  You had indicated that you wouldn't

13 typically keep notes of those conversations, but they

14 would be found in the report that you had done.  Are --

15 are -- is the information from Sergeant Lasater found in

16 this complaint?

17     A.    Officer John Doe HM was taken into custody by

18 the St. Louis County Police after he threatened to commit

19 suicide.  Officer John Doe HM -- let's see.  I knew he was

20 off duty.  He was visiting his ex-wife, I wouldn't have

21 known that, where he allegedly made suicidal threats.

22     Q.    Okay.  And you believe all of that

23 information came from Officer Lasater?

24     A.    Sergeant Lasater --

25     Q.    Sergeant Lasater?

BOYD-GWINN REPORTING

1        A.      -- verbally and then through -- the police

2   report verified it.

3        Q.      Okay.

4        A.      And that he was stopped a short distance by

5   Officer Thomeczek and Officer Venable and Sergeant

6   Lasater, and he was found in possession of two handguns,

7   where they were located, one in his waistband, the other

8   on the front seat, in close proximity to the driver's

9   seat.  That whole paragraph would for the most part -- it

10  described, you know, how -- the weapons were described,

11  how he was admitted to the Hyland Center for 72-hour

12  observation, and then the number of the police report.

13       Q.      Okay.

14       A.      I'm sure I got most of that from talking to

15  Sergeant Lasater.

16       Q.      Okay.  And then he was released by the

17  hospital on 1/1/06.  That is not something you would have

18  received from Sergeant Lasater?

19       A.      Probably not.

20       Q.      Okay.  Okay.  And you were not a witness to

21  any of these events directly, correct?

22       A.      No.  I was not.

23       Q.      Okay.  And you did not speak with Lisa Doe

24  directly, correct?

25       A.      No.  I did not.

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1      Q.      And is there any other individual besides

2  Sergeant Lasater that you did speak with concerning the

3  information found in Exhibit 23?

4      A.      Not that I recall.

5      Q.      Okay.  To be fair, on the first sentence, it

6  says, On Saturday, 12/31/05, Sergeant --

7      A.      Well --

8      Q.      -- Jeff Chellis contacted the undersigned.

9  Do you recall your conversation with Sergeant Chellis?

10     A.      He called me to advise me of what happened.

11  Yes.  I'm sorry.

12     Q.      Okay.  And again, Sergeant Chellis was also

13  not a direct witness to any of the events, --

14     A.      No.

15     Q.      -- correct?

16     A.      He was not.

17     Q.      I assume he was the sergeant who was on duty

18  at the time --

19     A.      Yes.

20     Q.      -- the call came in?

21     A.      Yes.

22     Q.      Do you recall any other details of the

23  conversation that you had with Sergeant Jeff Chellis?

24     A.      Not details.  No.

25     Q.      Okay.  Do you recall any of the other topics

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1  that you discussed with Sergeant Jeff Chellis other than

2  the fact that John Doe HM had been taken into custody?

3      A.   I know we had a conversation.  I just don't

4  remember what -- what else transpired other than the

5  incident occurred with John Doe HM.  There might have been

6  something else, but right now, I don't recall it.

7      Q.   Okay.  Did you only have one conversation

8  with Jeff Chellis?

9      A.   I believe so.

10     Q.   Did you have conversations with any other

11  individuals in the Creve Coeur Police Department except --

12  beyond Chief Beardslee concerning the matter -- the

13  incident with John Doe HM?

14     A.   During the entire -- this entire thing here?

15     Q.   Yeah.

16     A.   The entire incident from --

17     Q.   From --

18     A.   Not -- not specifically, but we went over

19  what we were going to do with other commanders in the

20  police department, yes.

21     Q.   Okay.  What other commanders did you go over

22  what you were going to do?

23     A.   By saying what we were going to do, what I'm

24  saying is for -- when John Doe HM was called in to see the

25  chief, how we were going to approach that, and I -- let's

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1  see.  I'm sure we spoke with Chief Eidman and Lieutenant

2  Funkhouser and Captain Spoerry, I believe.  I'm not sure

3  if Captain Kayser was involved in that or not, but he

4  could have been.

5      We were a little bit worried as to what might

6  happen when John Doe HM was told that he was terminated,

7  so we took substantial steps to make sure nothing

8  occurred, and we discussed it with every -- with all the

9  commanders.  I'm pretty confident of that.

10     Q.   Okay.  And do you recall what you told them

11 concerning John Doe HM?

12     A.   I can't tell you specifically what I told

13 them, but ·it would have something to do with, you know,

14 he's a police officer, he has guns, he had been in

15 observation for a couple -- a couple days, we are worried

16 as to what might happen, here's what we're going to do

17 when he comes in, here's the safety procedures we're going

18 to take care of.

19     Q.   Okay.  Besides Eidman, Funkhouser and

20 Spoerry, do you recall whether or not there were

21 conversations with any other members of the police force

22 concerning John Doe HM and the events of 12/31?

23     A.   Conversations?

24     Q.   Yes.

25     A.   No.

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1    Q.    Okay.  Do you recall whether there were any

2  communications --

3    A.    Yes.

4    Q.    -- with others?  And what communications

5  would those have been?

6    A.    After John Doe HM was terminated, Chief

7  Beardslee put out a memo to the police department because

8  we were concerned for the safety of all the police

9  officers, and John Doe HM I believe was not allowed back

10  on the city hall property without prior notice, something

11  like that, but there was a -- a memo, a bulletin, put out

12  by the chief of police.

13    Q.    Okay.  And to whom did that go?

14    A.    I believe it went to everybody.  It went --

15  it was a document that was posted, I believe.

16    Q.    Okay.  I think I have a copy of that.  Let me

17  pull it.

18          DEFENDANT EIDMAN:  It's 24.

19          MS. RANDLES:  24?

20          DEFENDANT EIDMAN:  Yes, ma'am.

21          MS. RANDLES:  Thank you.

22    Sorry.  I don't have copies of that.

23    A.    (Indicating).

24    Q.    (By Ms. Randles)  Okay.  Great.

25    A.    It's Exhibit 24?

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1          Q.    Yes.  This has previously been marked as

2    Exhibit 24.  Is this the employee safety alert that you

3    were referring to?

4          A.    Yes.

5          Q.    Okay.  And down at the bottom, it says,

6    Distribution; --

7          A.    Mm-hm.

8          Q.    -- is that correct?

9          A.    Yes.

10         Q.    Okay.  And to whom was it distributed?

11         A.    Captains, lieutenants, sergeants, bulletin

12   boards.

13         Q..   Okay.  And bulletin boards, does that mean it

14   was distributed generally to anyone in the police

15   department?

16         A.    It was hung up on the bulletin boards.

17         Q.    Is -- I'm not familiar with the Creve Coeur

18   Police Department.

19         A.    Mm-hm.  Sure.

20         Q.    Are the bulletin boards accessible by anyone

21   who is an employee of the police department?

22         A.    Of the police department.

23         Q.    Okay.  Is it set out where the general public

24   can see it?

25         A.    No.

CAPTAIN GEORGE MICHAEL KODAK, 2/26/09

1    Q.    Okay.  So it is only employees of the Creve

2 Coeur Police Department who have access to the bulletin

3 boards?

4    A.    Bulletin boards in the police department are

5 specifically police department.  No one has access to

6 them.

7    Q.    Okay.  So every employee of the Creve Coeur

8 Police Department then was given this employee safety

9 alert or given access to this?

10   A.    Given access to it.

11   Q.    Okay.  Now, with regard to the employee

12 safety alert, did you in any regard help to create or

13 write the bulletin?

14   A.    No.

15   Q.    You can take a minute to look at it.  Are you

16 familiar with all of the information located in it?

17   A.    I have read it.

18   Q.    Okay.  Now, were you aware -- in paragraph

19 two, it starts, Details of such matters are usually

20 confidential.

21   A.    Paragraph two.  Oh, wrong paragraph.  Yes.  I

22 see that.

23   Q.    Okay.  Looking at the -- the next to the last

24 sentence, it says, Officer John Doe HM has recently

25 disclosed information and exhibited signs of emotional

BOYD-GWINN REPORTING

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1   problems.

2         Did you know that Officer John Doe HM had disclosed

3   any information that could raise concern about his

4   emotional stability?

5         A.    No.

6         Q.    Okay.  Had you ever seen any signs of

7   emotional problems in Officer John Doe HM prior to the

8   31st?

9         A.    No.

10         Q.    Okay.  Now, after the 31st, did you ever

11   observe any indication that John Doe HM had exhibited

12   signs of emotional problems?

13         A.    No.

14         Q.    Okay.  During the course of the termination

15   itself, did Mr. John Doe HM in your observation ever show

16   signs of emotional instability?

17         A.    During the process?

18         Q.    Yes.  At the --

19         A.    At the chief's?

20         Q.    Mm-hm.

21         A.    No.

22         Q.    Did you have any conversations with Mr. John

23   Doe HM between the 31st of December and the 4th of

24   January, when he was terminated?

25         A.    Yes.

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1      Q.    Okay.  Do you -- how many conversations do

2  you recall having with him?

3      A.    The conversations, there may have been two,

4  but I can't say the exact number, but I did call him on

5  the phone and set out, you know, don't come to work or

6  something like that until you're -- until you're notified,

7  and then I may have called -- the other conversation would

8  have had to do with when to come in, we need to see you,

9  whatever day it was, and I think when he got there, we had

10 just chitchat or something and we said a couple words to

11 each other, but I don't think it had anything to do with

12 this incident.  So I probably talked to him about three

13 times in the -- two, basically to give him directions as

14 to what you're supposed to do, don't come to work, stuff

15 like that.

16     Q.    Okay.  Now, with regard to the don't come to

17 work conversation, would that have occurred on the 1st or

18 the 2nd, approximately?

19     A.    I don't know when his -- whenever his next

20 day was supposed to be to come to work, so I couldn't say.

21     Q.    Okay.  Well, all of this took place on the

22 31st, correct, the 31st to the 1st, the -- having him

23 being picked up and taken to the hospital?

24     A.    [Nodded head].

25     Q.    Is that a yes?

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1    A.    I'm trying to think.  It happened on a

2 Saturday.  I'm pretty sure it happened on a Saturday.  It

3 would -- yeah.  It would have been -- most of the

4 conversations would have occurred in that time frame.

5    Q.    Okay.  Now, with regard to the -- do you

6 recall whether he was still in the hospital at the time

7 that you talked to him?

8    A.    I don't recall.

9    Q.    Okay.  Do you recall having the conversation

10 with him about don't come to work?

11    A.    I don't remember specifically, but I'm sure I

12 said -- I did call him at one time to tell him not to come

13 to work, but I can't tell you where -- how I got a hold of

14 him.

15    Q.    Okay.  If he were acting crazy, then I would

16 assume you would remember a conversation like that,

17 correct?

18    A.    If he was acting crazy?

19    Q.    Uh-huh.

20    A.    What's --

21    Q.    That's the kind of thing that you would

22 typically remember?

23    A.    If he was acting unusual for him?

24    Q.    Yes.

25    A.    I probably would have, yes.

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1    Q.    Okay.  And in this situation, you can't

2  really recall what occurred in that conversation; isn't

3  that correct?

4    A.    No.  I do not recall.

5    Q.    Okay.  So you have no recollection that John

6  Doe HM was acting in any way in a manner that would

7  indicate he was emotionally unstable?

8    A.    I can't put -- I can't say with certainty

9  that he was unstable at that time.  I don't know.  I'm not

10  a -- I can't evaluate people that way.

11    Q.    Sure.  But there was nothing in the telephone

12  call that you had with him that made you go, Ooh, he's

13  acting --

14    A.    No.

15    Q.    -- emotionally unstable?

16    A.    No.

17    Q.    Okay.  And none of the conversations that you

18  had with him from the time that he was released from the

19  hospital until the time he was terminated gave you the

20  feeling that he was emotionally unstable, correct?

21    A.    Well, I have only -- it's awfully difficult

22  to figure out if somebody is emotionally unstable via the

23  telephone, and that's the only way I was contacting John

24  Doe HM at all, was by the telephone.

25    Q.    Okay.

BOYD-GWINN REPORTING

95

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1      A.    So -- so it's difficult to make any

2 evaluation over the phone, and the only other time I had a

3 face-to-face with him was when he came in the day that he

4 was terminated, so my chances of evaluating him were

5 pretty slim.

6      Q.    Okay.  Well, and he didn't do anything

7 outrageous --

8      A.    No.

9      Q.    -- where you were concerned --

10      A.    Not in the conversations that we had.

11      Q.    Sure.  And in the conversations you had with

12 him, he didn't yell, he didn't scream, --

13      A.    No.

14      Q.    -- he didn't act inappropriate?

15      A.    He did not yell, he did not scream.  He had

16 appropriate dialogue on the telephone.

17      Q.    Okay.  And we're stepping on each other.

18 That's what -- one of the issues, so if you'll just wait

19 until the end of the question, --

20      A.    Okay.

21      Q.    -- then say no, --

22      A.    Yes.

23      Q.    -- it will make it easier.

24      Now, with regard -- when a safety alert of this

25 type is issued, how should an employee act if they come

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1    into the same area that the individual who is the object

2    of the safety alert is -- I was going to say

3    confrontation, but there's --

4           A.    I -- I don't really know what you mean.

5           Q.    Okay.  That was a bad question.

6           If a -- if a worker at Creve Coeur Police

7    Department had been confronted with John Doe HM, that is,

8    run into him somewhere, how are they supposed to react?

9           A.    Well, I can only speak for myself, but my --

10   my determination would be I think I would not -- would not

11   have any conversation with him at all, and I probably

12   would vacate the area where it was at -- where we were at,

13   go the opposite direction, and then I would contact -- if

14   it came any -- any more than that, I would probably let

15   somebody know that, Hey, I saw John Doe HM at whatever,

16   whatever and he tried to make conversation with me or

17   whatever the case was.

18          Q.    Okay.  Once an individual is the subject of

19   an employee safety alert, are they then not to have any

20   contact with members of the police force or members of

21   Creve Coeur police force?

22          A.    I think that's something that you would

23   probably have to ask the chief, because I'm not exactly

24   sure, because this is the first time we had a safety

25   alert, but I can only act again for myself, is that my --

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1   personally, I would try to avoid whatever -- whatever the

2   situation was.

3          Q.     Okay.  Have you had any subsequent safety

4   alerts?

5          A.     No.

6          Q.     Were you part of the process in determining

7   whether or not a safety alert should go out?

8          A.     We had conversations, the chief and I, and I

9   believe other commanders, but I couldn't say exactly who,

10  that we kicked it around as to whether or not we should --

11  whether it was our duty to let everybody else know what

12  was going on with regards to the safety issue.

13         .Q.     And what was your position on that?

14         A.     I supported it.  I think we would have been

15  -- we wouldn't have been doing our jobs if we just let it

16  go without giving some people an alert, without giving

17  everybody an alert.  Police officers carry guns.  John Doe

18  HM had a bunch of guns.

19         Q.     Okay.  Were you ever concerned that the fact

20  that a safety alert was issued would put John Doe HM at

21  risk?

22         A.     No.  Not really.

23         Q.     Okay.  Why is that?

24         A.     For the most part, it kept him from coming on

25  the police department lot and the city hall lot.  It

BOYD-GWINN REPORTING

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1  didn't stop him from coming in as long as he contacted one

2  of the commanders that he was -- he could have come in for

3  official business, but without official business, there

4  was really no reason for him to be there in the first

5  place, so I don't see where it imposed any -- any hardship

6  on John Doe HM.  We gave -- got him all his things back,

7  so, no, I don't think there was a hardship on him at all.

8  I think we would have been derelict if something had

9  happened and we hadn't warned people.

10        Q.    Okay.  You had indicated that John Doe HM had

11  a lot of guns.  Do you know that?

12        A.    Well, he has three off duty -- three guns

13  that I knew of, yeah, this -- the one that he didn't have

14  certified, and he had two other guns, a Glock and a

15  Sigsauer, so he had three.  That's a lot of guns.  I only

16  have one.

17        Q.    Okay.  Do you know if he has any guns aside

18  from those?

19        A.    No.  I do not.

20        Q.    And do you know if he has those?

21        A.    Currently?

22        Q.    Uh-huh.

23        A.    I would have no idea.

24        Q.    Okay.  Do you know who was -- besides Officer

25  Chellis, do you know who else was working on the day of

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1   the incident?

2       A.    No.

3       Q.    Do you know which commanders were there?

4       A.    It was a Saturday.   There probably wasn't any

5   commanders there at all.

6       Q.    Okay.   So the sergeants --

7       A.    Right.

8       Q.    -- would have been the highest rank?

9       A.    Yes.

10      Q.    Going back for a minute to Exhibit 20, which

11  is the recommendation concerning him being off

12  probationary status, --

13      . A.   Yes.

14      Q.    -- is -- is this something that is kept in

15  the personnel file to your knowledge?

16      A.    To my knowledge, yes.

17      Q.    Okay.   And so if we were to find other

18  probationary employees and look in their file, the letters

19  that you have written for them would be substantially

20  similar to the one that was written for John Doe HM?

21      A.    Usually what changes is the fully meets

22  expectations on this yearly evaluation, because officers

23  are rated differently.   There's different ratings for

24  them.

25      Q.    Okay.

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1       A.      And there could be -- in some situations

2   where an officer wasn't recommended for probation or put

3   on extended probation, there could be -- there could be

4   minor details, but essentially that was -- that's the

5   template that I use, yes.

6       Q.      Okay.  Now, prior to 12/31 of '05, had you

7   ever received any complaints regarding John Doe HM that

8   raised concerns for you about his mental stability?

9               MS. OWENS:  I'm sorry.  What date did you

10  say?

11              MS. RANDLES:  Before 12/31.

12      A.      Had I -- please repeat it.

13      Q.      (By Ms. Randles)  Had you ever received any

14  complaints regarding John Doe HM that raised concerns

15  about his mental stability?

16      A.      Not that I recall.

17      Q.      Okay.  Did you ever receive any complaints

18  about John Doe HM from any police officer regarding him

19  before this date, before 12/31?

20      A.      His mental stability or any complaint at all?

21      Q.      Let's start with his mental stability.

22      A.      No.

23      Q.      Okay.  Did you ever receive any complaint at

24  all concerning John Doe HM?

25      A.      Well, I had received complaints on a bunch of

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1    officers, a lot of officers, and without going back to the

2    file, I couldn't answer that yes or no.

3         Q.    Okay.

4         A.    Officers get complaints all the time.

5         Q.    And I was asking about if any officer

6    complained about John Doe HM.

7         A.    I wouldn't know without looking at the file.

8         Q.    Okay.  But nothing stands out in your mind?

9         A.    No.  Nothing stands out.

10        Q.    Okay.  Were you familiar with -- from a

11   personal perspective, were you familiar with John Doe HM's

12   capability as an officer?

13        A.    Yes.

14        Q.    Okay.  You had indicated that he was a

15   competent officer at the time?

16        A.    I believe so.

17        Q.    Okay.  Were you familiar with the work he did

18   regarding his work on the computers or IT?

19        A.    Yes.

20        Q.    And did you believe that he had done a good

21   job with the IT?

22        A.    Absolutely.  He did a very good job with

23   that.

24        Q.    Okay.  And how about work with members of the

25   public?  Do you recall whether or not he received

1  compliments or whether he was good with members of the

2  public?

3       A.    I keep all those type things in a file, and I

4  don't recall any specific, but there could be something in

5  a file of a compliment.  I don't know.

6       Q.    Okay.  Now, you said you keep all of those in

7  a file.  Do you have a separate file for police officers

8  that's separate from their personnel file?

9       A.    I keep some data on officers, yes, --

10      Q.    Okay.

11      A.    -- for my own personal evaluation.

12      Q.    When an officer is evaluated, do the

13  evaluations then flow up to you for your review and input?

14      A.    Yes.

15      Q.    Okay.  So the file that you keep, is it for

16  purposes of being able to adequately evaluate the officers

17  when the evaluation form flows up to you?

18      A.    Yeah.  When the evaluation comes to me, I

19  compare what I have seen, what I have interpreted and

20  looked at, and I compare that to what the

21  sergeants/supervisors say.  If there's something grossly

22  wrong, I would suggest that they take a second look at

23  this or look at this, if there's something that they

24  missed that's a compliment to the officer or something

25  he's done well, I suggest that to the sergeants also, Did

1  you know that this officer did this, or did you know that

2  this officer did this.  Yes.

3       Q.    Okay.

4            MS. RANDLES:  I think that's part of the

5  30(b), but I don't know if it was named specifically.  We

6  would certainly like to see Captain Hodak's file with

7  regard to John Doe HM with regard to the 30(b).

8            MS. OWENS:  Sure.

9       Q.    (By Ms. Randles)  Now, do you know if -- if

10  the sergeants keep files on the officers in the same

11  manner that you kept files?

12       A.    They keep data.  How they do it is their own

13  -- their own prerogative.  Some may keep paper notes and

14  destroy them after the end of the year.  Some people may

15  not.

16       Q.    Okay.

17       A.    There has to be some way for you to be

18  evaluated.  I mean, you just can't make it up.  So I'm

19  sure the -- they have data on all their officers.  Now,

20  how long they keep them, I couldn't tell you.

21            MS. RANDLES:  Okay.  And the same would be --

22            MS. OWENS:  We'll check with all of the

23  sergeants as well.

24            MS. RANDLES:  Okay.

25       Q.    (By Ms. Randles)  At the time that John Doe

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1    HM was a probationary officer, do you recall how many

2    other probationary officers that you had?

3         A.    No.   I don't know the number.

4         Q.    Do you recall whether there were a large

5    number of probationary officers or not?

6         A.    I can only guess, and I don't know.

7         Q.    Okay.   Do you recall whether or not John Doe

8    HM was one of the better probationary officers at the

9    time?

10        A.    You're asking for my opinion?

11        Q.    Mm-hm.

12        A.    My opinion was that he was a competent police

13   officer, yes.

14        Q.    Okay.   Do you recall whether or not any of

15   the other probationary officers who were on probation at

16   the same time as John Doe HM, whether or not any of them

17   had either not passed their probation or had gotten an

18   extended probation?

19        A.    I don't recall specifically.

20        Q.    Okay.   It appears that Creve Coeur has a

21   fairly stable police force, not a whole lot of turnover.

22   In a given year, how many probationary officers would you

23   expect in order to keep your numbers up to approximately

24   51?

25        A.    It's -- it's hard to say with -- I mean, you

1   just -- I would just guess.  I really don't know the

2   specific numbers, but it would seem that we have at least

3   one officer -- at least one officer a year on probationary

4   status.  I mean, we have one now, so -- it depends.

5   There's really no way I can give you a good answer for

6   that.

7          Q.    Okay.  But you would typically not have ten

8   officers --

9          A.    No.

10         Q.    -- on probationary status?

11         A.    No.  Never.  Not that many.

12         Q.    Okay.  Okay.  As I understand it, once an

13   individual is hired as a probationary officer, they go

14   through a period of field training; is that correct?

15         A.    Yes.

16         Q.    Can you describe for us what field training

17   is?

18         A.    It's approximately 12 weeks, give or take,

19   there might be -- some might have 11, some might have 10,

20   but mostly it's 12 weeks.  The officer -- probationary

21   officer is assigned to a field training officer who has

22   gone to field training school.  We have a training

23   schedule -- we have a schedule that we put together, a

24   template, that makes sure the people get the -- get

25   hopefully different watches, different kinds of calls,

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1   different training, fairly standardized so that everybody

2   gets the same -- same training.

3          They're rated on a weekly basis as to how they

4   perform by their field training officer, and then their

5   sergeant, the supervisor, reviews that, and then sends me

6   a report on how the officer is doing.  It's a progression,

7   so that it's understood that a police officer in the first

8   couple of weeks is not going to be all that great at

9   everything, because he doesn't know everything, but he's

10  supposed to progress up the chain to the 12th week.

11         At the end of the 12th week, then there is a full

12  report by the field training officer as to 31 different

13  categories that the officer has to be proficient in.

14  There are a couple categories where if he's not proficient

15  in it, he doesn't get off field training.  Those are

16  givens.  You have to do this, you have to do this, you

17  have to do this, you have to be proficient in that or

18  you're not going to get off field training.

19         Other things such as report writing, which has just

20  come up, is that those are kind of learned things, so we

21  kind of understand that they might not be fantastic at

22  that, but that they'll improve as they go along, so those

23  wouldn't be considered the core criteria that they have to

24  be proficient at.

25         And so at the end of 12 weeks, they supply -- a

BOYD-GWINN REPORTING

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1   field training officer supplies a report.  I review the

2   report.  I also give the trainee tests, written, oral,

3   fill out reports.  We do a couple simulation tests to make

4   sure they're -- they don't do silly things.

5          And then based on all that, I make a recommendation

6   -- sergeants make a recommendation that the person comes

7   off field training, and I either concur or don't concur.

8   And he goes off -- he would be removed from field training

9   if we all agree and believe that he's proficient.

10         Q.    Okay.  And do you recall whether you ever had

11  any issue with John Doe HM's performance during field

12  training?

13         A.    I don't recall.

14         Q.    Okay.

15         A.    I'm sure there's files somewhere that -- that

16  say that though.

17         Q.    Well, he would have had to have gotten off of

18  field training in order to become --

19         A.    Yeah.

20         Q.    -- an officer?

21         A.    That's true.  Yes.

22         Q.    I am going to hand you what's been previously

23  marked as Exhibits 15, 16 and 17.  Can you describe for me

24  what these forms are?

25         A.    These are the quarterly coaching forms that

1    the supervisors fill out to mark the progress or chart the

2    progress of their officers.

3         Q.    Okay.  And are these given to every officer?

4         A.    They're supposed to.

5         Q.    Okay.  So these are not in any way

6    disciplinary?

7         A.    No.

8         Q.    Okay.  Can you describe for -- well, the idea

9    is to chart the progress of officers.  So what kind of

10   information is typically placed in the coaching forms?

11        A.    Well, everything -- everything is subject to

12   the officer being evaluated, so if you took one of our

13   evaluations and looked at it and what the officer's

14   responsibilities and job is supposed to do, everything is

15   -- can be evaluated and progress made or progress charted.

16        Q.    Okay.  If you would take a minute to look at

17   the coaching forms, do you see anything in those forms

18   that you would find to be particularly concerning for a

19   police officer with the Creve Coeur Police Department?

20        A.    The only thing that is really concerning, and

21   it's not a high degree of concern, with the first one

22   marked 15, would be that his attention to detail has

23   affected some of the other paperwork that he does, but

24   again it wouldn't be a high degree.

25        Q.    Okay.

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1      A.      On the second one, and I am not done with it,

2  No. 16, he had a low number of arrests, which was marked

3  here.  No. 16 is -- kind of reaffirms what they said in

4  the first one of the repeat mistakes of I believe it's

5  report -- paperwork errors.

6      Q.      Okay.

7      A.      And the third one is just one -- looks like a

8  one-time mistake, so that wouldn't be that dis -- that

9  concerning.

10     Q.      Okay.  Now, with regard to -- you said there

11 was a low number of arrests.  Is there a number of arrests

12 that officers are expected to make?

13     A.      There's -- it's based on peers, what your

14 peers do, and my personal expectation is that officers

15 will be self-initiated and they will make a variety of

16 arrests and self-initiated arrests.  Is there an exact

17 number, no, but there's never an end to it, I mean there's

18 not a top number either.

19     Q.      Okay.

20     A.      So you are usually compared with your peers,

21 and if your peers are doing more than you, then you had

22 better improve yourself, which I think is what the

23 sergeants are saying there.

24     Q.      Okay.  So would you agree with me then that

25 there was nothing sufficiently concerning in these that

1  would place his position at risk?

2         A.    I would agree with that.  Yes.

3         Q.    Okay.  Did you ever learn that Crystal

4  Marshall had accused John Doe HM of some form of assault?

5         A.    I don't recall hearing that.  No.

6         Q.    Okay.  Did you ever have a conversation with

7  Steve DeGhelder regarding the events of 12/31 to your

8  recollection?

9         A.    Steve had some type of contact with John Doe

10 HM.  I believe he was -- he called him.  Steve was

11 directed to send me an email about the conversation or the

12 contact.  I can't recall right now what was in the email

13 or the contact, but Steve did bring it to someone's

14 attention, I'm not even sure originally if it was me, but

15 then he was directed to send whatever information he got

16 from the contact to me.

17        Q.    Okay.  Was there anything in the contact that

18 he sent to you that you thought was inappropriate or

19 unusual?

20        A.    I don't remember what was in it without

21 reading it.  I would have to read it.

22        Q.    Okay.  Do you have a copy of that?  We don't

23 have it here.  Do you have a copy of any email in your

24 system that Steve DeGhelder may have sent to you?

25        A.    Yeah.  I have it here.

1          MS. OWENS:   That's fine.   It may have already

2    been attached to your IA form.

3          MS. MERKLIN VON KAENEL:   Can we go off the

4    record for a second?

5          [Discussion was held off the record.]

6     Q.    (By Ms. Randles)   You brought that with you

7    today?

8     A.    Yes.

9     Q.    Okay.   Okay.

10          MS. RANDLES:   Let's mark this as Exhibit 49.

11          [Reporter marked Exhibit 49.]

12    Q.    (By Ms. Randles)   What I would like you to

13   do, Captain, is to please check and make sure that these

14   are the exact same document, Exhibit 49 is the same as the

15   document you brought with you here today.

16    A.    It appears to be the same.

17    Q.    Okay.   Now, you had indicated that Steve

18   DeGhelder had sent you an email concerning a contact he

19   had with John Doe HM.   Is this the email you were

20   referring to?

21    A.    Yes.

22    Q.    Was there ever any other emails sent to you

23   by Steve DeGhelder indicating any contact after John Doe

24   HM was terminated?

25    A.    I don't recall.

CAPTAIN GEORGE MICHAEL KODAK, 2/26/09

1    Q.    Okay.  Now, with regard to the email that's

2  found in Exhibit 49, was that used by you in any regard in

3  your complaint that -- the internal investigation

4  complaint that you made?

5    A.    No.

6    Q.    To your knowledge, was that email used in any

7  investigation of John Doe HM?

8    A.    I don't know.

9    Q.    Did you pass that email on to Chief Beardslee

10 to your knowledge?

11    A.    I would think I did, but I can't say with

12 certainty.

13    Q.    Okay.  And you say this came to you via

14 email?

15    A.    I'm pretty certain of that.  The only thing I

16 recall with certainty is that Steve told me about it, and

17 I said, Send -- you know, write it up and send it to me,

18 and that's all I really recall about it.

19    Q.    Okay.

20    A.    He was -- everybody was directed to send

21 email or to send some kind of correspondence when they had

22 contact.

23    Q.    Did you receive any correspondence from any

24 other individual indicating that they had contact with

25 John Doe HM?

CAPTAIN GEORGE MICHAEL HODAK, 2/26/09

1       A.    I don't recall.

2       Q.    Is that the kind of thing that would still be

3  in your system?

4       A.    In my system?

5       Q.    Uh-huh.

6       A.    No.

7       Q.    Okay.  Do you, on a routine basis, print out

8  emails such as this and put them in files?

9       A.    Routine, no.

10      Q.    Okay.  In the case of John Doe HM, do you

11 recall whether you printed out all the emails that were

12 received from any police officers with whom he had contact

13 and put them in a file?

14      A.    No.  I don't recall.

15      Q.    Okay.  Do you still have a file concerning

16 John Doe HM?

17      A.    No, other than possibly the database that I

18 talked about about performance.  That's -- and that's just

19 a possible.  I'm not sure I still have that back from 19

20 or 2005, whenever it was.

21      Q.    Okay.  At the time of John Doe HM's -- that

22 you spoke with John Doe HM after he was in the hospital

23 and told him not to return to work, what kind of time was

24 he supposed to take?

25      A.    I recall saying don't -- we'll call you when

BOYD-GWINN REPORTING

114

1  we determine when we need to talk to you again.

2       Q.   Okay.  Was he supposed to take any form of --

3  specific form of leave, or was he required to contact

4  personnel and tell them that I won't be in?

5       A.   No.

6       Q.   Okay.

7       A.   As far as I remember, it was just don't come

8  to work, we'll call you when we need to talk to you.

9       Q.   Okay.  Do you know how that was logged?  Do

10 you know if it was logged as vacation time --

11      A.   I do not know.

12      Q.   -- or leave without pay?

13      A.   .I don't know.

14      Q.   Okay.  Do you know how long you allowed for

15 him to -- to be off?

16      A.   I would just be guessing.  I don't know

17 exactly.

18      Q.   Did you ever see any kind of suicide note

19 that John Doe HM allegedly wrote?

20      A.   No.

21      Q.   Do you know if Crystal Marshall ever provided

22 any alleged suicide note to anyone at the Creve Coeur

23 Police Department?

24      A.   I don't know.

25      Q.   Did Chief Beardslee ever tell you that he