IN THE DISTRICT COURT OF THE UNITED STATES
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

RECEIVED
MAR 20 2009
COUNTY COUNSELOR

JOHN DOE HM, an )
individual, )
)
          Plaintiff, )
) Case No. 4:07CV00946 ERW
vs. )
)
CITY OF CREVE COEUR, )
MISSOURI, and JOHN )
BEARDSLEE, Individually )
and in his Official )
Capacity as Police Chief )
in the Creve Coeur )
Police Department, et )
al., )
)
          Defendants. )


DEPOSITION OF CAPTAIN DENNIS A. SPOERRY
TAKEN ON BEHALF OF THE PLAINTIFF
March 4, 2009





EXHIBIT
W



**Catherine E. Boyd**
P.O. Box 190601
St. Louis, MO 63119
314.918.8265
Fax: 314.918.0429

**Boyd-Gwinn Reporting**

David J. Gwinn
6459 Arsenal
St. Louis, MO 63139
314.645.5229
Fax: 314.644.3579

CAPTAIN DENNIS A. SPOERRY   March 4, 2009
1979

| | |
|---|---|
| DIRECT EXAMINATION | 4 |
| BY MS. RANDLES | |
| CROSS-EXAMINATION | 50 |
| QUESTIONS BY MS. MERKLIN VON KAENEL | |
| CROSS-EXAMINATION | 69 |
| QUESTIONS BY MS. OWENS | |
| REDIRECT EXAMINATION | 70 |
| QUESTIONS BY MS. RANDLES | |
| RECROSS-EXAMINATION | 83 |
| QUESTIONS BY MS. MERKLIN VON KAENEL | |
| RECROSS-EXAMINATION | 85 |
| QUESTIONS BY MS. OWENS | |

| | |
|---|---|
| Exhibit 24 | 35 |
| Exhibit No. 47 | 59 |
| Exhibit 30 | 78 |
| Exhibit 29 | 82 |
| Position Statement for Creve Coeur | |

A P P E A R A N C E S:

For the Plaintiff:
     Randles, Mata & Brown, LLC
     406 West 34th Street
     Suite 623
     Kansas City, Missouri 64111
     By:  Rebecca M. Randles, Attorney at Law

For the Defendants, Creve Coeur Police Department and
Chief Beardslee:
     Sandberg Phoenix & von Gontard, L.L.C.
     One City Centre
     Suite 1500
     Saint Louis, Missouri 63101
     By:  Stacie A. Owens, Attorney at Law

For the Defendants, Saint Louis County Police
Department, et al:
     St. Louis County Counsel Counselor's Office
     41 South Central
     Lawrence K. Roos County Government Building
     Clayton, Missouri 63105
     By:  Lorena V. Merklin von Kaenel, Attorney at Law

     Also present: Sgt. Thomas Lasater, Officer Michael
Thomeczek, John Doe HM, and Police Chief Glenn Eidman

     {Exhibits retained by Stacie Owens, Attorney at Law.}

```
 1              IN THE DISTRICT COURT OF THE UNITED STATES
                    EASTERN DISTRICT OF MISSOURI
 2                        EASTERN DIVISION

 3
        JOHN DOE HM, an               )
 4      individual,                   )
                                      )
 5           Plaintiff,               )
        vs.                           ) Case No.
 6                                    ) 4:07CV00946 ERW
                                      )
 7      CITY OF CREVE COEUR,          )
        MISSOURI, and JOHN            )
 8      BEARDSLEE, Individually       )
        and in his Official           )
 9      Capacity as Police Chief      )
        in the Creve Coeur            )
10      Police Department, et         )
        al.,                          )
11                                    )
             Defendants.              )
12
             DEPOSITION OF CAPTAIN DENNIS A. SPOERRY, produced,
13      sworn, and examined on March 4, 2009, between the hours
        of 9:11 o'clock in the forenoon and 11:16 o'clock in
14      the forenoon of that day, at the law offices of
        Sandberg, Phoenix & von Gontard, One City Centre, 15th
15      Floor, Saint Louis, Missouri, before CATHERINE E. BOYD,
        a Certified Court Reporter, #0233, within and for the
16      State of Missouri, a Registered Professional Reporter,
        and a Certified Shorthand Reporter in the state of
17      Illinois, in a certain cause now pending in the United
        States District Court, within and for the Eastern
18      Division of the Eastern Judicial District of Missouri,
        wherein, JOHN DOE HM, an individual, are Plaintiffs and
19      CITY OF CREVE COEUR, MISSOURI, and JOHN BEARDSLEE,
        Individually and in his Official Capacity as Police
20      Chief in the Creve Coeur Police Department, et al., are
        Defendants.
21

22

23

24

25
```

1      IT IS HEREBY STIPULATED AND AGREED, by and between
counsel for the Plaintiff and counsel for the
2 Defendants that this deposition may be taken in
shorthand by Catherine E. Boyd, a Notary Public,
3 Certified Court Reporter, and Registered Professional
Reporter, and afterwards transcribed into typewriting;
4 and the signature of the witness is expressly reserved.

5                  * * * * *
               {The deposition commenced at 9:11 a.m.}

6

7             CAPTAIN DENNIS A. SPOERRY,

8 of lawful age, produced, sworn, and examined on behalf

9 of the Plaintiffs, deposes and says:

10                 DIRECT EXAMINATION

09:13  11 BY MS. RANDLES:

09:13  12      Q.   Good morning.

09:13  13      A.   Good morning.

09:13  14      Q.   My name is Rebecca Randles, and I represent

09:13  15 John Doe HM in this matter.

09:13  16         MS. RANDLES:  Before we go too far, Mr. John

09:13  17 Doe HM's name is confidential in the lawsuit, and what

09:13  18 we've been doing in depositions is we've been going

09:13  19 ahead and asking the court reporter to replace it with

09:13  20 the initials HM through the course of the deposition.

09:13  21 Can you do that?

09:13  22         THE REPORTER:  Absolutely.

09:14  23         MS. RANDLES:  And he also has a number of

09:14  24 siblings, and so with regard to the siblings, we've

09:14  25 been using their first name, and then Doe.

CAPTAIN DENNIS SPOERRY - March 4, 2009
1982

| | | |
|---|---|---|
| 09:14 | 1 | Q.    (By Ms. Randles)   And would you please state |
| 09:14 | 2 | your full name for the record? |
| 09:14 | 3 | A.    Sure.   Dennis Arnold Spoerry, S-p-o-e-r-r-y. |
| 09:14 | 4 | Q.    And you are Captain Spoerry? |
| 09:14 | 5 | A.    Yes, ma'am. |
| 09:14 | 6 | Q.    Through the deposition I'll either refer to |
| 09:14 | 7 | you as Captain Spoerry, or Captain, if that's okay with |
| 09:14 | 8 | you. |
| 09:14 | 9 | A.    Whatever.   Thank you. |
| 09:14 | 10 | Q.    And I assume you've given depositions |
| 09:14 | 11 | before? |
| 09:14 | 12 | A.    Yes, ma'am. |
| 09:14 | 13 | Q.    Just so we're all on the same page, I'll go |
| 09:14 | 14 | ahead and tell you kind of the rules of the |
| 09:14 | 15 | depositions, and I'm sure that we will all break them |
| 09:14 | 16 | during the course of the day.   But during the course of |
| 09:14 | 17 | the day, if you would answer with a yes or a no, |
| 09:14 | 18 | instead of an uh-huh or a huh-uh, it's much easier to |
| 09:14 | 19 | get down for the court reporter. |
| 09:15 | 20 | A.    Yes, ma'am. |
| 09:15 | 21 | Q.    And even though in the course of usual |
| 09:15 | 22 | conversation we tend to step on each others lines |
| 09:15 | 23 | because we know what's coming next, if you would wait |
| 09:15 | 24 | until the question is completely out, and I will wait |
| 09:15 | 25 | until your answer is completely out, again, for the |

| | | |
|---|---|---|
| 09:15 | 1 | court reporter's sake, so she can get down all of the |
| 09:15 | 2 | words that we're speaking. |
| 09:15 | 3 | A.   Yes, ma'am. |
| 09:15 | 4 | Q.   And you're doing a very nice job of |
| 09:15 | 5 | answering yes, as opposed to uh-huh, and I appreciate |
| 09:15 | 6 | that.  As you know, you're under oath. |
| 09:15 | 7 | A.   Yes, ma'am. |
| 09:15 | 8 | Q.   And this testimony can be used the same in |
| 09:15 | 9 | court, as if you were actually raising your hand in |
| 09:15 | 10 | court.  And you understand that as well? |
| 09:15 | 11 | A.   Yes, sir. |
| 09:15 | 12 | Q.   If during the course of the deposition, if |
| 09:15 | 13 | for any reason you want to take a break, just let me |
| 09:15 | 14 | know.  And that's perfectly okay to take a break at any |
| 09:15 | 15 | time.  I can see the sun bouncing off your glasses. |
| 09:15 | 16 | MS. OWENS:  We can close the blinds.  It |
| 09:15 | 17 | might keep it from getting hot in here. |
| 09:15 | 18 | Q.   (By Ms. Randles) Is that better? |
| 09:15 | 19 | A.   Thank you. |
| 09:16 | 20 | Q.   Is there any condition or any medication |
| 09:16 | 21 | that we should be aware of that either prevents you |
| 09:16 | 22 | from giving a deposition today, or that might limit or |
| 09:16 | 23 | inhibit your ability to give a deposition today? |
| 09:16 | 24 | A.   No. |
| 09:16 | 25 | Q.   Okay.  Can you tell us what your educational |

Boyd-Gwinn Reporting

CAPTAIN DENNIS A. SPOERRY   March 4, 2009
1984

09:16  1  history is, starting from the time you graduated high

09:16  2  school?

09:16  3       A.   Following high school, I attended Meramec

09:16  4  Community College, Jefferson Community College in

09:16  5  Hillsboro, and Tarkio College.

09:16  6       Q.   Over on the west side of the state?

09:16  7       A.   No.  They had a satellite here in the St.

09:16  8  Louis area.

09:16  9       Q.   Now, that college closed; didn't it?

09:16  10      A.   I think it did.

09:16  11      Q.   Yeah, that's too bad.  That was a good

09:16  12  school.  Student loans problems, I think.  Did you

09:17  13  graduate with a degree?

09:17  14      A.   Yes, ma'am.

09:17  15      Q.   From Tarkio?

09:17  16      A.   Yes, ma'am.

09:17  17      Q.   And with what degree did you graduate?

09:17  18      A.   Criminal Justice.

09:17  19      Q.   Subsequently, did you go to the Police

09:17  20  Academy?

09:17  21      A.   Well, prior to that, yes, ma'am; St. Louis

09:17  22  City Police Academy.

09:17  23      Q.   When did you go to the Police Academy?

09:17  24      A.   1974.

09:17  25      Q.   After you went to the Police Academy, did

Boyd-Gwinn Reporting

| | | |
|---|---|---|
| 09:17 | 1 | you go to work for a department? |
| 09:17 | 2 | A.   Yes, ma'am. |
| 09:17 | 3 | Q.   Where did you go to work? |
| 09:17 | 4 | A.   Creve Coeur Police Department. |
| 09:17 | 5 | Q.   And have you been at Creve Coeur ever since? |
| 09:17 | 6 | A.   Yes, ma'am. |
| 09:17 | 7 | Q.   Did you pick up your degree while you were a |
| 09:17 | 8 | police officer at Creve Coeur? |
| 09:17 | 9 | A.   Yes, ma'am. |
| 09:17 | 10 | Q.   Now, if you would, have you ever taught at |
| 09:17 | 11 | the Academy? |
| 09:17 | 12 | A.   Yes, ma'am. |
| 09:17 | 13 | Q.   And what have you taught at the Academy? |
| 09:17 | 14 | A.   Crime scene photography. |
| 09:18 | 15 | Q.   Do you still teach there? |
| 09:18 | 16 | A.   No, it was one semester. |
| 09:18 | 17 | Q.   When did you teach crime scene photography? |
| 09:18 | 18 | A.   I believe that was -- it's been a number of |
| 09:18 | 19 | years ago, probably in the 80s. |
| 09:18 | 20 | Q.   Okay.  And what is your current position |
| 09:18 | 21 | with Creve Coeur? |
| 09:18 | 22 | A.   I'm presently the Admin. Support Commander. |
| 09:18 | 23 | Q.   What does that mean? |
| 09:18 | 24 | A.   Oversee the dispatchers, supervise |
| 09:18 | 25 | dispatchers, records clerks, take care of the |

CAPTAIN DENNIS R. SPERRY — March 4, 2009

| | | |
|---|---|---|
| 09:18 | 1 | administrative and support services with regard to |
| 09:18 | 2 | purchases, and maintaining the radio equipment, police |
| 09:18 | 3 | vehicles. |
| 09:18 | 4 | Q. Does that include the IT and the police |
| 09:19 | 5 | vehicles? |
| 09:19 | 6 | A. I help support that, yes, ma'am. |
| 09:19 | 7 | Q. Any other job duties that you currently |
| 09:19 | 8 | fulfill as -- |
| 09:19 | 9 | A. Also involved in the emergency operations, |
| 09:19 | 10 | and WMD. |
| 09:19 | 11 | Q. What is that? |
| 09:19 | 12 | A. Weapons of Mass Destruction. |
| 09:19 | 13 | Q. WMD. |
| 09:19 | 14 | A. Yes, ma'am. |
| 09:19 | 15 | Q. What is your role with regard to WMD? |
| 09:19 | 16 | A. I was an instructor. |
| 09:19 | 17 | Q. Is that something that's fairly new, a new |
| 09:19 | 18 | issue that you're having to deal with? |
| 09:19 | 19 | A. No. Actually, started that -- We started it |
| 09:19 | 20 | in 1999. And then subsequent to 2001, it really kicked |
| 09:19 | 21 | off. |
| 09:19 | 22 | Q. Sure. Was the bombing in Oklahoma one of |
| 09:20 | 23 | the things that caused the -- |
| 09:20 | 24 | A. It was one, yes, ma'am. |
| 09:20 | 25 | Q. How long have you been the Administrative |

| | | |
|---|---|---|
| 09:20 | 1 | Support Commander? |
| 09:20 | 2 | A.    Presently since -- I believe it was November |
| 09:20 | 3 | of 15th of 2008.  And then I had another time, I |
| 09:20 | 4 | believe it was from around the middle of 2005 to about |
| 09:20 | 5 | the middle of 2006. |
| 09:20 | 6 | Q.    Okay.  Prior to -- Between 2006 and 2008, |
| 09:20 | 7 | what was your position? |
| 09:20 | 8 | A.    I was an investigative commander. |
| 09:20 | 9 | Q.    Is that the position that Captain Hodak now |
| 09:20 | 10 | has? |
| 09:20 | 11 | A.    Yes, ma'am. |
| 09:20 | 12 | Q.    And what were your job duties there? |
| 09:21 | 13 | A.    Oversee investigations,. supervise. |
| 09:21 | 14 | Q.    And would these be all investigations? |
| 09:21 | 15 | A.    Criminal investigations. |
| 09:21 | 16 | Q.    What about Internal Affairs investigations? |
| 09:21 | 17 | A.    If I were assigned, yes, ma'am. |
| 09:21 | 18 | Q.    And did you have any assignment for |
| 09:21 | 19 | investigating any allegations concerning John Doe HM? |
| 09:21 | 20 | A.    No, ma'am. |
| 09:21 | 21 | Q.    And then prior to -- from 2005 to 2006 then, |
| 09:21 | 22 | you were, again, the Administrative Support Commander? |
| 09:22 | 23 | A.    I believe that's the time frame, yeah.  I'm |
| 09:22 | 24 | trying to remember if I did, if it was 2004 and 2005, |
| 09:22 | 25 | and then I was Investigations in the latter part of |

Boyd-Gwinn Reporting

| | | |
|---|---|---|
| 09:22 | 1 | 2005 up to 2008. |
| 09:22 | 2 | Q.   Okay. |
| 09:22 | 3 | A.   I'm not real -- |
| 09:22 | 4 | Q.   But, approximately, in that time? |
| 09:22 | 5 | A.   Approximately, yes, ma'am. |
| 09:22 | 6 | Q.   That's close enough. |
| 09:22 | 7 | A.   Okay.  Thank you. |
| 09:22 | 8 | Q.   Prior to 2005, what was your -- 2004/ |
| 09:22 | 9 | 2005 -- |
| 09:22 | 10 | A.   Yes, ma'am. |
| 09:22 | 11 | Q.   -- what was your position? |
| 09:22 | 12 | A.   I was a Deputy Patrol Commander. |
| 09:22 | 13 | Q.   And how long were you Deputy Patrol |
| 09:22 | 14 | Commander? |
| 09:22 | 15 | A.   For about three years. |
| 09:22 | 16 | Q.   So from, approximately, 2001? |
| 09:22 | 17 | A.   I believe so. |
| 09:22 | 18 | Q.   And what were your job duties as Deputy |
| 09:22 | 19 | Patrol Commander? |
| 09:22 | 20 | A.   Assist the Patrol Commander.  I oversaw the |
| 09:23 | 21 | training, the Training Coordinator. |
| 09:23 | 22 | Q.   Okay.  Who was the Training Coordinator at |
| 09:23 | 23 | the time? |
| 09:23 | 24 | A.   I would have been the Training Coordinator |
| 09:23 | 25 | at that time.  And it was under two commanders, Captain |

Boyd-Gwinn Reporting

09:23  1  Bailey and Captain Kayser.

09:23  2      Q.    During that time frame, did you have any

09:23  3  duties in training John Doe HM?  I can't remember if he

09:23  4  was before or after that.  I mean, if he was after you.

09:23  5      A.    Not that I can recall.

09:23  6      Q.    Okay.  Prior to 2001, what was your job

09:24  7  title?

09:24  8      A.    I was a road supervisor, a sergeant.

09:24  9      Q.    What is a road supervisor sergeant?

09:24 10      A.    A sergeant, who worked actually in teams;

09:24 11  two sergeants to a shift, eight officers to a shift.

09:24 12      Q.    Is that like a watch commander?

09:24 13      A.    Yes, ma'am.

09:24 14      Q.    And how long were you the road supervisor

09:24 15  watch commander?

09:24 16      A.    Five years.  Four or five years.

09:24 17      Q.    So '97, '98, somewhere around that time

09:24 18  frame?

09:24 19      A.    I believe.

09:24 20      Q.    When did you move from -- I assume you

09:25 21  started as patrol?

09:25 22      A.    Actually, I started out as a dispatcher.

09:25 23      Q.    Oh, you started out as a dispatcher.

09:25 24      A.    Yes, ma'am.

09:25 25      Q.    And how long were you a dispatcher?

Boyd-Gwinn Reporting

| | | |
|---|---|---|
| 09:25 | 1 | A. About a year. |
| 09:25 | 2 | Q. And from dispatcher, where did you move? |
| 09:25 | 3 | A. Patrol officer. |
| 09:25 | 4 | Q. And how long were you a patrol officer? |
| 09:25 | 5 | A. From 1974 until I became a supervisor, a |
| 09:25 | 6 | sergeant. |
| 09:25 | 7 | Q. So until about 1997? |
| 09:25 | 8 | A. I believe. |
| 09:25 | 9 | Q. Approximately? |
| 09:25 | 10 | A. Yes, ma'am. |
| 09:25 | 11 | Q. Have you ever had any job responsibilities |
| 09:25 | 12 | as a detective? |
| 09:25 | 13 | A. Yes, ma'am. |
| 09:25 | 14 | Q. Is that when you were the investigative |
| 09:25 | 15 | commander? |
| 09:25 | 16 | A. Yes, ma'am. |
| 09:25 | 17 | Q. Can you just briefly give me the chain of |
| 09:26 | 18 | command at the police department as it stands right |
| 09:26 | 19 | now? |
| 09:26 | 20 | A. Yes, ma'am. Right now, you have the chief. |
| 09:26 | 21 | There are three captains. |
| 09:26 | 22 | Q. Okay. |
| 09:26 | 23 | A. What are their names? |
| 09:26 | 24 | Q. Yes, please. |
| 09:26 | 25 | A. Chief Eidman, Captain Hodak, Captain Kayser. |

CAPTAIN DENNIS A. SPERRY - March 31,
1991

```
09:26  1        Q.    Is that K-a-y-s-e-r?

09:26  2        A.    K-a-y-s-e-r, yes, ma'am.  And myself.  And

09:26  3  the lieutenant, Lieutenant Funkhouser.

09:26  4  F-u-n-k-h-o-u-s-e-r.

09:26  5        Q.    Just one lieutenant?

09:26  6        A.    Yes, ma'am.

09:26  7        Q.    And in the line of command, who would he

09:27  8  fall under?

09:27  9        A.    Captain Hodak.

09:27  10       Q.    And below the lieutenant, what would be the

09:27  11  next?

09:27  12       A.    The sergeants.

09:27  13       Q.    How many sergeants do you have?

09:27  14       A.    Six.

09:27  15       Q.    And are they --

09:27  16       A.    Yes, six.

09:27  17       Q.    And is there one person who is responsible

09:27  18  for their supervision?

09:27  19       A.    It would be fall under Lieutenant

09:27  20  Funkhouser, and then Captain Hodak.

09:27  21       Q.    Okay.  You don't need to give me the

09:27  22  sergeants' names.  But below the sergeants are the

09:27  23  patrol officers?

09:27  24       A.    I'm sorry, ma'am?

09:27  25       Q.    Below the sergeants are the patrol officers?
```

Boyd-Gwinn Reporting

| | | |
|---|---|---|
| 09:27 | 1 | A.   Yes, ma'am. |
| 09:27 | 2 | Q.   Now, do you have direct supervisory duties |
| 09:27 | 3 | over any group of individuals? |
| 09:27 | 4 | A.   Presently? |
| 09:27 | 5 | Q.   Yes. |
| 09:27 | 6 | A.   Yes, ma'am. |
| 09:27 | 7 | Q.   And over who do you have supervisory duties? |
| 09:28 | 8 | A.   Dispatchers and the record clerks. |
| 09:28 | 9 | Q.   Are those civilian employees? |
| 09:28 | 10 | A.   Yes. |
| 09:28 | 11 | Q.   Do you have any duties at all over the |
| 09:28 | 12 | police officers; supervisory? |
| 09:28 | 13 | A.   Well, as a commander, if there is not |
| 09:28 | 14 | another commander available, yes, I would. |
| 09:28 | 15 | Q.   And Captain Kayser, does he have any |
| 09:28 | 16 | supervisory functions over any of the employees of the |
| 09:28 | 17 | police department? |
| 09:28 | 18 | A.   Likewise, if there is no one available, he |
| 09:28 | 19 | is a commander, and he would be able to supervise, yes. |
| 09:28 | 20 | Q.   And is there anyone who falls directly under |
| 09:28 | 21 | him on a day-to-day basis? |
| 09:28 | 22 | A.   Officer Lisa Hahn. |
| 09:28 | 23 | Q.   What is her title? |
| 09:28 | 24 | A.   They're working together under special |
| 09:28 | 25 | projects. |

CAPTAIN DENNIS  SPERRY  March 29, 1993

09:28  1     Q.    Okay.  And does that pretty much cover all

09:28  2  of the employees for Creve Coeur Police Department

09:29  3  where they would fall in the chain of command?

09:29  4     A.    Police officers, yes, ma'am.

09:29  5     Q.    Are there any other civilians -- Aside from

09:29  6  secretaries, are there any other civilians that work

09:29  7  for the police department?

09:29  8     A.    There is an admin. aide that falls directly

09:29  9  under me.

09:29  10     Q.    What is the job duty of the admin. aide?

09:29  11     A.    To assist any of the -- with any of the

09:29  12  purchases.  Also helps to maintain records regarding

09:29  13  equipment and the vehicles.

09:29  14     Q.    What kind of records are maintained with

09:29  15  regard to equipment and vehicles?

09:29  16     A.    Mileage, service, repairs.

09:29  17     Q.    Is the administrative aide the one who's

09:29  18  responsible for the IT side, of keeping the records on

09:29  19  the IT side?

09:29  20     A.    Keeping the records on the IT?

09:30  21     Q.    I guess, are there any records kept with

09:30  22  regard to the computerized --

09:30  23     A.    That would fall -- The records would fall

09:30  24  under my supervision.

09:30  25     Q.    And what kind of records are kept concerning

09:30   1   the vehicles and their computerized functions?

09:30   2        A.   Are we talking about service, or --

09:30   3        Q.   I assume service records are kept?

09:30   4        A.   They're maintained in a -- We have a paper

09:30   5   file, and then we also have spreadsheets.

09:30   6        Q.   And then with regard to maintaining the

09:30   7   actual, say, the videos that are made from the police

09:30   8   calls, does that fall under your area, or does that

09:30   9   fall under another area?

09:30   10       A.   Actually, there is a sergeant that is

09:30   11  maintaining the videos and the service on the videos.

09:30   12       Q.   And who is that?

09:30   13       A.   Sergeant McCrary.

09:31   14       Q.   And now --

09:31   15       A.   I'm sorry.  If there is a problem with the

09:31   16  video, then we would look into it as far as the

09:31   17  equipment is concerned.

09:31   18       Q.   Okay.  If someone reports that a video isn't

09:31   19  working, does that come to your office?

09:31   20       A.   Generally, it goes through Sergeant McCrary,

09:31   21  and then to the admin. aide.

09:31   22       Q.   Did you know John Doe HM when he was on the

09:32   23  force?

09:32   24       A.   Yes, ma'am.

09:32   25       Q.   And how did you know John Doe HM when he was

09:32  1  on the force?

09:32  2      A.    He made application to become a police

09:32  3  officer.

09:32  4      Q.    And were you part of the process for vetting

09:32  5  or hiring police officers at that time?

09:32  6      A.    His name came before me.  I don't recall if

09:32  7  I was on any vetting committee at the time.

09:32  8      Q.    But you learned that he was one who had

09:32  9  applied?

09:32  10      A.    Yes, ma'am.

09:32  11      Q.    One way or another?

09:32  12      A.    Yes, ma'am.

09:32  13      Q.    And did you interview him when he came to be

09:32  14  interviewed?

09:32  15      A.    Not that I recall.

09:32  16      Q.    Okay.  Do you know if you did any background

09:32  17  checks?

09:32  18      A.    No.

09:32  19      Q.    Did you contact any references?

09:32  20      A.    No, ma'am.

09:32  21      Q.    Did any references contact you?

09:32  22      A.    No, ma'am.

09:32  23      Q.    So you never spoke to anyone about his

09:32  24  references before --

09:32  25      A.    No, ma'am.

| | | |
|---|---|---|
| 09:32 | 1 | Q. -- he became a police officer? If you would |
| 09:32 | 2 | wait until I finish the question, it would make it |
| 09:32 | 3 | easier for the court reporter. |
| 09:33 | 4 | Once he was hired -- And did you have any input |
| 09:33 | 5 | into his hiring? |
| 09:33 | 6 | A. They may have discussed with the commanders |
| 09:33 | 7 | someone being hired, and the attributes that that |
| 09:33 | 8 | person may bring to the department. |
| 09:33 | 9 | Q. Okay. Do you have any specific recollection |
| 09:33 | 10 | of discussing that regarding John Doe HM? |
| 09:33 | 11 | A. The one that I do remember was that Mr. John |
| 09:33 | 12 | Doe HM was very good with the computers, and we were |
| 09:33 | 13 | going through a transition at that time with regard to |
| 09:33 | 14 | in-car computers, and we thought it would be a plus to |
| 09:33 | 15 | have someone with his experience in computers. |
| 09:33 | 16 | Q. Did you find that to be accurate? |
| 09:33 | 17 | A. He did assist. |
| 09:33 | 18 | Q. And did he do a good job with assisting with |
| 09:33 | 19 | the computers? |
| 09:33 | 20 | A. I don't -- I don't recall -- I don't recall |
| 09:34 | 21 | any real problems, but I don't recall one way or the |
| 09:34 | 22 | other. |
| 09:34 | 23 | Q. Okay. And that was before you became the |
| 09:34 | 24 | Commander for Administrative Services; is that correct? |
| 09:34 | 25 | A. I believe so. |

09:34    1       Q.    Once Mr. John Doe HM became a member of the

09:34    2   force, how often did you have interaction with him?

09:34    3       A.    Met in the hallway. I would say we would

09:34    4   greet each other, exchange pleasantries.

09:34    5       Q.    Did you come to know anything about his

09:34    6   work, or how well he was doing with regard to his

09:34    7   probationary status?

09:34    8       A.    No.

09:34    9       Q.    Did Mr. John Doe HM have a reputation for

09:34   10   being a good police officer, as far as you knew?

09:35   11       A.    I don't -- I don't know anything that I can

09:35   12   say was particularly negative.

09:35   13       Q.    And the converse of.that is you also didn't

09:35   14   know of any -- he didn't have a reputation for being a

09:35   15   bad officer either?

09:35   16       A.    Not that I'm aware of.

09:35   17       Q.    Were you able to observe him enough to draw

09:35   18   your own conclusions as to the quality of the

09:35   19   performance that he gave to Creve Coeur?

09:35   20       A.    Again, I wasn't directly -- I wouldn't have

09:35   21   been supervising him at the time. I'm not aware of any

09:35   22   problems. I'm not aware of any exemplary actions

09:35   23   either.

09:35   24       Q.    Okay. Did you know Crystal Marshall?

09:36   25       A.    Yes, ma'am.

09:36  1      Q.   And how did you know Crystal Marshall?

09:36  2      A.   She was a dispatcher with the police

09:36  3  department.

09:36  4      Q.   Was she a dispatcher at the time that you

09:36  5  were the supervisor for dispatchers?

09:36  6      A.   Yes, ma'am.

09:36  7      Q.   And during what time frame?  You indicated

09:36  8  you were in administrative support twice?

09:36  9      A.   Again, I think it was -- I think it was

09:36  10  between May of '05 to -- I think it was middle of '06,

09:36  11  I think, right around that area.

09:36  12     Q.   Did you ever have any problems with Crystal

09:36  .13  Marshall as a dispatcher?

09:36  14     A.   The only thing that I remember about Crystal

09:36  15  was that she -- she, like many of the other

09:36  16  dispatchers, chitchatted a lot.

09:36  17     Q.   You had to tell them to get back to work?

09:37  18     A.   When -- Yes.

09:37  19     Q.   Okay.  Were there any other issues that you

09:37  20  had with regard to Crystal Marshall's performance?

09:37  21     A.   I believe on her evaluation it was the rumor

09:37  22  mongering.  I always tell them, if you don't have the

09:37  23  information up front, personal, then don't spread

09:37  24  anything.

09:37  25     Q.   Okay.  So she had been known to be something

09:37  1  of a gossip?

09:37  2      A.   Yes, ma'am.

09:37  3      Q.   Did you know at any point in time that

09:37  4  Crystal Marshall and John Doe HM were having a dating

09:37  5  relationship?

09:37  6      A.   Yes, I believe they were.

09:38  7      Q.   And when did you learn that Crystal Marshall

09:38  8  and John Doe HM were involved in a dating relationship?

09:38  9      A.   I believe it was when Mr. John Doe HM

09:38  10  started with the police department.

09:38  11      Q.   So that was a fact that was known when he

09:38  12  first came to the department?

09:38  13      A.   Yes, ma'am.

09:38  14      Q.   Do you know if Crystal Marshall dated anyone

09:38  15  else on the department?

09:38  16      A.   Not that I'm aware of.

09:38  17      Q.   Do you know if -- Did it ever become an

09:38  18  issue of her dating anyone from a different department?

09:38  19      A.   I believe she had a child from another --

09:38  20  police officer from another department.

09:38  21      Q.   Did that create any issues between the two

09:38  22  departments, or with regard to her ability to work?

09:39  23      A.   Not that I'm aware of, no.

09:39  24      Q.   Did you ever discuss with John Doe HM his

09:39  25  relationship with Crystal Marshall?

| | | |
|---|---|---|
| 09:39 | 1 | A. Not that I'm aware of. |
| 09:39 | 2 | Q. Did you ever discuss with Crystal Marshall |
| 09:39 | 3 | her relationship with John Doe HM? |
| 09:39 | 4 | A. Not that I -- Not that I'm aware of or |
| 09:39 | 5 | recall. |
| 09:39 | 6 | Q. Now, your relationship with Crystal |
| 09:39 | 7 | Marshall, was that -- were you friends? Did you do |
| 09:39 | 8 | anything -- and I don't mean in a dating manner, did |
| 09:39 | 9 | you do anything outside of the department together, |
| 09:39 | 10 | like go for drinks, or happy hour, or anything like |
| 09:39 | 11 | that? |
| 09:39 | 12 | A. No, ma'am. |
| 09:39 | 13 | Q. Were you friendly at the department? Would |
| 09:40 | 14 | you consider her a coworker friend, or was she merely a |
| 09:40 | 15 | supervisory -- |
| 09:40 | 16 | A. She was a coworker associate. |
| 09:40 | 17 | Q. Okay. Did she share with you any personal |
| 09:40 | 18 | things? |
| 09:40 | 19 | A. She may have. |
| 09:40 | 20 | Q. Do you recall any topics that she shared |
| 09:40 | 21 | with you? |
| 09:40 | 22 | A. I believe when she was -- when she was |
| 09:40 | 23 | pregnant, she was concerned with some of the problems |
| 09:40 | 24 | that she was having. |
| 09:40 | 25 | Q. And was that relative to her being unable to |

Boyd-Gwinn Reporting

| | | |
|---|---|---|
| 09:40 | 1 | be at work, or -- |
| 09:41 | 2 | A.    I believe sometime it was, yes, ma'am. |
| 09:41 | 3 | Q.    Did she engage in confidential -- what you |
| 09:41 | 4 | would consider, when I used the term yesterday:  Did |
| 09:41 | 5 | she become, in any regard, a confidant with you, where |
| 09:41 | 6 | she would share with you very personal things that she |
| 09:41 | 7 | expected you to keep confidential? |
| 09:41 | 8 | A.    No. |
| 09:41 | 9 | Q.    Do you know when the last time you spoke to |
| 09:41 | 10 | her was? |
| 09:41 | 11 | A.    I guess it was before -- before she had left |
| 09:41 | 12 | the department. |
| 09:41 | 13 | Q.    Do you recall when she left the department? |
| 09:41 | 14 | A.    No, ma'am. |
| 09:41 | 15 | Q.    Did you ever have a complaint filed against |
| 09:42 | 16 | you by Crystal Marshall of any kind? |
| 09:42 | 17 | A.    No, ma'am. |
| 09:42 | 18 | Q.    Or grievance? |
| 09:42 | 19 | A.    Not that I'm aware of. |
| 09:42 | 20 | Q.    Okay.  Did you become aware at some point in |
| 09:42 | 21 | time of a sequence of events that involved John Doe HM, |
| 09:42 | 22 | in which he was picked up or detained by the St. Louis |
| 09:42 | 23 | County Police Department, and then taken to the |
| 09:42 | 24 | Highland Center? |
| 09:42 | 25 | A.    Yes, ma'am. |

| 09:42 | 1 | Q. And when did you become aware of that? |
| 09:42 | 2 | A. I believe that was the latter part of 2005. |
| 09:42 | 3 | Q. Okay. |
| 09:42 | 4 | A. In December. |
| 09:42 | 5 | Q. For the record, because it's already been |
| 09:42 | 6 | established, the date that that occurred was |
| 09:42 | 7 | December 31st, New Year's Eve of 2005. |
| 09:42 | 8 | A. Yes, ma'am. |
| 09:42 | 9 | Q. Did Miss Marshall call you concerning John |
| 09:43 | 10 | Doe HM around that time? |
| 09:43 | 11 | A. Yes, ma'am. |
| 09:43 | 12 | Q. And can you tell me what Miss Marshall told |
| 09:43 | 13 | you with regard to John Doe HM? |
| 09:43 | 14 | A. It was -- She was -- The only thing I can |
| 09:43 | 15 | remember is that there was some concern. She had a |
| 09:43 | 16 | concern for Mr. John Doe HM, and it had something to do |
| 09:43 | 17 | with what was reported. And I said if she had any |
| 09:43 | 18 | information, she should contact the reporting |
| 09:43 | 19 | department because it didn't involve -- nothing |
| 09:43 | 20 | occurred within Creve Coeur. |
| 09:43 | 21 | Q. Did she tell you what she was concerned |
| 09:43 | 22 | about being reported? |
| 09:43 | 23 | A. I'm trying to think back. She had |
| 09:43 | 24 | information, personal information. |
| 09:43 | 25 | Q. Did she ever tell you that she had a suicide |

09:43  1   note from John Doe HM?

09:43  2        A.    She may have.  She may have.

09:44  3        Q.    Okay.  Do you recall if she called it a

09:44  4   suicide note, or if she called it something else?

09:44  5        A.    I don't -- I don't recall.

09:44  6        Q.    Okay.  What else did she tell you about John

09:44  7   Doe HM during that time frame?

09:44  8        A.    Again, the only thing I remember is she

09:44  9   wanted to report her concern for Mr. John Doe HM, and

09:44  10  she had this information.  It may have been a note, but

09:44  11  it did not involve the Creve Coeur Police Department.

09:44  12  If there was another agency taking the report, that

09:44  13  information should be given to -- whatever information

09:44  14  there was, should be given to that reporting

09:44  15  department.

09:44  16       Q.    Okay.  Do you know if she did that?

09:44  17       A.    No, ma'am, I do not.

09:45  18       Q.    Do you know if this happened on the night or

09:45  19  the day that Mr. John Doe HM was detained?

09:45  20       A.    I know it was at night when she called me.

09:45  21       Q.    Do you recall what her concerns were with

09:45  22  regard to Mr. John Doe HM?

09:45  23       A.    (No response.)

09:45  24       Q.    And the reason I'm asking, you said that she

09:45  25  had concern for John Doe HM regarding what was

```
09:45  1   reported.  And from your question, I couldn't quite
09:45  2   tell, did she have concerns about John Doe HM, and also
09:45  3   concerns about what was reported, or was she talking to
09:45  4   you about what was reported?
09:45  5        A.   I think she was concerned -- If I recall,
09:45  6   she was concerned for his welfare.
09:45  7        Q.   And do you recall what she said about that?
09:46  8        A.   No, ma'am, I don't.
09:46  9        Q.   Do you know if at the time -- Did she tell
09:46  10  you whether or not they were still dating at the time
09:46  11  that she made this call to you?
09:46  12       A.   I don't recall if there were or not.
09:46  13       Q.   Now, you also indicated that she was         .
09:46  14  concerned about how the issues were reported; is that
09:46  15  correct?
09:46  16            MS. OWENS:  Object.  Mischaracterizes --
09:46  17            MS. MERKLIN VON KAENEL:  Sorry.  Go ahead,
09:46  18  Stacie.
09:46  19            MS. OWENS:  Objection.  Mischaracterizes his
09:46  20  previous testimony.
09:46  21       Q.   (By Ms. Randles)  I had written down that
09:46  22  she was concerned regarding what was had reported; is
09:46  23  that accurate?
09:46  24       A.   She was concerned about Mr. John Doe's
09:46  25  welfare, and she wanted, she had information about Mr.
```

Boyd-Gwinn Reporting

09:47  1   John Doe HM.  And it may have had something to do with

09:47  2   a note.  All I remember is that it didn't involve --

09:47  3   nothing occurred within Creve Coeur.  And if she had

09:47  4   any information, it was important that she give it to

09:47  5   the investigating department.

09:47  6        Q.   Okay.  Once she made these calls to you --

09:47  7   Well, do you recall whether it was one call or more

09:47  8   than one?

09:47  9        A.   No, ma'am.

09:47  10       Q.   That is, you don't recall?

09:47  11       A.   I don't recall, no.

09:47  12       Q.   When Crystal or when anyone calls in like

09:47  13  that, is there some kind of log or report that has to

09:47  14  be kept?

09:48  15       A.   If there was a situation that involved --

09:48  16  because Mr. John Doe HM was with the Creve Coeur Police

09:48  17  Department at the time, I would have then contacted the

09:48  18  chief of police.

09:48  19       Q.   Do you recall making that contact with the

09:48  20  chief of police?

09:48  21       A.   I believe I did.

09:48  22            MS. MERKLIN VON KAENEL:  I'm sorry.  What

09:48  23  was your answer?

09:48  24       A.   I believe I did.

09:48  25            MS. MERKLIN VON KAENEL:  Thank you.  I'm

09:48  1  sorry.

09:48  2      Q.   (By Ms. Randles)  And that was Chief

09:48  3  Beardslee at the time?

09:48  4      A.   Yes.

09:48  5      Q.   What did you report to Chief Beardslee?

09:48  6      A.   I believe that Mr. John Doe HM was in the

09:48  7  hospital, and that a report was taken with St. Louis

09:48  8  County, and it was reported that he wanted to harm

09:48  9  himself.

09:48  10      Q.   And did you pass on that Crystal Marshall

09:48  11  had made a call to you?

09:48  12      A.   I probably did, yes.

09:48  13      Q.   Was Crystal Marshall the only means by which

09:49  14  you learned that John Doe HM was in the hospital?

09:49  15      A.   On that immediacy, I believe it was.

09:49  16      Q.   At the time that you reported to the Chief

09:49  17  Beardslee, was your report based solely on what Crystal

09:49  18  Marshall had told you at that time?

09:49  19      A.   I believe so.

09:49  20      Q.   Okay.  And because of the seriousness of the

09:49  21  allegations, it would be essential to go ahead and

09:49  22  report that information to Chief Beardslee; correct?

09:49  23      A.   Yes.

09:50  24      Q.   Okay.  Did Chief Beardslee discuss with you

09:50  25  any of that information?

Boyd-Gwinn Reporting

| 09:50 | 1 | A. (No response.) |
| 09:50 | 2 | Q. You indicated that you reported to Chief |
| 09:50 | 3 | Beardslee the information that Crystal had imparted to |
| 09:50 | 4 | you? |
| 09:50 | 5 | A. Right. |
| 09:50 | 6 | Q. Did Chief Beardslee then discuss with you |
| 09:50 | 7 | the importance or the relevance of any of that |
| 09:50 | 8 | information? |
| 09:50 | 9 | A. If -- I believe he may have already known. |
| 09:50 | 10 | Maybe someone else had called him. I don't recall, |
| 09:50 | 11 | other than that. |
| 09:50 | 12 | Q. Okay. Did you have to write a report |
| 09:51 | 13 | concerning Crystal Marshall's reports to you? |
| 09:51 | 14 | A. The only thing I did was advised the Chief. |
| 09:51 | 15 | Q. Nothing written? |
| 09:51 | 16 | A. No. |
| 09:51 | 17 | Q. I assume that your advising the chief was |
| 09:51 | 18 | via telephone? |
| 09:51 | 19 | A. Yes, ma'am. |
| 09:51 | 20 | Q. After the events of 12/31, did you have any |
| 09:51 | 21 | further -- did you have anything to do with the events |
| 09:51 | 22 | that transpired after that regarding John Doe HM, or |
| 09:51 | 23 | was this the only time that you became involved in this |
| 09:51 | 24 | situation at all? |
| 09:51 | 25 | A. There was a discussion with the chief, and |

CAPTAIN DENNIS A. SPOERRY   MARCH 4, 2009
2008

09:52  1   some of the command staff, or the command staff that

09:52  2   was available as to what had been reported through St.

09:52  3   Louis County.

09:52  4        Q.    And what did you learn had been reported

09:52  5   through St. Louis County?

09:52  6        A.    That Mr. John Doe HM had allegedly

09:52  7   threatened suicide.

09:52  8        Q.    And, to your knowledge, did the report of

09:52  9   the threatening of suicide come directly from the

09:52  10  County, or was that relying on Crystal Marshall?  Did

09:52  11  you see the police report?

09:52  12       A.    No.

09:52  13       Q.    Did you speak with anyone from St. Louis

09:53  14  County?

09:53  15       A.    No, ma'am.

09:53  16       Q.    And who reported then that St. Louis County

09:53  17  had indicated that John Doe HM had threatened suicide?

09:53  18       A.    I believe it was a relative.  I believe it

09:53  19  was wife -- ex-wife.

09:53  20       Q.    You did not speak directly with the wife or

09:53  21  the ex-wife?

09:53  22       A.    No, ma'am.

09:53  23       Q.    Do you know if anyone from Creve Coeur

09:53  24  actually spoke to the wife?

09:53  25       A.    I don't know.

09:53 1     Q.    This came from St. Louis County, though,

09:54 2  that the wife had indicated that John Doe HM had

09:54 3  attempted, or was --

09:54 4     A.    I believe so.

09:54 5     Q.    -- thinking of suicide?

09:54 6     A.    I believe so, yes, ma'am.

09:54 7     Q.    And with regard to the meeting of the

09:54 8  commanders, what else was discussed regarding John Doe

09:54 9  HM?

09:54 10     A.    They felt -- Because Mr. John Doe HM at that

09:54 11  time was on probation, his probationary period, and, I

09:54 12  believe, it caused -- of this event, it was determined

09:54 13  whether he should be maintained with the police

09:54 14  department.  And then I believe Chief Beardslee came up

09:55 15  with an exit strategy to release Mr. John Doe HM.

09:55 16     Q.    Now, you've already indicated that you did

09:55 17  not investigate any of the allegations, that that

09:55 18  wasn't --

09:55 19     A.    No, ma'am.

09:55 20     Q.    -- your responsibility?

09:55 21     A.    No, ma'am.

09:55 22     Q.    Do you know if any investigation concerning

09:55 23  any of these allegations was actually conducted?

09:55 24     A.    I don't know.

09:55 25     Q.    Is it routine that investigations would be

| | | |
|---|---|---|
| 09:55 | 1 | conducted into misconduct of an officer? |
| 09:55 | 2 | A.   They can be.   It depends upon what the |
| 09:55 | 3 | allegation is. |
| 09:55 | 4 | Q.   And who would be responsible for conducting |
| 09:55 | 5 | an investigation into the conduct of an officer? |
| 09:55 | 6 | A.   It would be signed by the chief. |
| 09:55 | 7 | Q.   And has the chief, in the past, occasionally |
| 09:56 | 8 | taken it upon himself to do the investigation into the |
| 09:56 | 9 | allegations against an officer? |
| 09:56 | 10 | A.   No. |
| 09:56 | 11 | Q.   Do you know -- |
| 09:56 | 12 | A.   Not that I recall. |
| 09:56 | 13 | Q.   Do you know whether the chief was the one |
| 09:56 | 14 | who assigned himself in this situation that John Doe |
| 09:56 | 15 | HM -- |
| 09:56 | 16 | A.   I don't know. |
| 09:56 | 17 | Q.   At any point in time, did you learn that |
| 09:56 | 18 | John Doe HM had been the victim of a childhood sexual |
| 09:56 | 19 | assault? |
| 09:56 | 20 | A.   Much later on. |
| 09:56 | 21 | Q.   When did you learn that? |
| 09:56 | 22 | A.   Mr. John Doe HM was gone, and it was -- |
| 09:56 | 23 | Matter of fact, I want to say that it was -- when I |
| 09:56 | 24 | became aware of it was when this lawsuit came about. |
| 09:56 | 25 | Q.   Okay.  How did you learn about this lawsuit? |

09:57 1         MS. OWENS: Other than discussion with

09:57 2 counsel?

09:57 3     Q. (By Ms. Randles) Exactly. I don't know

09:57 4 need to know anything that you discussed with your

09:57 5 counsel.

09:57 6     A. Prior to Chief Beardslee leaving, that there

09:57 7 was a lawsuit.

09:57 8     Q. Was this part of a meeting that Chief

09:57 9 Beardslee had with the commanders?

09:57 10     A. It may have been.

09:57 11     Q. Do you recall what he told you about the

09:57 12 lawsuit?

09:57 13     A. Only that Mr. John Doe HM was bringing a

09:57 14 lawsuit against the department for his dismissal.

09:57 15     Q. And you had indicated that you learned about

09:57 16 the childhood sexual assault after him bringing the

09:57 17 lawsuit. Did Chief Beardslee impart that to you?

09:57 18     A. I believe he did.

09:58 19     Q. Do you recall a safety alert being issued by

09:58 20 Creve Coeur concerning John Doe HM following his

09:58 21 termination?

09:58 22     A. Yes, ma'am.

09:58 23     Q. And did you have any part in the issuance of

09:58 24 that safety alert?

09:58 25     A. Chief Beardslee may have consulted with me,

09:58  1  and/or the other commanders.

09:58  2      Q.   Do you have a specific recollection of him

09:58  3  consulting with you?

09:58  4      A.   I believe we talked about it, yes.

09:58  5      Q.   And did he give you any indication as to why

09:58  6  he believed the safety alert was necessary?

09:58  7      A.   I believe it was because of the event, and

09:58  8  the safety, welfare of Mr. John Doe HM, and other

09:59  9  personnel.

09:59  10      Q.   Okay.

09:59  11      MS. MERKLIN VON KAENEL:  Can we stop for a

09:59  12  second?

09:59  13      {The preceding question and answer was read

09:59  14      back.}

09:59  15      Q.   (By Ms. Randles)  And I'm going to hand you

09:59  16  what has previously been marked as Exhibit 24.  We're a

09:59  17  little far apart.  In the second paragraph, it

09:59  18  indicates on the third line down that "Officer John Doe

09:59  19  HM has recently disclosed information, and exhibited

10:00  20  signs of emotional problems that include the potential

10:00  21  for suicide."  Were you aware of any disclosures of

10:00  22  information that Mr. John Doe HM had made?

10:00  23      A.   Just the suicide information.

10:00  24      Q.   Okay.  And that, of course, came to you from

10:00  25  Crystal Marshall, and from the commanders' meeting?

10:00  1    A.    Yes, ma'am.

10:00  2    Q.    Were you aware of any meeting that the chief

10:00  3  had with John Doe HM concerning the childhood sexual

10:00  4  abuse matter?

10:00  5    A.    No.

10:00  6    Q.    Then it goes on to say:  "Statements from

10:00  7  creditable sources suggest that Officer John Doe HM has

10:00  8  threatened harm to himself and others."  Do you know

10:00  9  who the credible sources were that were being referred

10:00 10  to in this safety alert?

10:00 11    A.    Probably based on the police report.

10:01 12    Q.    Have you ever seen an employee safety alert

10:01 13  such as this being issued by the department before?

10:01 14    A.    Not that I recall.

10:01 15    Q.    Do you recall whether any safety alert of

10:01 16  that type has been issued since Mr. John Doe HM was

10:01 17  terminated?

10:01 18    A.    I don't believe so.

10:01 19    Q.    Was Chief Beardslee the one who made the

10:02 20  decision to issue the safety alert?

10:02 21    A.    Yes.  But I think we -- I think, again,

10:02 22  questioned the commanders, if we thought it would be

10:02 23  appropriate, and I concurred.

10:02 24    Q.    And on what basis did you concur that the

10:02 25  safety alert was necessary?

10:02  1       A.   The fact that he had alleged suicide, and if

10:02  2  there was firearms involved, then that could be a

10:02  3  serious danger to Mr. John Doe HM, and any other

10:02  4  employee.

10:02  5       Q.   Were you concerned that the issuance of a

10:02  6  safety alert such as this, which especially says that

10:02  7  when stopped by -- "our officers should be especially

10:02  8  alert to any approach," were you concerned that that

10:02  9  would put Mr. John Doe HM at risk?

10:02  10      A.   How do you mean?

10:03  11      Q.   When an individual is considered armed and

10:03  12  dangerous, what is appropriate manner to approach them

10:03  13  if you're a police officer?

10:03  14      A.   If they're considered armed and dangerous?

10:03  15      Q.   Yes.

10:03  16      A.   Approach them with caution and try to

10:03  17  approach them in a safe area; cover, if he should be

10:03  18  displaying a weapon.

10:03  19      Q.   If an individual is considered armed and

10:03  20  dangerous and he is not displaying a weapon, is it

10:03  21  appropriate for a police offer to draw his weapon prior

10:03  22  to approaching this individual, who is known to be

10:03  23  armed and dangerous?

10:03  24      A.   It could be.

10:03  25      Q.   In the situation of this employee safety

| | | |
|---|---|---|
| 10:03 | 1 | alert, was it anticipated that a police officer should |
| 10:03 | 2 | draw their weapon should they be approached by John Doe |
| 10:03 | 3 | HM? |
| 10:03 | 4 | A.    No. |
| 10:03 | 5 | Q.    What is the difference? |
| 10:03 | 6 | A.    It's just a precaution that advised the |
| 10:03 | 7 | officers that because of the situation, that if Mr. |
| 10:03 | 8 | John Doe HM comes to the station, that we should be |
| 10:03 | 9 | observant, and be cautious. |
| 10:04 | 10 | Q.    Now, you have no knowledge as to whether any |
| 10:04 | 11 | independent investigation into any of the alleged facts |
| 10:04 | 12 | took place by the Creve Coeur Police Department; |
| 10:04 | 13 | correct? |
| 10:04 | 14 | A.    I have no knowledge of that, no. |
| 10:04 | 15 | Q.    Now, assuming that there never was a suicide |
| 10:04 | 16 | note, would that change your opinion as to whether or |
| 10:04 | 17 | not Mr. John Doe HM was appropriately terminated? |
| 10:04 | 18 | A.    I believe it had to do with the report -- I |
| 10:04 | 19 | don't know if the suicide -- I don't know how the |
| 10:04 | 20 | suicide note fits in.  But my understanding is that the |
| 10:05 | 21 | Mr. John Doe HM's wife, or ex-wife -- again, I don't |
| 10:05 | 22 | recall -- had reported it.  So I don't know if she had |
| 10:05 | 23 | any information about a suicide note. |
| 10:05 | 24 | Q.    Assume, if you will, that Crystal Marshall |
| 10:05 | 25 | called the ex-wife, and indicated there was a suicide |

10:05  1  note, and that she also called the St. Louis County

10:05  2  police officers, and indicated there was a suicide

10:05  3  note, but no suicide note, in fact, ever existed.   In

10:05  4  that situation, do you believe that the termination of

10:05  5  John Doe HM would have been an appropriate termination?

10:05  6          MS. OWENS:   Objection.   Assumes facts not in

10:05  7  evidence.   Other than that, you can answer, if you

10:05  8  know.

10:05  9      A.    I guess it would be based upon the totality

10:05  10 of the circumstances.   Again, I didn't do the

10:05  11 investigation.   St. Louis County took the report.   I'm

10:05  12 not familiar with what was in the report.   So I believe

10:06  13 that the chief made a decision based upon the report,

10:06  14 and the safety and welfare of Mr. John Doe HM, and the

10:06  15 personnel at Creve Coeur.

10:06  16     Q.    Your agreement, or your recommendation that

10:06  17 Mr. John Doe HM be terminated before his probationary

10:06  18 period ended was based upon the assessment by Chief

10:06  19 Beardslee, that this was the appropriate steps based

10:06  20 upon the police report; is that correct?

10:06  21     A.    It had to be based upon the information that

10:06  22 I would have received from the chief and the chief's

10:07  23 assessment.

10:07  24     Q.    But you were basing your assessment on what

10:07  25 the chief told you; correct?

| | | |
|---|---|---|
| 10:07 | 1 | A.    Yes. |
| 10:07 | 2 | Q.    And you had nothing independent to make any |
| 10:07 | 3 | kind of termination with regard to -- |
| 10:07 | 4 | A.    Other than the -- |
| 10:07 | 5 | Q.    -- Mr. John Doe HM? |
| 10:07 | 6 | A.    -- information I had with regard to Miss |
| 10:07 | 7 | Marshall. |
| 10:07 | 8 | Q.    And with regard to Miss Marshall, you did |
| 10:07 | 9 | have knowledge that she had, in the past, been told not |
| 10:07 | 10 | to rumormonger; is that correct? |
| 10:07 | 11 | A.    I told her that. |
| 10:07 | 12 | Q.    Now, can you describe for me what a |
| 10:07 | 13 | point-to-point alert is? |
| 10:08 | 14 | A.    It would come from an originating agency, |
| 10:08 | 15 | and then transmitted point-to-point as an alert.  And |
| 10:08 | 16 | it can go out as a general point-to-point or just |
| 10:08 | 17 | specific agencies. |
| 10:08 | 18 | Q.    Do you know if there was a point-to-point |
| 10:08 | 19 | that was sent with regard to John Doe HM on the night |
| 10:08 | 20 | of 12/31/05? |
| 10:08 | 21 | A.    I don't know. |
| 10:08 | 22 | Q.    At that point in time, were you in charge of |
| 10:08 | 23 | dispatchers? |
| 10:08 | 24 | A.    Yes. |
| 10:08 | 25 | Q.    Do you know -- |

| | | |
|---|---|---|
| 10:08 | 1 | A.   I believe so. |
| 10:08 | 2 | Q.   Do you know who would know about whether or |
| 10:08 | 3 | not a point-to-point was broadcast? |
| 10:08 | 4 | A.   Unless a dispatcher was on that night. |
| 10:08 | 5 | Whoever would have been on duty that evening. |
| 10:08 | 6 | Q.   And who were the dispatchers who were -- |
| 10:08 | 7 | A.   I don't know. |
| 10:08 | 8 | Q.   Was a Nancy -- I can't pull her last name. |
| 10:08 | 9 | A.   Lauer. |
| 10:08 | 10 | Q.   Yes.  Was Nancy Lauer a dispatcher at that |
| 10:08 | 11 | point in time? |
| 10:08 | 12 | A.   She would have been a dispatcher there, yes. |
| 10:08 | 13 | Q.   How many dispatchers did you have?   . |
| 10:09 | 14 | A.   At that time, I don't know if we were a full |
| 10:09 | 15 | complement.  We had a full complement of eight, and I |
| 10:09 | 16 | don't know if we had a full complement at that time or |
| 10:09 | 17 | not. |
| 10:09 | 18 | Q.   And the dispatchers, are they assigned to a |
| 10:09 | 19 | day shift or a night shift? |
| 10:09 | 20 | A.   They have rotating shifts, yes, ma'am. |
| 10:09 | 21 | Q.   Are the day shift dispatchers always on day |
| 10:09 | 22 | shift, or do they rotate? |
| 10:09 | 23 | A.   They rotate. |
| 10:09 | 24 | Q.   So any of the eight could be on at a given |
| 10:09 | 25 | time? |

10:09  1      A.    Within a month period, yes, ma'am.

10:09  2      Q.    At the time, 12/31 of '05, Crystal Marshall

10:09  3  had already left the force; hadn't she?

10:09  4           MS. OWENS:  Objection.  Assumes facts not in

10:09  5  evidence.

10:09  6      A.    I don't recall.  I really don't recall

10:09  7  whether she was there or not.

10:09  8      Q.    (By Ms. Randles)  Do you recall any of the

10:09  9  other dispatchers -- Crystal Marshall may or may not

10:09 10  have a dispatcher.  There is a Nancy Lauer.  And do you

10:10 11  recall any of the others who were dispatchers during

10:10 12  that time frame?

10:10 13      A.    There was probably a Mary Koenig.

10:10 14      Q.    What's that last name?

10:10 15      A.    K-o-e-n-i-g.  Amanda Lancaster.  Retha

10:10 16  Bromley.  And there may have been -- may have been a

10:10 17  Leanne Nelson at that time.

10:11 18      Q.    Okay.  Anyone else that you can recall?

10:11 19  That's six.

10:11 20      A.    We changed.  And I --

10:11 21      Q.    Sure.

10:11 22      A.    And I believe they were there at that time.

10:11 23      Q.    Okay.  Is there a policy -- Well, before we

10:11 24  go there:  Is there a document that is generated when a

10:11 25  point-to-point goes out?

10:11  1          A.    No.

10:11  2          Q.    Is there anyway to determine whether or not

10:11  3    a point-to-point went out with regard to John Doe HM on

10:11  4    12/31 of '05?

10:11  5          A.    A point-to-point radio transmission, not

10:11  6    that I'm aware of.

10:11  7          Q.    So if a point-to-point goes out, there is no

10:11  8    logging of that transmission?

10:11  9          A.    Not that I recall.

10:12 10          Q.    Now, as I understand it, a point-to-point is

10:12 11    kind of like you see on a T.V., an all points bulletin;

10:12 12    is that correct?

10:12 13          A.    Yes, ma'am.

10:12 14          Q.    Now, is there a policy regarding the manner

10:12 15    in which point-to-points are broadcast?

10:12 16          A.    It would be the originating department.

10:12 17          Q.    Okay.

10:12 18          A.    And that originating department would

10:12 19    contact the respective department, like Creve Coeur to

10:12 20    St. Louis County, or Creve Coeur to Des Peres;

10:12 21    point-to-point.

10:12 22          Q.    Now, when a point-to-point comes in, is

10:12 23    there any policy with regard to whether that

10:12 24    information can be transmitted to civilians?

10:12 25               MS. OWENS:   Other than the dispatchers?

Case: 4:07-cv-00046-ERW   Doc. #: 189-29   Filed: 04/31/2009   Page: 44 of 100 PageID #: 44
2021

| | | |
|---|---|---|
| 10:12 | 1 | Q. (By Ms. Randles) Yes. To members of the |
| 10:13 | 2 | public? |
| 10:13 | 3 | A. No. |
| 10:13 | 4 | Q. There is no policy? |
| 10:13 | 5 | A. They can't. It's not passed on to the |
| 10:13 | 6 | public, unless the public should be scanning it. |
| 10:13 | 7 | Q. Unless there is a specific threat against an |
| 10:13 | 8 | individual? |
| 10:13 | 9 | A. Well, if there were, then an officer would |
| 10:13 | 10 | contact that particular individual. |
| 10:13 | 11 | Q. Okay. Is there any disciplinary policy for |
| 10:13 | 12 | violation of the rule that point-to-point is not to be |
| 10:13 | 13 | circulated to members of the public? |
| 10:13 | 14 | A. Well, any information that would be |
| 10:13 | 15 | considered as confidential information should be kept |
| 10:13 | 16 | within the police community. |
| 10:14 | 17 | Q. And you don't recall whether Crystal |
| 10:14 | 18 | Marshall was or was not an employee at that point? |
| 10:14 | 19 | A. I don't recall, no, ma'am. |
| 10:14 | 20 | Q. Assuming that she was not an employee, would |
| 10:14 | 21 | it have been proper for anyone at the department to |
| 10:14 | 22 | tell Crystal Marshall that a point-to-point had been |
| 10:14 | 23 | issued concerning John Doe HM? |
| 10:14 | 24 | MS. OWENS: Objection. It assumes facts not |
| 10:14 | 25 | in evidence. You can answer, if you know, though. |

CAPTAIN DENNIS R. SPOERRY

| | | |
|---|---|---|
| 10:14 | 1 | A. Would you repeat the question? |
| 10:14 | 2 | Q. (By Ms. Randles) Sure. Assume for the |
| 10:14 | 3 | moment that Crystal Marshall was not an employee of the |
| 10:14 | 4 | Creve Coeur Police Department at that time. Would it |
| 10:14 | 5 | be proper for an employee to tell Crystal Marshall that |
| 10:14 | 6 | a point-to-point had been issued with regard to John |
| 10:14 | 7 | Doe HM? |
| 10:14 | 8 | A. No. |
| 10:14 | 9 | Q. And can one be disciplined if an individual |
| 10:15 | 10 | who is not an employee of Creve Coeur is told about a |
| 10:15 | 11 | point-to-point being issued regarding John Doe HM? |
| 10:15 | 12 | A. I suppose it could be. |
| 10:15 | 13 | Q. At any point in time -- I would like you to |
| 10:15 | 14 | move back now a couple of months from December 31st of |
| 10:15 | 15 | 2005, to the November time frame. In November of 2005, |
| 10:15 | 16 | did you ever receive any information that John Doe HM |
| 10:15 | 17 | was in counseling of any kind? |
| 10:15 | 18 | A. No. |
| 10:15 | 19 | Q. Did receive any information that John Doe HM |
| 10:15 | 20 | was on any kind of psychotropic medication? |
| 10:15 | 21 | A. No. |
| 10:15 | 22 | Q. Did you receive any information that John |
| 10:15 | 23 | Doe HM was struggling with emotional issues during that |
| 10:15 | 24 | time frame? |
| 10:15 | 25 | A. No. |

CAPTAIN DENNIS A. SPOERRY, March 04, 2009

| | | |
|---|---|---|
| 10:15 | 1 | Q. In November, or approximately there, did you |
| 10:15 | 2 | receive any information that John Doe HM had been a |
| 10:15 | 3 | victim of a childhood sexual abuse crime? |
| 10:16 | 4 | A. No. |
| 10:16 | 5 | Q. Did you become aware of any of these things |
| 10:16 | 6 | prior to John Doe HM's termination? |
| 10:16 | 7 | A. No, ma'am. |
| 10:16 | 8 | Q. Did you have any input whatsoever into the |
| 10:16 | 9 | Position Statement that was filed by the attorneys on |
| 10:16 | 10 | this matter with the EEOC? |
| 10:16 | 11 | A. No. |
| 10:16 | 12 | Q. Did you ever receive any complaint about |
| 10:16 | 13 | John Doe HM, that his emotional status was somehow |
| 10:16 | 14 | suspect at any time prior to 12/31 of '05? |
| 10:16 | 15 | A. No. |
| 10:16 | 16 | Q. Did you ever receive any complaints about |
| 10:17 | 17 | the emotional status of John Doe HM at any point after |
| 10:17 | 18 | 12/31 of '05? |
| 10:17 | 19 | MS. OWENS: Other than what we've already |
| 10:17 | 20 | discussed? |
| 10:17 | 21 | Q. (By Ms. Randles) Let me rephrase that. Did |
| 10:17 | 22 | you ever receive -- We know about the complaints |
| 10:17 | 23 | arising from 12/31 of '05. Putting aside that |
| 10:17 | 24 | incident, did you ever receive any complaints about |
| 10:17 | 25 | John Doe HM's emotional capacity after 12/31 of '05? |

10:17   1      A.    No, ma'am.

10:17   2      Q.    Did you ever have any concerns about his

10:17   3 mental stability before 12/31 of '05?

10:17   4      A.    Myself, no, ma'am.

10:17   5      Q.    Yes. Before 12/31 of '05 were you ever a

10:17   6 party to any discussion about his mental stability?

10:17   7      A.    No, ma'am.

10:17   8      Q.    And after 12/31 of '05, putting aside this

10:17   9 one incident, did you ever have any discussions with

10:18  10 regard to John Doe HM's mental stability?

10:18  11      A.    Putting that incident aside?

10:18  12      Q.    Yes.

10:18  13      A.    No.

10:18  14      Q.    So was the only incident that raised any

10:18  15 concern for you concerning his mental stability the

10:18  16 incident of 12/31 of '05?

10:18  17      A.    Yes, ma'am.

10:18  18      Q.    And, again, the information that you

10:18  19 received with regard to 12/31 of '05 came from Chief

10:18  20 Beardslee and from Crystal Marshall; correct?

10:18  21      A.    Yes. Others may have been informed, but I'm

10:18  22 not aware of it.

10:18  23      Q.    Do you recall anything else that Crystal

10:18  24 Marshall told you with regard to John Doe HM at any

10:18  25 point in time?

10:18  1        MS. OWENS:  I'm sorry.  Can you repeat the

10:18  2  question.

10:18  3        Q.   (By Ms. Randles)  I said, do you recall

10:18  4  anything that Crystal Marshall may have told him at any

10:18  5  point in time concerning John Doe HM?

10:18  6        A.   No.

10:19  7        MS. RANDLES:  I think I'm finished, but

10:19  8  let's take just a brief break.

10:19  9        MS. OWENS:  Sure.

10:19  10        {Short break taken.}

10:29  11        Q.   (By Ms. Randles)  I just have a couple of

10:30  12  follow-up questions.  And the first is:  Did you learn

10:30  13  of the existence of the St. Louis County report

10:30  14  initially from Crystal Marshall?

10:30  15        A.   I don't recall.

10:30  16        Q.   You indicated there was a Commander meeting

10:30  17  to discuss the events of 12/31 regarding John Doe HM.

10:30  18  Do you recall when that occurred?

10:30  19        A.   I believe that would have been -- It was on

10:30  20  a Monday, I believe.

10:30  21        Q.   31st was a Saturday, I believe, so the

10:30  22  following Monday?

10:30  23        A.   Probably.

10:30  24        Q.   And was it decided at that meeting to

10:30  25  terminate John Doe HM?

10:30  1      A.    We gave our opinions as to the concerns.

10:30  2  And, again, at the time, Mr. John Doe HM was on

10:31  3  probationary status.

10:31  4      Q.    So was it at the Commander meeting that you

10:31  5  concurred in the chief's evaluation that he should be

10:31  6  terminated?

10:31  7           MS. OWENS:  I object.  It assumes facts not

10:31  8  in evidence.  You can answer, if you know.

10:31  9      A.    I think he asked for opinions.  And if we

10:31  10 felt there was a safety concern, especially because of

10:31  11 the probationary status, the chief could make that

10:31  12 ultimate decision based upon the information that he

10:31  13 had regarding to this incident.  And because he was on

10:31  14 probationary status, basically it's at will.

10:32  15     Q.    In the end, it was the chief's decision

10:32  16 alone to terminate John Doe HM, wasn't it?

10:32  17     A.    He would make that decision.  It would go

10:32  18 through the city administrator.

10:32  19     Q.    Who was the city administrator at the time?

10:32  20     A.    Mr. Mark Perkins, P-e-r-k-i-n-s.

10:32  21     Q.    Is he still the city administrator?

10:32  22     A.    Yes, ma'am.

10:32  23     Q.    Do you know how long he's been there?

10:32  24     A.    Probably about six years or so.

10:32  25     Q.    Okay.  Did you ever learn of an incident

| | | |
|---|---|---|
| 10:32 | 1 | involving Crystal Marshall and Officer McIntyre or |
| 10:32 | 2 | McAtee from St. Louis County? |
| 10:32 | 3 | A.   I don't recall anything involving -- no. |
| 10:33 | 4 | MS. RANDLES:  No.  Okay.  All right. I have |
| 10:33 | 5 | nothing further. |
| 10:33 | 6 | CROSS-EXAMINATION |
| 10:33 | 7 | QUESTIONS BY MS. MERKLIN VON KAENEL: |
| 10:33 | 8 | Q.   Hi.  My name is Lorena Merklin von Kaenel. |
| 10:33 | 9 | I represent the defendants that are collectively known |
| 10:33 | 10 | as the St. Louis County defendants.  They include St. |
| 10:33 | 11 | Louis County, itself, Chief Lee, our Chief of Police, |
| 10:33 | 12 | and Police Officers Thomeczek and Lasater.  And I |
| 10:33 | 13 | represent that group.  And I'm going to ask you a |
| 10:33 | 14 | couple of questions, and the same rules apply; if you |
| 10:33 | 15 | don't understand what I'm saying, please ask me to |
| 10:33 | 16 | repeat myself.  Please ask me to slow down if that's |
| 10:33 | 17 | necessary.  And then we'll try not to talk over each |
| 10:33 | 18 | other. |
| 10:33 | 19 | A.   Yes, ma'am. |
| 10:33 | 20 | Q.   And I'm going to try to go back through your |
| 10:33 | 21 | testimony that you gave Miss Randles, so it's going to |
| 10:33 | 22 | sound a little bit jumpy, but I'm going to try to go in |
| 10:34 | 23 | that order. |
| 10:34 | 24 | A.   Yes, ma'am. |
| 10:34 | 25 | Q.   You stated that you had a conversation with |

CAPTAIN DENNIS A. SPOERRY   March 4, 2009   51

| | | |
|---|---|---|
| 10:34 | 1 | Crystal Marshall with respect to the 12/31 of '05 |
| 10:34 | 2 | events? |
| 10:34 | 3 | A.    Yes, ma'am. |
| 10:34 | 4 | Q.    So I'm going to take you back to that |
| 10:34 | 5 | conversation.  And you said -- and if I'm mistaken, |
| 10:34 | 6 | please correct me -- you said that she had expressed |
| 10:34 | 7 | concern for John Doe's HM welfare? |
| 10:34 | 8 | A.    That's what I recall, yes. |
| 10:34 | 9 | Q.    How did she do that, sir? |
| 10:34 | 10 | A.    Because of what had occurred, the incident, |
| 10:34 | 11 | itself -- |
| 10:34 | 12 | Q.    Uh-huh. |
| 10:34 | 13 | A.    -- I believe she was concerned for, you |
| 10:34 | 14 | know, his well-being, his safety.  And it may have been |
| 10:34 | 15 | they were still going together at the time.  That's all |
| 10:34 | 16 | I recall. |
| 10:34 | 17 | Q.    Did she seem upset?  You know, sometimes |
| 10:34 | 18 | when you're worried, you're emotional.  Did she seem -- |
| 10:35 | 19 | A.    I think she -- Yeah, on the phone, I would |
| 10:35 | 20 | say she was probably emotional, yes. |
| 10:35 | 21 | Q.    But an emotion that's consistent with |
| 10:35 | 22 | concern? |
| 10:35 | 23 | A.    Yes, ma'am. |
| 10:35 | 24 | Q.    Okay.  And then later on in your testimony, |
| 10:35 | 25 | we talked -- you spoke about the safety alert that was |

Boyd-Gwinn Reporting

| | | |
|---|---|---|
| 10:35 | 1 | issued -- |
| 10:35 | 2 | A.   Yes. |
| 10:35 | 3 | Q.   -- by Creve Coeur Police Department.  And |
| 10:35 | 4 | that safety alert, to your knowledge, is that simply |
| 10:35 | 5 | internal to the Creve Coeur Police Department? |
| 10:35 | 6 | A.   Yes, ma'am. |
| 10:35 | 7 | Q.   And, to your knowledge, was it generated |
| 10:35 | 8 | anywhere outside the Creve Coeur Police Department? |
| 10:35 | 9 | A.   Not that I'm aware of, no, ma'am. |
| 10:35 | 10 | Q.   And, to your knowledge, do you know -- It |
| 10:35 | 11 | was created by Chief Beardslee, and certain of the |
| 10:35 | 12 | upper command staff? |
| 10:35 | 13 | A.   . Yes, ma'am. |
| 10:35 | 14 | Q.   Was anybody from St. Louis County directly |
| 10:35 | 15 | involved in that alert, if you know? |
| 10:36 | 16 | A.   No. |
| 10:36 | 17 | Q.   And you talked about issuing a safety alert |
| 10:36 | 18 | because you have concerns for safety and for welfare of |
| 10:36 | 19 | your employees. |
| 10:36 | 20 | A.   Yes, ma'am. |
| 10:36 | 21 | Q.   Are there situations where a police |
| 10:36 | 22 | department would -- Explain to me why a police |
| 10:36 | 23 | department would be concerned about the welfare of |
| 10:36 | 24 | their employees with respect to an armed police officer |
| 10:36 | 25 | in this situation alleged to have been suicidal? |

| 10:36 | 1 | A. For that fact, alone. If the officer had |
|---|---|---|
| 10:36 | 2 | been -- It depends upon the time of the occurrence. If |
| 10:36 | 3 | the officer threatened suicide, and came to within the |
| 10:36 | 4 | confines of a police department, or met an officer, and |
| 10:36 | 5 | that officer is aware of it; the officer has to be |
| 10:36 | 6 | concerned if the other officer, the alleged officer, is |
| 10:37 | 7 | armed, and concerned about that person's intentions. |
| 10:37 | 8 | Are they wishing to commit suicide by them self, or do |
| 10:37 | 9 | they want to have suicide by cop? |
| 10:37 | 10 | Q. What does that mean, "suicide by cop"? |
| 10:37 | 11 | A. That's if someone -- If an individual wants |
| 10:37 | 12 | to commit suicide, but for whatever reason, they may |
| 10:37 | 13 | not be able to do it themselves, they may get into a |
| 10:37 | 14 | confrontation with a -- push an officer, become |
| 10:37 | 15 | aggressive with an officer, and, essentially, force |
| 10:37 | 16 | that officer to take some forceful action against them. |
| 10:37 | 17 | Q. Sort of an indirect way of committing |
| 10:37 | 18 | suicide? |
| 10:37 | 19 | A. Yes, ma'am. |
| 10:37 | 20 | Q. And with respect to employees who are either |
| 10:37 | 21 | former employees -- Is it a concern, generally, in our |
| 10:38 | 22 | society with respect to ex-employees? I mean, is that |
| 10:38 | 23 | an independent concern? |
| 10:38 | 24 | MS. RANDLES: Objection. Calls for |
| 10:38 | 25 | speculation. |

|       |    |                                                                          |
|-------|----|--------------------------------------------------------------------------|
| 10:38 | 1  | MS. OWENS:  You may answer.                                               |
| 10:38 | 2  | A.    Yes, ma'am.  I think the term that is used                          |
| 10:38 | 3  | most predominant is "going postal."                                      |
| 10:38 | 4  | Q.    (By Ms. Merklin von Kaenel)  Is that one of                         |
| 10:38 | 5  | the concerns that Creve Coeur had?                                        |
| 10:38 | 6  | A.    I believe so.                                                       |
| 10:38 | 7  | Q.    And, again, I'm jumping, and I apologize,                           |
| 10:38 | 8  | but I'll let you know what we're talking about.  You                      |
| 10:38 | 9  | talked about conversations you had with Crystal                          |
| 10:38 | 10 | Marshall.  If she was an employee at the time, that is                    |
| 10:38 | 11 | between 2004 and 2005, would she have been under your                     |
| 10:38 | 12 | management chain as a dispatcher?                                         |
| 10:38 | 13 | A. . Uh-huh.                                                              |
| 10:38 | 14 | Q.    And so you had daily interactions with her?                         |
| 10:39 | 15 | A.    I may have, yes.                                                    |
| 10:39 | 16 | Q.    With your dispatch staff?                                           |
| 10:39 | 17 | A.    Yes, ma'am.                                                         |
| 10:39 | 18 | Q.    But with her, you may have?                                         |
| 10:39 | 19 | A.    I may have.                                                         |
| 10:39 | 20 | Q.    But are you familiar with her work habits?                          |
| 10:39 | 21 | A.    Yes, ma'am.                                                         |
| 10:39 | 22 | Q.    And you explained some of them to Miss                              |
| 10:39 | 23 | Randles.  In your experience with respect to Miss                         |
| 10:39 | 24 | Marshall, when you managed her, had you had any                           |
| 10:39 | 25 | specific knowledge that she was incredible?                               |

10:39   1          A.    While I worked with her, no, she -- I did

10:39   2    one evaluation on her.

10:39   3          Q.    Uh-huh.

10:39   4          A.    And her -- She was competent at her job,

10:39   5    worked well under stress.  The only problem that I had,

10:39   6    that I saw when I became the commander for that short

10:39   7    period of time down there was just too much hen pecking

10:40   8    and rumor mongering.

10:40   9          Q.    What does hen pecking mean?

10:40  10          A.    One dispatcher may not like another

10:40  11    dispatcher, and may say -- may have some tidbit of

10:40  12    information, true or not true, and they rumormonger.

10:40  13          Q.    Did you have any specific knowledge that

10:40  14    Crystal Marshall was a liar and passing false

10:40  15    information?

10:40  16          A.    No.

10:40  17          Q.    She was just talking about other people?

10:40  18          A.    Yes, ma'am.

10:40  19          Q.    Okay.  And then Miss Randles started talking

10:40  20    to you about situations where it is known that someone

10:40  21    is armed and possibly dangerous.  Do you remember that

10:41  22    conversation?

10:41  23          A.    Yes, ma'am.

10:41  24          Q.    Okay.  And you spoke a little bit about the

10:41  25    appropriateness of drawing a weapon or an officer

10:41  1  drawing a weapon.  In a situation -- and I'm going to

10:41  2  ask you to -- I'm going to give you some facts, and I'm

10:41  3  going to ask you to assume them for purposes of the

10:41  4  question.  Let me just ask you:  You've been a police

10:41  5  officer for 35 years; is that right, close?

10:41  6      A.    Getting close.

10:41  7      Q.    Getting close.  And you've been through the

10:41  8  Academy; is that correct?

10:41  9      A.    Yes, ma'am.

10:41  10      Q.    And you've, throughout your career as a

10:41  11  police officer, you've undergone inservice training?

10:41  12      A.    Yes, ma'am.

10:41  13      Q.  . And that kind of training is for the further

10:41  14  development of yourself as a police officer; is that

10:41  15  correct?

10:41  16      A.    Yes, ma'am.

10:41  17      Q.    And through the Academy, they impart

10:41  18  knowledge with respect to police techniques?

10:41  19      A.    Yes, ma'am.

10:41  20      Q.    The law?

10:41  21      A.    Yes, ma'am.

10:41  22      Q.    And then through your own department, you've

10:42  23  developed an expertise with respect to being a police

10:42  24  officer; is that correct?

10:42  25      A.    Correct.

CAPTAIN DENNIS A. SPOERRY - March 4, 2009

| | | |
|---|---|---|
| 10:42 | 1 | Q. And that's your 35 years of being a patrol |
| 10:42 | 2 | officer, supervisor, captain, and part of the command |
| 10:42 | 3 | staff; is that right? |
| 10:42 | 4 | A. Yes, ma'am. |
| 10:42 | 5 | Q. So with respect to a situation where a |
| 10:42 | 6 | police officer is confronted with a known police |
| 10:42 | 7 | officer with weapons, and it is alleged that he is |
| 10:42 | 8 | suicidal, might it be appropriate to draw a weapon as a |
| 10:42 | 9 | stopping officer in that situation? |
| 10:42 | 10 | A. Yes, ma'am. |
| 10:42 | 11 | Q. And might it also be appropriate, given |
| 10:42 | 12 | those facts, if the -- and the fact is, you're pulling |
| 10:42 | 13 | over a police officer who is known to have weapons, and |
| 10:42 | 14 | you have knowledge that he's suicidal. If that officer |
| 10:42 | 15 | that you're pulling over engages in a maneuver where he |
| 10:43 | 16 | U-turns his car, so it is facing your car, would that |
| 10:43 | 17 | be considered an aggressive maneuver? |
| 10:43 | 18 | A. Yes, ma'am. |
| 10:43 | 19 | Q. And if that officer that you're pulling over |
| 10:43 | 20 | doesn't immediately comply with your command, is that |
| 10:43 | 21 | also a place for concern for you as a stopping officer? |
| 10:43 | 22 | A. Yes, ma'am. |
| 10:43 | 23 | Q. And might those situations, given the |
| 10:43 | 24 | totality of those circumstances, might it be |
| 10:43 | 25 | appropriate to draw a weapon in those circumstances? |

10:43  1        A.    Yes, ma'am.

10:43  2        Q.    And why would it be appropriate in that

10:43  3   circumstance?

10:43  4        A.    Based upon what you just said --

10:43  5        Q.    Yes, sir.

10:43  6        A.    -- when a police officer stops a vehicle,

10:43  7   and they try to maintain behind that vehicle, and

10:43  8   approach the vehicle, generally speaking from the

10:43  9   passenger side, so that they have a better overview of

10:43  10  the person or persons inside the vehicle.  If the

10:44  11  person doesn't stop immediately and comply with those

10:44  12  officer's commands, the officer become more cautious

10:44  13  and suspect.  Again, based upon what you said, if the

10:44  14  driver of the vehicle, as you say, did a U-turn, and

10:44  15  faced you, a couple of things, the vehicle is now --

10:44  16  could be considered a weapon, in itself.  And that

10:44  17  person is now facing you.  And you have less control,

10:44  18  or unable to see as that person exits the vehicle, if

10:44  19  that person should have anything in his or her hand.

10:44  20       Q.    Are all officers taught at the Academy that

10:44  21  the best tactical position is to behind the vehicle you

10:44  22  stop?

10:44  23       A.    Yes, ma'am.

10:44  24       Q.    And would John Doe HM have known that at the

10:44  25  time that he was stopped on 12/31 of '05, having been,

10:44 1 almost a year employee of Creve Coeur Police

10:45 2 Department?

10:45 3     A.    I believe so, yes.

10:45 4     Q.    And with respect to the decisions you make

10:45 5 as a police officer on the scene, is it based on -- is

10:45 6 your guidepost that you consider the totality of the

10:45 7 circumstances?

10:45 8     A.    Yes, ma'am.

10:45 9     Q.    And I'm going to hand you, and I'm going to

10:45 10 ask your lawyer to hand you what has been marked as

10:45 11 Exhibit No. 47.  And these are the exhibits that we've

10:45 12 been using in this deposition in these series of

10:45 13 depositions between Creve Coeur, St. Louis County, and

10:45 14 the plaintiff.

10:45 15     A.    Yes, ma'am.

10:45 16     Q.    And I'm just going to briefly describe the

10:45 17 area.  It's a road that is depicted in the middle of it

10:45 18 is Tesson Ferry Road, or otherwise known as 21?

10:45 19     A.    Yes, ma'am.

10:45 20     Q.    Are you familiar with that road?

10:45 21     A.    Yes, ma'am.

10:45 22     Q.    And what is depicted on the right-most side

10:45 23 is generally the location of 270, although this is not

10:46 24 to scale.

10:46 25     A.    Yes, ma'am.

10:46  1      Q.    And -- I'm sorry.  The way you're looking at

10:46  2  it would be on the left.  I'm sorry.  And what is

10:46  3  marked as an X as been designated as St. Anthony's

10:46  4  Hospital?

10:46  5      A.    Yes, ma'am.

10:46  6      Q.    And then what's circled with an "FB" is a

10:46  7  bank?

10:46  8      A.    (Indicating.)

10:46  9      Q.    And then if you go further down the road of

10:46  10  21 towards the left-hand side of the drawing, there is

10:46  11  a parking lot?

10:46  12      A.    Yes, ma'am.

10:46  13      Q.    And that's depicted as a rectangle?

10:46  14      A.    Yes, ma'am.

10:46  15      Q.    So if I told you that the testimony was that

10:46  16  the person that -- Mr. John Doe HM came into the

10:46  17  parking lot, and turned his car in such a way,

10:46  18  following the curving line that connects to the car

10:46  19  designated as "MH."  If I told you that Mr. John Doe HM

10:46  20  did that maneuver, as a stopping officer would that

10:47  21  give you concern?

10:47  22      A.    Yes, ma'am.

10:47  23      Q.    And why is that, sir?

10:47  24      A.    Well, because -- the officer, or this

10:47  25  person, whoever in this car, as the officer is

| | | |
|---|---|---|
| 10:47 | 1 | approaching, if this vehicle stops, this officer has to |
| 10:47 | 2 | put it into gear, make observations, and all this |
| 10:47 | 3 | person has to do is open the door, and start shooting, |
| 10:47 | 4 | if that person had a weapon. |
| 10:47 | 5 | Q.    And if I give you this fact:  There are no |
| 10:47 | 6 | other cars in this parking lot. |
| 10:47 | 7 | MS. RANDLES:  Objection.  That assumes facts |
| 10:47 | 8 | not in evidence. |
| 10:47 | 9 | Q.    (By Ms. Merklin von Kaenel) I'm going to |
| 10:47 | 10 | give you that fact there are no other cars in this |
| 10:47 | 11 | parking lot.  Would it have been better for Mr. John |
| 10:47 | 12 | Doe HM to have just pulled it straight in to one of the |
| 10:47 | 13 | spots that are sort of roughly designated along the |
| 10:47 | 14 | bottom right of that rectangle? |
| 10:47 | 15 | A.    Yes, ma'am. |
| 10:47 | 16 | Q.    And would that have been a safer position |
| 10:47 | 17 | for the stopping officer? |
| 10:47 | 18 | MS. RANDLES:  Objection.  That was an |
| 10:47 | 19 | improper hypothetical, as it doesn't include all facts |
| 10:48 | 20 | that are in evidence, and it does not include an |
| 10:48 | 21 | appropriate description of the manner in which the |
| 10:48 | 22 | ingress for that particular parking lot is used, as |
| 10:48 | 23 | well as the speed bumps that are going to the parking |
| 10:48 | 24 | lots on the right and the left. |
| 10:48 | 25 | Q.    (By Ms. Merklin von Kaenel)  And then I'm |

Boyd-Gwinn Reporting

10:48  1  going to ask you, with respect to the -- I'm going to

10:48  2  go back -- I'm going to keep going along your

10:48  3  testimony.  You spoke about point-to-point alerts with

10:48  4  Mis Randles.

10:48  5      A.   Yes, ma'am.

10:48  6      Q.   With respect to making a point-to-point

10:48  7  alert, whose decision -- if it's Creve Coeur, whose

10:48  8  decision is it to make the point-to-point alert?

10:48  9      A.   To any agency that may be affected or come

10:48  10 in contact with this person.

10:48  11     Q.   Who within Creve Coeur makes that decision?

10:48  12     A.   Generally, if there is not a commander on,

10:48  13 it would be the sergeant, and they would pass it onto

10:48  14 the dispatcher to make contact.

10:48  15     Q.   So the dispatcher makes that decision in

10:48  16 conjunction with the sergeant?

10:48  17         MS. OWENS:  Objection.  Misstates the

10:48  18 testimony.

10:48  19     Q.   (By Ms. Merklin von Kaenel)  I'm sorry.  The

10:48  20 decision is made by the sergeant who then relates it to

10:49  21 the dispatcher to carry out?

10:49  22     A.   It may also be a police officer who says:

10:49  23 "Will you contact this police department point-to-point

10:49  24 and advise them."

10:49  25     Q.   Is it a changing situation, depending on the

| | | |
|---|---|---|
| 10:49 | 1 | necessity of the action? |
| 10:49 | 2 | A.   It could be very fluid, yes. |
| 10:49 | 3 | Q.   And some of these situations go very |
| 10:49 | 4 | quickly, don't they? |
| 10:49 | 5 | A.   Yes, ma'am. |
| 10:49 | 6 | Q.   And I'm going to go to the chief's decision |
| 10:49 | 7 | to terminate Mr. John Doe HM at this point.  And, |
| 10:49 | 8 | again, if I'm misstating your testimony, correct me |
| 10:49 | 9 | please. |
| 10:49 | 10 | A.   Yes, ma'am. |
| 10:49 | 11 | Q.   And your lawyer certainly will.  The |
| 10:49 | 12 | decision to terminate Mr. John Doe HM is made -- is a |
| 10:49 | 13 | combination of the chief of police, Mr. Beardslee, and |
| 10:49 | 14 | the city administrative, Mr. Mark Perkins; is that |
| 10:49 | 15 | correct? |
| 10:49 | 16 | A.   Yes, ma'am. |
| 10:49 | 17 | Q.   And we just briefly spoke about Exhibit No. |
| 10:50 | 18 | 24, which I'll tell you, it's also another exhibit |
| 10:50 | 19 | we've used in these depositions, and it is the Creve |
| 10:50 | 20 | Coeur Position Statement. |
| 10:50 | 21 | MS. RANDLES:  Is that 29? |
| 10:50 | 22 | Q.   (By Ms. Merklin von Kaenel) To the EEOC. |
| 10:50 | 23 | 29.  I'm sorry.  And I'm going to turn to page -- It's |
| 10:50 | 24 | the fourth physical page, but it would be the second |
| 10:50 | 25 | page of the Statement of Position, the first two pages |

CAPTAIN DENNIS A. SPOERRY   March 17, 2009

| | | |
|---|---|---|
| 10:50 | 1 | are a letter, a cover letter.  And then we get into the |
| 10:50 | 2 | Statement of Position which starts on the third page of |
| 10:50 | 3 | this exhibit.  And then there is the fourth page.  And |
| 10:50 | 4 | at the bottom of the fourth page.  There is a paragraph |
| 10:50 | 5 | that begins, the last paragraph, partial paragraph, |
| 10:50 | 6 | that starts with:  "Upon completion of the |
| 10:50 | 7 | investigation..."  Do you see that, sir? |
| 10:50 | 8 | A.   Yes, ma'am. |
| 10:50 | 9 | Q.   Will you do me a favor.  Can you please read |
| 10:50 | 10 | that paragraph? |
| 10:51 | 11 | A.   Yes, ma'am.  "Upon completion..." |
| 10:51 | 12 | Q.   I'm sorry.  Read it to yourself. |
| 10:51 | 13 | .    MS. RANDLES:  I object to this line of |
| 10:51 | 14 | questioning on the basis of foundation as he has |
| 10:51 | 15 | already testified he has no input into the preparation |
| 10:51 | 16 | of this material. |
| 10:51 | 17 | Q.   (By Ms. Merklin von Kaenel)  You may read |
| 10:51 | 18 | it. |
| 10:51 | 19 | A.   Yes, ma'am.  Yes, ma'am. |
| 10:51 | 20 | Q.   And tell me if this is consistent with your |
| 10:51 | 21 | reading of this:  It essentially says that Mr. John Doe |
| 10:51 | 22 | HM was terminated for the reasons in that paragraph; is |
| 10:52 | 23 | that right? |
| 10:52 | 24 | A.   Yes, ma'am. |
| 10:52 | 25 | Q.   And are those reasons consistent with your |

| | | |
|---|---|---|
| 10:52 | 1 | understanding of why Mr. John Doe HM was fired? |
| 10:52 | 2 | A.    Yes, ma'am. |
| 10:52 | 3 | Q.    And one of those reasons being a violation |
| 10:52 | 4 | of conduct unbecoming an officer, which is the Creve |
| 10:52 | 5 | Coeur SOP 121.02? |
| 10:52 | 6 | A.    Yes, ma'am. |
| 10:52 | 7 | Q.    And that is, 121.02 is a Standard Operating |
| 10:52 | 8 | Procedure for Creve Coeur? |
| 10:52 | 9 | A.    Yes, ma'am. |
| 10:52 | 10 | Q.    And if you're a police officer for Creve |
| 10:52 | 11 | Coeur, that's a term of your employment, you must |
| 10:52 | 12 | follow that; is that correct? |
| 10:52 | 13 | A.    Yes, ma'am. |
| 10:52 | 14 | Q.    And SOP 262.02 C-2, carrying an unauthorized |
| 10:52 | 15 | secondary weapon, is that also Creve Coeur Standard |
| 10:52 | 16 | Operating Procedure? |
| 10:52 | 17 | A.    Yes, ma'am. |
| 10:52 | 18 | Q.    And that is also a term of the police |
| 10:52 | 19 | officer's -- term of his employment with Creve Coeur; |
| 10:52 | 20 | is that correct? |
| 10:52 | 21 | A.    Yes, ma'am. |
| 10:52 | 22 | Q.    And violations of either of these two |
| 10:52 | 23 | subject police officer to discipline; is that correct? |
| 10:52 | 24 | A.    Yes, ma'am. |
| 10:52 | 25 | Q.    And is it your understanding that Mr. John |

| | | |
|---|---|---|
| 10:53 | 1 | Doe HM, one of the reasons he was terminated was |
| 10:53 | 2 | because he was carrying an unauthorized secondary |
| 10:53 | 3 | weapon? |
| 10:53 | 4 | MS. RANDLES:  Objection.  No foundation. |
| 10:53 | 5 | Q.    (By Ms. Merklin von Kaenel) If it's your |
| 10:53 | 6 | understanding? |
| 10:53 | 7 | A.    It is now. |
| 10:53 | 8 | Q.    Had you not known that at the time that you |
| 10:53 | 9 | discussed Mr. John Doe's termination? |
| 10:53 | 10 | A.    I don't recall that. |
| 10:53 | 11 | Q.    But you may have? |
| 10:53 | 12 | A.    It may have.  But I don't recall it. |
| 10:53 | 13 | .Q.    Okay.  And then another -- The third reason |
| 10:53 | 14 | is given toward the end:  "In violation of 121.04 |
| 10:53 | 15 | Standard Operating Procedure, unable to physically or |
| 10:53 | 16 | mentally perform duties."  Is that also another Creve |
| 10:53 | 17 | Coeur Standard Operating Procedure, 121.04? |
| 10:53 | 18 | A.    Yes, ma'am. |
| 10:53 | 19 | Q.    And is that also a term of employment for a |
| 10:53 | 20 | Creve Coeur police officer? |
| 10:53 | 21 | A.    Yes, ma'am. |
| 10:53 | 22 | Q.    And a violation of that Standard Operating |
| 10:53 | 23 | Procedure could subject a police officer of Creve Coeur |
| 10:53 | 24 | to discipline or termination? |
| 10:53 | 25 | A.    Yes, ma'am. |

| | | |
|---|---|---|
| 10:53 | 1 | Q.    And, in fact, any one of these three -- a |
| 10:54 | 2 | violation of any one of these three; 121.02, 262.02 |
| 10:54 | 3 | C-2, and 121.04, a violation of which could subject a |
| 10:54 | 4 | Creve Coeur police officer to discipline and/or |
| 10:54 | 5 | termination? |
| 10:54 | 6 | A.    Yes, ma'am. |
| 10:54 | 7 | Q.    And is it your understanding that in order |
| 10:54 | 8 | to be able to carry a secondary weapon in accordance |
| 10:54 | 9 | with the terms of your employment, a police officer's |
| 10:54 | 10 | employment with Creve Coeur, you must have a weapon |
| 10:54 | 11 | qualified? |
| 10:54 | 12 | A.    Approved. |
| 10:54 | 13 | Q.    Okay.  Is one of the steps getting it |
| 10:54 | 14 | qualified? |
| 10:54 | 15 | A.    Yes, ma'am. |
| 10:54 | 16 | Q.    And this final step is getting it approved, |
| 10:54 | 17 | is that what you're saying? |
| 10:54 | 18 | A.    Yes, ma'am. |
| 10:54 | 19 | Q.    And who approves? |
| 10:54 | 20 | A.    They qualify through with the range officer. |
| 10:54 | 21 | Q.    Uh-huh. |
| 10:54 | 22 | A.    And that information is then presented to |
| 10:55 | 23 | the chief, and it's signed off, and there is an |
| 10:55 | 24 | approved list of secondary weapons. |
| 10:55 | 25 | Q.    So the ultimate decision maker with respect |

| 10:55 | 1 | to whether an officer can carry a secondary, or off |
| 10:55 | 2 | duty weapon, is with the chief? |
| 10:55 | 3 | A. Yes. |
| 10:55 | 4 | Q. And at that time, on December of 2005, that |
| 10:55 | 5 | would have been Chief Beardslee? |
| 10:55 | 6 | A. Yes, ma'am. |
| 10:55 | 7 | Q. And only if you know: Is it your |
| 10:55 | 8 | understanding that that list doesn't come out until |
| 10:55 | 9 | January -- wouldn't have come out until January of 2006 |
| 10:55 | 10 | for that year? |
| 10:55 | 11 | A. At the -- At least, yes. |
| 10:55 | 12 | Q. And what do you mean by "at least"? |
| 10:55 | 13 | . A. Well, sometime in January, maybe even the |
| 10:55 | 14 | first of February, but, generally speaking, it's in |
| 10:55 | 15 | January. |
| 10:55 | 16 | Q. So if you -- And, generally, if you know |
| 10:55 | 17 | this, if you were an officer, and you wanted to qualify |
| 10:55 | 18 | with a weapon in 2005, you probably couldn't get |
| 10:55 | 19 | approval until sometime between mid January to February |
| 10:56 | 20 | of the next -- |
| 10:56 | 21 | A. Correct. |
| 10:56 | 22 | Q. -- of the following year? |
| 10:56 | 23 | A. You would -- If you were a new officer from |
| 10:56 | 24 | another department, and you wanted to carry a secondary |
| 10:56 | 25 | weapon, I believe you're allowed to go through |

Boyd-Gwinn Reporting

| | | |
|---|---|---|
| 10:56 | 1 | qualification on that, and then there would be an |
| 10:56 | 2 | approval, and it would be added to that list. |
| 10:56 | 3 | Q.   Okay.   With respect -- Are you familiar with |
| 10:56 | 4 | Post? |
| 10:56 | 5 | A.   Yes, ma'am. |
| 10:56 | 6 | Q.   And in order to -- if you're a police |
| 10:56 | 7 | officer, does Post qualify you as a police officer? |
| 10:56 | 8 | A.   Certifies you. |
| 10:56 | 9 | Q.   Certifies.   And how do you become certified |
| 10:56 | 10 | with Post? |
| 10:56 | 11 | A.   Completion of Academy, and receiving a |
| 10:57 | 12 | certification through the Academy to the state. |
| 10:57 | 13 | Q.   And the decision to certify or decertify is |
| 10:57 | 14 | with Post; is that correct? |
| 10:57 | 15 | A.   It's my understanding, yes. |
| 10:57 | 16 | Q.   Are you familiar with the Creve Coeur |
| 10:57 | 17 | Post -- excuse the double use of the word -- posting |
| 10:57 | 18 | with respect to Post in relation to Mr. John Doe HM; |
| 10:57 | 19 | are you familiar with, that Creve Coeur had given Post |
| 10:57 | 20 | some information with respect to Mr. John Doe HM? |
| 10:57 | 21 | A.   No. |
| 10:57 | 22 | MS. MERKLIN VON KAENEL:   I have nothing |
| 10:58 | 23 | further.   Thank you very much. |
| 10:58 | 24 | CROSS-EXAMINATION |
| 10:58 | 25 | QUESTIONS BY MS. OWENS: |

Boyd-Gwinn Reporting

CAPTAIN DENNIS A. SPOERRY  March 4, 2009

10:58  1      Q.    I just have one question for you.

10:58  2      A.    Yes, ma'am.

10:58  3      Q.    If the St. Louis County Police report

10:58  4  indicated that Mr. John Doe HM on 12/31, at the time

10:58  5  that he was pulled over was carrying on his person a

10:58  6  Walther PPK, and that Walther PPK was not on the prior

10:58  7  year's approved list, and the approved list for the

10:58  8  2005 qualification time period had not yet come out,

10:58  9  was he authorized to carry that weapon?

10:59  10     A.    No, ma'am.

10:59  11           MS. OWENS:  I have nothing further.

10:59  12                 REDIRECT EXAMINATION

10:59  13  QUESTIONS BY MS. RANDLES:

10:59  14     Q.    I have some follow-up with regard to some of

10:59  15  the things that Lorena was asking you.

10:59  16     A.    Yes.

10:59  17     Q.    First of all, are you familiar with the

10:59  18  parking lot in question at Tesson Ferry Road?

10:59  19     A.    No.

10:59  20     Q.    No.  So the only thing you were basing your

10:59  21  testimony on is a sketch that was made during the

10:59  22  course of a deposition; correct?

10:59  23     A.    What's in front of me, yes, ma'am.

10:59  24     Q.    So you have no idea as to how wide that

10:59  25  parking lot is; is that correct?

CAPTAIN DENNIS A. SPOERRY March 4, 2009

| | | |
|---|---|---|
| 10:59 | 1 | A.    No, ma'am. |
| 10:59 | 2 | Q.    And you have no idea how long it is? |
| 10:59 | 3 | A.    No, ma'am. |
| 10:59 | 4 | Q.    And you have no idea as to where the parking |
| 10:59 | 5 | spaces are in relation to any building that's there? |
| 10:59 | 6 | A.    No, ma'am. |
| 10:59 | 7 | Q.    And you have no idea as to where the trees |
| 10:59 | 8 | are located in that parking lot? |
| 10:59 | 9 | A.    No, ma'am. |
| 10:59 | 10 | Q.    And you have no idea where vehicles may have |
| 10:59 | 11 | been parked in that parking lot? |
| 10:59 | 12 | A.    No, ma'am. |
| 10:59 | 13 | Q.    You have no idea whether or not that parking |
| 10:59 | 14 | lot is wide enough to do a U-turn in? |
| 10:59 | 15 | A.    No, ma'am. |
| 11:00 | 16 | Q.    And you have no idea whether there is a |
| 11:00 | 17 | second way to get in or out of that parking lot based |
| 11:00 | 18 | upon that drawing; is that correct? |
| 11:00 | 19 | A.    Is there a what?  I'm sorry. |
| 11:00 | 20 | Q.    A second way to get in or out of that |
| 11:00 | 21 | parking lot based on that drawing? |
| 11:00 | 22 | A.    No, ma'am. |
| 11:00 | 23 | Q.    So the only thing you could discern from |
| 11:00 | 24 | that drawing was what had been said at a previous |
| 11:00 | 25 | deposition concerning how the cars were brought in; |

Boyd-Gwinn Reporting

CAPTAIN DENNIS A. SPOERRY - MARCH 4, 2009

11:00  1    correct?

11:00  2         A.    The only thing I could determine is what's

11:00  3    in front of me, ma'am.

11:00  4         Q.    Okay.  Now, let's look for a minute at

11:00  5    what's in front of you and make some assumptions.  And

11:00  6    then based on those assumptions, I'll ask you some

11:00  7    testimony about them.  First, let's assume that because

11:00  8    the testimony has been that John Doe HM was on the

11:00  9    telephone with his wife when he saw Officer Thomeczek

11:00  10   see him before Officer Thomeczek turned on his sirens

11:00  11   or lights.  Okay?

11:00  12        A.    All right.

11:00  13        Q.    And at the point in time that he saw him, he

11:00  14   asked his wife if she had called the police.  Okay.

11:01  15        A.    Okay.

11:01  16        Q.    And at that moment, he pulled up from the

11:01  17   stoplight that was there by the First Bank, and it

11:01  18   immediately made a left into the parking lot, and at

11:01  19   this point in time, let's assume that Officer Thomeczek

11:01  20   had not turned on his lights or siren.  Okay.  And then

11:01  21   he made a left-hand turn into the parking lot.  Let's

11:01  22   also assume over on the right is a closed -- it used to

11:01  23   be a Wendy's, it's now a Taco Bell.  At that point in

11:01  24   time, it was closed.  And going left was where the

11:01  25   building would be that had no construction and no

Boyd-Gwinn Reporting

| | | |
|---|---|---|
| 11:01 | 1 | impairment to the parking lot.  Can you make that |
| 11:01 | 2 | assumption? |
| 11:01 | 3 | A.  Okay. |
| 11:01 | 4 | Q.  And that there are speed bumps along, that |
| 11:01 | 5 | you have to pull into, and cross over as you turn into |
| 11:01 | 6 | the left, one of those big wide ones.  Can we make that |
| 11:01 | 7 | assumption as well? |
| 11:01 | 8 | A.  Okay. |
| 11:01 | 9 | Q.  If you make that assumption, that there is a |
| 11:01 | 10 | wide speed bump, and a tree that you have to pull into |
| 11:01 | 11 | and go around, would it make more sense to pull into a |
| 11:02 | 12 | parking space to the left than it would to the right? |
| 11:02 | 13 | A.  May I ask a question? |
| 11:02 | 14 | Q.  Sure. |
| 11:02 | 15 | A.  What time did this occur? |
| 11:02 | 16 | Q.  At 1:00 o'clock in the afternoon. |
| 11:02 | 17 | A.  And he pulled in, and you're saying there |
| 11:02 | 18 | are speed bumps here, or here? |
| 11:02 | 19 | Q.  Yes.  There is a wide speed bump. |
| 11:02 | 20 | A.  Right here? |
| 11:02 | 21 | Q.  Right to the -- The entrance is actually a |
| 11:02 | 22 | road between two parking lots. |
| 11:02 | 23 | MS. OWENS:  I'm going to object.  It assumes |
| 11:02 | 24 | facts not in evidence.  So based on her assumption. |
| 11:02 | 25 | Q.  (By Ms. Randles)  Based upon the assumption |

11:02  1  that that entrance is a road between two parking lots.

11:02  2      A.   Okay.

11:02  3      Q.   And if you were to continue straight on down

11:02  4  that road, this may make -- Are you familiar with the

11:02  5  road between two parking lots, and you pull straight on

11:02  6  down, and there is a like a LaPetite Academy, or a

11:02  7  child daycare center back there, right on Tesson Ferry?

11:03  8      A.   I'm not familiar with it.

11:03  9      Q.   Okay.  Let's make the assumption that Mr.

11:03  10  John Doe HM pulls in, goes to the left, across the

11:03  11  speed bump, around the tree, and then is pulling toward

11:03  12  a parking spot.  Assume then that Officer Thomeczek

11:03  13  pulls in after him, but instead of following him, takes

11:03  14  a move to cut him off.  In that situation, would that

11:03  15  be considered appropriate tactical moves for Officer

11:03  16  Thomeczek to make?

11:03  17      A.   To cut him off?

11:03  18      Q.   Yes.

11:03  19      A.   I wouldn't have done it.

11:03  20      Q.   And why not?

11:03  21      A.   I'd still want to remain behind the subject.

11:03  22      Q.   And in the situation where the police

11:03  23  officer is following the subject, isn't it the police

11:03  24  officer's duty to remain behind the vehicle; is that

11:03  25  correct?

CAPTAIN DENNIS A. SPOERRY - March 17, 2009

11:03   1        A.    It depends upon the totality of the

11:03   2    circumstances.

11:03   3        Q.    Okay.

11:03   4        A.    And if there -- Well, if there was a reason

11:04   5    to believe that this person could have harmed anyone in

11:04   6    here, then the officer could have taken more aggressive

11:04   7    action.  Based upon what you said, I would want to

11:04   8    remain behind the vehicle.

11:04   9        Q.    Okay.  And, in fact, failing to maintain

11:04  10    your distance behind the vehicle, where it was possible

11:04  11    to do so, could cause an officer to be disciplined,

11:04  12    could it not, or reprimanded?

11:04  13        A.    Say that again.

11:04  14        Q.    If an officer engages in activity that is

11:04  15    unsafe for that officer in a stop, then that officer

11:04  16    could be reprimanded for that activity; correct?

11:04  17             MS. MERKLIN VON KAENEL:  I'm going to object

11:04  18    only insofar as you know with respect to your rules;

11:04  19    Creve Coeur rules.

11:04  20        A.    If the officer did something that was

11:04  21    harmful to --

11:04  22        Q.    (By Ms. Randles)  Where he didn't maintain

11:04  23    his own safety during the course of the stop, where it

11:05  24    was possible to do so, then that officer could be

11:05  25    reprimanded; correct?

| | | |
|---|---|---|
| 11:05 | 1 | A. He could be. |
| 11:05 | 2 | Q. Now, the safety alert, you indicated the |
| 11:05 | 3 | safety alert is supposed to be internal only; is that |
| 11:05 | 4 | correct? |
| 11:05 | 5 | A. Yes, ma'am. |
| 11:05 | 6 | Q. Do you know if it was disseminated to the |
| 11:05 | 7 | Olivette Police Department? |
| 11:05 | 8 | A. No, I don't. |
| 11:05 | 9 | Q. If it were disseminated to the Olivette |
| 11:05 | 10 | Police Department, would that be a violation of |
| 11:05 | 11 | Standard Operating Procedures concerning a safety alert |
| 11:05 | 12 | for an employee? |
| 11:05 | 13 | A. I believe that was with respect to the city |
| 11:05 | 14 | of Creve Coeur. If there was any other information |
| 11:05 | 15 | passed onto the other department, it would have to do |
| 11:05 | 16 | with the safety of the officers of that police |
| 11:05 | 17 | department. |
| 11:05 | 18 | Q. Okay. Now, do you have relatives on the |
| 11:05 | 19 | force at Arnold? |
| 11:05 | 20 | A. Do I? |
| 11:05 | 21 | Q. Yes. |
| 11:06 | 22 | A. No. |
| 11:06 | 23 | Q. Do you have relatives in other area police |
| 11:06 | 24 | forces? |
| 11:06 | 25 | A. I have -- I think he's still there. I have |

| | | |
|---|---|---|
| 11:06 | 1 | a cousin that is a St. Louis City police officer. |
| 11:06 | 2 | Q.    Do you know if he knows what happened with |
| 11:06 | 3 | regard to John Doe HM on the night of 12/31 of '05? |
| 11:06 | 4 | A.    No. |
| 11:06 | 5 | Q.    You don't know? |
| 11:06 | 6 | A.    I don't know. |
| 11:06 | 7 | Q.    Now, if someone -- If your cousin informally |
| 11:06 | 8 | approached you about John Doe HM and his termination, |
| 11:06 | 9 | what would you tell him? |
| 11:06 | 10 | A.    Nothing. |
| 11:06 | 11 | Q.    Okay.  If he said, "Hey, should we hire this |
| 11:06 | 12 | guy?"  What would you tell him? |
| 11:06 | 13 | A.    Nothing.          . |
| 11:06 | 14 | Q.    And why is that? |
| 11:06 | 15 | A.    It's not my position to tell him anything. |
| 11:06 | 16 | Q.    Is there a particular procedure, a policy, |
| 11:06 | 17 | that Creve Coeur has with regard to -- |
| 11:06 | 18 | A.    If you had -- If someone was applying with |
| 11:06 | 19 | whatever department, normal practices are that you |
| 11:06 | 20 | would contact the chief of police of that department to |
| 11:06 | 21 | obtain information from that person. |
| 11:07 | 22 | Q.    And do you ever receive information from |
| 11:07 | 23 | another department concerning an officer that does not |
| 11:07 | 24 | come directly from the police chief, that is informal |
| 11:07 | 25 | in nature? |

Boyd-Gwinn Reporting

| | | |
|---|---|---|
| 11:07 | 1 | A. Do you hear things, you mean? |
| 11:07 | 2 | Q. Sure. |
| 11:07 | 3 | A. Yes. |
| 11:07 | 4 | Q. And with regard to John Doe HM since 12/31 |
| 11:07 | 5 | of '05, have you heard anything negative concerning |
| 11:07 | 6 | him? |
| 11:07 | 7 | A. No. |
| 11:07 | 8 | Q. To your knowledge, has anyone from Creve |
| 11:07 | 9 | Coeur imparted negative information concerning John Doe |
| 11:07 | 10 | HM? |
| 11:07 | 11 | A. To another agency? |
| 11:07 | 12 | Q. Yes. |
| ·11:07 | 13 | A. No. |
| 11:07 | 14 | Q. And your knowledge would just be based |
| 11:07 | 15 | upon -- you've never transmitted negative information |
| 11:07 | 16 | concerning John Doe HM; correct? |
| 11:07 | 17 | A. Correct. |
| 11:07 | 18 | Q. I'm going to hand you what has previously |
| 11:07 | 19 | been marked as Exhibit 30. Have you seen that document |
| 11:07 | 20 | before? |
| 11:08 | 21 | A. No. |
| 11:08 | 22 | Q. Did you have any input into any of the |
| 11:08 | 23 | information that was transmitted to Post? |
| 11:08 | 24 | A. No. |
| 11:08 | 25 | Q. When you were in charge of investigations, |

CAPTAIN DENNIS A. SPOERRY  March 4, 2009

11:08 1  you used to do some of the background checks to some of

11:08 2  the individuals who were applying to the police force;

11:08 3  didn't you?

11:08 4      A.   Yes.

11:08 5      Q.   Did you check Post when they were doing

11:08 6  those applications?

11:08 7      A.   If they -- Yeah, to see if there was any

11:08 8  kind of violations.

11:08 9      Q.   Okay.  Now, if you had received that Post

11:08 10 concerning any applicant to Creve Coeur Police

11:08 11 Department, would you have considered him an

11:08 12 appropriate applicant?

11:08 13     A.   It would bring into question.  I'd have to

11:08 14 question it.

11:08 15     Q.   Okay.  And if you had -- When you filled a

11:09 16 job, approximately --

11:09 17     Is there an average number of applications you

11:09 18 receive for any of the positions that you fill as

11:09 19 police officer?

11:09 20     A.   It depends upon -- It depends upon the time,

11:09 21 and it's been anywhere between 3 to 4, to tens.

11:09 22     Q.   If you were in a situation where you were

11:09 23 looking at having tens of applications, would the

11:09 24 information found on Post on this application

11:09 25 automatically disqualify the individual from your

| | | |
|---|---|---|
| 11:09 | 1 | consideration? |
| 11:09 | 2 | A. It would bring bearing upon it. |
| 11:09 | 3 | Q. Okay. Would you go ahead and interview that |
| 11:09 | 4 | individual if you received that information from Post? |
| 11:09 | 5 | A. Again -- Well, depending upon how many |
| 11:09 | 6 | applicants. |
| 11:09 | 7 | Q. Assuming that you had tens of applicants for |
| 11:09 | 8 | the position that was being filled. |
| 11:09 | 9 | A. In my opinion, I probably wouldn't consider |
| 11:10 | 10 | it. |
| 11:10 | 11 | Q. Okay. And if you had 3 or 4 applicants for |
| 11:10 | 12 | a single position, would that information on Post |
| 11:10 | 13 | disqualify the applicant? |
| 11:10 | 14 | A. Again, it would be considered. You would |
| 11:10 | 15 | want to know why. |
| 11:10 | 16 | Q. Uh-huh. Okay. |
| 11:10 | 17 | A. I would. |
| 11:10 | 18 | Q. Is that one of those automatic culls? You |
| 11:10 | 19 | know, occasionally you see something on an application, |
| 11:10 | 20 | hup, can't have this guy, automatic cull; is that |
| 11:10 | 21 | information something that you would consider an |
| 11:10 | 22 | automatic cull? |
| 11:10 | 23 | A. I would want to call and find out more. |
| 11:10 | 24 | MS. OWENS: Are you saying cull or call? |
| 11:10 | 25 | MS. RANDLES: Cull, c-u-l-l. |

Boyd-Gwinn Reporting

| | |
|---|---|
| 11:10 | 1 |
| 11:10 | 2 |
| 11:10 | 3 |
| 11:10 | 4 |
| 11:10 | 5 |
| 11:10 | 6 |
| 11:10 | 7 |
| 11:10 | 8 |
| 11:10 | 9 |
| 11:10 | 10 |
| 11:10 | 11 |
| 11:11 | 12 |
| 11:11 | 13 |
| 11:11 | 14 |
| 11:11 | 15 |
| 11:11 | 16 |
| 11:11 | 17 |
| 11:11 | 18 |
| 11:11 | 19 |
| 11:11 | 20 |
| 11:11 | 21 |
| 11:11 | 22 |
| 11:11 | 23 |
| 11:11 | 24 |
| 11:11 | 25 |

MS. OWENS: He said call. We need to clarify that then. Can you tell me what you meant by cull?

Q. (By Ms. Randles) Sure. Some Human Resources people have what the call the C pile, and that is when they get applications in, those that go to the C pile are the culls, the ones that they know they aren't going to do anything with. If you had this Post information come in, in a situation where you had three, maybe four applicants for a single job, would that Post information move the resume' to the automatic cull pile for you?

A. Again, I would want to know more information. Not necessarily.

Q. Okay.

A. I think we try to give everyone an equal opportunity to try to determine the circumstances involving everything.

Q. Okay. Considering -- Well, never mind. With regard to Crystal Marshall, Miss Von Kaenel asked you: "So the real problem was that Crystal Marshall talked about people, correct?" Do you recall that question?

A. Among others, yes, ma'am.

Q. Now, isn't it true that one of the issues

| 11:11 | 1 | that you had was the problem that she would impact |
| 11:11 | 2 | information not knowing whether it was true? |
| 11:11 | 3 | A.   Yes, ma'am. |
| 11:11 | 4 | Q.   With regard to report writing, if an officer |
| 11:11 | 5 | draws his weapon, is that supposed to appear in the |
| 11:12 | 6 | report? |
| 11:12 | 7 | A.   On the Creve Coeur Police Department, if an |
| 11:12 | 8 | officer draws the weapon, and they point the weapon at |
| 11:12 | 9 | someone on the Creve Coeur Police Department, that's |
| 11:12 | 10 | considered Use of Force Report. |
| 11:12 | 11 | Q.   Okay.  And so is that a separate report, or |
| 11:12 | 12 | is that part of the report of the incident? |
| 11:12 | 13 | A.   It's a separate report. |
| 11:12 | 14 | Q.   And in part of the incident report, does it |
| 11:12 | 15 | also -- is it also supposed to clarify that I drew my |
| 11:12 | 16 | weapon, or a weapon was drawn? |
| 11:12 | 17 | A.   Yes. |
| 11:12 | 18 | Q.   So it should appear in two places if a |
| 11:12 | 19 | weapon was actually drawn; on a Force Report, and on |
| 11:12 | 20 | the actual Incident Report for Creve Coeur Police |
| 11:12 | 21 | Department? |
| 11:12 | 22 | A.   Yes, ma'am. |
| 11:12 | 23 | Q.   Now, Miss Von Kaenel also asked you about |
| 11:13 | 24 | SOPs; SOP 262.02, SOP 121.01, and SOP 121.04, |
| 11:13 | 25 | concerning -- that were found in Exhibit 29, which was |

CAPTAIN DENNIS A. SPOERRY  March 4/31/2009

11:13  1  the Position Statement for Creve Coeur.  Now, as I

11:13  2  understand it, you did not have any part of conducting

11:13  3  any investigation into whether or not John Doe HM, for

11:13  4  example, engaged in contact unbecoming an officer that

11:13  5  night; correct?

11:13  6       A.    Correct.

11:13  7       Q.    And you did not conduct any investigation

11:13  8  into whether or not John Doe HM was mentally able to

11:13  9  perform his duties; is that correct?

11:13 10       A.    Correct.

11:13 11       Q.    And you also did not conduct the

11:13 12  investigation into whether or not John Doe HM was

11:13 13  carrying an unauthorized secondary weapon; correct?

11:13 14       A.    Correct.

11:13 15       Q.    In fact, you had no independent knowledge of

11:13 16  any of those things; correct?

11:13 17       A.    Correct.

11:14 18            MS. RANDLES:  I have no further questions.

11:14 19                  RECROSS-EXAMINATION

11:14 20  QUESTIONS BY MS. MERKLIN VON KAENEL:

11:14 21       Q.    I have one question.

11:14 22       A.    Yes, ma'am.

11:14 23       Q.    We talked about the totality of

11:14 24  circumstances.  And with respect to every situation a

11:14 25  police officer encounters, what the police officer does

Boyd-Gwinn Reporting

11:14  1  or doesn't do is based on the totality of

11:14  2  circumstances, is that correct?

11:14  3       A.    Yes, ma'am.

11:14  4       Q.    And each situation that a police officer

11:14  5  encounters is fluid with its own -- it can change at

11:14  6  any moment; is that right?

11:14  7       A.    Yes, ma'am.

11:14  8       Q.    Is there -- and Miss Randles gave you a

11:14  9  couple of facts with respect to that Exhibit No. 47,

11:14  10  that drawing.  And I gave you that facts about that

11:14  11  exhibit as well.  Is there a situation where you would

11:14  12  want to contain, or stop some person exiting, if you

11:15  13  know the person is suicidal, has two weapons, is

11:15  14  driving a vehicle, and is a trained police officer?  Is

11:15  15  there a situation where you might want to contain him

11:15  16  from going anywhere else?

11:15  17       A.    If I were considering the totality of the

11:15  18  circumstances, the officer is looking at the area that

11:15  19  they're in, looking at people that could be in the

11:15  20  area, could be exposed to this, also looking at

11:15  21  expressions, body language, even in a vehicle, taking

11:15  22  all that into consideration, and trying to make a very

11:15  23  quick decision, split second decision, what would be

11:15  24  the best way to stop or alter the person's further

11:15  25  actions.

11:15  1          MS. MERKLIN VON KAENEL:  Okay.  Thanks.

11:16  2  Nothing further.

11:16  3                    RECROSS-EXAMINATION

11:16  4  QUESTIONS BY MS. OWENS:

11:16  5      Q.   I have one quick question.  Miss Randles

11:16  6  asked you some questions with regard to the Post

11:16  7  notice, and how that would affect your decision making

11:16  8  with regard to hiring.  Do you have any knowledge, how

11:16  9  that would affect any other jurisdiction's decision

11:16  10 making with regard to hiring?

11:16  11     A.   No, ma'am.

11:16  12     Q.   And are you aware of any, or have you been

11:16  13 notified of any positions at other jurisdictions that

11:16  14 Mr. John Doe HM has applied for?

11:16  15     A.   No, ma'am.

11:16  16          MS. OWENS:  Nothing further.

11:16  17          MS. RANDLES:  I have nothing further.

11:16  18          MS. OWENS:  We'll read.

19

20

21

22

23

24

25

Boyd-Gwinn Reporting

Boyd-Gwinn Reporting
Registered Professional Reporters
P. O. Box 190601
St. Louis, MO 63119
314.918.8265 * FAX 314.918.0429

---------------------------------------------------------

March 12, 2009


Stacie A. Owens, Attorney at Law
Sandberg Phoenix & von Gontard, L.L.C.
One City Centre
Suite 1500
Saint Louis, Missouri 63101


In re:  JOHN DOE HM, an individual vs. CITY OF CREVE
COEUR, MISSOURI, and JOHN BEARDSLEE, Individually and in
his Official Capacity as Police Chief in the Creve Coeur
Police Department, et al.

Dear Ms. Owens:

     Please find enclosed a copy of Captain Dennis A.
Spoerry's deposition given on March 4, 2009.  Please have
Captain Spoerry read your copy of the deposition, and
indicate any changes and/or corrections on the enclosed
correction sheet, the page number, how it should read, and
the reason for the change; i.e., typographical error,
misspelled.

     Also please find enclosed the original signature page
to be signed before a Notary Public.  Any used correction
sheets should also be signed.

     Please return the original notarized signature page
to Rebecca M. Randles, Attorney at Law, with a copy to the
attorneys of record, and to this office, as well as each
correction sheet completed, as soon as possible.


Kind regards,



Catherine E. Boyd, CCR, RPR, IL-CSR

cc: Rebecca M. Randles, Attorney at Law
    Lorena V. Merklin von Kaenel, Attorney at Law

1 | State of Missouri          )
   |                           ) SS
2 | County of St. Louis       )

3

4 |        SIGNATURE OF CAPTAIN DENNIS A. SPOERRY

5 |     I, CAPTAIN DENNIS A. SPOERRY do hereby certify:
   | That I have read the foregoing deposition;
6 |     That I have made such changes in form and/or
   | substance within the deposition as might be necessary
7 | to render the same true and correct;
   |     That having made such changes thereon, I hereby
8 | subscribe my name to the deposition.
   |     I declare under penalty of perjury that the
9 | foregoing is true and correct.
   |     Executed this _____ day of
10 | _____, 2009.

11

   |      _____.
12 |          CAPTAIN DENNIS A. SPOERRY

13 | My Commission Expires:

14 | Notary Public:
   | Signature page sent to:    Stacie A. Owens, Attorney at
15 | Law

16 | REPORTER:  Catherine E. Boyd, CCR, RPR, IL-CSR

17 | DEPONENT:  CAPTAIN DENNIS A. SPOERRY
   | JOHN DOE HM, an individual vs. CITY OF CREVE COEUR,
18 | MISSOURI, and JOHN BEARDSLEE, Individually and in his
   | Official Capacity as Police Chief in the Creve Coeur
19 | Police Department, et al.
   | Cause No. 4:07CV00946 ERW
20
   | March 4, 2009
21

22

23

24

25

CAPTAIN DENNIS A. SPOERRY   March 7, 2009

CAPTAIN DENNIS A. SPOERRY

DEPOSITION CORRECTION SHEET

IN RE:  JOHN DOE HM, an individual vs. CITY OF CREVE COEUR, MISSOURI, and JOHN BEARDSLEE, Individually and in his Official Capacity as Police Chief in the Creve Coeur Police Department, et al.

Upon reading the deposition and before subscribing thereto the deponent indicated the following changes should be made:

Page   Line      Should read:

   REASON ASSIGNED FOR CHANGE:

Page   Line      Should read:

   REASON ASSIGNED FOR CHANGE:

Page   Line      Should read:

   REASON ASSIGNED FOR CHANGE:

Page   Line      Should read:

   REASON ASSIGNED FOR CHANGE:
Page   Line      Should read:

   REASON ASSIGNED FOR CHANGE:

Page   Line      Should read:

   REASON ASSIGNED FOR CHANGE:
Page   Line      Should read:

   REASON ASSIGNED FOR CHANGE:

Page   Line      Should read:

   REASON ASSIGNED FOR CHANGE:

_____

CAPTAIN DENNIS A. SPOERRY

CAPTAIN DENNIS A. SPOERRY   March 12, 2009

```
 1   STATE OF MISSOURI        )
                              ) SS
 2   COUNTY OF ST. LOUIS      )

 3        I, Catherine E. Boyd, a Certified Court Reporter,
 4   within and for the State of Missouri, #0233, Registered
     Professional Reporter, and Certified Shorthand Reporter
 5   within and for the State of Illinois, do hereby certify
     that pursuant to notice between counsel, there came
 6   before me at the offices of Sandberg, Phoenix & von
     Gontard, One City centre, Saint Louis, Missouri,
 7
              CAPTAIN DENNIS A. SPOERRY
 8
     a witness of lawful age, who was by me first duly sworn
 9   to testify to the whole truth touching and concerning
     the matters in controversy therein; that the witness
10   was examined, and said examination was reduced to
     shorthand by me on that day, between the aforesaid, and
11   later transcribed into computer-assisted transcription
     under my supervision, that it is a true record of the
12   testimony given by the witness, and now is herewith
     returned.
13
     I further certify that I am neither attorney, nor
14   counsel for, nor related to, nor employed by any of the
     parties to the action in which this deposition is
15   taken; and further, that I am not a relative or
     employee of any attorney, or employed by the parties
16   hereto, or financially interested in the action.

17        IN WITNESS WHEREOF, I have hereunto set my hand on
     March 12, 2009.
18

19

20

21        _____
          Catherine E. Boyd, CCR # 233, RPR
22        Certified Court Reporter within and for the
                  State of Missouri.

23

24

25
```

# #

**#0233** [2] - 3:16, 89:4

# '

**'05** [16] - 21:10, 42:2, 43:4, 46:14, 46:18, 46:23, 46:25, 47:3, 47:5, 47:8, 47:16, 47:19, 51:1, 58:25, 77:3, 78:5
**'06** [1] - 21:10
**'97** [1] - 12:17
**'98** [1] - 12:17

# 1

**11:16** [1] - 3:14
**12** [1] - 86:4, 89:17
**12/31** [18] - 30:20, 42:2, 43:4, 46:14, 46:18, 46:23, 46:25, 47:3, 47:5, 47:8, 47:16, 47:19, 48:17, 51:1, 58:25, 70:4, 77:3, 78:4
**12/31/05** [1] - 40:20
**121.01** [1] - 82:24
**121.02** [3] - 65:5, 65:7, 67:2
**121.04** [4] - 66:14, 66:17, 67:3, 82:24
**1500** [2] - 2:17, 86:7
**15th** [2] - 3:15, 10:13
**190601** [2] - 1:20, 86:2
**1974** [2] - 7:24, 13:5
**1997** [1] - 13:7
**1999** [1] - 9:20
**1:00** [1] - 73:16

# 2

**2001** [3] - 9:20, 11:16, 12:6
**2004** [3] - 10:24, 11:8, 54:11
**2005** [14] - 10:4, 10:21, 10:24, 11:1, 11:8, 11:9, 25:2, 25:7, 45:15, 54:11, 68:4, 68:18, 70:8
**2006** [4] - 10:5, 10:6, 10:21, 68:9
**2008** [3] - 10:3, 10:6, 11:1
**2009** [7] - 1:16, 3:13, 86:4, 86:13, 87:10,

87:20, 89:17
**21** [2] - 59:18, 60:10
**233** [1] - 89:21
**24** [3] - 2:8, 35:16, 63:18
**262.02** [3] - 65:14, 67:2, 82:24
**270** [1] - 59:23
**29** [4] - 2:10, 63:21, 63:23, 82:25

# 3

**3** [2] - 79:21, 80:11
**30** [2] - 2:9, 78:19
**314.918.0429** [2] - 1:21, 86:3
**314.918.8265** [2] - 1:21, 86:3
**31st** [3] - 25:7, 45:14, 48:21
**34th** [1] - 2:13
**35** [3] - 2:8, 56:5, 57:1

# 4

**4** [7] - 1:16, 2:1, 3:13, 79:21, 80:11, 86:13, 87:20
**406** [1] - 2:13
**41** [1] - 2:21
**47** [3] - 2:9, 59:11, 84:9
**4:07CV00946** [3] - 1:5, 3:6, 87:19

# 5

**50** [1] - 2:2
**59** [1] - 2:9

# 6

**623** [1] - 2:13
**63101** [2] - 2:18, 86:8
**63105** [1] - 2:22
**63119** [2] - 1:20, 86:2
**64111** [1] - 2:14
**69** [1] - 2:3

# 7

**70** [1] - 2:4
**78** [1] - 2:9

# 8

**80s** [1] - 8:19
**82** [1] - 2:10
**83** [1] - 2:5
**85** [1] - 2:6

# 9

**9:11** [2] - 3:14, 4:5

# A

**a.m** [1] - 4:5
**ability** [2] - 6:23, 22:22
**able** [5] - 15:19, 20:17, 53:13, 67:8, 83:8
**Absolutely** [1] - 4:22
**abuse** [2] - 36:4, 46:3
**Academy** [12] - 7:20, 7:22, 7:23, 7:25, 8:11, 8:13, 56:8, 56:17, 58:20, 69:11, 69:12, 74:6
**accordance** [1] - 67:8
**accurate** [2] - 19:16, 27:23
**action** [5] - 53:16, 63:1, 75:7, 89:14, 89:16
**actions** [2] - 20:22, 84:25
**activity** - 75:14, 75:16
**actual** [1] - 17:7, 82:20
**added** [1] - 69:2
**admin** [3] - 16:8, 16:10, 17:21
**Admin** [1] - 8:22
**Administrative** [3] - 9:25, 10:22, 19:24
**administrative** [4] - 9:1, 16:17, 21:8, 63:14
**administrator** [3] - 49:18, 49:19, 49:21
**advise** [1] - 62:24
**advised** [2] - 30:14, 38:6
**advising** [1] - 30:17
**Affairs** [1] - 9:11
**affect** [2] - 85:7, 85:9
**affected** [1] - 62:9
**aforesaid** [1] - 89:10

**afternoon** [1] - 73:16
**afterwards** [1] - 4:3
**age** [2] - 4:8, 89:8
**agencies** [1] - 40:17
**agency** [4] - 26:12, 40:14, 62:9, 78:11
**aggressive** [3] - 53:15, 57:17, 75:6
**ago** [1] - 8:19
**AGREED** [1] - 4:1
**agreement** [1] - 39:16
**ahead** [5] - 4:19, 5:14, 27:17, 29:21, 80:3
**aide** [4] - 16:8, 16:10, 16:17, 17:21
**al** [7] - 1:10, 2:20, 3:11, 3:20, 86:11, 87:19, 88:4
**alert** [22] - 34:19, 34:24, 35:6, 36:10, 36:12, 36:15, 36:20, 36:25, 37:6, 37:8, 38:1, 40:13, 40:15, 51:25, 52:4, 52:15, 52:17, 62:7, 62:8, 76:2, 76:3, 76:11
**alerts** [1] - 62:3
**allegation** [1] - 33:3
**allegations** [5] - 10:19, 29:21, 32:17, 32:23, 33:9
**alleged** [5] - 37:1, 38:11, 52:25, 53:6, 57:7
**allegedly** [1] - 31:6
**allowed** [1] - 68:25
**almost** [1] - 59:1
**alone** [2] - 49:16, 53:1
**alter** [1] - 84:24
**Amanda** [1] - 42:15
**AND** [1] - 4:1
**answer** [8] - 5:17, 5:25, 28:23, 35:13, 39:7, 44:25, 49:8, 54:1
**answering** [1] - 6:5
**Anthony's** [1] - 60:3
**anticipated** [1] - 38:1
**anyway** [1] - 43:2
**apart** [1] - 35:17
**apologize** [1] - 54:7
**appear** [2] - 82:5, 82:18
**applicant** [3] - 79:10, 79:12, 80:13
**applicants** [4] - 80:6, 80:7, 80:11, 81:10
**application** [3] -

18:2, 79:24, 80:19
**applications** [4] - 79:6, 79:17, 79:23, 81:6
**applied** [2] - 18:9, 85:14
**apply** [1] - 50:14
**applying** [2] - 77:18, 79:2
**appreciate** [1] - 6:5
**approach** [4] - 37:8, 37:12, 37:17, 58:8
**Approach** [1] - 37:16
**approached** [2] - 38:2, 77:8
**approaching** [2] - 37:22, 61:1
**appropriate** [12] - 36:23, 37:12, 37:21, 39:5, 39:19, 57:8, 57:11, 57:25, 58:2, 61:21, 74:15, 79:12
**appropriately** [1] - 38:17
**appropriateness** [1] - 55:25
**approval** [2] - 68:19, 69:2
**Approved** [1] - 67:12
**approved** [4] - 67:16, 67:24, 70:7
**approves** [1] - 67:19
**area** [9] - 7:8, 17:8, 17:9, 21:11, 37:17, 59:17, 76:23, 84:18, 84:20
**arising** [1] - 46:23
**armed** [7] - 37:11, 37:14, 37:19, 37:23, 52:24, 53:7, 55:21
**Arnold** [2] - 5:3, 76:19
**aside** [3] - 46:23, 47:8, 47:11
**Aside** [1] - 16:5
**assault** [2] - 33:19, 34:16
**assessment** [3] - 39:18, 39:23, 39:24
**assigned** [3] - 10:17, 33:14, 41:18
**ASSIGNED** [8] - 88:9, 88:11, 88:13, 88:15, 88:16, 88:18, 88:20, 88:22
**assignment** [1] - 10:18
**assist** [2] - 16:11, 19:17
**Assist** [1] - 11:20
**assisted** [1] - 89:11

assisting [1] - 19:18
associate - 23:16
assume [8] - 5:10, 12:20, 17:3, 30:17, 56:3, 72:7, 72:19, 72:22
Assume [3] - 38:24, 45:2, 74:12
assumes [4] - 44:24, 49:7, 61:7, 73:23
Assumes [2] - 39:6, 42:4
Assuming [2] - 44:20, 80:7
assuming [1] - 38:15
assumption [6] - 73:2, 73:7, 73:9, 73:24, 73:25, 74:9
assumptions [2] - 72:5, 72:6
attempted [1] - 32:3
attended [1] - 7:3
Attorney [9] - 2:14, 2:18, 2:22, 3:1, 86:6, 86:19, 86:25, 86:25, 87:14
attorney [2] - 89:13, 89:15
attorneys [2] - 46:9, 86:20
attributes [1] - 19:7
authorized [1] - 70:9
automatic [4] - 80:18, 80:20, 80:22, 81:11
automatically [1] - 79:25
available [3] - 15:14, 15:18, 31:2
average [1] - 79:17
aware [20] - 6:21, 20:16, 20:21, 20:22, 22:16, 22:23, 23:1, 23:4, 24:19, 24:20, 25:1, 33:24, 35:21, 36:2, 43:6, 46:5, 47:22, 52:9, 53:5, 85:12

**B**

background [2] - 18:16, 79:1
bad [2] - 7:11, 20:15
Bailey [1] - 12:1
Bank [1] - 72:17
bank [1] - 60:7
Based [3] - 58:4, 73:25, 75:7
based [16] - 29:17, 36:11, 39:9, 39:13,

39:18, 39:19, 39:21, 49:12, 58:13, 59:5, 71:17, 71:21, 72:6, 73:24, 78:14, 84:1
basing [2] - 39:24, 70:20
basis [3] - 15:21, 36:24, 64:14
Beardslee [19] - 2:16, 29:3, 29:5, 29:17, 29:22, 29:24, 30:3, 30:6, 32:14, 34:6, 34:9, 34:17, 34:25, 36:19, 39:19, 47:20, 52:11, 63:13, 68:5
BEARDSLEE [6] - 1:8, 3:8, 3:19, 86:10, 87:18, 88:3
bearing [1] - 80:2
became [7] - 13:5, 19:1, 19:23, 20:1, 30:23, 33:24, 55:6
become [9] - 18:2, 22:17, 24:5, 24:20, 25:1, 46:5, 53:14, 58:12, 69:9
begins [1] - 64:5
BEHALF [1] - 1:15
behalf [1] - 4:8
behind [6] - 58:7, 58:21, 74:21, 74:24, 75:8, 75:10
Bell [1] - 72:23
below [2] - 14:10, 14:22
Below [1] - 14:25
best [2] - 58:21, 84:24
better [3] - 6:18, 58:9, 61:11
Between [1] - 10:6
between [13] - 3:13, 4:1, 21:10, 22:21, 54:11, 59:13, 68:19, 73:22, 74:1, 74:5, 79:21, 89:5, 89:10
big [1] - 73:6
bit [2] - 50:22, 55:24
blinds [1] - 6:16
body [1] - 84:21
bombing [1] - 9:22
bottom [2] - 61:14, 64:4
bouncing [1] - 6:15
BOX [1] - 1:20
Box [1] - 86:2
Boyd [4] - 4:2, 86:1, 86:24, 87:16, 89:3, 89:21
BOYD [2] - 1:19,

3:15
Boyd-Gwinn [1] - 86:1
BOYD-GWINN [1] - 1:19
break [5] - 5:15, 6:13, 6:14, 48:8, 48:10
brief [1] - 48:8
briefly [1] - 13:17, 59:16, 63:17
bring [3] - 19:8, 79:13, 80:2
bringing [2] - 34:13, 34:16
broadcast [2] - 41:3, 43:15
Bromley [1] - 42:16
brought [1] - 71:25
Brown [1] - 2:12
Building [1] - 2:21
building [2] - 71:5, 72:25
bulletin [1] - 43:11
bump [3] - 73:10, 73:19, 74:11
bumps [3] - 61:23, 73:4, 73:18
BY [12] - 2:2, 2:3, 2:4, 2:5, 2:6, 2:7, 4:11, 50:7, 69:25, 70:13, 83:20, 85:4

**C**

C-2 [2] - 65:14, 67:3
c-u-l-l [1] - 80:25
capacity [1] - 46:25
Capacity [6] - 1:9, 3:9, 3:20, 86:10, 87:18, 88:4
captain [1] - 57:2
Captain [13] - 5:4, 5:7, 10:9, 11:25, 12:1, 13:25, 14:9, 14:20, 15:15, 86:13, 86:14
CAPTAIN [10] - 1:15, 3:13, 4:7, 87:4, 87:5, 87:12, 87:17, 88:1, 88:24, 89:7
captains [1] - 13:21
car [6] - 19:14, 57:16, 60:17, 60:18, 60:25
care [1] - 8:25
career [1] - 56:10
carry [5] - 62:21, 67:8, 68:1, 68:24, 70:9
carrying [4] - 65:14, 66:2, 70:5, 83:13

cars [2] - 61:6, 61:10, 71:25
Catherine [5] - 4:2, 86:24, 87:16, 89:3, 89:21
CATHERINE [1] - 3:15
caused [2] - 9:23, 32:12
caution [1] - 37:16
cautious [2] - 38:9, 58:12
cc [1] - 86:25
CCR [3] - 86:24, 87:16, 89:21
center [1] - 74:7
Center [1] - 24:24
Central [1] - 2:21
centre [1] - 89:6
Centre [3] - 2:17, 3:15, 86:7
certain [3] - 3:17, 52:11
certainly [1] - 63:11
certification [1] - 69:12
Certified [6] - 3:16, 3:17, 4:3, 89:3, 89:4, 89:21
certified [1] - 69:9
Certifies [2] - 69:8, 69:9
certify [4] - 69:13, 87:5, 89:5, 89:13
chain [1] - 13:17, 16:3, 54:12
change [3] - 38:16, 84:5, 86:15
CHANGE [8] - 88:9, 88:11, 88:13, 88:15, 88:16, 88:18, 88:20, 88:22
changed [1] - 42:20
changes [4] - 86:14, 87:6, 87:7, 88:6
changing [1] - 62:25
charge [2] - 40:22, 78:25
check [1] - 79:5
checks [2] - 18:17, 79:1
Chief [29] - 1:9, 2:16, 2:24, 3:9, 3:20, 13:25, 29:2, 29:5, 29:16, 29:22, 29:24, 30:2, 30:6, 30:14, 32:14, 34:6, 34:8, 34:17, 34:25, 36:19, 39:18, 47:19, 50:11, 52:11, 68:5, 86:10, 87:18, 88:4

chief [18] - 13:20, 28:18, 28:20, 30:17, 30:25, 33:6, 33:7, 33:13, 36:2, 39:13, 39:22, 39:25, 49:11, 63:13, 67:23, 68:2, 77:20, 77:24
chief's [4] - 39:22, 49:5, 49:15, 63:6
child [2] - 22:19, 74:7
childhood [4] - 33:18, 34:16, 36:3, 46:3
chitchatted [1] - 21:16
circled [1] - 60:6
circulated [1] - 44:13
circumstance [1] - 58:3
circumstances [9] - 39:10, 57:24, 57:25, 59:7, 75:2, 81:17, 83:24, 84:2, 84:18
CITY [6] - 1:7, 3:7, 3:19, 86:9, 87:17, 88:3
City [7] - 2:14, 2:17, 3:15, 7:22, 77:1, 86:7, 89:6
city [5] - 49:18, 49:19, 49:21, 63:14, 76:13
civilian [1] - 15:9
civilians [3] - 16:5, 16:6, 43:24
clarify [1] - 81:2, 82:15
Clayton [1] - 2:22
clerks [2] - 8:25, 15:8
close [5] - 6:16, 11:6, 56:5, 56:6, 56:7
closed [2] - 7:9, 72:22, 72:24
COEUR [6] - 1:7, 3:7, 3:19, 86:10, 87:17, 88:3
Coeur [56] - 1:9, 2:10, 2:15, 3:10, 3:20, 8:4, 8:5, 8:8, 8:21, 16:2, 20:19, 25:20, 26:11, 28:3, 28:16, 31:23, 34:20, 38:12, 39:15, 43:19, 43:20, 45:4, 45:10, 52:3, 52:5, 52:8, 54:5, 59:1, 59:13, 62:7, 62:11, 63:20, 65:5, 65:8, 65:11, 65:15, 65:19, 66:17, 66:20, 66:23,

67:4, 67:10, 69:16, 69:19, 75:19, 76:14, 77:17, 78:9, 79:10, 82:7, 82:9, 82:20, 83:1, 86:10, 87:18, 88:4
  collectively [1] - 50:9
  College [3] - 7:4, 7:5
  college [1] - 7:9
  combination [1] - 63:13
  coming [1] - 5:23
  command [8] - 13:18, 14:7, 16:3, 31:1, 52:12, 57:2, 57:20
  commander [9] - 10:8, 12:12, 12:15, 13:15, 15:13, 15:14, 15:19, 55:6, 62:12
  Commander [10] - 8:22, 10:1, 10:22, 11:12, 11:14, 11:19, 11:20, 19:24, 48:16, 49:4
  commanders [6] - 11:25, 19:6, 32:8, 34:9, 35:1, 36:22
  commanders' [1] - 35:25
  commands [1] - 58:12
  commenced [1] - 4:5
  Commission [1] - 87:13
  commit [2] - 53:8, 53:12
  committee [1] - 18:7
  committing [1] - 53:17
  Community [2] - 7:4
  community [1] - 44:16
  competent [1] - 55:4
  complaint [2] - 24:15, 46:12
  complaints [3] - 46:16, 46:22, 46:24
  complement [3] - 41:15, 41:16
  completed [1] - 86:20
  completely [2] - 5:24, 5:25
  Completion [1] - 69:11
  completion [1] - 64:6
  completion.. [1] - 64:11
  comply [2] - 57:20, 58:11

computer [1] - 89:11
  computer-assisted [1] - 89:11
  computerized [2] - 16:22, 17:1
  computers [4] - 19:12, 19:14, 19:15, 19:19
  concern [12] - 25:15, 25:16, 26:9, 26:25, 47:15, 49:10, 51:7, 51:22, 53:21, 53:23, 57:21, 60:21
  concerned [14] - 17:17, 23:23, 25:21, 27:5, 27:6, 27:14, 27:22, 27:24, 37:5, 37:8, 51:13, 52:23, 53:6, 53:7
  concerning [19] - 10:19, 16:25, 25:9, 30:13, 32:22, 34:20, 36:3, 44:23, 47:15, 48:5, 71:25, 76:11, 77:23, 78:5, 78:9, 78:16, 79:10, 82:25, 89:9
  concerns [7] - 26:21, 27:2, 27:3, 47:2, 49:1, 52:18, 54:5
  conclusions [1] - 20:18
  concur [1] - 36:24
  concurred [2] - 36:23, 49:5
  condition [1] - 6:20
  conduct [4] - 33:5, 65:4, 83:7, 83:11
  conducted [2] - 32:23, 33:1
  conducting [2] - 33:4, 83:2
  confidant [1] - 24:5
  confidential [4] - 4:17, 24:3, 24:7, 44:15
  confines [1] - 53:4
  confrontation [1] - 53:14
  confronted [1] - 57:6
  conjunction [1] - 62:16
  connects [1] - 60:18
  consider [5] - 23:14, 24:4, 59:6, 80:9, 80:21
  consideration [2] - 80:1, 84:22
  considered [10] - 37:11, 37:14, 37:19, 44:15, 57:17, 58:16,

74:15, 79:11, 80:14, 82:10
  Considering [1] - 81:19
  considering [1] - 84:17
  consistent [3] - 51:21, 64:20, 64:25
  construction [1] - 72:25
  consulted [1] - 34:25
  consulting [1] - 35:3
  contact [11] - 18:19, 18:21, 25:18, 28:19, 43:19, 44:10, 62:10, 62:14, 62:23, 77:20, 83:4
  contacted [1] - 28:17
  contain [2] - 84:12, 84:15
  continue [1] - 74:3
  control [1] - 58:17
  controversy [1] - 89:9
  conversation [4] - 5:22, 50:25, 51:5, 55:22
  conversations [1] - 54:9
  converse [1] - 20:13
  Coordinator [3] - 11:21, 11:22, 11:24
  cop [2] - 53:9, 53:10
  copy [3] - 86:13, 86:14, 86:19
  correct [36] - 19:24, 27:15, 29:22, 38:13, 39:20, 39:25, 40:10, 43:12, 47:20, 51:6, 56:8, 56:15, 56:24, 63:8, 63:15, 65:12, 65:20, 65:23, 69:14, 70:22, 70:25, 71:18, 72:1, 74:25, 75:16, 75:25, 76:4, 78:16, 81:22, 83:5, 83:9, 83:13, 83:16, 84:2, 87:7, 87:9
  Correct [7] - 56:25, 68:21, 78:17, 83:6, 83:10, 83:14, 83:17
  CORRECTION [1] - 88:2
  correction [3] - 86:15, 86:17, 86:20
  corrections [1] - 86:14
  counsel [6] - 4:1, 34:2, 34:5, 89:5, 89:14
  Counsel [1] - 2:20

counseling [1] - 45:17
  Counselor's [1] - 2:20
  COUNTY [1] - 89:2
  County [22] - 2:19, 2:20, 2:21, 24:23, 29:8, 31:3, 31:5, 31:10, 31:14, 31:16, 32:1, 39:1, 39:11, 43:20, 48:13, 50:2, 50:10, 50:11, 52:14, 59:13, 70:3, 87:2
  couple [5] - 45:14, 48:11, 50:14, 58:15, 84:9
  course [8] - 4:20, 5:16, 5:21, 6:12, 35:24, 70:22, 75:23
  COURT [2] - 1:1, 3:1
  court [6] - 4:19, 5:19, 6:1, 6:9, 6:10, 19:3
  Court [5] - 3:16, 3:18, 4:3, 89:3, 89:21
  cousin [2] - 77:1, 77:7
  cover [3] - 16:1, 37:17, 64:1
  coworker [2] - 23:14, 23:16
  create [1] - 22:21
  created [1] - 52:11
  credible [1] - 36:9
  creditable [1] - 36:7
  CREVE [6] - 1:7, 3:7, 3:19, 86:9, 87:17, 88:3
  Creve [56] - 1:9, 2:10, 2:15, 3:10, 3:20, 8:4, 8:5, 8:8, 8:21, 16:2, 20:19, 25:20, 26:11, 28:3, 28:16, 31:23, 34:20, 38:12, 39:15, 43:19, 43:20, 45:4, 45:10, 52:3, 52:5, 52:8, 54:5, 59:1, 59:13, 62:7, 62:11, 63:19, 65:4, 65:8, 65:10, 65:15, 65:19, 66:16, 66:20, 66:23, 67:4, 67:10, 69:16, 69:19, 75:19, 76:14, 77:17, 78:8, 79:10, 82:7, 82:9, 82:20, 83:1, 86:10, 87:18, 88:4
  Crime [1] - 8:14
  crime [2] - 8:17, 46:3
  Criminal [2] - 7:18, 10:15
  CROSS [4] - 2:2, 2:3,

50:6, 69:24
  cross [1] - 73:5
  CROSS-EXAMINATION [4] - 2:2, 2:3, 50:6, 69:24
  Crystal [37] - 20:24, 21:1, 21:12, 21:14, 21:20, 22:4, 22:7, 22:14, 22:25, 23:2, 23:6, 24:16, 28:12, 29:10, 29:13, 29:17, 30:3, 30:13, 31:10, 35:25, 38:24, 42:2, 42:9, 44:17, 44:22, 45:3, 45:5, 47:20, 47:23, 48:4, 48:14, 50:1, 51:1, 54:9, 55:14, 81:20, 81:21
  CSR [2] - 86:24, 87:16
  cull [5] - 80:20, 80:22, 80:24, 81:3, 81:12
  Cull [1] - 80:25
  culls [2] - 80:18, 81:7
  current [1] - 8:20
  curving [1] - 60:18
  cut [2] - 74:14, 74:17

  **D**

  daily [1] - 54:14
  danger [1] - 37:3
  dangerous [5] - 37:12, 37:14, 37:20, 37:23, 55:21
  date [1] - 25:6
  dated [2] - 22:14
  dating [5] - 22:4, 22:8, 22:18, 23:8, 27:10
  day-to-day [1] - 15:21
  daycare [1] - 74:7
  deal [1] - 9:18
  Dear [1] - 86:12
  December [4] - 25:4, 25:7, 45:14, 68:4
  decertify [1] - 69:13
  decided [1] - 48:24
  decision [18] - 36:20, 39:13, 49:12, 49:15, 49:17, 62:7, 62:8, 62:11, 62:15, 62:20, 63:6, 63:12, 67:25, 69:13, 84:23, 85:7, 85:9
  decisions [1] - 59:4
  declare [1] - 87:8
  Defendants [6] - 1:11, 2:15, 2:19, 3:12,

3:21, 4:2
defendants [2] -
50:9, 50:10
degree [3] - 7:13,
7:17, 8:7
DENNIS [10] - 1:15,
3:13, 4:7, 87:4, 87:5,
87:12, 87:17, 88:1,
88:24, 89:7
Dennis [2] - 5:3,
86:13
department [36] -
8:1, 13:18, 15:17,
16:7, 19:8, 21:3,
22:10, 22:12, 22:15,
22:18, 22:20, 23:9,
23:13, 24:12, 24:13,
25:19, 26:15, 28:5,
32:14, 34:14, 36:13,
43:16, 43:18, 43:19,
44:21, 52:22, 52:23,
53:4, 56:22, 62:23,
68:24, 76:15, 76:17,
77:19, 77:20, 77:23
Department [25] -
1:10, 2:15, 2:20, 3:10,
3:20, 8:4, 16:2, 24:23,
26:11, 28:17, 38:12,
45:4, 52:3, 52:5, 52:8,
59:2, 76:7, 76:10,
79:11, 82:7, 82:9,
82:21, 86:11, 87:19,
88:4
departments [1] -
22:22
depicted [3] - 59:17,
59:22, 60:13
DEPONENT [1] -
87:17
deponent [1] - 88:6
deposes [1] - 4:9
deposition [17] - 4:2,
4:5, 4:20, 5:6, 6:12,
6:22, 6:23, 59:12,
70:22, 71:25, 86:13,
86:14, 87:5, 87:6,
87:8, 88:5, 89:14
DEPOSITION [3] -
1:15, 3:13, 88:2
depositions [5] -
4:18, 5:10, 5:15,
59:13, 63:19
Deputy [3] - 11:12,
11:13, 11:18
Des [1] - 43:20
describe [2] - 40:12,
59:16
description [1] -
61:21
designated [3] -
60:3, 60:19, 61:13

Destruction [1] -
9:12
detained [2] - 24:22,
26:19
detective [1] - 13:12
determine [1] - 43:2,
72:2, 81:17
determined [1] -
32:12
developed [1] -
56:23
development [1] -
56:14
difference [1] - 38:5
different [1] - 22:18
DIRECT [2] - 2:1,
4:10
direct [1] - 15:2
directly [7] - 15:20,
16:8, 20:20, 31:9,
31:20, 52:14, 77:24
discern [1] - 71:23
disciplinary [1] -
44:11
discipline [3] -
65:23, 66:24, 67:4
disciplined [2] -
45:9, 75:11
disclosed [1] - 35:19
disclosures [1] -
35:21
discuss [5] - 22:24,
23:2, 29:24, 30:6,
48:17
discussed [5] - 19:6,
32:8, 34:4, 46:20,
66:9
discussing [1] -
19:10
discussion [3] -
30:25, 34:1, 47:6
discussions [1] -
47:9
dismissal [1] - 34:14
dispatch [1] - 54:16
dispatcher [17] -
12:22, 12:23, 12:25,
13:2, 21:2, 21:4,
21:13, 41:4, 41:10,
41:12, 42:10, 54:12,
55:10, 55:11, 62:14,
62:15, 62:21
dispatchers [12] -
8:24, 8:25, 21:5,
21:16, 40:23, 41:6,
41:13, 41:18, 41:21,
42:9, 42:11, 43:25
Dispatchers [1] -
15:8
displaying [2] -
37:18, 37:20

disqualify [2] -
79:25, 80:13
disseminated [2] -
76:6, 76:9
distance [1] - 75:10
DISTRICT [4] - 1:1,
1:1, 3:1, 3:2
District [2] - 3:18,
3:18
DIVISION [2] - 1:2,
3:2
Division [1] - 3:18
document [2] -
42:24, 78:19
DOE [6] - 1:3, 3:4,
3:19, 86:9, 87:17,
88:3
Doe [103] - 2:24,
4:15, 4:17, 4:25,
10:19, 12:3, 17:22,
17:25, 19:10, 19:12,
20:1, 20:9, 22:4, 22:8,
22:9, 22:24, 23:3,
24:21, 25:10, 25:13,
25:16, 26:1, 26:7,
26:9, 26:19, 26:22,
26:25, 27:2, 28:1,
28:16, 29:6, 29:14,
30:22, 31:6, 31:17,
32:2, 32:8, 32:10,
32:15, 33:14, 33:18,
33:22, 34:13, 34:20,
35:8, 35:18, 35:22,
36:3, 36:7, 36:16,
37:3, 37:9, 38:2, 38:8,
38:17, 38:21, 39:5,
39:14, 39:17, 40:5,
40:19, 43:3, 44:23,
45:7, 45:11, 45:16,
45:19, 45:23, 46:2,
46:6, 46:13, 46:17,
46:25, 47:10, 47:24,
48:5, 48:17, 48:25,
49:2, 49:16, 58:24,
60:16, 60:19, 61:12,
63:7, 63:12, 64:21,
65:1, 66:1, 69:18,
69:20, 70:4, 72:8,
74:10, 77:3, 77:8,
78:4, 78:9, 78:16,
83:3, 83:8, 83:12,
85:14
Doe's [3] - 27:24,
51:7, 66:9
done [1] - 74:19
door [1] - 61:3
double [1] - 69:17
down [9] - 5:19, 6:1,
27:21, 35:18, 50:16,
55:7, 60:9, 74:3, 74:6
draw [5] - 20:17,
37:21, 38:2, 57:8,

57:25
drawing [7] - 55:25,
56:1, 60:10, 71:18,
71:21, 71:24, 84:10
drawn [2] - 82:16,
82:19
draws [2] - 82:5,
82:8
drew [1] - 82:15
drinks [1] - 23:10
driver [1] - 58:14
driving [1] - 84:14
duly [1] - 89:8
During [1] - 12:2
during [9] - 5:16,
6:12, 21:7, 26:7,
42:11, 45:23, 70:21,
75:23
duties [9] - 9:7,
10:12, 11:18, 12:3,
15:2, 15:7, 15:11,
66:16, 83:9
duty [4] - 16:10,
41:5, 68:2, 74:24

E

easier [2] - 5:18,
19:3
Eastern [2] - 3:18,
3:18
EASTERN [4] - 1:1,
1:2, 3:2, 3:2
educational [1] -
6:25
EEOC [2] - 46:10,
63:22
Eidman [2] - 2:24,
13:25
eight [3] - 12:11,
41:15, 41:24
either [6] - 5:6, 6:21,
20:15, 20:23, 53:20,
65:22
emergency [1] - 9:9
emotion [1] - 51:21
emotional [7] -
35:20, 45:23, 46:13,
46:17, 46:25, 51:18,
51:20
employed [2] -
89:14, 89:15
employee [12] -
36:12, 37:4, 37:25,
44:18, 44:20, 45:3,
45:5, 45:10, 54:10,
59:1, 76:12, 89:15
employees [8] -
15:9, 15:16, 16:2,
52:19, 52:24, 53:20,
53:21, 53:22

employment [5] -
65:11, 65:19, 66:19,
67:9, 67:10
enclosed [3] - 86:13,
86:14, 86:17
encounters [2] -
83:25, 84:5
end [2] - 49:15,
66:14
ended [1] - 39:18
engage [1] - 24:3
engaged [1] - 83:4
engages [2] - 57:15,
75:14
entrance [2] - 73:21,
74:1
equal [1] - 81:16
equipment [4] - 9:2,
16:13, 16:15, 17:17
error [1] - 86:15
ERW [3] - 1:5, 3:6,
87:19
especially [3] - 37:6,
37:7, 49:10
essential [1] - 29:21
essentially [2] -
53:15, 64:21
established [1] -
25:6
et [7] - 1:10, 2:20,
3:10, 3:20, 86:11,
87:19, 88:4
evaluation [3] -
21:21, 49:5, 55:2
Eve [1] - 25:7
evening [1] - 41:5
event [2] - 32:12,
35:7
events [5] - 24:21,
30:20, 30:21, 48:17,
51:2
evidence [7] - 39:7,
42:5, 44:25, 49:8,
61:8, 61:20, 73:24
ex [5] - 31:19, 31:21,
38:21, 38:25, 53:22
ex-employees [1] -
53:22
ex-wife [4] - 31:19,
31:21, 38:21, 38:25
Exactly [1] - 34:3
EXAMINATION [12] -
2:1, 2:2, 2:3, 2:4, 2:5,
2:6, 4:10, 50:6, 69:24,
70:12, 83:19, 85:3
examination [1] -
89:10
examined [3] - 3:13,
4:8, 89:10
example [1] - 83:4
exchange [1] - 20:4

**excuse** [1] - 69:17
**Executed** [1] - 87:9
**exemplary** [1] - 20:22
**Exhibit** [10] - 2:8, 2:9, 2:9, 2:10, 35:16, 59:11, 63:17, 78:19, 82:25, 84:9
**exhibit** [3] - 63:18, 64:3, 84:11
**exhibited** [1] - 35:19
**exhibits** [1] - 59:11
**Exhibits** [1] - 3:1
**existed** [1] - 39:3
**existence** [1] - 48:13
**exit** [1] - 32:15
**exiting** [1] - 84:12
**exits** [1] - 58:18
**expected** [1] - 24:7
**experience** [2] - 19:15, 54:23
**expertise** [1] - 56:23
**Expires** [1] - 87:13
**Explain** [1] - 52:22
**explained** [1] - 54:22
**exposed** [1] - 84:20
**expressed** [1] - 51:6
**expressions** [1] - 84:21
**expressly** [1] - 4:4

## F

**F-u-n-k-h-o-u-s-e-r** [1] - 14:4
**faced** [1] - 58:15
**facing** [2] - 57:16, 58:17
**fact** [11] - 22:11, 33:23, 37:1, 39:3, 53:1, 57:12, 61:5, 61:10, 67:1, 75:9, 83:15
**facts** [12] - 38:11, 39:6, 42:4, 44:24, 49:7, 56:2, 57:12, 61:7, 61:19, 73:24, 84:9, 84:10
**failing** [1] - 75:9
**fairly** [1] - 9:17
**fall** [7] - 14:8, 14:19, 16:3, 16:23, 17:8, 17:9
**falls** [2] - 15:20, 16:8
**false** [1] - 55:14
**familiar** [9] - 39:12, 54:20, 59:20, 69:3, 69:16, 69:19, 70:17, 74:4, 74:8
**far** [4] - 4:16, 17:16,

**excuse** [1] - 69:17
**favor** [1] - 64:9
**FAX** [2] - 1:21, 86:3
**FB** [1] - 60:6
**February** [2] - 68:14, 68:19
**felt** [2] - 32:10, 49:10
**Ferry** [3] - 59:18, 70:18, 74:7
**file** [1] - 17:5
**filed** [2] - 24:15, 46:9
**fill** [1] - 79:18
**filled** [2] - 79:15, 80:8
**final** [1] - 67:16
**financially** [1] - 89:16
**finish** [1] - 19:2
**finished** [1] - 48:7
**firearms** [1] - 37:2
**fired** [1] - 65:1
**First** [3] - 70:17, 72:7, 72:17
**first** [6] - 4:25, 22:12, 48:12, 63:25, 68:14, 89:8
**fits** [1] - 38:20
**Five** [1] - 12:16
**five** [1] - 12:16
**Floor** [1] - 3:15
**fluid** [2] - 63:2, 84:5
**follow** [3] - 48:12, 65:12, 70:14
**follow-up** [2] - 48:12, 70:14
**Following** [1] - 7:3
**following** [7] - 34:20, 48:22, 60:18, 68:22, 74:13, 74:23, 88:6
**FOR** [8] - 88:9, 88:11, 88:13, 88:15, 88:16, 88:18, 88:20, 88:22
**Force** [2] - 82:10, 82:19
**force** [7] - 17:23, 18:1, 20:2, 42:3, 53:15, 76:19, 79:2
**forceful** [1] - 53:16
**forces** [1] - 76:24
**foregoing** [2] - 87:5, 87:9
**forenoon** [2] - 3:14, 3:14
**form** [1] - 87:6
**former** [1] - 53:21
**foundation** [2] - 64:14, 66:4
**Four** [1] - 12:16
**four** [1] - 81:10
**fourth** [3] - 63:24,

**excuse** [1] - 69:17
**frame** [8] - 10:23, 12:2, 12:18, 21:7, 26:7, 42:12, 45:15, 45:24
**friend** [1] - 23:14
**friendly** [1] - 23:13
**friends** [1] - 23:7
**front** [4] - 21:23, 70:23, 72:3, 72:5
**fulfill** [1] - 9:8
**full** [4] - 5:2, 41:14, 41:15, 41:16
**functions** [2] - 15:16, 17:1
**Funkhouser** [2] - 14:3, 14:20

## G

**gear** [1] - 61:2
**general** [1] - 40:16
**Generally** [2] - 17:20, 62:12
**generally** [5] - 53:21, 58:8, 59:23, 68:14, 68:16
**generated** [2] - 42:24, 52:7
**given** [10] - 5:10, 26:13, 26:14, 41:24, 57:11, 57:23, 66:14, 69:19, 86:13, 89:12
**glasses** [1] - 6:15
**Glenn** [1] - 2:24
**Gontard** [4] - 2:16, 3:15, 86:6, 89:6
**gossip** [1] - 22:1
**Government** [1] - 2:21
**graduate** [2] - 7:13, 7:17
**graduated** [1] - 7:1
**greet** [1] - 20:4
**grievance** [1] - 24:18
**group** [2] - 15:3, 50:13
**guess** [3] - 16:21, 24:11, 39:9
**guidepost** [1] - 59:6
**guy** [2] - 77:12, 80:20
**Gwinn** [1] - 86:1
**GWINN** [1] - 1:19

## H

**habits** [1] - 54:20
**Hahn** [1] - 15:22
**hallway** [1] - 20:3

**hand** [9] - 6:9, 35:15, 58:19, 59:9, 59:10, 60:10, 72:21, 78:18, 89:17
**happy** [1] - 23:10
**harm** [2] - 29:8, 36:8
**harmed** [1] - 75:5
**harmful** [1] - 75:21
**hear** [1] - 78:1
**heard** [1] - 78:5
**help** [1] - 9:6
**helps** [1] - 16:12
**hen** [2] - 55:7, 55:9
**hereby** [3] - 87:5, 87:7, 89:5
**HEREBY** [1] - 4:1
**hereto** [1] - 89:16
**hereunto** [1] - 89:17
**herewith** [1] - 89:12
**Hi** [1] - 50:8
**high** [2] - 7:1, 7:3
**Highland** [1] - 24:24
**Hillsboro** [1] - 7:5
**himself** [4] - 29:9, 33:8, 33:14, 36:8
**hire** [1] - 77:11
**hired** [2] - 19:4, 19:7
**hiring** [4] - 18:5, 19:5, 85:8, 85:10
**history** [1] - 7:1
**HM** [105] - 1:3, 2:24, 3:4, 3:19, 4:15, 4:20, 10:19, 12:3, 17:22, 17:25, 19:10, 19:12, 20:1, 20:9, 22:4, 22:8, 22:9, 22:24, 23:3, 24:21, 25:10, 25:13, 25:16, 26:1, 26:7, 26:9, 26:19, 26:22, 26:25, 27:2, 28:1, 28:16, 29:6, 29:14, 30:22, 31:6, 31:17, 32:2, 32:9, 32:10, 32:15, 33:15, 33:18, 33:22, 34:13, 34:20, 35:8, 35:19, 35:22, 36:3, 36:7, 36:16, 37:3, 37:9, 38:3, 38:8, 38:17, 39:5, 39:14, 39:17, 40:5, 40:19, 43:3, 44:23, 45:7, 45:11, 45:16, 45:19, 45:23, 46:2, 46:13, 46:17, 47:24, 48:5, 48:17, 48:25, 49:2, 49:16, 51:7, 58:24, 60:16, 60:19, 61:12, 63:7, 63:12, 64:22, 65:1, 66:1, 69:18, 69:20, 70:4, 72:8, 74:10, 77:3, 77:8,

**hand** [9] - 78:4, 78:10, 78:16, 83:3, 83:8, 83:12, 85:14, 86:9, 87:17, 88:3
**HM's** [5] - 4:17, 38:21, 46:6, 46:25, 47:10
**Hodak** [4] - 10:9, 13:25, 14:9, 14:20
**Hospital** [1] - 60:4
**hospital** [2] - 29:7, 29:14
**hot** [1] - 6:17
**hour** [1] - 23:10
**hours** [1] - 3:13
**Human** [1] - 81:4
**hup** [1] - 80:20
**hypothetical** [1] - 61:19

## I

**i.e** [1] - 86:15
**idea** [7] - 70:24, 71:2, 71:4, 71:7, 71:10, 71:13, 71:16
**IL** [2] - 86:24, 87:16
**IL-CSR** [2] - 86:24, 87:16
**Illinois** [3] - 3:17, 89:5
**immediacy** [1] - 29:15
**immediately** [3] - 57:20, 58:11, 72:18
**impact** [1] - 82:1
**impairment** [1] - 73:1
**impart** [2] - 34:17, 56:17
**imparted** [1] - 30:3, 78:9
**importance** [1] - 30:7
**important** [1] - 28:4
**improper** [1] - 61:19
**IN** [4] - 1:1, 3:1, 88:3, 89:17
**in-car** [1] - 19:14
**incident** [10] - 46:24, 47:9, 47:11, 47:14, 47:16, 49:13, 49:25, 51:10, 82:12, 82:14
**Incident** [1] - 82:20
**include** [5] - 9:4, 35:20, 50:10, 61:19, 61:20
**incredible** [1] - 54:25
**independent** [4] - 38:11, 40:2, 53:23, 83:15

indicate [1] - 86:14
indicated [13] - 21:7, 27:13, 30:2, 31:17, 32:2, 32:16, 34:15, 38:25, 39:2, 48:16, 70:4, 76:2, 88:6
indicates [1] - 35:18
Indicating [1] - 60:8
indication [1] - 35:5
indirect [1] - 53:17
individual [15] - 1:4, 3:4, 3:19, 37:11, 37:19, 37:22, 44:8, 44:10, 45:9, 53:11, 79:25, 80:4, 86:9, 87:17, 88:3
Individually [6] - 1:8, 3:8, 3:20, 86:10, 87:18, 88:3
individuals [2] - 15:3, 79:2
informal [1] - 77:24
informally [1] - 77:7
information [46] - 21:23, 25:18, 25:24, 26:10, 26:13, 27:25, 28:4, 29:22, 29:25, 30:3, 30:8, 35:19, 35:22, 35:23, 38:23, 39:21, 40:6, 43:24, 44:14, 44:15, 45:16, 45:19, 45:22, 46:2, 47:18, 49:12, 55:12, 55:15, 67:22, 69:20, 76:14, 77:21, 77:22, 78:9, 78:15, 78:23, 79:24, 80:4, 80:12, 80:21, 81:9, 81:11, 81:14, 82:2
informed [1] - 47:21
ingress [1] - 61:22
inhibit [1] - 6:23
initially [1] - 48:14
initials [1] - 4:20
input [4] - 19:4, 46:8, 64:15, 78:22
inservice [1] - 56:11
inside [1] - 58:10
insofar [1] - 75:18
instead [1] - 5:18, 74:13
instructor [1] - 9:16
intentions [1] - 53:7
interaction [1] - 20:2
interactions [1] - 54:14
interested [1] - 89:16
Internal [1] - 10:16
internal [2] - 52:5, 76:3
interview [2] - 18:13,

80:3
interviewed [1] - 18:14
investigate [1] - 32:17
investigating [1] - 10:19, 28:5
investigation [8] - 32:22, 33:5, 33:8, 38:11, 39:11, 83:3, 83:7, 83:12
investigation.. [1] - 64:7
investigations [6] - 10:13, 10:14, 10:15, 10:16, 32:25, 78:25
Investigations [1] - 10:25
investigative [2] - 10:8, 13:14
involve [2] - 25:19, 26:11, 28:2
involved [7] - 9:9, 22:8, 24:21, 28:15, 30:23, 37:2, 52:15
involving [3] - 50:1, 50:3, 81:18
IS [1] - 4:1
issuance [2] - 34:23, 37:5
issue [3] - 9:18, 22:18, 36:20
issued [1] - 34:19, 36:13, 36:16, 44:23, 45:6, 45:11, 52:1
issues [5] - 21:19, 22:21, 27:14, 45:23, 81:25
issuing [1] - 52:17
IT [4] - 4:1, 9:4, 16:18, 16:19, 16:20
itself [3] - 50:11, 51:11, 58:16

J

January [5] - 68:9, 68:13, 68:15, 68:19
Jefferson [1] - 7:4
job [11] - 6:4, 9:7, 10:12, 11:18, 12:6, 13:11, 16:10, 19:18, 55:4, 79:16, 81:10
John [105] - 2:24, 4:15, 4:16, 10:19, 12:3, 17:22, 17:25, 19:10, 19:11, 20:1, 20:9, 22:4, 22:8, 22:9, 22:24, 23:3, 24:21, 25:9, 25:13, 25:16, 26:1, 26:6, 26:9,

26:19, 26:22, 26:25, 27:2, 27:24, 28:1, 28:16, 29:6, 29:14, 30:22, 31:6, 31:17, 32:2, 32:8, 32:10, 32:15, 33:14, 33:18, 33:22, 34:13, 34:20, 35:8, 35:18, 35:22, 36:3, 36:7, 36:16, 37:3, 37:9, 38:2, 38:8, 38:17, 38:21, 39:5, 39:14, 39:17, 40:5, 40:19, 43:3, 44:23, 45:6, 45:11, 45:16, 45:19, 45:22, 46:2, 46:6, 46:13, 46:17, 46:25, 47:10, 47:24, 48:5, 48:17, 48:25, 49:2, 49:16, 51:7, 58:24, 60:16, 60:19, 61:11, 63:7, 63:12, 64:21, 65:1, 65:25, 66:9, 69:18, 69:20, 70:4, 72:8, 74:10, 77:3, 77:8, 78:4, 78:9, 78:16, 83:3, 83:8, 83:12, 85:14
JOHN [12] - 1:3, 1:7, 3:4, 3:8, 3:19, 3:19, 86:9, 86:10, 87:17, 87:18, 88:3, 88:3
Judicial [1] - 3:18
jumping [1] - 54:7
jumpy [1] - 50:22
jurisdiction's [1] - 85:9
jurisdictions [1] - 85:13
Justice [1] - 7:18

K

K-o-e-n-i-g [1] - 42:15
Kaenel [12] - 2:22, 50:8, 54:4, 61:9, 61:25, 62:19, 63:22, 64:17, 66:5, 81:20, 82:23, 86:25
KAENEL [14] - 2:3, 2:6, 27:17, 28:22, 28:25, 35:11, 50:7, 69:22, 75:17, 83:20, 85:1
Kansas [1] - 2:14
KAYSER [2] - 14:1, 14:2
Kayser [3] - 12:1, 13:25, 15:15
keep [3] - 6:17, 24:7, 62:2

keeping [1] - 16:18
Keeping [1] - 16:20
kept [5] - 16:21, 16:25, 17:3, 28:14, 44:15
kicked [1] - 9:20
Kind [1] - 86:22
kind [11] - 5:14, 16:14, 16:25, 24:16, 28:13, 40:3, 43:11, 45:17, 45:20, 56:13, 79:8
knowing [1] - 82:2
knowledge [15] - 31:8, 38:10, 38:14, 40:9, 52:4, 52:7, 52:10, 54:25, 55:13, 56:18, 57:14, 78:8, 78:14, 83:15, 85:8
known [11] - 21:25, 22:11, 30:9, 37:22, 50:9, 55:20, 57:6, 57:13, 58:24, 59:18, 66:8
knows [1] - 77:2
Koenig [1] - 42:13

L

L.L.C [2] - 2:16, 86:6
Lancaster [1] - 42:15
language [1] - 84:21
LaPetite [1] - 74:6
Lasater [2] - 2:23, 50:12
last [4] - 24:9, 41:8, 42:14, 64:5
latter [1] - 10:25, 25:2
Lauer [3] - 41:9, 41:10, 42:10
law [2] - 3:14, 56:20
Law [9] - 2:14, 2:18, 2:22, 3:1, 86:6, 86:19, 86:25, 86:25, 87:15
lawful [2] - 4:8, 89:8
Lawrence [1] - 2:21
lawsuit [7] - 4:17, 33:24, 33:25, 34:7, 34:12, 34:14, 34:17
lawyer [2] - 59:10, 63:11
Leanne [1] - 42:17
learn [7] - 22:7, 31:4, 33:17, 33:21, 33:25, 48:12, 49:25
learned [3] - 18:8, 29:14, 34:15
least [2] - 68:11, 68:12
leaving [1] - 34:6

Lee [1] - 50:11
left [12] - 24:11, 24:13, 42:3, 60:2, 60:10, 61:24, 72:18, 72:21, 72:24, 73:6, 73:12, 74:10
left-hand [2] - 60:10, 72:21
less [1] - 58:17
letter [2] - 64:1
liar [1] - 55:14
lieutenant [1] - 14:3, 14:5, 14:10
Lieutenant [2] - 14:3, 14:19
lights [2] - 72:11, 72:20
Likewise [1] - 15:18
limit [1] - 6:22
line [4] - 14:7, 35:18, 60:18, 64:13
Line [1] - 88:8, 88:10, 88:12, 88:14, 88:15, 88:17, 88:19, 88:21
lines [1] - 5:22
Lisa [1] - 15:22
list [5] - 67:24, 68:8, 69:2, 70:7
LLC [1] - 2:12
loans [1] - 7:12
located [1] - 71:8
location [1] - 59:23
log [1] - 28:13
logging [1] - 43:8
look [2] - 17:16, 72:4
looking [1] - 60:1, 79:23, 84:18, 84:19, 84:20
Lorena [4] - 2:22, 50:8, 70:15, 86:25
LOUIS [2] - 1:20, 89:2
Louis [28] - 2:18, 2:19, 2:20, 3:15, 7:8, 7:21, 24:22, 29:7, 31:3, 31:5, 31:13, 31:16, 32:1, 39:1, 39:11, 43:20, 48:13, 50:2, 50:10, 50:11, 52:14, 59:13, 70:3, 77:1, 86:2, 86:8, 87:2, 89:6

M

ma'am [149] - 5:5, 5:12, 5:20, 6:3, 6:7, 7:14, 7:16, 7:21, 8:2, 8:6, 8:9, 8:12, 9:6, 9:14, 9:24, 10:11,

10:17, 10:20, 11:5, 11:10, 12:13, 12:24, 13:10, 13:13, 13:16, 13:20, 14:2, 14:6, 14:24, 15:1, 15:6, 16:4, 17:24, 18:10, 18:12, 18:20, 18:22, 18:25, 20:25, 21:6, 22:2, 22:13, 23:12, 24:2, 24:14, 24:17, 24:25, 25:8, 25:11, 26:17, 27:8, 28:9, 30:19, 31:15, 31:22, 32:6, 32:19, 32:21, 34:22, 36:1, 41:20, 42:1, 43:13, 44:19, 46:7, 47:1, 47:4, 47:7, 47:17, 49:22, 50:19, 50:24, 51:3, 51:23, 52:6, 52:9, 52:13, 52:20, 53:19, 54:2, 54:17, 54:21, 55:18, 55:23, 56:9, 56:12, 56:16, 56:19, 56:21, 57:4, 57:10, 57:18, 57:22, 58:1, 58:23, 59:8, 59:15, 59:19, 59:21, 59:25, 60:5, 60:12, 60:14, 60:22, 61:15, 62:5, 63:5, 63:10, 63:16, 64:8, 64:11, 64:19, 64:24, 65:2, 65:6, 65:9, 65:13, 65:17, 65:21, 65:24, 66:18, 66:21, 66:25, 67:6, 67:15, 67:18, 68:6, 69:5, 70:2, 70:10, 70:23, 71:1, 71:3, 71:6, 71:9, 71:12, 71:15, 71:22, 72:3, 76:5, 81:24, 82:3, 82:22, 83:22, 84:3, 84:7, 85:11, 85:15
maintain [4] - 16:12, 58:7, 75:9, 75:22
maintained [3] - 16:14, 17:4, 32:13
maintaining [3] - 9:2, 17:6, 17:11
maker [1] - 67:25
managed [1] - 54:24
management [1] - 54:12
maneuver [3] - 57:15, 57:17, 60:20
manner [4] - 23:8, 37:12, 43:14, 61:21
March [6] - 1:16, 3:13, 86:4, 86:13, 87:20, 89:17
Mark [2] - 49:20,

63:14
marked [4] - 35:16, 59:10, 60:3, 78:19
Marshall [37] - 20:24, 21:1, 21:13, 22:4, 22:7, 22:14, 22:25, 23:2, 23:7, 24:16, 25:9, 25:12, 29:10, 29:13, 29:18, 31:10, 35:25, 38:24, 40:7, 40:8, 42:2, 42:9, 44:18, 44:22, 45:3, 45:5, 47:20, 47:24, 48:4, 48:14, 50:1, 51:1, 54:10, 54:24, 55:14, 81:20, 81:21
Marshall's [2] - 21:20, 30:13
Mary [1] - 42:13
Mass [1] - 9:12
Mata [1] - 2:12
material [1] - 64:16
matter [3] - 4:15, 36:4, 46:10
Matter [1] - 33:23
matters [1] - 89:9
McAtee [1] - 50:2
McCrary [2] - 17:13, 17:20
McIntyre [1] - 50:1
mean [9] - 8:23, 12:4, 23:8, 37:10, 53:10, 53:22, 55:9, 68:12, 78:1
means [1] - 29:13
meant [1] - 81:2
medication [2] - 6:20, 45:20
meeting [7] - 32:7, 34:8, 35:25, 36:2, 48:16, 48:24, 49:4
member [1] - 20:1
members [2] - 44:1, 44:13
mental [4] - 47:3, 47:6, 47:10, 47:15
mentally [2] - 66:16, 83:8
Meramec [1] - 7:3
merely [1] - 23:14
Merklin [10] - 2:22, 50:8, 54:4, 61:9, 61:25, 62:19, 63:22, 64:17, 66:5, 86:25
MERKLIN [11] - 2:3, 2:6, 27:17, 28:22, 28:25, 35:11, 50:7, 69:22, 75:17, 83:20, 85:1
met [1] - 53:4
Met [1] - 20:3

MH [1] - 60:19
Michael [1] - 2:23
mid [1] - 68:19
middle [4] - 10:4, 10:5, 21:10, 59:17
might [6] - 6:17, 6:22, 57:8, 57:11, 57:23, 57:24, 84:15, 87:6
Mileage [1] - 16:16
mind [1] - 81:19
minute [1] - 72:4
Mis [1] - 62:4
Mischaracterizes [2] - 27:16, 27:19
misconduct [1] - 33:1
Miss [12] - 25:9, 25:12, 40:6, 40:8, 50:21, 54:22, 54:23, 55:19, 81:20, 82:23, 84:8, 85:5
MISSOURI [9] - 1:1, 1:7, 3:2, 3:8, 3:19, 86:10, 87:18, 88:3, 89:1
Missouri [11] - 2:14, 2:18, 2:22, 3:15, 3:16, 3:18, 86:8, 87:1, 89:4, 89:6, 89:22
misspelled [1] - 86:16
Misstates [1] - 62:17
misstating [1] - 63:8
mistaken [1] - 51:5
MO [2] - 1:20, 86:2
moment [3] - 45:3, 72:16, 84:6
Monday [2] - 48:20, 48:22
mongering [2] - 21:22, 55:8
month [1] - 42:1
months [1] - 45:14
morning [2] - 4:12, 4:13
most [2] - 54:3, 59:22
move [5] - 12:20, 13:2, 45:14, 74:14, 81:11
moves [1] - 74:15
MS [52] - 2:2, 2:3, 2:4, 2:5, 2:6, 2:7, 4:11, 4:16, 4:23, 6:16, 27:16, 27:17, 27:19, 28:22, 28:25, 34:1, 35:11, 39:6, 42:4, 43:25, 44:24, 46:19, 48:1, 48:7, 48:9, 49:7, 50:4, 50:7, 53:24,

54:1, 61:7, 61:18, 62:17, 63:21, 64:13, 66:4, 69:22, 69:25, 70:11, 70:13, 73:23, 75:17, 80:24, 80:25, 81:1, 83:18, 83:20, 85:1, 85:4, 85:16, 85:17, 85:18
must [2] - 65:11, 67:10

N

name [9] - 4:14, 4:17, 4:25, 5:2, 18:6, 41:8, 42:14, 50:8, 87:8
names [2] - 13:23, 14:22
Nancy [3] - 41:8, 41:10, 42:10
nature [1] - 77:25
necessarily [1] - 81:14
necessary [4] - 35:6, 36:25, 50:17, 87:6
necessity [1] - 63:1
need [3] - 14:21, 34:4, 81:1
negative [4] - 20:12, 78:5, 78:9, 78:15
Nelson [1] - 42:17
never [4] - 18:23, 38:15, 78:15, 81:19
New [1] - 25:7
new [3] - 9:17, 68:23
next [3] - 5:23, 14:11, 68:20
nice [1] - 6:4
night [7] - 26:18, 26:20, 40:19, 41:4, 41:19, 77:3, 83:5
normal [1] - 77:19
notarized [1] - 86:19
Notary [3] - 4:2, 86:17, 87:14
note [10] - 26:1, 26:4, 26:10, 28:2, 38:16, 38:20, 38:23, 39:1, 39:3
Nothing [5] - 30:15, 77:10, 77:13, 85:2, 85:16
nothing [7] - 25:19, 28:3, 40:2, 50:5, 69:22, 70:11, 85:17
notice [2] - 85:7, 89:5
notified [1] - 85:13
November [4] - 10:2, 45:15, 46:1

number [4] - 4:23, 8:18, 79:17, 86:15

O

o'clock [3] - 3:14, 73:16
oath [1] - 6:6
object [4] - 49:7, 64:13, 73:23, 75:17
Object [1] - 27:16
Objection [9] - 27:19, 39:6, 42:4, 44:24, 53:24, 61:7, 61:18, 62:17, 66:4
observant [1] - 38:9
observations [1] - 61:2
observe [1] - 20:17
obtain [1] - 77:21
occasionally [2] - 33:7, 80:19
occur [1] - 73:15
occurred [5] - 25:6, 25:20, 28:3, 48:18, 51:10
occurrence [1] - 53:2
OF [16] - 1:1, 1:1, 1:7, 1:15, 1:15, 3:1, 3:2, 3:7, 3:13, 3:19, 86:9, 87:4, 87:17, 88:3, 89:1, 89:2
offer [1] - 37:21
Office [1] - 2:20
office [2] - 17:19, 86:20
Officer [10] - 2:23, 15:22, 35:18, 36:7, 50:1, 72:9, 72:10, 72:19, 74:12, 74:15
officer [78] - 8:8, 13:3, 13:4, 18:3, 19:1, 20:10, 20:15, 22:20, 33:1, 33:5, 33:9, 37:13, 38:1, 44:9, 52:24, 53:1, 53:3, 53:4, 53:5, 53:6, 53:14, 53:15, 53:16, 55:25, 56:5, 56:11, 56:14, 56:24, 57:2, 57:6, 57:7, 57:9, 57:13, 57:14, 57:19, 57:21, 58:6, 58:12, 59:5, 60:20, 60:24, 60:25, 61:1, 61:17, 62:22, 65:4, 65:10, 65:23, 66:20, 66:23, 67:4, 67:20, 68:1, 68:17, 68:23, 69:7, 74:23, 75:6, 75:11,

75:14, 75:15, 75:20, 75:24, 77:1, 77:23, 79:19, 82:4, 82:8, 83:4, 83:25, 84:4, 84:14, 84:18

officer's [4] - 58:12, 65:19, 67:9, 74:24

officers [11] - 12:11, 14:23, 14:25, 15:12, 16:4, 18:5, 37:7, 38:7, 39:2, 58:20, 76:16

Officers [1] - 50:12

offices [2] - 3:14, 89:6

Official [6] - 1:8, 3:9, 3:20, 86:10, 87:18, 88:4

often [1] - 20:2

Oklahoma [1] - 9:22

Olivette [2] - 76:7, 76:9

ON [1] - 1:15

Once [3] - 19:4, 20:1, 28:6

One [6] - 2:17, 3:15, 18:11, 55:10, 86:7, 89:6

one [30] - 8:16, 9:22, 9:24, 14:5, 14:17, 15:18, 16:17, 18:8, 19:11, 19:21, 28:7, 28:8, 33:13, 36:19, 45:9, 47:9, 54:4, 55:2, 61:12, 65:3, 66:1, 67:1, 67:2, 67:13, 70:1, 73:6, 80:18, 81:25, 83:21, 85:5

ones [2] - 73:6, 81:7

open [1] - 61:3

Operating [6] - 65:7, 65:16, 66:15, 66:17, 66:22, 76:11

operations [1] - 9:9

opinion [2] - 38:16, 80:9

opinions [2] - 49:1, 49:9

opportunity [1] - 81:17

opposed [1] - 6:5

order [3] - 50:23, 67:7, 69:6

original [2] - 86:17, 86:19

originating [3] - 40:14, 43:16, 43:18

otherwise [1] - 59:18

outside [2] - 23:9, 52:8

oversaw [1] - 11:20

Oversee [2] - 8:24,

10:13

overview [1] - 58:9

OWENS [24] - 2:4, 2:7, 6:16, 27:16, 27:19, 34:1, 39:6, 42:4, 43:25, 44:24, 46:19, 48:1, 48:9, 49:7, 54:1, 62:17, 69:25, 70:11, 73:23, 80:24, 81:1, 85:4, 85:16, 85:18

Owens [5] - 2:18, 3:1, 86:6, 86:12, 87:14

own [4] - 20:18, 56:22, 75:23, 84:5

## P

P-e-r-k-i-n-s [1] - 49:20

P.O [1] - 1:20

page [11] - 5:13, 63:23, 63:24, 63:25, 64:2, 64:3, 64:4, 86:15, 86:17, 86:19, 87:14

Page [8] - 88:8, 88:10, 88:12, 88:14, 88:15, 88:17, 88:19, 88:21

pages [1] - 63:25

paper [1] - 17:4

paragraph [6] - 35:17, 64:4, 64:5, 64:10, 64:22

parked [1] - 71:11

parking [22] - 60:11, 60:17, 61:6, 61:11, 61:22, 61:23, 70:18, 70:25, 71:4, 71:8, 71:11, 71:13, 71:17, 71:21, 72:18, 72:21, 73:1, 73:12, 73:22, 74:1, 74:5, 74:12

part [9] - 10:25, 18:4, 25:2, 34:8, 34:23, 57:2, 82:12, 82:14, 83:2

partial [1] - 64:5

particular [3] - 44:10, 61:22, 77:16

particularly [1] - 20:12

parties [2] - 89:14, 89:15

party [1] - 47:6

pass [2] - 29:10, 62:13

passed [2] - 44:5, 76:15

passenger [1] - 58:9

passing [1] - 55:14

past [2] - 33:7, 40:9

patrol [5] - 12:21, 13:4, 14:23, 14:25, 57:1

Patrol [5] - 11:12, 11:13, 11:19, 11:20, 13:3

pecking [2] - 55:7, 55:9

penalty [1] - 87:8

pending [1] - 3:17

people [1] - 55:17, 81:5, 81:22, 84:19

Peres [1] - 43:20

perfectly [1] - 6:14

perform [2] - 66:16, 83:9

performance [2] - 20:19, 21:20

period [5] - 32:11, 39:18, 42:1, 55:7, 70:8

perjury [1] - 87:8

Perkins [2] - 49:20, 63:14

person [17] - 14:17, 19:8, 58:10, 58:11, 58:17, 58:18, 58:19, 60:16, 60:25, 61:3, 61:4, 62:10, 70:5, 75:5, 77:21, 84:12, 84:13

person's [2] - 53:7, 84:24

personal [4] - 21:23, 23:17, 24:6, 25:24

personnel [2] - 35:9, 39:15

persons [1] - 58:10

Phoenix [4] - 2:16, 3:15, 86:6, 89:6

phone [1] - 51:19

photography [2] - 8:14, 8:17

physical [1] - 63:24

physically [1] - 66:15

pick [1] - 8:7

picked [1] - 24:22

pile [2] - 81:5, 81:7, 81:12

place [2] - 38:12, 57:21

places [1] - 82:18

Plaintiff [4] - 1:5, 2:12, 3:5, 4:1

plaintiff [1] - 59:14

PLAINTIFF [1] - 1:15

Plaintiffs [2] - 3:19, 4:9

pleasantries [1] - 20:4

plus [1] - 19:14

point [56] - 22:3, 24:20, 33:17, 40:13, 40:15, 40:16, 40:18, 40:22, 41:3, 41:11, 42:25, 43:3, 43:5, 43:7, 43:10, 43:15, 43:21, 43:22, 44:12, 44:18, 44:22, 45:6, 45:11, 45:13, 46:17, 47:25, 48:5, 62:3, 62:6, 62:8, 62:23, 63:7, 72:13, 72:19, 72:23, 82:8

point-to-point [20] - 40:13, 40:15, 40:16, 40:18, 41:3, 42:25, 43:3, 43:5, 43:7, 43:10, 43:21, 43:22, 44:12, 44:22, 45:6, 45:11, 62:3, 62:6, 62:8, 62:23

point-to-points [1] - 43:15

points [2] - 43:11, 43:15

police [66] - 8:8, 9:2, 9:4, 13:18, 15:12, 15:17, 16:7, 17:7, 18:2, 18:5, 19:1, 20:10, 21:2, 22:10, 22:20, 28:18, 28:20, 31:11, 32:13, 36:11, 37:13, 37:21, 38:1, 39:2, 39:20, 44:16, 52:21, 52:22, 52:24, 53:4, 56:4, 56:11, 56:14, 56:18, 56:23, 57:6, 57:13, 58:6, 59:5, 62:22, 62:23, 63:13, 65:10, 65:18, 65:23, 66:20, 66:23, 67:4, 67:9, 69:6, 69:7, 72:14, 74:22, 74:23, 76:16, 76:23, 77:1, 77:20, 77:24, 79:2, 79:19, 83:25, 84:4, 84:14

Police [40] - 1:9, 1:10, 2:15, 2:19, 2:24, 3:9, 3:10, 3:20, 3:20, 7:19, 7:22, 7:23, 7:25, 8:4, 16:2, 16:4, 24:23, 26:11, 28:16, 38:12, 45:4, 50:11, 50:12, 52:3, 52:5, 52:8, 59:1, 70:3, 76:7, 76:10, 79:10, 82:7, 82:9, 82:20, 86:10, 86:11, 87:18, 87:19, 88:4,

88:4

policy [6] - 42:23, 43:14, 43:23, 44:4, 44:11, 77:16

Position [6] - 2:10, 46:9, 63:20, 63:25, 64:2, 83:1

position [8] - 8:20, 10:7, 10:9, 11:11, 58:21, 61:16, 77:15, 80:8, 80:12

positions [2] - 79:18, 85:13

possible [3] - 75:10, 75:24, 86:20

possibly [1] - 55:21

Post [16] - 69:4, 69:7, 69:10, 69:14, 69:17, 69:18, 69:19, 78:23, 79:5, 79:9, 79:24, 80:4, 80:12, 81:8, 81:11, 85:6

postal [1] - 54:3

posting [1] - 69:17

potential [1] - 35:20

PPK [1] - 70:6

practices [1] - 77:19

precaution [1] - 38:6

preceding [1] - 35:13

predominant [1] - 54:3

pregnant [1] - 23:23

preparation [1] - 64:15

present [1] - 2:23

presented [1] - 67:22

presently [1] - 8:22

Presently [1] - 10:2, 15:4

pretty [1] - 16:1

prevents [1] - 6:21

previous [2] - 27:20, 71:24

previously [2] - 35:16, 78:18

probation [1] - 32:11

probationary [6] - 20:7, 32:11, 39:17, 49:3, 49:11, 49:14

problem [4] - 17:15, 55:5, 81:21, 82:1

problems [6] - 7:12, 19:21, 20:22, 21:12, 23:23, 35:20

procedure [1] - 77:16

Procedure [5] - 65:8, 65:16, 66:15, 66:17, 66:23

Procedures [1] - 76:11

process [1] - 18:4
produced [2] - 3:13, 4:8
Professional [4] - 3:16, 4:3, 86:1, 89:4
projects [1] - 15:25
proper [2] - 44:21, 45:5
psychotropic [1] - 45:20
Public [3] - 4:2, 86:17, 87:14
public [4] - 44:2, 44:6, 44:13
pull [5] - 41:8, 73:5, 73:10, 73:11, 74:5
pulled [4] - 61:12, 70:5, 72:16, 73:17
pulling [4] - 57:12, 57:15, 57:19, 74:11
pulls [2] - 74:10, 74:13
purchases [2] - 9:2, 16:12
purposes [1] - 56:3
pursuant [1] - 89:5
push [1] - 53:14
put [2] - 37:9, 61:2
Putting [2] - 46:23, 47:11
putting [1] - 47:8

Q

qualification [2] - 69:1, 70:8
qualified [2] - 67:11, 67:14
qualify [2] - 67:20, 68:17, 69:7
quality [1] - 20:18
questioned [1] - 36:22
questioning [1] - 64:14
QUESTIONS [10] - 2:3, 2:4, 2:5, 2:6, 2:7, 50:7, 69:25, 70:13, 83:20, 85:4
questions [4] - 48:12, 50:14, 83:18, 85:6
quick [2] - 84:23, 85:5
quickly [1] - 63:4
quite [1] - 27:1

R

radio [2] - 9:2, 43:5

raised [1] - 47:14
raising [1] - 6:9
RANDLES [17] - 2:2, 2:5, 4:11, 4:16, 4:23, 48:7, 50:4, 53:24, 61:7, 61:18, 63:21, 64:13, 66:4, 70:13, 80:25, 83:18, 85:17
Randles [26] - 2:12, 2:14, 4:14, 5:1, 6:18, 27:21, 29:2, 34:3, 35:15, 42:8, 44:1, 45:2, 46:21, 48:3, 48:11, 50:21, 54:23, 55:19, 62:4, 73:25, 75:22, 81:4, 84:8, 85:5, 86:19, 86:25
range [1] - 67:20
re [1] - 86:9
RE [1] - 88:3
read [15] - 35:13, 64:9, 64:17, 85:18, 86:14, 86:15, 87:5, 88:8, 88:10, 88:12, 88:14, 88:15, 88:17, 88:19, 88:21
Read [1] - 64:12
reading [2] - 64:21, 88:5
real [3] - 11:3, 19:21, 81:21
really [2] - 9:20, 42:6
REASON [8] - 88:9, 88:11, 88:13, 88:15, 88:16, 88:18, 88:20, 88:22
reason [6] - 6:13, 26:24, 53:12, 66:13, 75:4, 86:15
reasons [4] - 64:22, 64:25, 65:3, 66:1
Rebecca [2] - 2:14, 4:14, 86:19, 86:25
receive [10] - 45:16, 45:19, 45:22, 46:2, 46:12, 46:16, 46:22, 46:24, 77:22, 79:18
received [4] - 39:22, 47:19, 79:9, 80:4
receiving [1] - 69:11
recently [1] - 35:19
recollection [2] - 19:9, 35:2
recommendation [1] - 39:16
record [5] - 5:2, 15:8, 25:5, 86:20, 89:11
records [9] - 8:25, 16:12, 16:14, 16:18, 16:20, 16:21, 16:23, 16:25, 17:3

RECROSS [4] - 2:5, 2:6, 83:19, 85:3
RECROSS-EXAMINATION [4] - 2:5, 2:6, 83:19, 85:3
rectangle [2] - 60:13, 61:14
REDIRECT [2] - 2:4, 70:12
reduced [1] - 89:10
refer [1] - 5:6
references [3] - 18:19, 18:21, 18:24
referred [1] - 36:9
regard [33] - 4:24, 9:1, 9:15, 16:15, 16:22, 17:6, 19:13, 20:6, 21:20, 22:22, 24:5, 25:13, 26:22, 32:7, 40:3, 40:6, 40:8, 40:19, 43:3, 43:23, 45:6, 47:10, 47:19, 47:24, 70:14, 77:3, 77:17, 78:4, 81:20, 82:4, 85:6, 85:8, 85:10
regarding [10] - 16:12, 19:10, 26:25, 27:22, 30:22, 32:8, 43:14, 45:11, 48:17, 49:13
regards [1] - 86:22
Registered [4] - 3:16, 4:3, 86:1, 89:4
related [1] - 89:14
relates [1] - 62:20
relation [2] - 69:18, 71:5
relationship [5] - 22:5, 22:8, 22:25, 23:3, 23:6
relative [3] - 23:25, 31:18, 89:15
relatives [2] - 76:18, 76:23
release [1] - 32:15
relevance [1] - 30:7
relying [1] - 31:10
remain [3] - 74:21, 74:24, 75:8
remember [8] - 10:24, 12:3, 19:11, 21:14, 25:15, 26:8, 28:2, 55:21
render [1] - 87:7
repairs [1] - 16:16
repeat [3] - 45:1, 48:1, 50:16
rephrase [1] - 46:21
replace [1] - 4:19
Report [3] - 82:10,

82:19, 82:20
report [24] - 26:9, 26:12, 28:13, 29:5, 29:7, 29:17, 29:22, 30:12, 31:8, 31:11, 36:11, 38:18, 39:11, 39:12, 39:13, 39:20, 48:13, 70:3, 82:4, 82:6, 82:11, 82:12, 82:13, 82:14
reported [14] - 25:17, 25:22, 27:1, 27:3, 27:4, 27:14, 27:22, 29:8, 29:16, 30:2, 31:2, 31:4, 31:16, 38:22
Reporter [9] - 3:16, 3:16, 3:17, 4:3, 4:3, 89:3, 89:4, 89:21
reporter [3] - 4:19, 5:19, 19:3
REPORTER [2] - 4:22, 87:16
reporter's [1] - 6:1
Reporters [1] - 86:1
reporting [2] - 25:18, 26:14
Reporting [1] - 86:1
REPORTING [1] - 1:19
reports [2] - 17:18, 30:13
represent [3] - 4:14, 50:9, 50:13
reprimanded [3] - 75:12, 75:16, 75:25
reputation [2] - 20:9, 20:14
reserved [1] - 4:4
Resources [1] - 81:5
respect [19] - 51:1, 52:24, 53:20, 53:22, 54:23, 56:18, 56:23, 57:5, 59:4, 62:1, 62:6, 67:25, 69:3, 69:18, 69:20, 75:18, 76:13, 83:24, 84:9
respective [1] - 43:19
response [2] - 26:23, 30:1
responsibilities [1] - 13:11
responsibility [1] - 32:20
responsible [3] - 14:17, 16:18, 33:4
resume' [1] - 81:11
retained [1] - 3:1
Retha [1] - 42:15
return [1] - 86:19

returned [1] - 89:12
right-most [1] - 59:22
risk [1] - 37:9
road [10] - 12:8, 12:9, 12:14, 59:17, 59:20, 60:9, 73:22, 74:1, 74:4, 74:5
Road [2] - 59:18, 70:18
role [1] - 9:15
Roos [1] - 2:21
rotate [2] - 41:22, 41:23
rotating [1] - 41:20
roughly [1] - 61:13
routine [1] - 32:25
RPR [3] - 86:24, 87:16, 89:21
rule [1] - 44:12
rules [4] - 5:14, 50:14, 75:18, 75:19
rumor [2] - 21:21, 55:8
rumormonger [2] - 40:10, 55:12

S

S-p-o-e-r-r-y [1] - 5:3
safe [1] - 37:17
safer [1] - 61:16
safety [3] - 34:19, 34:24, 35:6, 35:8, 36:10, 36:12, 36:15, 36:20, 36:25, 37:6, 37:25, 39:14, 49:10, 51:14, 51:25, 52:4, 52:17, 52:18, 75:23, 76:2, 76:3, 76:11, 76:16
Saint [5] - 2:18, 2:19, 3:15, 86:8, 89:6
sake [1] - 6:1
Sandberg [2] - 2:16, 3:15, 86:6, 89:6
satellite [1] - 7:7
Saturday [1] - 48:21
saw [3] - 55:6, 72:9, 72:13
scale [1] - 59:24
scanning [1] - 44:6
scene [3] - 8:14, 8:17, 59:5
school [3] - 7:2, 7:3, 7:12
second [6] - 35:12, 35:17, 63:24, 71:17, 71:20, 84:23
secondary [7] -

65:15, 66:2, 67:8, 67:24, 68:1, 68:24, 83:13

secretaries [1] - 16:6

see [8] - 6:15, 31:11, 43:11, 58:18, 64:7, 72:10, 79:7, 80:19

seem [2] - 51:17, 51:18

self [1] - 53:8

semester [1] - 8:16

sense [1] - 73:11

sent [2] - 40:19, 87:14

separate [2] - 82:11, 82:13

sequence [1] - 24:21

Sergeant [2] - 17:13, 17:20

sergeant [8] - 12:8, 12:9, 12:10, 13:6, 17:10, 62:13, 62:16, 62:20

sergeants [5] - 12:11, 14:12, 14:13, 14:22, 14:25

sergeants' [1] - 14:22

series [1] - 59:12

serious [1] - 37:3

seriousness [1] - 29:20

service [4] - 16:16, 17:2, 17:3, 17:11

services [1] - 9:1

Services [1] - 19:24

set [1] - 89:17

sexual [4] - 33:18, 34:16, 36:3, 46:3

Sgt [1] - 2:23

share [2] - 23:17, 24:6

shared [1] - 23:20

SHEET [1] - 88:2

sheet [2] - 86:15, 86:20

sheets [1] - 86:18

shift [6] - 12:11, 41:19, 41:21, 41:22

shifts [1] - 41:20

shooting [1] - 61:3

Short [1] - 48:10

short [1] - 55:6

Shorthand [2] - 3:17, 89:4

shorthand [1] - 4:2, 89:10

siblings [2] - 4:24

side [6] - 7:6, 16:18, 16:19, 58:9, 59:22, 60:10

SIGNATURE [1] - 87:4

signature [3] - 4:4, 86:17, 86:19

Signature [1] - 87:14

signed [4] - 33:6, 67:23, 86:17, 86:18

signs [1] - 35:20

simply [1] - 52:4

single [2] - 80:12, 81:10

siren [1] - 72:20

sirens [1] - 72:10

situation [19] - 28:15, 30:24, 33:14, 37:25, 38:7, 39:4, 52:25, 56:1, 57:5, 57:9, 62:25, 74:14, 74:22, 79:22, 81:9, 83:24, 84:4, 84:11, 84:15

situations [4] - 52:21, 55:20, 57:23, 63:3

Six [1] - 14:14

six [3] - 14:16, 42:19, 49:24

sketch [1] - 70:21

slow [1] - 50:16

society [1] - 53:22

solely [1] - 29:17

someone [9] - 17:18, 19:7, 19:15, 30:10, 53:11, 55:20, 77:7, 77:18, 82:9

sometime [3] - 24:2, 68:13, 68:19

sometimes [1] - 51:17

somewhere [1] - 12:17

soon [1] - 86:20

SOP [5] - 65:5, 65:14, 82:24

SOPs [1] - 82:24

Sorry [1] - 27:17

sorry [11] - 14:24, 17:15, 28:22, 29:1, 48:1, 60:1, 60:2, 62:19, 63:23, 64:12, 71:19

sort [1] - 61:13

Sort [1] - 53:17

sound [1] - 50:22

sources [2] - 36:7, 36:9

South [1] - 2:21

space [1] - 73:12

spaces [1] - 71:5

speaking [3] - 6:2, 58:8, 68:14

special [1] - 15:24

specific [6] - 19:9, 35:2, 40:17, 44:7, 54:25, 55:13

speculation [1] - 53:25

speed [6] - 61:23, 73:4, 73:10, 73:18, 73:19, 74:11

split [1] - 84:23

SPOERRY [10] - 1:15, 3:13, 4:7, 87:4, 87:5, 87:12, 87:17, 88:1, 88:24, 89:7

Spoerry [4] - 5:3, 5:4, 5:7, 86:14

Spoerry's [1] - 86:13

spot [1] - 74:12

spots [1] - 61:13

spread [1] - 21:23

spreadsheets [1] - 17:5

SS [2] - 87:1, 89:2

ST [2] - 1:20, 89:2

St [24] - 2:20, 7:7, 7:21, 24:22, 29:7, 31:2, 31:5, 31:13, 31:16, 32:1, 39:1, 39:11, 43:20, 48:13, 50:2, 50:10, 52:14, 59:13, 60:3, 70:3, 77:1, 86:2, 87:2

stability [4] - 47:3, 47:6, 47:10, 47:15

Stacie [5] - 2:18, 3:1, 27:18, 86:6, 87:14

staff [5] - 31:1, 52:12, 54:16, 57:3

Standard [6] - 65:7, 65:15, 66:15, 66:17, 66:22, 76:11

stands [1] - 13:18

start [1] - 61:3

started [7] - 9:19, 12:21, 12:22, 12:23, 22:10, 55:19

starting [1] - 7:1

starts [2] - 64:2, 64:6

State [3] - 3:16, 87:1, 89:4, 89:5, 89:22

STATE [1] - 89:1

state [4] - 3:17, 5:1, 7:6, 69:12

Statement [6] - 2:10, 46:9, 63:20, 63:25, 64:2, 83:1

Statements [1] - 36:6

States [1] - 3:18

STATES [2] - 1:1, 3:1

station [1] - 38:8

status [6] - 20:7, 46:13, 46:17, 49:3, 49:11, 49:14

step [2] - 5:22, 67:16

steps [2] - 39:19, 67:13

still [6] - 8:15, 27:10, 49:21, 51:15, 74:21, 76:25

STIPULATED [1] - 4:1

stop [7] - 35:11, 58:11, 58:22, 75:15, 75:23, 84:12, 84:24

stoplight [1] - 72:17

stopped [2] - 37:7, 58:25

stopping [4] - 57:9, 57:21, 60:20, 61:17

stops [2] - 58:6, 61:1

straight [3] - 61:12, 74:3, 74:5

strategy [1] - 32:15

Street [1] - 2:13

stress [1] - 55:5

struggling [1] - 45:23

Student [1] - 7:12

subject [5] - 65:23, 66:23, 67:3, 74:21, 74:23

subscribe [1] - 87:8

subscribing [1] - 88:5

subsequent [1] - 9:20

Subsequently [1] - 7:19

substance [1] - 87:6

suggest [1] - 36:7

suicidal [4] - 52:25, 57:8, 57:14, 84:13

suicide [22] - 25:25, 26:4, 31:7, 31:9, 31:17, 32:5, 35:21, 35:23, 37:1, 38:15, 38:19, 38:20, 38:23, 38:25, 39:2, 39:3, 53:3, 53:8, 53:9, 53:10, 53:12, 53:18

Suite [2] - 2:13, 2:17, 86:7

sun [1] - 6:15

supervise [3] - 8:24, 10:13, 15:19

supervising [1] - 20:21

supervision [3] - 14:18, 16:24, 89:11

supervisor [6] - 12:8, 12:9, 12:14,

13:5, 21:5, 57:2

supervisory [5] - 15:2, 15:7, 15:12, 15:16, 23:15

Support [3] - 8:22, 10:1, 10:22

support [3] - 9:1, 9:6, 21:8

suppose [1] - 45:12

supposed [3] - 76:3, 82:5, 82:15

suspect [2] - 46:14, 58:13

sworn [3] - 3:13, 4:8, 89:8

**T**

T.V [1] - 43:11

Taco [1] - 72:23

tactical [2] - 58:21, 74:15

TAKEN [1] - 1:15

Tarkio [2] - 7:5, 7:15

taught [3] - 8:10, 8:13, 58:20

teach [2] - 8:15, 8:17

teams [1] - 12:10

techniques [1] - 56:18

telephone [2] - 30:18, 72:9

tend [1] - 5:22

tens [3] - 79:21, 79:23, 80:7

term [6] - 24:4, 54:2, 65:11, 65:18, 65:19, 66:19

terminate [4] - 48:25, 49:16, 63:7, 63:12

terminated [6] - 36:17, 38:17, 39:17, 49:6, 64:22, 66:1

termination [9] - 34:21, 39:4, 39:5, 40:3, 46:6, 66:9, 66:24, 67:5, 77:8

terms [1] - 67:9

Tesson [3] - 59:12, 70:18, 74:7

testified [1] - 64:15

testify [1] - 89:9

testimony [12] - 6:8, 27:20, 50:21, 51:24, 60:15, 62:3, 62:18, 63:8, 70:21, 72:7, 72:8, 89:12

THE [6] - 1:1, 1:15, 3:1, 4:22

themselves [1] - 53:13

therein [1] - 89:9
thereon [1] - 87:7
thereto [1] - 88:6
thinking [1] - 32:5
third [3] - 35:18, 64:2, 66:13
Thomas [1] - 2:23
Thomeczek [7] - 2:24, 50:12, 72:9, 72:10, 72:19, 74:12, 74:16
threat [1] - 44:7
threatened [4] - 31:7, 31:17, 36:8, 53:3
threatening [1] - 31:9
three [5] - 11:15, 13:21, 67:1, 67:2, 81:10
throughout [1] - 56:10
tidbit [1] - 55:11
title [2] - 12:7, 15:23
today [2] - 6:22, 6:23
together [3] - 15:24, 23:9, 51:15
took [2] - 38:12, 39:11
topics [1] - 23:20
totality [7] - 39:9, 57:24, 59:6, 75:1, 83:23, 84:1, 84:17
touching [1] - 89:9
toward [2] - 66:14, 74:11
towards [1] - 60:10
trained [1] - 84:14
training [4] - 11:21, 12:3, 56:11, 56:13
Training [3] - 11:21, 11:22, 11:24
transcribed [2] - 4:3, 89:11
transcription [1] - 89:11
transition [1] - 19:13
transmission [2] - 43:5, 43:8
transmitted [4] - 40:15, 43:24, 78:15, 78:23
transpired [1] - 30:22
tree [2] - 73:10, 74:11
trees [1] - 71:7
true [7] - 55:12, 81:25, 82:2, 87:7, 87:9, 89:11
truth [1] - 89:9

try [7] - 37:16, 50:17, 50:20, 50:22, 58:7, 81:16, 81:17
trying [3] - 10:24, 25:23, 84:22
turn [5] - 58:14, 63:23, 71:14, 72:21, 73:5
turned [3] - 60:17, 72:10, 72:20
turns [1] - 57:16
twice [1] - 21:8
two [10] - 11:25, 12:11, 22:21, 63:25, 65:22, 73:22, 74:1, 74:5, 82:18, 84:13
type [1] - 36:16
typewriting [1] - 4:3
typographical [1] - 86:15

## U

U-turn [2] - 58:14, 71:14
U-turns [1] - 57:16
ultimate [2] - 49:12, 67:25
unable [2] - 23:25, 58:18, 66:15
unauthorized [3] - 65:14, 66:2, 83:13
unbecoming [2] - 65:4, 83:4
under [14] - 6:6, 11:25, 14:8, 14:19, 15:20, 15:24, 16:9, 16:24, 17:8, 17:9, 54:11, 55:5, 87:8, 89:11
undergone [1] - 56:11
United [1] - 3:17
UNITED [2] - 1:1, 3:1
Unless [2] - 41:4, 44:7
unless [1] - 44:6
unsafe [1] - 75:15
up [8] - 8:7, 11:1, 21:23, 24:22, 32:14, 48:12, 70:14, 72:16
upper [1] - 52:12
upset [1] - 51:17
usual [1] - 5:21

## V

vehicle [14] - 58:6, 58:7, 58:8, 58:10, 58:14, 58:15, 58:18,

58:21, 61:1, 74:24, 75:8, 75:10, 84:14, 84:21
vehicles [6] - 9:3, 9:5, 16:13, 16:15, 17:1, 71:10
vetting [2] - 18:4, 18:7
via [1] - 30:18
victim [2] - 33:18, 46:3
video [2] - 17:16, 17:18
videos [3] - 17:7, 17:11
violation [7] - 44:12, 65:3, 66:14, 66:22, 67:2, 67:3, 76:10
violations [2] - 65:22, 79:8
VON [11] - 2:3, 2:6, 27:17, 28:22, 28:25, 35:11, 50:7, 69:22, 75:17, 83:20, 85:1
Von [2] - 81:20, 82:23
von [14] - 2:16, 2:22, 3:15, 50:8, 54:4, 61:9, 61:25, 62:19, 63:22, 64:17, 66:5, 86:6, 86:25, 89:6
vs [5] - 1:6, 3:6, 86:9, 87:17, 88:3

## W

wait [3] - 5:23, 5:24, 19:2
Walther [2] - 70:6
wants [1] - 53:11
watch [2] - 12:12, 12:15
weapon [25] - 37:18, 37:20, 37:21, 38:2, 55:25, 56:1, 57:8, 57:25, 58:16, 61:4, 65:15, 66:3, 67:8, 67:10, 68:2, 68:18, 68:25, 70:9, 82:5, 82:8, 82:16, 82:19, 83:13
weapons [4] - 57:7, 57:13, 67:24, 84:13
Weapons [1] - 9:12
welfare [7] - 27:6, 27:25, 35:8, 39:14, 51:7, 52:18, 52:23
well-being [1] - 51:14
Wendy's [1] - 72:23
west [1] - 7:6

West [1] - 2:13
whatsoever [1] - 46:8
wherein [1] - 3:19
WHEREOF [1] - 89:17
whole [1] - 89:9
wide [5] - 70:24, 71:14, 73:6, 73:10, 73:19
wife [11] - 31:19, 31:20, 31:21, 31:24, 32:2, 38:21, 38:25, 72:9, 72:14
wishing [1] - 53:8
witness [4] - 4:4, 89:8, 89:9, 89:12
WITNESS [1] - 89:17
WMD [3] - 9:10, 9:13, 9:15
word [1] - 69:17
words [1] - 6:2
work [8] - 8:1, 8:3, 16:6, 20:6, 21:17, 22:22, 24:1, 54:20
worked [2] - 12:10, 55:1, 55:5
working [2] - 15:24, 17:19
worried [1] - 51:18
write [1] - 30:12
writing [1] - 82:4
written [2] - 27:21, 30:15

## Y

year [4] - 13:1, 59:1, 68:10, 68:22
year's [1] - 70:7
Year's [1] - 25:7
years [7] - 8:19, 11:15, 12:16, 49:24, 56:5, 57:1
yesterday [1] - 24:4
yourself [1] - 56:14, 64:12